**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, <br><br> Plaintiff, <br><br> and <br><br> GOVERNMENT OF THE REPUBLIC OF KOREA, <br><br> Plaintiff-Intervenor <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR CORPORATION, <br><br> Defendant-Intervenor. | Ct. No. 23-00211 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Hyundai Steel Company hereby moves for judgment on the agency record in this action.  Hyundai Steel Company challenges the *Final Results* issued by the U.S. Department of Commerce ("Commerce") in *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023) ("*Final Results*").  Commerce's determination in the *Final Results* that the Government of Korea's ("GOK") provision of electricity for less than adequate remuneration was *de facto* specific under section 771(5A)(D)(iii)(III) of the Tariff Act of 1930 and its determination not to provide the GOK with an opportunity to submit the 2021 KEPCO cost data,

and to instead rely on facts available, is unsupported by substantial evidence and is otherwise not in accordance with law.  The legal and factual grounds for Plaintiff's motion are set forth in the brief accompanying this motion.  A proposed order is also attached.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion and (1) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law; (2) remand this case to Commerce with instructions to correct the errors identified by the Court; and (3) grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen A. Morrison
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>             Plaintiff,<br>   and<br><br>GOVERNMENT OF THE REPUBLIC<br>OF KOREA,<br><br>             Plaintiff-Intervenor<br><br>      v.<br><br>UNITED STATES,<br><br>             Defendant,<br><br>   and<br><br>NUCOR CORPORATION,<br><br>             Defendant-Intervenor. | Ct. No. 23-00211 |

## <u>ORDER</u>

Upon consideration of Plaintiff Hyundai Steel Company's Rule 56.2 Motion for Judgment on the Agency Record, and all other pertinent papers, it is hereby:

**ORDERED** that Plaintiff's motion is granted; and it is further

**ORDERED** that the *Final Results* that the U.S. Department of Commerce ("Commerce") issued in *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023) ("*Final Results*") are unsupported by substantial evidence and otherwise not in accordance with law; and it is further

**ORDERED** that the *Final Results* are hereby remanded to Commerce for reconsideration in accordance with the Court's opinion in this matter.

**SO ORDERED**.

_____
Claire R. Kelly, Judge

Dated: _____
New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| | ) |
| Plaintiff, | ) **PUBLIC VERSION** |
| | ) Proprietary |
| and | ) Information |
| | ) Removed from |
| GOVERNMENT OF THE REPUBLIC | ) Pages 17 and 19-20 |
| OF KOREA, | ) |
| | ) |
| Plaintiff-Intervenor | ) Court No. 23-00211 |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR CORPORATION, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen A. Morrison
Ryan R. Migeed

March 12, 2024

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

## TABLE OF CONTENTS

I.      *Statement Pursuant to Rule 56.2* ................................................................................. 1

II.     *Issues Of Law Presented and Reasons for Contesting the Administrative Determination*  2

III.    *Statement of Facts* ............................................................................................................ 2

IV.     *Summary Of Argument* .................................................................................................. 12

V.      *Standard of Review* ....................................................................................................... 13

VI.     *Argument* ........................................................................................................................ 14

     A.      *Commerce's Determination That KEPCO's Provision of Electricity for LTAR is De Facto Specific is Unsupported by Substantial Evidence And is Otherwise Contrary to Law.* ............................................................................................. 14

     B.      *Commerce's Determination Not to Provide the Government of Korea with an Opportunity to Submit KEPCO's 2021 Cost Data is Unsupported by Substantial Evidence and an Abuse of Discretion.* ............................................... 21

VII.    *Conclusion And Relief Requested* ................................................................................. 27

*Certificate Of Compliance* ........................................................................................................ 28

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*American Honey Producers Association v. United States,*
    653 F. Supp. 3d 1329 (Ct. Int'l Trade 2023) ....................................................23, 24

*Bethlehem Steel Corp. v. United States,*
    140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ......................................17, 18, 19, 20

*Carlisle Tire and Rubber Co. v. United States,*
    564 F. Supp. 834 (Ct. Int'l Trade 1983) ................................................................15

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States,*
    815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) .........................................................26

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995).........................................................................24, 25

*Papierfabrik August Koehler SE v. United States,*
    843 F.3d 1373 (Fed. Cir. 2016)..............................................................................25

*Parkdale Int'l v. United States,*
    475 F.3d 1375 (Fed. Cir. 2007)..............................................................................26

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) .........................................................24

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990)..............................................................................26

*Samsung Electronics Co., Ltd. v. United States,*
    37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014) .....................................................17, 18

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001)..............................................................................24

*Timken U.S. Corp. v. United States,*
    434 F.3d 1345 (Fed. Cir. 2006)..............................................................................24

*Usinor Sacilor v. United States,*
    872 F. Supp. 1000 (Ct. Int'l Trade 1994) ..............................................................24

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................................13

19 U.S.C. § 1677(5)(B) & (5A) ............................................................14

19 U.S.C. § 1677(5A)(D)(iii)...........................................................12, 15

19 U.S.C. § 1677(5A)(D)(iii)(III) ...............................2, 10, 11, 12, 14, 15

19 U.S.C. § 1677e(a)..........................................................................21

19 U.S.C. § 1677e(a)(1)................................................................6, 7, 21

19 U.S.C. § 1677m(d)........................................................................21

**Regulations**

19 C.F.R. § 351.511(a)(2)(iii) ..............................................................4

**Other Authorities**

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results, and Rescission, in Part, of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 53,728 (Dep't Commerce Sept. 1, 2022).......................................4

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Preliminary Intent To Rescind, in Part, the Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 13,433 (Dep't Commerce March 3, 2023)....................................6

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 21,619 (Dep't Commerce April 12, 2022) .............................................2

*Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 22,188 (Dep't Commerce Apr. 14, 2022) .............................................24

Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. .............................15, 20

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | | |
|---|---|---|
| HYUNDAI STEEL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | **CONFIDENTIAL** |
| | ) | Proprietary Information |
| and | ) | Contained in |
| | ) | Pages 17 and 19-20 |
| GOVERNMENT OF THE REPUBLIC | ) | |
| OF KOREA, | ) | |
| | ) | Court No. 23-00211 |
| Plaintiff-Intervenor | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| NUCOR CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with U.S. Court of International Trade ("USCIT") Rule 56.2, and the

January 12, 2024, scheduling order, Plaintiff Hyundai Steel Company ("Hyundai Steel") files

this brief in support of its Rule 56.2 motion for judgment upon the agency record.  Scheduling

Order, ECF No. 27.  As discussed below, the U.S. Department of Commerce's ("Commerce")

*Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.

I.      *Statement Pursuant to Rule 56.2*

The administrative determination under review is Commerce's *Final Results* in the

countervailing duty ("CVD") administrative review of certain cut-to-length carbon-quality steel

plate ("CTL plate") from the Republic of Korea ("Korea"), which covered entries of subject

merchandise into the United States between January 1, 2021 and December 31, 2021 ("POR").

*See Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final*

*Results and Rescission in Part, of Countervailing Duty Administrative Review; 2021*, 88 Fed.

Reg. 61,509 (Dep't Commerce Sept. 7, 2023) ("*Final Results*"), PR 225,[1] and accompanying

Issues and Decision Mem. ("I&D Mem."), PR 222.

II.    *Issues Of Law Presented and Reasons for Contesting the Administrative Determination*

     1.    Whether Commerce's determination that the provision of electricity for less than

adequate remuneration ("LTAR") program was *de facto* specific under section

771(5A)(D)(iii)(III) of the Tariff Act of 1930[2] is unsupported by substantial evidence and is

otherwise not in accordance with law.

     2.    Whether Commerce's determination not to provide the Government of Korea

("GOK") with an opportunity to submit the 2021 Korea Electric Power Corporation ("KEPCO")

cost data, and to instead rely on facts available ("FA"), is unsupported by substantial evidence

and is otherwise not in accordance with law.

III.    *Statement of Facts*

     On April 12, 2022, Commerce initiated an administrative review of the CVD order on

CTL plate for the 2021 POR.  *See Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 87 Fed. Reg. 21,619 (Dep't Commerce April 12, 2022), PR 13.  On May

2, 2022, Commerce selected Hyundai Steel as the sole mandatory respondent in this

administrative review and issued an initial questionnaire to the Government of Korea ("GOK")

---

[1] The administrative record is contained in a confidential record ("CR"), ECF No. 24-2, and a public record ("PR"), ECF No. 24-3.

[2] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and reference to the U.S. Code are to the 2018 edition unless otherwise specified.

and Hyundai Steel.[3]  *See* Mem. to Erin Begnal, Director, Office III, AD/CVD Operations from

Stephanie Berger, International Trade Compliance Analyst, Office III, Antidumping and

Countervailing Duty Operations, "Countervailing Duty Administrative Review of Certain Cut-

to-Length Carbon-Quality Steel Plate from the Republic of Korea: Respondent Selection," (May

2, 2022), CR 5, PR 21; Letter from Peter Zukowski, Program Manager of AD/CVD Operations

Office III, "Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from

Korea, Countervailing Duty Questionnaire" (May 2, 2022) ("Initial Questionnaire"), PR 22.  On

June 27, 2022, Hyundai Steel filed its complete Initial Questionnaire response.  *See* Letter to

Sec'y Commerce from Morris, Manning & Martin, LLP, "Certain Cut-to-Length Carbon-Quality

Steel Plate from the Republic of Korea, Case No. C-580-837: Hyundai Steel's Initial

Questionnaire Response," (June 27, 2022) ("Hyundai Steel's IQR"), CR 67–88, 148–213, PR

113–124.  The GOK filed its response to the Initial Questionnaire in two parts on June 27, 2022

and July 5, 2022.  *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative

Review on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:

Response to the Initial Questionnaire" (June 27, 2022) ("GOK IQR"), CR 29–66, PR 60–85;

Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative Review on Certain Cut-to-

Length Carbon-Quality Steel Plate from the Republic of Korea: Response to the Initial

Questionnaire" (July 5, 2022) ("GOK IQR Part 2"), CR 214, PR 126.

One of the programs being reviewed by Commerce was the provision of electricity for

LTAR.  *See* Initial Questionnaire at 17–22.  This electricity for LTAR program had been

reviewed by Commerce in previous reviews, and Commerce had established a methodology for

analyzing whether the provision of electricity provided a countervailable benefit.  *See, e.g.,*

---

[3] Commerce later selected Dongkuk Steel Mill as an additional voluntary respondent, but this
is not discussed as it is not relevant to this appeal.

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results, and Rescission, in Part, of Countervailing Duty Administrative Review; 2020*, 87 Fed Reg. 53,728 (Dep't Commerce Sept. 1, 2022), and accompanying Issues and Decision Mem. at Comment 4. Under this benefit methodology, and pursuant to 19 C.F.R. § 351.511(a)(2)(iii), Commerce requires information on whether the government price is consistent with market principles, including the government's price-setting philosophy, whether the price charged is sufficient to recover costs with a rate of return sufficient to ensure future operations, or whether there is discrimination among various types of users. *See id.*

To evaluate whether the GOK conferred a benefit through the provision of electricity for LTAR, Commerce requested that the GOK provide information and data regarding costs associated with the generation, distribution, and sale of electricity in Korea, including the cost report that KEPCO files annually with the Ministry of Trade, Industry and Energy ("MOTIE"). *See* Initial Questionnaire at 20–21. This information is relevant to the analysis of "whether the price charged is sufficient to recover costs with a rate of return sufficient to ensure future operations" as this is one of the elements considered by Commerce as part of its market principles analysis. In response to this request for KEPCO's 2021 cost report, the GOK provided annualized cost data for 2020, explaining that the 2021 data was not yet available as the new system of calculating the cost data for the POR had resulted in delays in the preparation of the information. *See* GOK IQR at 32, 39–41 and Exhibit E-9. The GOK also provided a table containing the top ten industries by electricity consumption. *Id.* at 35–36. This table contained the total electricity consumption by industry and the percentage of electricity consumed in both the industrial class and total overall consumption in Korea. *Id.* This electricity consumption data was later used by Commerce in its *de facto* specificity analysis.

On January 11, 2023, Commerce issued a supplemental questionnaire to the GOK asking whether the 2021 data was available. *See* Letter from Peter Zukowski, Program Manager of AD/CVD Operations Office III, "Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from Korea, Countervailing Duty Questionnaire" (Jan. 11, 2023) ("GOK SQ2"), CR 237, PR 161.  The GOK informed Commerce that the 2021 cost data was not yet available as data was being verified, and that this verification was taking more time than expected. *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative Review on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Response to the Supplemental Questionnaire" (January 30, 2023) ("GOK SQR2") at 2, CR 238, PR 170.  On January 31, 2023, Commerce issued another request for the KEPCO data and requested that the GOK provide an estimate of the timeline for the data's finalization. *See* Letter from Peter Zukowski, Program Manager of AD/CVD Operations Office III, "Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: GOK Third Supplemental Questionnaire" (January 31, 2023) ("GOK SQ3"), PR 174.   In response, the GOK stated that the KEPCO cost data was not yet finalized and was undergoing an audit and, as such, could not yet be provided to Commerce for review. *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative Review on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Response to the Supplemental Questionnaire" (February 6, 2023) ("GOK SQR3") at 1–2, PR 175. The GOK also noted that it was unable at that time to provide a precise estimate when the audit would be completed and the data would be available. *See id.* at 2–3.

On February 27, 2023, Commerce issued its *Preliminary Results*. *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Preliminary Intent To Rescind, in Part, the Countervailing Duty Administrative Review; 2021,*

88 Fed. Reg. 13,433 (March 3, 2023), PR 186, and accompanying Preliminary Decision Mem. ("PDM"), PR 183. With regard to the electricity for LTAR program, Commerce explained that without KEPCO's 2021 cost information it was not able to conduct a complete evaluation of the price-setting philosophy underlying the new January 2021 rates, nor did it have the comprehensive cost information needed to evaluate whether the prices charged in 2021 permitted cost recovery plus a reasonable rate of return. PDM at 11. Consequently, Commerce preliminarily determined that necessary information was not available on the record and that it must rely on FA in making its preliminary determination, in accordance with section 776(a)(1) of the Tariff Act of 1930. *Id.* As FA, Commerce found that it was appropriate to rely on other information placed on the record by KEPCO as a proxy for evaluating whether KEPCO's electricity tariffs are in accordance with market principles and the extent of any benefit conferred. *Id.*

In particular, Commerce relied on cost and sales data from KEPCO's 2021 unconsolidated financial statements, as well as information contained in KEPCO's 20-F disclosure form filed with the U.S. Securities and Exchange Commission ("SEC"). *Id.* Commerce found that this information provided a comparison of whether costs were recovered and factors in a rate of return. *Id.* Commerce reasoned that cost recovery and the rate of return were the two key items KEPCO's tariffs are intended to cover and had consistently been the basis for evaluating whether the program confers a benefit in the past. *Id.* In addition, Commerce found that the information contained in the financial statements and SEC disclosure form was the most comparable information to the cost and sales data normally provided by KEPCO, and, thus, the agency was evaluating the program with the most detailed information available on the record. *Id.* Relying on this information as FA, Commerce found that KEPCO

did not recover its costs under its market principles analysis. *Id.* The resulting countervailable

benefit based on this FA methodology was 0.51 percent, *ad valorem*. *Id.* at 30.

 As part of its preliminary determination that Hyundai Steel received a countervailable

benefit from the provision of electricity for LTAR, Commerce also determined that this program

provided a financial contribution. *Id.* at 26. In the *Preliminary Results*, Commerce did not

address or explain the basis for its specificity determination.

 On March 14, 2023, the GOK contacted Commerce officials via email, indicating that the

audit of the KEPCO cost data was substantially complete and that the GOK was now in a

position to submit KEPCO's 2021 cost data. *See* Mem. to Interested Parties from David

Lindgren, Program Manager, AD/CVD Operations Office III, "Countervailing Duty

Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic

of Korea; Communication with Counsel" (May 10, 2023) ("Correspondence Memo") at Attach.,

PR 194. The GOK noted that while KEPCO's current data was still subject to review by MOTIE

and the Board of Audit and Inspection of Korea, "empirically speaking" it was substantially

complete and not subject to much change. *See id.* Because Commerce's regulations provided no

opportunity to submit unsolicited new factual information at this stage of the review, the GOK

requested that Commerce issue a supplemental questionnaire requesting the KEPCO cost data for

2021 so that the GOK could submit it on the record. *See id.* The GOK noted that it was also

open to submitting the data in any manner that Commerce deemed appropriate. *See id.* The

GOK apologized for the delay in completion of this data, which it explained was the result of the

change of the electricity tariff rate system and the national audit. *See id.* On April 26, 2023, the

GOK again requested Commerce to issue a supplemental questionnaire to allow the GOK to

submit KEPCO's 2021 cost data, stating that the data would be finalized and the audit completed

before April 28, 2023.  *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative Review on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Req. for Supplemental Questionnaire" (Apr. 26, 2023), PR 190.

On May 10, 2023, *fifty-seven days* after the GOK first offered to provide KEPCO's 2021 cost data, Commerce finally responded to the GOK's offer and determined not to solicit additional factual information from the GOK.  *See* Correspondence Memo.  In support of this decision, Commerce noted that the cost information was requested in the Initial Questionnaire and two additional times prior to its issuance of the *Preliminary Results*, but the GOK informed Commerce each time that the audit was still ongoing and, as such, the data was not available. *See id.* at 1.  Commerce also found that the GOK did not provide any timeline for completion of the audit.  *See id.*  Commerce ultimately concluded not to solicit additional factual information from the GOK because (1) the cost data were not fully audited; and (2) insufficient time remained in the review to collect and fully analyze any final cost data.  *See id.*  Commerce found that since the audit was not complete any information that Commerce collected related to 2021 cost data might not be reliable.  *See id.*

Commerce also found that regardless of the status of the audit of KEPCO's 2021 cost data, there was not sufficient time in the review to collect and analyze the data in question within the statutory deadlines.  *See id.* at 2.  As support, Commerce explained that after the *Preliminary Results*, it devoted its resources to analyzing and addressing the new subsidy allegations filed by the Petitioners, which Commerce was unable to fully analyze earlier in the proceeding.  *See id.* Furthermore, Commerce noted that if it had collected the data, it would have to analyze an entirely new data set that is particularly complex and detailed, requiring significant time to conduct a thorough review that could also include a need to request additional information or

further clarification in supplemental questionnaires.  *See id.*  Additionally, for any new

information placed on the record, Commerce noted that it was obligated to provide interested

parties an opportunity to comment and submit factual information related to that information.

*See id.*  According to Commerce, all of this would have to be completed before Commerce could

establish the deadlines for interested parties to submit their case and rebuttal briefs, conduct the

requested hearing and carry out its analysis for the *Final Results*.  *See id.*  Commerce thus

concluded that the notification from the GOK's counsel arrived too late in the proceeding and

thus it declined to collect or consider the additional information.  *See id.*

      Two days later, on May 12, 2023, the GOK asked Commerce to reconsider its decision

not to solicit additional information.  *See* Letter from Yoon & Yang LLC to Sec'y Commerce,

"Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic

of Korea: Response to Communication with Counsel" (May 12, 2023) ("Resp. to

Correspondence Mem."), PR 198.  In support, the GOK explained that the reason for the delay in

submitting KEPCO's 2021 cost data was because the audit was being conducted by the National

Audit Board of Korea and so neither MOTIE nor KEPCO could promise when the audit would

be complete.  *See id.* at 2.  The GOK also pointed out that nearly two months had passed since it

offered to provide the KEPCO data and so there was sufficient time to collect and analyze the

data had Commerce requested it at that time.  *See id.*  Finally, the GOK explained that while the

KEPCO data was still subject to minor changes, it was substantially complete when it offered to

provide it to Commerce in March.  *See id.*

      The parties then submitted case briefs on May 25, 2023.  *See* Letter from Yoon & Yang

LLC to Sec'y Commerce, "Administrative Review on Certain Cut-to-Length Carbon-Quality

Steel Plate from the Republic of Korea: Case Br. of the Gov't of the Republic of Korea" (May

25, 2023) ("GOK's Case Br."), CR 264, PR 205; Letter to Sec'y Commerce from Morris,

Manning & Martin, LLP, "Certain Cut-To-Length Carbon Quality Steel Plate from the Republic

of Korea, Case No. C-580-837: Hyundai Steel's Case Br." (May 25, 2023) ("Hyundai Steel's

Case Br."), CR 266, PR 207.[4]   In its case brief, the GOK argued that Commerce had failed to

address the issue of specificity and argued that the provision of electricity program was neither

*de jure* nor *de facto* specific.  *See* GOK Case Br. at 13–20.  The GOK also argued that

Commerce's application of FA to determine the existence of a benefit from the electricity for

LTAR program was unlawful and should be reversed.  *See id.* at 20.  In its case brief, Hyundai

Steel also argued that Commerce should reconsider its decision not to solicit the 2021 KEPCO

cost data.  *See* Hyundai Steel's Case Br. at 19–23. Since Commerce had not even addressed

specificity in its *Preliminary Results*, Hyundai Steel did not separately brief the issue of

specificity for the electricity for LTAR program.

       On June 9, 2023, Petitioners filed a rebuttal brief addressing the issues raised by Hyundai

Steel and the GOK, including the electricity for LTAR program.  *See* Letter from Wiley Rein &

Schagrin Associates to Sec'y of Commerce, "Certain Cut-to-Length Carbon-Quality Steel Plate

from the Republic of Korea: Rebuttal Br." (June 9, 2023), CR 268, PR 214.  Petitioners argued,

*inter alia*, that Commerce had appropriately declined to permit the GOK to submit the KEPCO

2021 cost data and that Commerce's electricity for LTAR program was *de facto* specific under

section 771(5A)(D)(iii)(III) of the Tariff Act of 1930.  *See id.* at 24–26, 31–32.

       On June 28, 2023, the GOK had an *ex parte* video meeting with Commerce to discuss the

electricity for LTAR arguments made in it is case brief.  *See* Mem. to Interested Parties, from

David Lindgren, Program Manager, AD/CVD Operations Office III, "Countervailing Duty

---

[4] Petitioners also filed a case brief but it did not raise arguments related to the electricity for
LTAR program and thus is not relevant to this appeal.

Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; *Ex Parte* Video Conference" (June 28, 2023), PR 217.  The GOK subsequently filed a letter on the same date requesting that Commerce issue it a supplemental questionnaire requesting the submission of the 2021 KEPCO cost data.  *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative Review on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Request for Supplemental Questionnaire" (June 28, 2023), PR 216.

In the *Final Results*, Commerce reaffirmed its decision not to solicit or provide the GOK with an opportunity to submit the KEPCO 2021 cost data.  I&D Mem. at 10–12.  Commerce rejected the notion that it had sufficient time to collect and analyze the data, relying heavily on the fact that the 2021 KEPCO cost data was not "final" and that Commerce had no obligation to collect and rely on data that was not finalized.  *See id.* at 11.  Commerce further averred that it would have needed to evaluate the data, potentially issue supplemental questionnaires and provide interested parties a chance to comment, and possibly issue a post-preliminary decision on this issue since it was based on new data.  *See id.* at 11–12.

In the *Final Results*, Commerce also addressed the specificity issue for the first time and found that the program was *de facto* specific in accordance with 19 U.S.C. § 1677(5A)(D)(iii)(III).  *See id.* at 15.  To support its *de facto* specificity determination, Commerce relied on usage data provided by the GOK for the steel industry and the top ten largest electricity consuming industries that reflected their consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification.  *See id.* The GOK data were proprietary, but Commerce found that they demonstrated that the steel industry and three other industries combined, consumed a disproportionately large amount of

electricity in Korea during the POR.  Commerce found this sufficient to support a

disproportionality specificity determination under 19 U.S.C. § 1677(5A)(D)(iii).  *See id.* at 16.

      As part of its analysis, Commerce also considered the extent of diversification of

economic activities within the jurisdiction of the authority providing the subsidy.  *See id.*  This

was done using the Korea Economic Diversification Memorandum that Commerce placed on the

record, which concluded that a wide diversification of economic activities exists in Korea,

including 19 industry groupings with a broad range of distinctly different types of economic

activities within these groupings.  *See* Mem. to File, "Placement of Republic of Korea Economic

Diversification Mem. on the Record" (May 3, 2022), PR 24.  This appeal followed.

## IV.   *Summary Of Argument*

      Commerce's determination in the *Final Results* that the GOK's provision of electricity

for LTAR was *de facto* specific is unsupported by substantial evidence and is otherwise not in

accordance with law.  Pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III), in order to find that a

subsidy is *de facto* specific, the record must show that "an enterprise or industry receives a

disproportionately large amount of the subsidy."  Here, the record does not indicate that the steel

industry received a disproportionately large amount of this subsidy.  Instead, Commerce simply

aggregated the total electricity use of unrelated industries in order to conclude that the steel

industry consumed a disproportionately large amount of electricity in Korea during the POR.

But this random grouping of unrelated industries does not demonstrate that the steel industry was

a disproportionate user of this program, and instead leads to the absurd result that a good that is

used broadly by everyone in Korea is being found to be *de facto* specific.  This *de facto*

specificity determination is unsupported by substantial evidence and is otherwise not in

accordance with law.

Additionally, Commerce's refusal to accept the KEPCO 2021 cost data is unsupported by substantial evidence and is not in accordance with law.  First, Commerce did not provide Hyundai Steel with a true opportunity to remedy the fact that it was unable to provide KEPCO's 2021 cost data in its response to the Initial Questionnaire.  While Commerce made further requests for this cost data, as the GOK consistently informed Commerce, the cost data was in the process of being collected and audited, and the GOK was thus not able to provide it at the time Commerce requested it.  The GOK could not provide something that was not yet available.

Second, Commerce abused its discretion in not soliciting KEPCO's 2021 cost data.  Although Commerce is not required to provide interested parties with an opportunity to submit factual information later than thirty days prior to issuing preliminary results, Commerce is obligated to calculate CVD margins as accurately as possible.  In furtherance of this obligation, Commerce has broad authority under its regulations to request that an interested party submit factual information at any time during a proceeding.  More than five months before Commerce issued its *Final Results*, the GOK notified Commerce that the audit of the KEPCO 2021 cost data was nearly completed, and that the GOK was willing and able to provide this information.  Even if this cost data was not absolutely final, it was substantially so and represented exactly the data that Commerce always uses in its market principles analysis.  It was the best factual information available.  Five and a half months was more than enough time for Commerce to review the data, allow parties to comment on the agency's analysis of the data, and respond to those comments.  In other words, the burden of soliciting the 2021 cost data at that stage of the review did not outweigh the interests of fairness and accuracy in calculating Hyundai Steel's margin.

V.    *Standard of Review*

In reviewing a challenge to Commerce's determination in a CVD administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be

13

unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

VI.    *Argument*

In order to find that a countervailable subsidy exists, Commerce must determine that a government authority has provided (i) a financial contribution, that (ii) confers a benefit that is (iii) specific.  19 U.S.C. § 1677(5)(B) & (5A).  This appeal challenges two decisions related to Commerce's electricity for LTAR program.  The first challenge relates to Commerce's determinations that the GOK's provision of electricity at LTAR to Hyundai Steel was *de facto* specific.  The second challenge relates to Commerce's determination not to solicit KEPCO's 2021 cost data and instead rely on FA in its analysis of whether the electricity for LTAR program conferred a benefit.  On both counts, Commerce's decision falls short under the standard of review.

A.    *Commerce's Determination That KEPCO's Provision of Electricity for LTAR is De Facto Specific is Unsupported by Substantial Evidence And is Otherwise Contrary to Law.*

In the *Final Results*, Commerce found that the GOK's provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) because "the steel industry and three other industries combined, consume a disproportionately large amount of electricity in Korea."  I&D Mem. at 16.  In support of its determination, Commerce relied on proprietary GOK data which indicated that the steel industry was one of the largest consumers of electricity in Korea during the POR.  *See* I&D Mem. at 15; *see also* GOK IQR at 35–36.  Commerce concluded that the data "demonstrate{d} that the steel industry and *three other industries combined* consumed a disproportionately large amount of electricity in Korea."  I&D Mem. at 16 (emphasis added).  Commerce also noted that the statute "instructs Commerce when evaluating the factors for *de facto* specificity to take into account the extent of diversification of economic

14

activities within the jurisdiction of the authority providing the subsidy." *Id.* at 15. Commerce thus also sought to support its decision by noting that "a wide diversification of economic activities exists in Korea, including 19 industry groupings with a broad range of distinctly different types of economic activities within these groupings." *Id*. (citing to Mem. to The File, "Placement of Korea Economic Diversification Mem. on the Record" (May 3, 2022) ("Diversification Mem."), PR 24. Commerce's determination is not supported by substantial evidence and is contrary to law.

Pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III), a domestic subsidy is *de facto* specific if "{an} enterprise or industry receives a disproportionately large amount of the subsidy." In evaluating whether an enterprise or industry receives a disproportionately large amount of a subsidy, Commerce must take into account the extent of diversification of economic activities in the country providing the subsidy. *See* 19 U.S.C. § 1677(5A)(D)(iii). The specificity test is meant to "winnow out" subsidies that are broadly available and widely used throughout an economy. *See* Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4241. The GOK's provision of electricity is exactly the type of widely used public program that Congress intended <u>not</u> to be countervailed. *See id*. (citing to *Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983) (stating that countervailing generally available government benefits such as "public highways and bridges, as well as tax credits for expenditures on capital investment even if available to all industries and sectors. . . . simply defies reason."). The SAA recognizes that regarding widely used programs such as these to be "specific" would produce absurd results. SAA, 1994 U.S.C.C.A.N. at 4242. Simply put, utilities like electricity are used by not only all sectors of the Korean economy, but by every person in Korea, and thus its

provision can hardly be called specific.  Providing a good or service that every person in the country uses is different from the provision of types of good or services that are used by discrete sectors of the economy.

This is particularly true where, as here, electricity is broadly available and widely used and the electricity rates for industrial users such as the steel industry and the other sectors relied upon by Commerce to support its disproportionality decision are based on a standard pricing mechanism and thus no one company or industrial user receives a more preferential rate for electricity than other companies or industrial users.  *See* GOK IQR at Ex. E-10.  As demonstrated in the Electricity Tariff Table submitted by the GOK, the industrial electricity tariff rate is applicable to all electricity users involved in mining, manufacturing, and other business.  *Id.*  Furthermore, the industrial tariff rates are higher than the residential, general, agricultural and educational tariffs and thus it can hardly be said that this random grouping of industrial consumers, or the steel industry in particular, are being specifically targeted for electricity subsidies.  The Electricity Tariff Table demonstrates that not only do industrial users pay higher rates than other users, but that industrial users with high usage (contract demand of 300kW or more) pay the highest rates for electricity.  *See* GOK IQR at Exhibit E-10; *see also* GOK IQR at 27 ("{O}n the basis of Article 14 of the Notification, the tariff rates can be adjusted after considering the customers' economic circumstances and other societal factors.").

Even if the Court were to consider that a broadly available and widely used public program such as electricity could be considered "specific," Commerce's analysis of the GOK's data defies logic.  In order to find that the steel industry received a disproportionately large amount of the subsidy, Commerce lumped together four disparate industries within the narrower industrial classification of electricity consumers in Korea.  However, Commerce cannot rely on

the combined electricity use of four industry groups to support the conclusion that the *steel industry* received a disproportionate amount of the alleged subsidy.  Instead, Commerce needs to analyze the consumption data for the steel industry alone to support a disproportionality determination for the steel industry.  The data relied on by Commerce shows that the steel industry consumed [                    ] of the total industrial electricity consumption in Korea, and only [            ] of the total electricity consumption in Korea.  *See* GOK IQR at 35–36.  This does not demonstrate disproportionate use by the steel industry.

Commerce has previously found that even a much greater percentage of countervailable benefits received by the Korean steel industry did not support a finding of *de facto* specificity based on disproportionality.  In *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001), the court sustained Commerce's determination that a program pursuant to which the steel industry had received over 51 percent of the benefits was not *de facto* specific. *Id*. at 1369.  Commerce found that despite the majority of the benefits going to a single industry, the benefits received were not disproportionate because high electricity usage was an inherent characteristic of the steel industry, all recipients received an identical rate reduction based on a standard mechanism, and the subsidy was not designed to benefit any one industry.  *Id*. at 1368– 70.  In sustaining this determination, the court reasoned:

> In virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group.  To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws.

*Id*. at 1369.

Likewise, in *Samsung Electronics Co., Ltd. v. United States*, 37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014), the court held that Commerce failed to adequately address how a tax credit

program provided by the GOK to Samsung Electronics Company ("Samsung") was disproportionately large based on the facts of the case. In that case, it was undisputed that respondent Samsung received a larger share of tax credits than the average beneficiary. *Id.* at 1326. However, the court admonished Commerce for failing to consider the aspects of the program relevant to disproportionality, namely, that the GOK conferred tax credits based on usage and pursuant to a standard pricing mechanism. *Id.* In other words, the GOK conferred tax credits relative to eligible expenditures. *Id.*

Similar to the cases discussed above, while the record demonstrates that the steel industry may consume a larger amount of electricity relative to other market participants, the electricity for LTAR program is based on usage and electricity prices are set based on a standard pricing mechanism. *See* GOK IQR at 30, Ex. E-10 (showing that electricity prices were based on standard pricing).[5] In fact, unlike in *Samsung Electronics*, here the record is devoid of evidence that Hyundai Steel itself receives a larger amount of benefits relative to other companies benefitting under the electricity for LTAR program—only that the steel industry overall allegedly receives a higher percentage. Differences in the proportion of electricity consumed by the steel industry compared to that of other industries is attributable to the fact that high electricity use is an inherent characteristic of the steel industry. *See Bethlehem Steel*, 140 F. Supp. 3d at 1369. The record here shows only that there is some disparity in the energy consumption between industries in Korea, and Commerce has provided no evidence that the benefit was specific to the steel industry. Thus, imposing countervailing duties in this case "is

---

[5] If anything, industrial users like the steel industry may have been subsidizing energy use by other electricity users. *See* GOK IQR at Ex. E-10 (showing that industrial tariff rates are generally higher than the general, residential, educational, and agricultural tariff rates).

anathema to the purpose of countervailing duty laws." *See Bethlehem Steel*, 140 F. Supp. 2d at 1369.

Furthermore, Commerce's reliance on an arbitrary grouping of the top four consumers of industrial electricity is nothing more than a gerrymandering to reach a desired result. Nowhere does Commerce attempt to explain why it selected the top four industries—all of which are unrelated to each other—to determine that a "group" of industries received a disproportionately large amount of the subsidy. Indeed, it would appear that Commerce simply chose to aggregate industries together until the total electricity consumption of those industries exceeded [

] of the electricity consumed by industrial users. *See* GOK IQR at 35–36. If Commerce truly sought to determine that the steel industry was disproportionately benefitting from the provision of electricity for LTAR, it would have identified a group of similar industries (*e.g.*, a group of industries involved in producing metals and using steel as a major input). Doing so, however, would not have allowed Commerce to reach the arbitrary threshold of [          ] of all industrial electricity consumption. *See* GOK IQR at 35–36. Instead, it would have diluted the per industry percentage of electricity consumption, weakening Commerce's conclusion that the steel industry disproportionately benefitted from the provision of electricity for LTAR.

Commerce's aggregation of the electricity use by these industries is the definition of arbitrary, capricious and an abuse of discretion. Nowhere in the *Final Results* does Commerce attempt to explain its choice to group these industries. To the extent that Commerce relies on Korea's economic diversification to determine that the provision of electricity for LTAR is disproportionately used by the steel industry, this reliance is misplaced. While Commerce may take into account the extent of economic diversification, this criterion should "serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors."

19

*See* SAA, 1994 U.S.C.C.A.N. at 4243.  Here, Commerce fails to link its finding that the economy of Korea is diverse with its finding that the steel industry, or even the group of industries in which Commerce lumped the steel industry together with, consumes a disproportionately large amount of electricity.[6]  And, as discussed above, "impos{ing} countervailing duties on an industry where disparity alone is demonstrated," but evidence that the benefit was specific is absent, "is anathema to the purpose of the countervailing duty laws." *Bethlehem Steel*, 140 F. Supp. 2d at 1369.

Finally, when viewing the steel industry's total electricity consumption (or for that matter, the electricity consumption of the four largest industrial users) in comparison to the total electricity consumption in Korea by all users, it is abundantly clear that the steel industry does not receive a disproportionate amount of the subsidy.  When viewed in relation to the overall consumption, the steel industry consumes only [                ] of all electricity, and the four industries Commerce has decided to arbitrarily lump together account for only [                ] of all consumption.  These low percentages indicate that neither the steel industry nor the group of industries Commerce analyzed consume a disproportionately large percentage of electricity in the Korean market.

Accordingly, this Court should find that Commerce's determination that the GOK's provision of electricity for LTAR was *de facto* specific is not supported by substantial evidence and is otherwise not in accordance with law.

---

[6] While the Korean economy may span 19 different industry groupings, the data upon which Commerce relies also shows that the number of establishments in each of these industries is not equal.  For example, the number of manufacturing establishments (413,849) far outnumbers the number of establishments in 14 of these 19 industry groupings.  *See* Diversification Mem.  Nor does this economic diversity account for differences in electricity use between industries.  For example, manufacturing establishments will certainly consume more electricity than establishments involved in wholesale and retail trade, hospitality services and transportation.

> **B.**    *Commerce's Determination Not to Provide the Government of Korea with an Opportunity to Submit KEPCO's 2021 Cost Data is Unsupported by Substantial Evidence and an Abuse of Discretion.*

In the *Final Results*, Commerce declined to solicit and analyze KEPCO's 2021 cost data and instead applied FA for the provision of electricity for LTAR program.  *See* I&D Mem. at 10. Commerce explained that it was declining to collect the cost data because there was insufficient time left in the review to analyze the data and allow parties to comment on its analysis.  *Id*. at 12. This decision is unsupported by substantial evidence and is not in accordance with law.

Commerce may use FA only if it finds that necessary information is not available on the record, or that an interested party (1) withholds information requested by Commerce, (2) fails to provide requested information by the submission deadlines, (3) significantly impedes a proceeding, or (4) provides information that cannot be verified.  *See* 19 U.S.C. § 1677e(a).  The use of FA is, however, subject to 19 U.S.C. § 1677m(d), which requires Commerce to provide a party with an opportunity to remedy or explain responses that Commerce's determines to be deficient.

Thus, in order to resort to FA, Commerce was required to provide the GOK with the opportunity to "remedy or explain" the deficiency to Commerce's request for KEPCO's 2021 cost data in light of the time limits for the review.  *See* 19 U.S.C. §§ 1677e(a)(1), 1677m(d). While there is no dispute that Commerce made multiple requests for the 2021 cost data, Commerce did not provide the GOK with a legitimate opportunity to *remedy* its deficient response.  Each time that Commerce requested this information, the GOK explained that the data was not ready and that it had to be reviewed and audited.  This audit was conducted by the Board of Audit and Inspection of Korea that "neither the {GOK's} Ministry of Trade, MOTIE nor KEPCO could have control over" and, thus, the GOK could not estimate when it would be completed, let alone expedite it.  Resp. to Correspondence Mem. at 2.  And, despite Commerce's

reliance on the fact that it had asked for KEPCO's 2021 cost data multiple times, the record demonstrates that, in response, the GOK kept Commerce apprised of the status of the GOK's audit of this information and that this information was not immediately available.  Commerce was aware that the GOK was diligently working to complete this information and willing to provide it when complete and audited.  Given this fact, it is even more egregious that Commerce refused to provide the GOK with an opportunity to submit the 2021 cost data.  Requests for information that Commerce knows are not yet available do not provide a respondent with an actual opportunity to "remedy" a deficiency.

Throughout the proceeding, the GOK was transparent with Commerce about the reasons for not immediately being able to provide KEPCO's 2021 cost data.  In its initial questionnaire, the GOK explained that KEPCO had not yet completed preparing its cost data sheet for the 2021 POR and instead submitted KEPCO's cost data for the 2020 POR.  *See* GOK IQR at 32.  In the second supplemental questionnaire, Commerce asked the GOK to provide the KEPCO 2021 cost data "if this information is now available."  GOK SQR2 at 2.  The GOK responded that the requested data was "currently under verification" and that the verification process was taking longer than expected.  GOK SQR2 at 2.  Commerce then again asked the GOK to submit the 2021 cost data if it was finalized and, if not, to provide an estimated date when the GOK expected it to be finalized.[7]  GOK SQR3 at 1.  The GOK responded that the information was currently being audited and that it was "uncertain and hard to predict" when the audit would be completed.  GOK SQR3 at 1–2.  When the audit was nearly complete, the GOK promptly

---

[7] Hyundai Steel notes that this request for the 2021 costs data came only one day after the GOK responded that the data was still being verified and provided the GOK with only one week to respond.

informed Commerce that it was able to submit the requested information.  *See* Correspondence Memo at Attach.

This fact pattern is similar to *American Honey Producers Association v. United States* ("*AHPA*"), 653 F. Supp. 3d 1329 (Ct. Int'l Trade 2023).  In *AHPA*, Commerce requested in an initial questionnaire audited financial statements from respondents for FY 2019-2020 and FY 2020-2021.  653 F. Supp. 3d at 1333.  In July 2021, respondents informed Commerce that the financial statements for FY 2020-2021 were not yet available.  *Id*.  In August 2021, Commerce again requested the 2020-2021 financial statements and, again, respondents explained that the requested financial statements had not yet been prepared.  *Id*. at 1333–34.  Respondents continued to inform Commerce that the audited financial statements were not finalized in response to second sets of supplemental questionnaires in November 2021.  *Id*. at 1334.  It was not until Commerce issued questionnaires in lieu of verification that respondents finally provided the requested financial statements, which still did not include an auditor's report.  Despite respondents' failure to provide the requested information until verification, Commerce determined that respondents had complied with its requests for information and did not impede the proceeding by withholding information.  *Id*. at 1334.

Here, while Commerce made multiple requests for the 2021 cost data, each time Hyundai Steel informed the agency that the data had not yet been audited and that it would provide the data when available.  Unlike in *AHPA*, the GOK in this case actually informed Commerce that the 2021 cost data was available for submission more than five months prior to Commerce's issuance of the *Final Results*, instead of waiting until verification to provide Commerce with the information.  *Compare* Correspondence Memo (contacting Commerce on March 14, 2023) *with* I&D Mem. (issued August 30, 2023).  While each administrative proceeding has its own record

and stands on its own, Commerce is required to provide an explanation "for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). Commerce has not adequately explained its refusal to allow the GOK to submit KEPCO's 2021 cost data five and a half months before it issued the *Final Results*, despite its acceptance of the financial statements at verification in the proceeding in *AHPA*.[8]  Thus, its determination is not supported by substantial evidence.

Commerce also abused its discretion by refusing to issue a supplemental questionnaire to the GOK requesting the 2021 cost data following the *Preliminary Results*.  While courts traditionally afford agencies broad discretion to determine their own procedures, including setting deadlines for filing submissions, an agency's discretion to set and enforce deadlines is not absolute.  *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207 (Fed. Cir. 1995).  A deadline-setting regulation that "is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion."  *Id.* at 1207.  In determining whether rejection of an untimely filing amounts to an abuse of discretion, the court weighs "the burden imposed upon the agency by accepting the late submission," *Usinor Sacilor v. United States*, 872 F. Supp. 1000, 1008 (Ct. Int'l Trade 1994), "the consideration of whether the information will increase the accuracy" of a determination, *see Pro-Team Coil Nail Enterprise, Inc. v. United States*, 419 F. Supp. 3d 1319, 1332 (Ct. Int'l Trade 2019), and "the need for finality at the final results stage," *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006).  Furthermore, while "a tension may arise between finality

---

[8] The verification responses were placed on the record less than three months before the final determination in *AHPA*.  *See Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 22,188 (Dep't Commerce Apr. 14, 2022), and accompanying Issues and Decision Mem. at 2, 33 (stating that the financial statements were provided in the verification questionnaire responses that were filed with Commerce on January 18, 2022).

and correct result" at later stages of an investigation, "{p}reliminary determinations are 'preliminary' precisely because they are subject to change . . . the tension between finality and correctness {does} not exist at th{at} time." *NTN*, 74 F.3d at 1208. "Commerce abuse{s} its discretion {when it} refus{es} to accept updated data when there {i}s plenty of time for Commerce to verify or consider it." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016).

Commerce recognized that it has the discretion to collect information at any point in the review, *see* I&D Mem. at 12, but that the agency had to "weigh how the collection of {the cost data} would impact {its} ability to conduct the review within the statutorily required time frame," *id*. While Hyundai Steel does not dispute that Commerce must complete a review within the time frame mandated by Congress, Commerce would have had over five months to review and analyze the data, provide interested parties with an opportunity to comment, and issue any deficiency questionnaires prior to the *Final Results*. This was also a program that Commerce had reviewed multiple times in the past, and to which interested parties were familiar. Under these circumstances, Commerce's refusal to provide the GOK with an opportunity to remedy this deficiency was an abuse of discretion. The GOK informed Commerce that the requested information was available less than two weeks after the *Preliminary Results* were published and over five months prior to the issuance of the *Final Results*. Despite Commerce's protestations, even if Commerce had refused to accept the information until the audit had been completed at the end of April, *see* I&D Mem. at 11, there was plenty of time—over four months—to verify and consider the information. Commerce's determination not to request this information is thus an abuse of discretion, *see Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016).

Furthermore, in this case "the interests of accuracy and fairness outweigh the burden placed on {Commerce}." *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012). Commerce's use of FA to determine that KEPCO's electricity prices during the POR were not set in accordance with market principles resulted in a countervailing duty rate of 0.51 percent *ad valorem* with respect to the provision of electricity for LTAR. I&D Mem. at 8. Commerce must strive to calculate margin rates as accurately as possible. *See e.g., Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Use of KEPCO's actual cost data, and not information from its financial statements, would lead to the calculation of the most accurate margin possible. Indeed, this is the exact data that Commerce always uses in its market principles analysis and thus is the most accurate data. Commerce still had considerable time to analyze this cost data without affecting its ability to complete the review within the statutory deadlines and, thus, abused its discretion in refusing to provide the GOK with the opportunity to submit this data.

Accordingly, the Court should find that Commerce's determination not to provide the GOK with an opportunity to provide the audited KEPCO cost data was not supported by substantial evidence and an abuse of discretion.

VII.    *Conclusion And Relief Requested*

Based on the foregoing, Hyundai Steel respectfully requests that this Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen A. Morrison
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 8,199 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  March 12, 2024