## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, )<br><br>Plaintiff, )<br>and )<br><br>GOVERNMENT OF THE REPUBLIC OF )<br>KOREA, )<br>Plaintiff-Intervenor )<br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>NUCOR CORPORATION, )<br><br>Defendant-Intervenor ) | Before: Hon. Claire R. Kelly<br>Judge<br><br>**Court No. 23-00211**<br><br>NONCONFIDENTIAL<br><br>Business Proprietary Information<br>Removed from Pages 4, 6, 8, 9, and<br>19. |

### PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S MEMORANDUM IN SUPPORT OF HYUNDAI STEEL'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Yujin K. McNamara
Daniel M. Witkowski
Devin S. Sikes
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: April 2, 2024

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .......................................................................................................... 1

ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED ........................... 1

STATEMENT OF ISSUES ............................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 2

STANDARD OF REVIEW ............................................................................................ 2

ARGUMENT ............................................................................................................... 2

I.    COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED
      BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN
      ACCORDANCE WITH LAW ................................................................................ 3

      A.    Commerce Did Not Conduct the Requisite Analysis for a *De Facto*
            Specificity Finding ................................................................................. 4

      B.    Commerce Precedent and Record Evidence Demonstrate that Hyundai
            Steel Did Not Consume a Disproportionately Large Amount of Electricity .......... 7

            1.    Electricity in Korea Is Widely Used by Virtually Everyone ...................... 8

            2.    The GOK Provided Electricity Under a Standard Pricing
                  Mechanism ................................................................................. 9

II.   COMMERCE'S REFUSAL TO ACCEPT KEPCO'S 2021 COST
      INFORMATION IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND
      AN ABUSE OF DISCRETION ............................................................................ 10

      A.    Commerce Had Ample Time to Consider the 2021 KEPCO Cost Data ............... 11

      B.    Commerce's Refusal to Consider the 2021 KEPCO Cost Data Resulted in
            an Inaccurate Determination ................................................................... 18

CONCLUSION ........................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

***Cases***

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ...... 4, 7, 8, 9

*Mosaic Company v. United States*, 659 F. Supp. 3d 1285, 1316 (Ct. Int'l Trade 2023) ............... 8

***Statutes***

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................... 2

19 U.S.C. § 1671b(b)(1) ............................................................................................ 13

19 U.S.C. § 1671b(c)(1) ............................................................................................ 13

19 U.S.C. § 1671d(a)(1) ............................................................................................ 14

19 U.S.C. § 1677(5) ................................................................................................... 14

19 U.S.C. § 1677(5)(E) .............................................................................................. 18

19 U.S.C. § 1677(5A)(D)(iii)(III) ......................................................................... 3, 4, 5

19 U.S.C. § 1677m(i)(1) ............................................................................................ 14

28 U.S.C. § 1581(c) ..................................................................................................... 2

***Regulations***

19 C.F.R. § 351.301(c)(1)(i) ...................................................................................... 13

19 C.F.R. § 351.301(c)(1)(v) ..................................................................................... 14

***Administrative Decisions***

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021) ............................................................................................ 20

*Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 40,465 (July 28, 2021) ...... 19

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Sept. 7, 2023) ................................................................................................. 1

*Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 50,103 (Aug. 1, 2023) ......................................................................................................................................... 17

*Large Diameter Welded Pipe From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 88 Fed. Reg. 85,236 (Dec. 7, 2023)..................................................... 16

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015)........................................................................................... 7

*Passenger Vehicle Light Truck Tires (PVLT) From China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 15,371 (Mar. 13, 2023) ................................. 15, 17

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,267 (July 2, 2021) ........................................................................................................................................ 16

*Utility Scale Wind Towers From Malaysia: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 17,404 (Mar. 11, 2024)................................................................ 15

*Wooden Cabinet and Vanities and Components Thereof From the People's Republic of China: Final Results and Final Determination of No Shipments of the Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 76,729 (Nov. 7, 2023) ............................... 15

## INTRODUCTION

This brief is submitted on behalf of Plaintiff-Intervenor the Government of the Republic of Korea ("GOK") in support of Plaintiff Hyundai Steel Company's ("Hyundai Steel") Rule 56.2 motion for judgment upon the agency record relating to errors of law and fact committed by the U.S. Department of Commerce ("Commerce") in the 2021 administrative review of the countervailing duty ("CVD") order on Cut-to-Length ("CTL") Carbon-Quality Steel Plate From the Republic of Korea.  *See* Pl. Hyundai Steel's Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 30 ("Pl. Br.").  For the reasons explained by Hyundai Steel and those set forth in this brief, Commerce's determination that the GOK provided electricity for less than adequate remuneration ("LTAR") rests upon a flawed finding that the provision of electricity is *de facto* specific and an inaccurate cost-recovery analysis stemming from Commerce's refusal to accept the data needed to reach an accurate decision.

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

The GOK challenges certain aspects of Commerce's final results in the 2021 administrative review of the CVD order on CTL plate, published as *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Sept. 7, 2023) (P.R.225) ("*Final Results*").

## STATEMENT OF ISSUES

1.    Whether Commerce's determination that the GOK's provision of electricity for LTAR was *de facto* specific is supported by substantial evidence on the record and is otherwise in accordance with law.

2.     Whether Commerce's use of facts available ("FA") in lieu of Korea Electric Power Corporation's ("KEPCO") 2021 cost information is supported by substantial evidence on the record and is otherwise in accordance with law.

## STATEMENT OF FACTS

The GOK adopts Hyundai Steel's statement of facts. To the extent that additional facts not mentioned by Hyundai Steel are relevant to the GOK's arguments, they are discussed within the context of the arguments set forth in this brief.

## STANDARD OF REVIEW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## ARGUMENT

In proceedings related to several countervailing duty orders, including the CVD order on CTL plate, Commerce has repeatedly declined to countervail the GOK's provision of electricity. Commerce should have reached that same conclusion in this review.

Commerce's specificity determination is unsupported by substantial evidence and otherwise not in accordance with law. Commerce's departure from its prior treatment of this program rested upon a flawed finding that the provision of electricity is *de facto* specific. Commerce improperly conflated disparate electricity consumption with disproportionate electricity consumption. Commerce ignored that electricity is broadly available and widely used in Korea. Commerce further neglected to consider that electricity prices in Korea are determined by a standard pricing mechanism and industrial users are not treated differently from other user

classifications. Rather, record evidence demonstrates that neither Hyundai Steel nor the steel industry consumed disproportionately large amounts of electricity.

Commerce's determination also rested upon a flawed benefit determination. Commerce found that the electricity prices charged by KEPCO were insufficient to cover costs during the period of review ("POR"), and thus the remuneration for electricity was inadequate. Commerce then calculated a benefit amount based on the difference between KEPCO's actual cost recovery and the amount sufficient for KEPCO to recover its costs and earn a return on investment. Commerce conducted this analysis based on KEPCO's overall cost-recovery rate, despite evidence that KEPCO's cost-recovery rate for sales to industrial users like Hyundai Steel would be higher than KEPCO's average cost-recovery rate for sales to all users. Commerce relied on KEPCO's overall cost-recovery rate as FA because data specific to the provision of electricity to industrial users for the POR were not on the record. The GOK, however, had offered to provide the 2021 KEPCO cost data necessary to reach an accurate determination for industrial users like Hyundai Steel several months before the *Final Results* were issued. Commerce's refusal to accept those data and to instead rely on facts available is unsupported by substantial evidence and an abuse of discretion.

## I. COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW

In its *Final Results*, Commerce determined that the GOK's provision of electricity was *de facto* specific pursuant to Section 771(5A)(D)(iii)(III) of the Tariff Act of 1930 (the "Tariff Act"), 19 U.S.C. § 1677(5A)(D)(iii)(III). Memorandum from James Maeder to Lisa Wang, "Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review; 2021: Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea" (Aug. 30, 2023) ("*Final Results IDM*") at 15-16 (P.R.222). Commerce reasoned that the "GOK data . . .

demonstrate the steel industry and three other industries combined, consume a disproportionately large amount of electricity in Korea." *Id.* at 16.  Commerce did not specify the three other industries in the *Final Results IDM*, but the three other industries consuming the most amount of electricity were the [                                                            ] industries.  Letter from Yoon & Yang LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire" (June 27, 2022) ("GOK IQR") at 35 (C.R.29/P.R.60).  Commerce's finding of *de facto* specificity is unsupported by substantial evidence and otherwise not in accordance with law.

### A.    Commerce Did Not Conduct the Requisite Analysis for a *De Facto* Specificity Finding

Section 771(5A)(D)(iii) of the Tariff Act provides that "{w}here there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist: . . . (III) An enterprise or industry receives a disproportionately large amount of the subsidy."  19 U.S.C. § 1677(5A)(D)(iii)(III).  Under this provision, Commerce cannot determine that the GOK's provision of electricity to certain industrial users is *de facto* specific simply because some users consume higher levels of electricity.

*Bethlehem Steel Corp. v. United States* confirmed that the term "disproportionate" should not be erroneously equated to "disparity."  140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001).  Instead, *Bethlehem Steel* held that imposing "countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws."  *Id.* at 1369.  For that reason, the court held that the "mere fact that the {Korean} steel industry received a greater monetary benefit from the program than did other participants is not determinative of whether that industry was 'dominant' or receiving 'disproportionate' benefits."  *Id.*

The plain meaning of the terms "disparity" and "disproportionately" align with the holding in *Bethlehem Steel*. The word "disparity" is defined as "a noticeable and usually significant difference or dissimilarity," while the term "disproportionately" refers to "being out of proportion" or being "too large or too small in comparison to something else." *Disparity and Disproportionately Definitions*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/; *Disproportionately Definition*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/disproportionately. In other words, "disparity" may occur even if a subsidy is not industry-specific due to the fundamental differences across different groups. On the other hand, an analysis of "disproportionately" requires some sort of comparison and consideration of context, and Commerce therefore must consider whether certain enterprises or industries (or groups thereof) receive an outsized benefit from the program at issue that is out of proportion.

Commerce undertook no such comparison in its specificity analysis regarding the GOK's alleged provision of electricity. *Final Results IDM* at 15-16 (P.R.222). Its determination consisted entirely of a bald and unreasoned finding that a certain set of industries together consumed a "disproportionately large amount of electricity" during the POR. *Id.* Commerce provided no explanation as to how the amount of electricity consumed by certain industries, by itself, showed that those industries "receive{d} a disproportionately large amount of the subsidy" as is required under Section 771(5A)(D)(iii) of the Tariff Act, 19 U.S.C. § 1677(5A)(D)(iii)(III). Rather, Commerce's finding only demonstrates that there was a disparity in electricity consumption between the steel industry and three other industries, on the one hand, and all other industries on the other.

Further, in simply concluding that there was a "disproportionately" large consumption by the four industries, Commerce completely failed to account for the differences in characteristics and size across industries that explain the disparity in electricity consumption.  As Hyundai Steel points out, certain industries consume more electricity than others solely due to their inherent characteristics, and this disparity does not indicate that the GOK provided a disproportionately large amount of electricity to certain industries.  Pl. Br. 18.  For example, manufacturing industries naturally tend to consume more electricity than other industries, such as retail, because they are required to operate large machines and equipment to manufacture their products.

The difference in the actual size of enterprises and industries also plays a substantial role in creating a disparity in electricity consumption.  While a variety of economic activities occur in Korea on a national and regional level, some enterprises and industries are much larger than others.  For example, export data show that the semiconductor, automobile, ship, and wireless communication device industries were the top four largest exporters in Korea in 2016, exporting a total of $167 billion-worth of goods.  *See* GOK IQR Exhibit LTKEA-3 (C.R.46/P.R.72).  Similarly, 2020 data show that the [                                                    ], and steel industries were among the major industries related to the export growth rate in Korea.  *See* GOK IQR Exhibit GEN-1 (C.R.31-32/P.R.62-63).  Unsurprisingly, these large industries tended to be among the top energy-intensive industries.  *See* GOK IQR at 35-36 (C.R.29/P.R.60).  It is to be expected that large industries like the [                                              ], and steel industries—the four industries identified by Commerce as supposedly consuming a disproportion amount of electricity—would consume more electricity than relatively smaller industries.  As large enterprises and industries have significantly larger scales of operations than those of other smaller enterprises and industries, their usage of electricity will naturally create a significant

disparity in electricity consumption notwithstanding the fact that their consumption may in fact be proportionate to their size. As such, this disparity should not and cannot be equated to disproportionality. The court has already ruled that a disparity finding alone is insufficient to show *de facto* specificity. *Bethlehem Steel*, 140 F. Supp. 2d at 1369.

Commerce is required to support its disproportionality determination with substantial evidence. However, as demonstrated above, Commerce has only shown disparity among industries that naturally have different levels of electricity consumption. Commerce failed to point to any evidence that would support its conclusion that the GOK provided disproportionately large amount of electricity to the four industries it identified, including the steel industry. Rather, Commerce based its determination on the unreasonable and unsupported assumption that all industries and enterprises are of the same nature and size and thus consume the same amount of electricity. To the contrary, the size of individual enterprises and industries in Korea varies substantially, and it is only logical that larger industries in Korea would consume comparatively larger amounts of electricity than small industries, even if the consumption is proportional to their size. Commerce's finding that certain industries, including the steel industry, consume a disproportionate amount of electricity is unsupported by substantial evidence.

**B.    Commerce Precedent and Record Evidence Demonstrate that Hyundai Steel Did Not Consume a Disproportionately Large Amount of Electricity**

Commerce precedent establishes that there is no specificity when electricity is provided throughout the country and industrial users are treated in a manner consistent or even less favorable than other consumers with respect to the electricity tariff schedule. *See Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying Issues and Decision Memorandum at 12-13. Further,

the CIT has upheld Commerce's conclusion that the provision of electricity is not specific and, thus, not countervailable "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers." *Bethlehem Steel*, 140 F. Supp. 2d at 1369.

### 1.    Electricity in Korea Is Widely Used by Virtually Everyone

As stated in Hyundai Steel's case brief, Commerce must apply the specificity test to "winnow out" subsidies that are broadly available and widely used throughout an economy.  Pl. Br. 15.  For the same reason, the court in *Mosaic Company v. United States* "caution{ed} against {an} overreaching and indiscriminate type of specificity finding" by citing to the Statement of Administrative Action accompanying the Uruguay Round Agreements Act.  659 F. Supp. 3d 1285, 1316 (Ct. Int'l Trade 2023).

Commerce's finding of specificity regarding the GOK's provision of electricity is precisely a case of an "overreaching and indiscriminate type of specificity finding" that the court had cautioned against.  *Id.*  Contrary to Commerce's finding, record evidence demonstrates that electricity in Korea is a public utility that is available to any person upon request and is therefore widely available and used.  *See* GOK IQR at 16-17, 30, 208 (C.R.29/P.R.60), Exhibits E-4 at 63 (C.R.41/P.R.69) and E-10 (C.R.43/P.R.70).  Further, record evidence does not support a finding that Hyundai Steel, the steel industry, or any group of industries were predominant users of this program or used a disproportionately large amount of electricity.  The steel industry consumed only **[    ]** percent of the total amount of electricity consumed in Korea, whereas the top industry in terms of electricity consumption (i.e., the **[                    ]**) consumed only **[    ]** percent.  *See* GOK IQR at 35-36 (C.R.29/P.R.60), Exhibit E-11 (C.R.43/P.R.70).  On this basis alone, Commerce should not have found the program to be specific.

However, Commerce bluntly ignored the facts that electricity was widely used by virtually everyone in the country and the Korean economy.  Commerce then simply grouped the top four industries to reach the conclusion that they consumed disproportionately large amount of electricity (i.e., over [    ] percent to the total electricity consumed by the industrial classification).  It never provided an explanation as to why it focused solely on the top four industries.  Commerce's decision to group these industries appears to be arbitrary, especially when considering that there are other industries which shared similar characteristics and output as the steel industry and the other three industries aggregated by Commerce, such as the [                    ] industry.  *See* GOK IQR at 35-36 (C.R.29/P.R.60).  Yet, Commerce decided to group four industries that have nothing in common other than the fact that they were among the largest electricity consuming industries.  *Final Results IDM* at 15-16 (P.R.222).  Nor did Commerce explain why it was reasonable to compare their electricity usage to the total usage by only industrial users, rather than all purchasers of electricity.

Besides, even if Commerce were allowed to arbitrarily group the top four industries, the combined consumption of [    ] percent does not warrant a finding of *de facto* specificity. Commerce has previously determined that a program pursuant to which the steel industry by itself had received over 51 percent of the benefits was not *de facto* specific, Pl. Br. 17, a decision that the court sustained in *Bethlehem Steel*, 140 F. Supp. 2d at 1369-70.

## 2.    The GOK Provided Electricity Under a Standard Pricing Mechanism

Record evidence demonstrates that KEPCO provided electricity to all enterprises and industries in Korea that use electricity and that electricity was provided under a standard pricing mechanism, i.e., KEPCO's electricity tariff schedule.  *See* GOK IQR at 16-17, 30, 203 (C.R.29/P.R.60), Exhibit E-10 (C.R.43/P.R.70).  Nothing in the record evidence demonstrates that the steel industry and Hyundai Steel were treated favorably.  To the contrary, record

evidence indicates that KEPCO enforced a standard pricing mechanism and provided electricity to users in other classifications, such as residential, educational, and agricultural, at lower rates than industrial users.  GOK IQR at 16-17, 30 (C.R.29/P.R.60), Exhibit E-10 (C.R.43/P.R.70).

For all of these reasons, Commerce could not have concluded that Hyundai Steel, the steel industry, or even the top four electricity-consuming industries combined received a "disproportionately" large amount of subsidy.  *See* GOK IQR at 35-36 (C.R.29/P.R.60). Commerce's finding of *de facto* specificity is not supported by substantial evidence on the record or otherwise in accordance with law.

## II.    COMMERCE'S REFUSAL TO ACCEPT KEPCO'S 2021 COST INFORMATION IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND AN ABUSE OF DISCRETION

In the *Final Results*, Commerce determined that the GOK provided electricity to Hyundai Steel for LTAR on the basis of FA.  *See Final Results IDM* at 6 (P.R.222).  Commerce concluded that KEPCO's electricity prices were not set in accordance with market principles based on an analysis of KEPCO's overall cost-recovery, rather than an analysis specific to the tariffs charged to industrial users.  *Id.* at 14, 17; *see also* Memorandum from James Maeder to Abdelali Elouaradia, "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review, 2021: Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea" (Feb. 27, 2023) ("*PDM*") at 10-11 (P.R.183).  Commerce then determined a benefit amount based on KEPCO's overall loss on all sales of electricity.  *Final Results IDM* at 16-18 (P.R.222); *PDM* at 29-30 (P.R.183).  Commerce resorted to FA because 2021 KEPCO cost data broken down by customer classification were not on the record.  *Final Results IDM* at 10, 14, 18 (P.R.222).  The GOK offered the 2021 KEPCO cost data to Commerce on March 14, 2023, when the data were considered substantially final, and again on April 26, 2023, upon completion of an audit of the data.  *Id.* at 10-11.  Commerce, however, declined to accept those

data, asserting that there was insufficient time remaining in the review to analyze the data. *Id.* at

11-12.  Commerce reached that conclusion even though the deadline for the *Final Results* was

several months away.

As Commerce recognized in the *Final Results,* it had "discretion to collect additional

information at any point in the review." *Final Results IDM* at 12 (P.R.222).  Commerce abuses

its discretion in refusing to accept new or corrective information when the interests of accuracy

outweigh the burden on Commerce in accepting that information and the interests in finality. *See*

Pl. Br. 24-25.  Commerce had sufficient time to consider the 2021 KEPCO cost data each time

the GOK offered to provide it, with each of the GOK's offers coming several months before

Commerce's deadline to issue the *Final Results*.  Meanwhile, Commerce's refusal to accept the

2021 KEPCO cost data and instead resort to FA led to a benefit determination that was clearly

overstated.  Commerce's refusal to accept the data therefore is unsupported by substantial

evidence and constitutes an abuse of discretion.

### A.    Commerce Had Ample Time to Consider the 2021 KEPCO Cost Data

Commerce had sufficient time to accept and consider the 2021 KEPCO cost data.  The

GOK first offered to provide the data on March 14, 2023, five and a half months before

Commerce issued the *Final Results* on August 31, 2023.  Although the data were still undergoing

a review and audit at that point, the GOK explained that the data were substantially complete and

subject to only minor changes. *See* Memorandum from David Lindgren to Interested Parties,

"Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel

Plate from the Republic of Korea; Communication with Counsel" (May 10, 2023) at Attachment

("Correspondence Memo") (P.R.194).  Six weeks later, the GOK again offered to provide the

2021 KEPCO cost data, this time after the data had been audited. *See* Letter from Yoon & Yang

LLC to Sec'y Commerce, "Administrative Review on Certain Cut-to-Length Carbon-Quality

Steel Plate from the Republic of Korea: Req. for Supplemental Questionnaire" (Apr. 26, 2023)

(P.R.190).  But Commerce refused to accept the data.  *See* Correspondence Memo; *Final Results IDM* at 10 (P.R.222).

In the *Final Results*, Commerce expressed concern about relying on data that were not audited and completely final, which could impact the accuracy of Commerce's determination. *See Final Results IDM* at 11 (P.R.222).  In reaching that conclusion, however, Commerce did not bother to acknowledge that the GOK had offered to provide the audited data with four months to spare before the deadline for the *Final Results*.  *See generally id.*  Moreover, given that the data Commerce ultimately relied upon as FA led to a clearly inaccurate determination and a significantly overstated benefit amount, *see* Section II.B *infra*, the "accuracy" concerns that Commerce expressed regarding the substantially complete version of the KEPCO cost data ring hollow.

In any event, had Commerce accepted the audited 2021 KEPCO cost data when they were offered, Commerce still would have had four months to consider the data before issuing the *Final Results*.  Commerce opined in the *Final Results* that four months would not have been enough time to consider the data and reach a determination taking those data into account.  *Final Results IDM* at 11 (P.R.222).  This assertion lacks merit.  Four months was plenty of time.

Commerce did not solicit and consider any new factual information after the *Preliminary Results*.  On May 2, 2023, just days after the GOK offered to submit the finalized and audited 2021 KEPCO cost data, Commerce decided not to initiate an examination into two new subsidy allegations made by Petitioner.  *Final Results IDM* at 2 (P.R.222).  As a result, after May 2, 2023, Commerce only reviewed the parties' briefs, held a meeting with GOK officials, and issued its decision.  *See id.*  The information offered by the GOK went solely to a single program

12

(electricity for LTAR) and only to a single issue (whether KEPCO recovered its costs on sales of electricity to industrial users). Other aspects of Commerce's determination with respect to this program, such as its specificity analysis, were in no way dependent upon the data.

Moreover, Commerce was familiar with the program at issue as it headed toward the final results. Commerce devoted several single-spaced pages in the Preliminary Decision Memorandum to describing the Korean electricity system and the tariff-setting methodology that was applicable in 2021. *PDM* at 24-28 (P.R.183). Commerce also explained that it had consistently relied upon the KEPCO cost data in prior proceedings. *Id.* at 10-11. Even if some aspects of the data may have changed in 2021, Commerce cannot feign ignorance as to basic elements of the data, particularly when Commerce had already reviewed and analyzed detailed information regarding the changes that were made in 2021 to the Korean electricity tariffs. *See id.* at 24-28. Thus, the 2021 KEPCO data went to a discrete issue with which Commerce already had familiarity, and Commerce had no other outstanding factual issues to resolve. The burden on Commerce in accepting and analyzing the data was low.

Four months (roughly 120 days) is more than enough time for Commerce to analyze data, consider arguments, and issue a decision with respect to a single issue. In CVD investigations, the default deadline for Commerce to issue a preliminary determination is only 65 days. 19 U.S.C. § 1671b(b)(1). Even in "extraordinarily complicated cases," Commerce must issue a preliminary determination within 130 days. 19 U.S.C. § 1671b(c)(1). During that time period, Commerce must select respondents, issue questionnaires, and then give the respondents at least 30 days to respond before Commerce can even begin analyzing the data. 19 C.F.R. § 351.301(c)(1)(i). Thus, in investigations, the time period between when Commerce actually receives information and when Commerce needs to issue a decision is far less than the 120 days

that Commerce had in this review, even when the preliminary determination deadline in an investigation is fully extended.

Aside from the number of days that Commerce had at its disposal, the record confirms that Commerce had relatively less to do in the underlying review, underscoring that it abused its discretion in rejecting the 2021 KEPCO data. In a CVD investigation, Commerce normally must reach a decision with respect to a number of alleged subsidies that it encounters for the first time and for which it would need to analyze each element of a countervailable subsidy—financial contribution, benefit, and specificity. *See* 19 U.S.C. § 1677(5). Following its issuance of a preliminary determination in a CVD investigation, Commerce has 75 additional days to issue a final determination, meaning that Commerce may have up to 205 total days from initiation to the final determination in a CVD investigation. 19 U.S.C. § 1671d(a)(1).[1] But Commerce must also conduct verification before issuing its final determination. 19 U.S.C. § 1677m(i)(1).[2] Commerce was not required to, and did not, conduct verification in the underlying review, and it was familiar with the program at issue. In light of the demands and deadlines the statute places upon Commerce in investigations, and Commerce's familiarity with the program at issue, it is hardly unreasonable to expect Commerce to be able to analyze and reach a decision with respect to a single aspect of a single previously examined subsidy program within 120 days of Commerce receiving the relevant information.

---

[1] The final determination can be postponed only if there is a simultaneous antidumping investigation and the petitioner asks for the final determinations in both investigations to be aligned.

[2] Commerce noted in the *Final Results IDM* that if it accepted the 2021 KEPCO cost data, it would need to allow Petitioner an opportunity to comment on and potentially rebut the data. *Final Results IDM* at 11 (P.R.222). Commerce would need to do the same in a CVD investigation. Commerce also has discretion in setting the deadline for any rebuttal to a questionnaire response in light of the time remaining in an investigation or review. 19 C.F.R. § 351.301(c)(1)(v).

Commerce has accepted new factual information at even later points in the proceeding in other cases, further demonstrating that Commerce had plenty of time to consider and analyze the 2021 KEPCO cost data.  As noted in Hyundai Steel's opening brief, Commerce accepted new financial statements less than three months before the final determination in *Raw Honey from India*.  Pl. Br. 23-24.  In the 2020 administrative review of *PVLT Tires from China*, Commerce issued a supplemental questionnaire after briefing was originally completed, received the response only a month and a half before the deadline for the final results,[3] and analyzed that information in its final decision.  *Passenger Vehicle Light Truck Tires (PVLT) From China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 15,371 (Mar. 13, 2023), and accompanying Issues and Decision Memorandum ("*PVLT Tires from China 2020 IDM*") at 2, 7, 13-14.  In the 2021 administrative review of *Utility Scale Wind Towers From Malaysia*, Commerce issued two post-preliminary supplemental questionnaires and received the response to the second post-preliminary supplemental questionnaire only two months before the deadline for the final results.[4]  *Utility Scale Wind Towers From Malaysia: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 17,404 (Mar. 11, 2024), and accompanying Issues and Decision Memorandum at 2.  *See also Wooden Cabinet and Vanities and Components Thereof From the People's Republic of China: Final Results and Final Determination of No Shipments of the Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 76,729 (Nov. 7, 2023), and accompanying Issues and Decision Memorandum at 2

---

[3] Commerce received the response on January 20, 2023, and issued the final results on March 7, 2023.

[4] Commerce received the response on January 3, 2024, and issued the final results on March 5, 2024.

(Commerce considered new factual information submitted four and a half months before the deadline for the final results).

Indeed, Commerce has accepted the KEPCO cost data at later points in other Korea CVD proceedings and, thus, could have reasonably expected that four to five months would be sufficient time to analyze the data. In the 2020 countervailing duty investigation of *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea*, Commerce analyzed the 2020 KEPCO cost data, as well as three supplemental questionnaire responses, in less than five months after having initially relied on FA in its preliminary determination due to the KEPCO cost data not being available at the time due to an ongoing audit.[5] *See Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,267 (July 2, 2021), and accompanying Issues and Decision Memorandum at 2-3. In the 2021 administrative review of *Large Diameter Welded Pipes from the Republic of Korea*, which took place around the same time as the present 2021 administrative review of the CVD order on CTL plate, Commerce was able to complete its analysis of the 2021 KEPCO cost data in around three months.[6] *See Large Diameter Welded Pipe From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 85,236 (Dec. 7, 2023), and accompanying Issues and Decision Memorandum at 2, 26, 30.

---

[5] Similar to the administrative review at issue, the GOK notified Commerce of the completion of audit on the cost data on December 16, 2020. Thereafter, Commerce issued a supplemental questionnaire on January 29, 2021, and the GOK submitted the cost data on February 8, 2021. Commerce then reversed its decision to rely on FA and took the cost data into account in its final determination on June 25, 2021.

[6] The GOK submitted 2021 KEPCO cost data on May 10, 2023. Commerce then issued its post-preliminary analysis on August 16, 2023, which included its analysis of the 2021 KEPCO cost data.

Consideration of the 2021 KEPCO cost data would not have prevented Commerce from timely issuing the *Final Results*.  Accepting the KEPCO cost data would not have delayed Commerce's consideration of the other issues in the review.  Commerce often employs staggered briefing schedules, whereby the briefing on certain programs is deferred while the briefing on other issues occurs earlier in the investigation or review.  *See, e.g.*, *Certain Softwood Lumber Products From Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 50,103 (Aug. 1, 2023), and accompanying Issues and Decision Memorandum at 6 (describing briefing tranches); *PVLT Tires from China 2020* IDM at 2 (explaining that Commerce issued additional supplemental questionnaire after briefing was initially completed and then allowed supplemental briefing to address program potentially impacted by supplemental questionnaire).  Although parties may have appreciated Commerce issuing a post-preliminary results analysis of the KEPCO cost data to aid their briefing, *see Final Results IDM* at 11 (P.R.222) (noting that Commerce may have decided to issue a post-preliminary analysis if it had accepted the data), Commerce was not required to do so.  For example, in *PVLT Tires from China 2020*, Commerce issued a supplemental questionnaire after briefing was originally completed, and the parties filed supplemental briefs regarding the impacted program less than three weeks after the response was filed without any interim analysis by Commerce.  As an additional example, in the review at issue here, Commerce failed to make any preliminary finding with respect to specificity for the electricity for LTAR program in the *Preliminary Results*, *PDM* 24-30 (P.R.183), yet the parties were still able to brief that issue.  Thus, Commerce was neither required to postpone the briefing and its consideration of the other issues in this review while it considered the KEPCO cost data nor obligated to issue a post-preliminary analysis that would have further delayed briefing regarding the KEPCO cost data.

Finally, while Commerce noted that it does not have any obligation to "collect incomplete, unaudited, or unfinalized data," *Final Results IDM* at 11, this cannot be a valid reason for Commerce not accepting the KEPCO 2021 cost data as the GOK had already notified Commerce on April 26, 2023 that "KEPCO's cost and sales data for 2021 will be finalized before the end of this week (April 28th)."  Letter from Yoon & Yang LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Request for Supplemental Questionnaire" (April 26, 2023).

In sum, at the time the 2021 KEPCO cost data were offered—whether in mid-March 2023 or the end of April 2023—Commerce had more than enough time to consider the data and timely issue the *Final Results*.

### B.    Commerce's Refusal to Consider the 2021 KEPCO Cost Data Resulted in an Inaccurate Determination

As Commerce itself acknowledged in the *Final Results*, and as evidenced by Commerce's practice of using KEPCO cost data to analyze the adequacy of Korean electricity prices, it needed the 2021 KEPCO cost data to reach an accurate determination.  By failing to accept the 2021 KEPCO cost data and resorting instead to facts available, Commerce relied on data that had little probative value as to whether the GOK provided electricity to Hyundai Steel for LTAR and significantly overstated any benefit that may have been received by Hyundai Steel.

When Commerce assesses whether goods or services are provided for LTAR, "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review."  19 U.S.C. § 1677(5)(E).  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*  Hyundai Steel purchased electricity according to the Industrial B tariff schedule to manufacture subject

merchandise.  GOK IQR at 40 (C.R.29/P.R.60).  KEPCO charged different electricity rates to different kinds of users.  *Id.* at 27, Exhibit E-10 (C.R.43/P.R.70).  The cost of supplying electricity to particular customer classifications also varied.  *Id.* at 28 (C.R.29/P.R.60).  As a result, the cost-recovery rates differ by customer classifications.

For example, in 2020, KEPCO's cost-recovery rate (inclusive of a rate of return) for the industrial classification was **[       ]** percent, which was the **[       ]** among all classifications, while the recovery rate for certain other classifications was **[              ]**.  GOK IQR at 27, 32-33 (C.R.29/P.R.60).  KEPCO's overall cost-recovery rate in 2020 was **[      ]** percent, which was **[            ]** than the cost-recovery rate for the industrial classification.  *Id.* at 32-33.  The 2019 data show a similar pattern.  Again, the cost-recovery rate was **[       ]** for the industrial classification.  *Id.* at 33-34.  The cost-recovery rate for the industrial classification was **[     ]** percent, while the weighted-average cost-recovery rate 2019 was **[      ]** percent.  *Id.*[7] Thus, KEPCO earned more than an adequate rate of return on its sales of electricity to industrial users, despite an overall loss.  KEPCO similarly showed a loss in 2018, but Commerce nevertheless found during the 2018 period of review that the prices charged to industrial users like Hyundai Steel reflected adequate remuneration.  *See, e.g., id.* at 26 (explaining that KEPCO suffered a loss in 2018); *Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 40,465 (July 28, 2021), and accompanying Issues and Decision Memorandum at Comment 1 (finding KEPCO's prices to industrial users to recover costs and a rate of return in 2018).  Commerce has even found a one-year overall loss by KEPCO to be insufficient evidence upon which to initiate

---

[7] This figure is calculated by summing the cost for each classification, the revenue for each classification, and dividing total revenue by total cost.

an investigation into allegations that electricity is provided for LTAR, which has a lower evidentiary standard than a finding that a good was in fact provided for LTAR. *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Mar. 22, 2021), and accompanying Issues and Decision Memorandum at 23.

Commerce was thus aware that KEPCO's cost recovery for sales to industrial users is significantly higher than KEPCO's overall cost recovery, and that KEPCO suffering an overall loss is of very little probative value as to whether electricity provided to industrial users is for LTAR. Commerce also noted in the Preliminary Decision Memorandum that the KEPCO cost data would allow Commerce to determine cost recovery "as it relates to the industrial tariff class." *PDM* at 29-30 (P.R.183). Commerce explained that it "has consistently relied on this information in order to determine whether KEPCO is providing electricity for LTAR." *Id.* at 10-11. Commerce further explained that it resorted to using FA to determine whether electricity was provided for LTAR because "necessary information is not available on the record." *Id.* at 11; *see also Final Results IDM* at 13 (P.R.222) ("{B}ecause the GOK did not provide the KEPCO 2021 cost data, we were unable to conduct an analysis of whether the 2021 electricity prices were set in accordance with market principles . . . ."). Commerce thus recognized that the KEPCO 2021 cost data were "necessary" for an accurate determination in this review, consistent with its prior determinations to use the KEPCO data to analyze cost recovery and benefit. Yet, Commerce refused to accept the information that was necessary for an accurate determination despite having time to consider such data, and instead relied on data that it knew bore little relation to the adequacy of the electricity tariffs that were actually paid by Hyundai Steel.

By using KEPCO's overall cost-recovery rate, Commerce ignored prevailing market conditions, relied on evidence that it had previously found to offer little probative value as to whether electricity is provided for LTAR, and significantly inflated any benefit for Hyundai Steel.  Commerce could have avoided such an inaccurate determination by accepting the 2021 KEPCO cost data.  The 2021 KEPCO cost data, even in only a substantially finalized form as first offered to Commerce on March 14, 2023, would have allowed Commerce to make a more accurate determination than the overall cost-recovery data Commerce relied upon, which bore only a minimal relationship to the electricity rates paid by Hyundai Steel.  And Commerce was offered the finalized and audited data in late April 2023, four months before the *Final Results*, which would have enabled Commerce to reach the most accurate determination possible.  In this situation, the interests in accuracy and fairness that would have been served by accepting the 2021 KEPCO cost data vastly outweighed any interest in finality and the burden on Commerce in accepting that information.  Commerce accordingly abused its discretion in refusing to accept the 2021 KEPCO cost data.

## CONCLUSION

For the reasons discussed above, Commerce's *Final Results* are not supported by substantial evidence or otherwise in accordance with law.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Daniel M. Witkowski
Devin S. Sikes
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: April 2, 2024                    *Counsel for the Government of the Republic of Korea*

22

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that the forgoing Memorandum in Support of Hyundai Steel's Rule 56.2 Motion for Judgment on the Agency Record, dated, complies with the word-count limitation set forth in the Court's January 12, 2024 Scheduling Order.  The memorandum of law contains 6,351 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
Dated: April 2, 2024                                          *Counsel for the Government of the Republic of Korea*