NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>     Plaintiff,<br><br>  and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>     Plaintiff-Intervenor,<br><br>  v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>  and<br><br>NUCOR CORPORATION,<br><br>     Defendant-Intervenor. | Before: Hon. Claire R. Kelly,<br>    Judge<br><br>Court No. 23-00211<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information<br>Removed from Pages: 3, 5, 12, 14-19 |

## DEFENDANT-INTERVENOR NUCOR CORPORATION RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Paul A. Devamithran, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Corporation*

Dated: June 24, 2024

Ct. No. 23-00211                                              NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    RULE 56.2 STATEMENT ................................................................................... 2

    A.     Administrative Decision Under Review ................................................. 2

    B.     Issues Presented ..................................................................................... 2

III.   STATEMENT OF FACTS .................................................................................. 4

    A.     Introduction ............................................................................................ 4

    B.     KEPCO Cost Data .................................................................................. 5

    C.     Specificity .............................................................................................. 7

IV.    Standard of Review ............................................................................................ 8

V.     Argument ........................................................................................................... 9

    A.     Commerce Properly Refused to Accept the GOK's Untimely
        Submission of KEPCO's 2021 Cost Data ............................................. 9

    B.     The GOK's Provision of Electricity for LTAR Is Specific ................... 14

Ct. No. 23-00211                                                     NON-CONFIDENTIAL VERSION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp. v. United States,*
   192 F.3d 1367 (Fed. Cir. 1999)................................................................15

*ArcelorMittal USA LLC v. United States,*
   399 F.Supp.3d 1271 (Ct. Int'l Trade 2019) ..............................................13

*Bethlehem Steel Corp. v. United States,*
   25 CIT 307, 140 F.Supp.2d 1354 (2001) ..................................................15

*Canadian Solar Inc. v. United States,*
   Consol. Ct. No. 19-00178, slip op. 22-49 (Ct. Int'l Trade May 19, 2022) ..............................20

*Ceramica Regiomontana, S.A. v. United States,*
   810 F.2d 1137 (Fed. Cir. 1987)..................................................................8

*Changzhou Trina Solar Energy Co. v. United States,*
   466 F.Supp.3d 1287 (Ct. Int'l Trade 2020) ..............................................20

*Consol. Fibers, Inc. v. United States,*
   32 CIT 24, 535 F.Supp.2d 1345 (2008) ....................................................9

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ...................................................................................8

*Deacero S.A.P.I. de C.V. v. United States,*
   996 F.3d 1283 (Fed. Cir. 2021)................................................................11

*Dongtai Peak Honey Indus. Co. v. United States,*
   38 CIT 334, 971 F.Supp.2d 1234 (2014), *aff'd*, 777 F.3d 1343 (Fed. Cir. 2015) ..........................................................................................8, 9

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996)....................................................................8

*INS v. Elias-Zacarias,*
   502 U.S. 478 (1992)....................................................................................8

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
   38 CIT 1632, 28 F.Supp.3d 1317 (2014) ..................................................9

*Linyi Chengen Imp. and Exp. Co. v. United States,*
   391 F.Supp.3d 1283 (Ct. Int'l Trade 2019) ......................................12, 13

i

Ct. No. 23-00211                                                          NON-CONFIDENTIAL VERSION

*Matsushita Elec. Indus. Co. v United States,*
    750 F.2d 927 (Fed. Cir. 1984)..................................................................................8

*Mosaic Co. v. United States,*
    589 F.Supp.3d 1298 (Ct. Int'l Trade 2022) ............................................................20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..........................................................................................8, 9

*Shandong Dongfang Bayley Wood Co. v. United States,*
    375 F.Supp.3d 1339 (Ct. Int'l Trade 2019) .........................................................12

*Tatung Co. v. United States,*
    18 CIT 1137 (1994) ........................................................................................13

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ........................................................................................8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).....................................................................................8

19 U.S.C. § 1677(5A)(D)...........................................................................14, 17, 21

19 U.S.C. § 1677(5A)(D)(iii)....................................................................................14

**Regulations**

19 C.F.R. § 351.301(c)(1) ......................................................................................12

19 C.F.R. § 351.502(a)...........................................................................................17

19 C.F.R. § 351.502(b) ..........................................................................................17

**Administrative Materials**

*Certain Aluminum Foil from the Sultanate of Oman,*
    86 Fed. Reg. 52,888 (Dep't Commerce Sept. 23, 2021).........................................20

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea,*
    88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ...................................18, 19

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea,*
    89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024) ..........................................19

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
    89 Fed. Reg. 6,500 (Dep't Commerce Feb. 1, 2024)............................................19

Ct. No. 23-00211                                                    **NON-CONFIDENTIAL VERSION**

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea,*
    87 Fed. Reg. 79 (Dep't Commerce Jan. 3, 2022) .......................................................4

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea,*
    87 Fed. Reg. 53,728 (Dep't Commerce Sept. 1, 2022).............................................4

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea,*
    89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) ..........................................19

*Certain Steel Nails from Thailand,*
    87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022)..........................................20

*Large Diameter Welded Pipe from the Republic of Korea,*
    88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) ...........................................19

*Multilayered Wood Flooring from the People's Republic of China,*
    79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014)...........................................20

Ct. No. 23-00211                                        NON-CONFIDENTIAL VERSION

## I.    <u>INTRODUCTION</u>

On behalf of Defendant-Intervenor Nucor Corporation ("Nucor"), we hereby submit the following response to the March 12, 2024 brief in support of the motion for judgment on the agency record filed by Plaintiff Hyundai Steel Company ("Hyundai Steel" or "Plaintiff"), Pl.'s Br. in Supp. of Pl.'s Mot. for J. on the Agency R. (Mar. 12, 2024), ECF No. 31 ("Pl. Br."), and the April 2, 2024 brief in support of the motion for judgment on the agency record filed by the Government of Korea ("GOK" or "Plaintiff-Intervenor"), Pl.-Intervenor's Br. in Supp. of Pl.'s Mot. for J. on the Agency R. (Apr. 2, 2024), ECF No. 32 ("Plaintiff-Intervenor Br.").  For the reasons discussed in this brief, in conjunction with the arguments presented by Defendant United States, Defendant-Intervenor respectfully requests that this Court reject the arguments raised by Plaintiff and Plaintiff-Intervenor, and affirm aspects of the Final Results of the U.S. Department of Commerce ("Commerce") in the 2021 administrative review of the countervailing duty ("CVD") order on *Certain Cut-to-Length Carbon Quality Steel Plate from the Republic of Korea* ("*CTL from Korea*").

As directed by this Court, Order (Jan. 12, 2024), ECF No. 27, Defendant-Intervenor does not intend to repeat arguments raised by Defendant in its June 3, 2024 brief with respect to Plaintiff's and Plaintiff-Intervenor's arguments on Commerce's decision not to accept untimely filed electricity cost data and Commerce's determination that the electricity for less than adequate remuneration ("LTAR") program is *de facto* specific. Def.'s Resp. to Pls.' Mots. for J. on the Agency R. (June 3, 2024), ECF No. 35 ("Def. Br.").  Nucor concurs with and adopts by reference the arguments made by Defendant with regard to the reasonableness of Commerce's decision not to accept untimely filed electricity cost data and Commerce's determination that the electricity for LTAR program is *de facto* specific.

## II.    RULE 56.2 STATEMENT

### A.    Administrative Decision Under Review

The administrative determination challenged in this appeal is Commerce's Final Results in the 2021 administrative review of the CVD order on *CTL from Korea*.  Issues and Decision Memorandum accompanying *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023) (final results and rescission, in part, of countervailing duty admin. rev.; 2021), P.R. 222 ("IDM").[1]  *See also Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023) (final results and rescission, in part, of countervailing duty admin. rev.; 2021), P.R. 225 ("Final Results").

### B.    Issues Presented

### 1.    Whether Commerce Properly Refused to Accept the GOK's Untimely Submission of KEPCO's 2021 Cost Data?

Yes. Commerce acted within its discretion by properly refusing to accept the GOK's untimely submission of Korean Electric Power Company's ("KEPCO") 2021 cost data. In an administrative review that Commerce initiated in 2022 and published preliminary results in March 2023, Commerce provided the GOK with ample opportunities to submit KEPCO's cost data from calendar year 2021. *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*, 88 Fed. Reg. 13,433 (Dep't Commerce Mar. 3, 2023) (prelim. results and prelim. intent to rescind, in part, the countervailing duty admin. rev.; 2021), P.R. 186 ("Preliminary Results").  Not only did the GOK refuse to offer to provide an unaudited version of the data until after the

---

[1]    Documents on the public record of the underlying administrative review are identified here as "P.R.," followed by the number assigned to the relevant document in the administrative record index filed with the Court on December 13, 2023.  Documents in the confidential administrative record are identified by name, followed by "C.R." and the corresponding record number.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

publication of the preliminary results in this review (the "Preliminary Results"), the GOK also refused to even provide an estimate of when the data would become available, even though this data should have been incorporated into its audited financial statements for calendar year 2021. In accordance with its long-standing practice of rejecting new factual information after publishing the preliminary results, Commerce properly did not accept the GOK's untimely submission of KEPCO's 2021 cost data and relied on the facts otherwise available. Memorandum from David Lindgren, Program Manager, AD/CVD Operations, Off. III to Interested Parties, re: *Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Communication with Counsel* (May 10, 2023), P.R. 194 ("Communication with Counsel Memo").

> **2.**      <u>**Whether Commerce Correctly Found That the GOK's Provision of Electricity for LTAR was *De Facto* Specific Given that the Steel Industry Consumed a Disproportionate Amount of the Subsidy?**</u>

Yes. Commerce correctly found that the GOK's provision of electricity for LTAR was *de facto* specific and conferred a countervailable benefit. In an economy with 19 diversified economic industry sectors, Commerce found that the steel industry was the [     ] largest consumer of electricity in Korea. IDM at 15-16. The top 10 industries consuming electricity in the same industrial class represented [     ] of total consumption, and the steel industry represented [     ] of that figure. *Id.*; Letter from Yoon & Yang LLP, to Sec'y Commerce, re: *Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire* (June 27, 2022), C.R. 29, P.R. 60 at 35-36 ("GOK Questionnaire Response"). Commerce properly found that the steel industry was among the top four electricity consuming industries, which consumed more than [     ] (*i.e.*, a disproportionate amount) of the subsidized electricity under this tariff category. IDM at 15-16. Thus, the GOK's

NON-CONFIDENTIAL VERSION

provision of electricity for LTAR is plainly *de facto* specific and Commerce's path may reasonably be discerned from its final results.

## III.    STATEMENT OF FACTS

### A.    Introduction

Commerce initiated an administrative review of the countervailing duty order on CTL Plate from Korea covering the 2021 period of review on April 12, 2022 and selected Hyundai Steel as the mandatory respondent. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 21,619 (Dep't Commerce Apr. 12, 2022), P.R. 13; Letter from Stephanie Berger, Int'l Trade Compliance Analyst, Off. III, AD/CVD Operations, through Peter Zukowski, Program Manager, Off. III, AD/CVD Operations, to Erin Begnal, Dir. Off III, AD/ CVD Operations, re: *Administrative Review of the Countervailing Duty Order of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Respondent Selection* (May 2, 2022), C.R. 5, P.R. 21. Commerce evaluated the provision of electricity for LTAR subsidy program, as the agency had done for the administrative reviews covering the two prior periods of review, *i.e.*, 2019 and 2020. Preliminary Results and accompanying Preliminary Decision Memorandum at 24-30, P.R. 183 ("PDM"). *See also* Issues and Decision Memorandum accompanying *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*, 87 Fed. Reg. 79 (Dep't Commerce Jan. 3, 2022) (final results of countervailing duty admin. rev.; 2019) at 6; Issues and Decision Memorandum accompanying *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea*, 87 Fed. Reg. 53,728 (Dep't Commerce Sept. 1, 2022) (final results, and rescission, in part, of countervailing duty admin. rev.; 2020) at 6. Consistent with its practice, Commerce issued the initial questionnaire to the GOK on May 2, 2022. Letter from Peter Zukowski, Program Manager, AD/CVD Operations, Off. III to Government of Korea, re:

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

*Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Countervailing Duty Questionnaire* (May 2, 2022) at 17-22, P.R. 22 ("Initial Questionnaire").

###    B.    KEPCO Cost Data

In the May 2, 2022 initial questionnaire to the GOK, Commerce requested standard information regarding the provision of electricity for LTAR program. *Id.* Commerce included its usual request for the data necessary to evaluate the provision of electricity in Korea, including KEPCO's cost data for 2021, without which Commerce is unable to verify the costs associated with the generation, distribution, and sale of electricity in Korea to companies like Hyundai Steel during the period of review. *Id.* at 22.

On June 27, 2022, the GOK responded to Commerce's initial questionnaire and claimed that it was unable to provide the 2021 cost data because it was not yet completed but stated that cost data is generally completed at the end of the succeeding year, *i.e.*, the end of 2022. GOK Questionnaire Response at 27, 32, 35, 45. The GOK provided KEPCO's 2020 cost data instead, which was not contemporaneous with the POR. *Id.* at 45 (citing Exhibit E-9 (C.R. 65)). Based on its non-contemporaneous 2020 data, the GOK explained that "with regard to the supply of electricity to general and industrial class consumers, the GOK notes that the revenue earned from supplying electricity to these consumers was [            ] to cover the costs and expenses incurred." *Id.* at 35.

Commerce requested the 2021 data two additional times, on January 11, 2023 and January 31, 2023, and each time the GOK failed to provide the relevant data. *See* Letter from Peter Zukowski, Program Manager, Off. III, Ad/CVD Duty Operations, Enf't & Compliance, to Hyundai Steel Company, re: *Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Hyundai Steel Secon Supplemental*

NON-CONFIDENTIAL VERSION

*Questionnaire* (Jan. 11, 2023) at 2, P.R. 159 ; Letter from Yoon & Yang LLC to Sec'y Commerce, re: *Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Supplemental Questionnaire* (Jan. 30, 2023) at 2, C.R. 238, P.R. 170; Letter from David Lindgren, Program Manager, Off. III to Government of Korea, re: *Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: GOK Third Supplemental Questionnaire* (Jan. 31, 2023) at 1, P.R. 174 ("Third Supplemental Questionnaire"). Letter from Yoon & Yang LLC to Sec'y Commerce, re: *Countervailing Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Response to the Supplemental Questionnaire* (Feb. 6, 2023) at 1-2, P.R. 175 ("GOK Third SQR").

On February 6, 2023, when failing for the third time to provide KEPCO's cost data, the GOK supplied instead KEPCO Audited Unconsolidated Financial Statements for the years ended December 31, 2021 and 2020, with the independent auditor's report attached. GOK Third SQR at Exhibit UFSKEPCO. KEPCO's Audited Unconsolidated Financial Statement covering the year 2022 is dated March 14, 2022—predating the issuance of the initial questionnaire and Commerce's first request for KEPCO's cost data by two months, and predating the GOK's latest refusal to supply KEPCO's cost data by almost an entire year. *Id*. In preparing KEPCO's Audited financial statements, its auditors "obtained the Company's business plan and external data for major unobservable inputs such as future sales volumes, unit sales price and cost of power purchase. . ." among other financial indicators. *Id*. KEPCO's 2021 financial statements showed a loss for the year of 5.6 trillion won compared to KEPCO's 1.9 trillion won profit for calendar year 2020. *Id*.

On March 3, 2023, Commerce published its preliminary results—using facts otherwise available due to the GOK's repeated failure to provide KEPCO 2021 cost data—to calculate a net

countervailable subsidy rate of 1.10% for Hyundai Steel. *Preliminary Results*, 88 Fed. Reg. 13,433; PDM at 4. Specifically, Commerce relied on "cost and sales data from KEPCO's 2021 unconsolidated financial statements" and "information contained in KEPCO's 20-F disclosure form filed with the U.S. Securities and Exchange Commission (SEC)." PDM at 11.

On March 14, 2023, shortly after Commerce issued the preliminary results, the GOK contacted Commerce claiming that the 2021 cost data was "substantially complete" and available to collect. Communication with Counsel Memo at Attachment 1. The GOK reiterated this request for Commerce to collect the 2021 cost data on April 26, 2023. Letter from Yoon & Yang LLC to Sec'y Commerce, re: *Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Request for Supplemental Questionnaire* (Apr. 26, 2023), P.R. 190.

Commerce declined to request the untimely 2021 cost data, explaining that Commerce had requested the data several times throughout the review, had provided ample time for the GOK to supply it, and that it was now too late in the proceeding to consider the data and provide an opportunity for comment. Communication with Counsel Memo.

On September 7, 2023, Commerce published its final results, continuing to rely on facts available and assigning Hyundai a net countervailable subsidy rate of 1.08 percent. *Final Results*, 88 Fed. Reg. 61,509; IDM at 4.

## C. <u>Specificity</u>

Nucor adopts Defendant's detailed statement of facts concerning Commerce's review of the provision for electricity for LTAR subsidy program and finding of specificity. Def. Br. at 3-10. To the extent that additional facts not mentioned by the Defendant are relevant to Nucor's arguments, they are discussed within the context of the arguments set forth in this brief. Nucor adopts Defendant's detailed statement of facts. *Id.* To the extent that additional facts not mentioned by

the Defendant are relevant to Nucor's arguments, they are discussed within the context of the arguments set forth in this brief.

## IV.    STANDARD OF REVIEW

This Court reviews Commerce's decisions in CVD proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). *See also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). *See also Dongtai Peak Honey Indus. Co. v. United States*, 38 CIT 334, 336, 971 F.Supp.2d 1234, 1239 (2014), *aff'd*, 777 F.3d 1343, 1349 (Fed. Cir. 2015).

A plaintiff cannot ask the court to re-weigh the evidence on the record and decide the case for Commerce. *See Matsushita Elec. Indus. Co. v United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Factual findings by Commerce are afforded considerable deference. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). In addition, the court "uphold{s} a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce

Ct. No. 23-00211                                                    NON-CONFIDENTIAL VERSION

need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle M,frs. Ass'n*, 463 U.S. at 43 (citation omitted).

Moreover, in determining whether Commerce's decisions in CVD proceedings are "unsupported by substantial evidence on the record, or otherwise not in accordance with law," this Court reviews the agency's conduct under the abuse of discretion standard. *See Dongtai Peak*, 38 CIT at 336, 971 F.Supp.2d at 1239; *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT 1632, 1634-35, 28 F.Supp.3d 1317, 1323 (2014). Accordingly, the Court has recognized that it "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 32 CIT 24, 35-36, 535 F.Supp.2d 1345, 1354 (2008).

## V.    **ARGUMENT**

### A.    **Commerce Properly Refused to Accept the GOK's Untimely Submission of KEPCO's 2021 Cost Data**

In its Preliminary Results, Commerce correctly rejected the GOK's untimely submission of KEPCO's 2021 Cost Data. The GOK reported a significant change in its electricity tariff system whereby beginning on January 2021, "tariffs may be adjusted for fluctuations in fuel costs on a quarterly basis." PDM at 10 (citation omitted). As a result, "electricity tariffs are now somewhat dynamic, based on quarterly fluctuations in fuel costs." *Id.* (citation omitted). Consistent with its long-time practice in prior reviews of this and other orders, Commerce requested data, including KEPCO's annual cost report, on the annual costs associated with generation, distribution, and sales of electricity in Korea for 2021. Initial Questionnaire at 17-22. Commerce requested the 2021 data three times, and each time the GOK failed to provide the relevant data, instead only providing cost

9

data for 2020. GOK Questionnaire Response. The GOK also had an opportunity to submit the data pursuant to the all other factual information deadline. Not only was the 2020 data not contemporaneous with the period of review ("POR"), it also obviously did not reflect the changes that apparently took effect in January 2021. *Id.* at 20. In its last request for the 2021 data, on January 31, 2023, Commerce requested an estimate of when 2021 data would be ready and the GOK failed to provide even that. *See* Third Supplemental Questionnaire; *see also* GOK Third SQR. Only after months of delays and after assessing Commerce's Preliminary Results wherein Commerce used KEPCO's SEC data as facts available did the GOK eventually offer to provide the data on March 12, 2023. Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, Case No. C-580-837: Hyundai Steel's Case Brief* (May 25, 2023) at 20, C.R. 266, P.R. 207. Again, cost data that should have been prepared and audited in early 2022 was not even offered until the week after receiving public notice of Commerce's Preliminary Results.

It is important to note the context in which the GOK withheld KEPCO's cost data during this administrative review period. It is undisputed that KEPCO prepared and submitted audited financial statements, which included the cost of goods sold (*i.e.*, electricity generation costs) and revenue (*i.e.*, electricity sales), for the calendar year 2021 by March 14, 2022. GOK Second Supplemental Response at 1-2 (Feb. 6, 2023) at Exhibit UFSKEPCO, P.R. 175. As a publicly traded company, the electricity cost data that was used as the basis for its calendar year 2021 audited financial statements, and incorporated into those statements, should have been prepared and verified if they formed the basis of KEPCO's costs and revenue. *Id.* (noting that the auditors "obtained the Company's business plan and external data for major unobservable inputs such as future sales volumes, unit sales price and cost of power purchase. . ." among other financial

indicators.) But in its initial questionnaire filed on June 27, 2022 (more than two months after its complete audited financial statements were filed with the SEC), the GOK claimed that KEPCO's 2021 cost data was not ready to be submitted but asserted that data from 2020 showed that electricity tariffs charged for the type of electricity that Hyundai Steel consumes covered costs by 114%. GOK Questionnaire Response at 35. That is, the GOK provided non-contemporaneous information that attempted to show that the subsidized electricity program provided no benefit to the steel industry based on KEPCO's cost recovery rates in 2020.  But unlike calendar year 2020, KEPCO experienced massive losses during calendar year 2021. GOK Second Supplemental Response at 1-2 (Feb. 6, 2023) at Exhibit UFSKEPCO, P.R. 175. (KEPCO's 2021 financial statements showed a *loss* for the year of 5.6 trillion won compared to KEPCO's 1.9 trillion won *profit* for calendar year 2020.) (emphasis added) With a 5.6 trillion won loss in 2021,  the GOK knew or should have known that the tariff rates charged during the POR were unlikely to cover its costs for the categories of electricity that Hyundai consumed and should have been forthcoming to Commerce in explaining the current situation in its initial questionnaire. *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1298 (Fed. Cir. 2021) ("Deacero IV") (noting that facts available is appropriate when it is "reasonable for Commerce to expect that more forthcoming responses should have been made"). Indeed, just as the GOK provided irrelevant non-contemporaneous 2020 data for KEPCO, the GOK could have easily described the contents of unverified 2021 data in narrative form but chose not to do so.  As a result, the GOK slow-rolled the release of KEPCO's 2021 electricity cost data, claiming that it was still undergoing verification nearly a year after it submitted audited financial statements to Korean and U.S. financial regulators. GOK Second Supplemental Response at 1-2 (Feb. 6, 2023) at Exhibit UFSKEPCO, P.R. 175.

**BUSINESS PROPRIETARY INFORMATION**
                                                      **HAS BEEN DELETED**

This context is important because had the GOK been successful in its delay, Commerce would have relied on the 2020 data [                                                  ] and Commerce would have inappropriately found that the electricity for LTAR program provided no benefit to Hyundai Steel. Given that the deadline to submit new factual information had already elapsed, the GOK would have had no incentive, and in fact, have been under no obligation to submit KEPCO's updated 2021 cost data for Commerce to incorporate into the final results. And as Commerce explained in its final results, the agency did not have sufficient bandwidth to examine new cost data from KEPCO at this late stage in the proceeding. *See* IDM at 11. This is gamesmanship. To be clear, it wasn't until Commerce issued unfavorable preliminary results that the GOK then suddenly offered to submit an incomplete version of the cost data to attempt to try and obtain a better outcome. And even then, the document was not fully complete. Commerce must be able to protect the integrity of its proceedings, and Hyundai Steel's claim that Commerce should have issued another supplemental questionnaire to allow the GOK to place new factual information on the record evidence after the preliminary is not supported by the regulations, the statute, or the law.

Commerce's refusal to accept the GOK's untimely submission of KEPCO's 2021 cost data is wholly consistent with its long-established practice as affirmed by the courts. Commerce's regulations are clear regarding the treatment of untimely filed data that is responsive to questionnaires: "{t}he Secretary will reject any untimely filed or unsolicited questionnaire response." 19 C.F.R. § 351.301(c)(1). Moreover, Commerce is not required to accept later filed information after a respondent fails to cooperate with Commerce's requests. *See Linyi Chengen Imp. and Exp. Co. v. United States*, 391 F.Supp.3d 1283, 1299-1300 (Ct. Int'l Trade 2019); *see also Shandong Dongfang Bayley Wood Co. v. United States*, 375 F.Supp.3d 1339, 1347-48 (Ct. Int'l Trade 2019). For example, in *Linyi Chengen*, the CIT upheld Commerce's decision to

disregard information that was offered to cure deficient reporting in initial and supplemental questionnaires. *Linyi Chengen*, 391 F.Supp.3d at 1299-1300.  Commerce is rightfully especially wary of new factual information submitted <u>after</u> the agency's publication of its Preliminary Results, as was the case here. *See, e.g.*, *Tatung Co. v. United States*, 18 CIT 1137, 1140 (1994) (stating that "{d}ue to stringent time deadlines and the significant limitations on Commerce's resources, it is vital that accurate information be provided promptly to allow the agency sufficient time for review") (citation omitted).

"Strict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation of its decision," which Commerce provided here. *ArcelorMittal USA LLC v. United States*, 399 F.Supp.3d 1271, 1279 (Ct. Int'l Trade 2019) (citations omitted).  Commerce explained that despite repeated requests for KEPCO's 2021 cost data, the GOK only offered to submit a "substantially complete," *i.e.*, incomplete, version of the data after the Preliminary Results. Communication with Counsel Memo at 1. The agency determined not to solicit the incomplete data "because (1) the cost data were not fully audited; and (2) insufficient time remains in the review to collect and fully analyze any final cost data." *Id.* Commerce went on to explain in detail that "regardless of the current status of the 2021 KEPCO cost data, we determined that there was not sufficient time in the instant review to collect and analyze the data in question within the statutory deadlines {sic}." *Id.* Specifically, Commerce noted first, that it was analyzing and addressing the new subsidy allegation timely-filed by Petitioners and second, that collecting and analyzing an entirely new data set would require significant time and would delay the proceeding if subsequent questionnaires were required and the requisite opportunities to comment were provided. *Id.* Commerce reasonably concluded that "the notification from the GOK's counsel arrived too late in the segment and we therefore have

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

declined to collect or consider the additional information for the final results." *Id.* Thus, Commerce offered a thorough explanation for why it refused to accept the GOK's untimely submission of KEPCO's 2021 cost data, and its refusal is neither arbitrary nor an abuse of discretion.

      **B.**     **The GOK's Provision of Electricity for LTAR Is Specific**

      Commerce properly found that the provision of electricity for LTAR is *de facto* specific in this administrative review.  The statute provides that a subsidy is *de facto* specific when: (i) the actual recipients are limited in number; (ii) and enterprise or industry is a predominant user of the subsidy; (iii) an enterprise or industry receives a disproportionate amount of the subsidy; or (iv) the subsidizing authority favors an enterprise or industry over others in granting the subsidy. 19 U.S.C. § 1677(5A)(D)(iii).  For the *de facto* specificity analysis, the term "enterprise or industry" includes a group of enterprises or industries. *Id.* § 1677(5A)(D). The statute also requires Commerce to consider "the extent of diversification of economic activities within the jurisdiction . . . ." *Id.* § 1677(5A)(D).

      In its final results, Commerce found that the provision of electricity for LTAR is *de facto* specific because "the steel industry and three other industries combined consume a disproportionately large amount of electricity in Korea" and thus received a disproportionately large amount of the subsidy. IDM at 16. By the GOK's own admission, the steel industry in Korea [

                                                               ]. *See* GOK Questionnaire Response at 35-36. That is, in an economy with at least [        ] economic industry sectors, Commerce found that the steel industry was the [   ] largest consumer of electricity in Korea. *See id.* Commerce properly found that the steel industry was among the top four electricity consuming industries (all of which were manufacturing industries), which consumed more

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

than [     ] (*i.e.*, a disproportionate amount) of the subsidized electricity under this tariff category. As such, Commerce's path may reasonably be discerned from its final results.

In arguing that Commerce's *de facto* specificity analysis was unlawful, the Plaintiff relies heavily on the Court of International Trade's decision in *Bethlehem Steel Corp. v. United States*, but that case is inapplicable here. As the Federal Circuit has explained, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999). The determination at issue in *Bethlehem Steel* did not involve an adequacy of remuneration subsidy. Instead, it addressed a "voluntary curtailment" program in which the GOK automatically provided identical price discounts to general, educational, or industrial users that voluntarily agreed to curtail electricity consumption by at least 20%.[2] *Bethlehem Steel Corp. v. United States*, 25 CIT 307, 319-20, 140 F.Supp.2d 1354, 1367 (2001). Here, in contrast, the issue is an LTAR subsidy in which the benefit amounts are necessarily tied to the individual pricing and consumption patterns of individual companies and the type of electricity consumed. Benefits will vary, for example, depending on which industrial tariff classification applies to a certain enterprise or industry or what times of day or times of year the enterprise or industry consumes electricity. *See* GOK Questionnaire Response at Exhibit E-10. Indeed, that is why Commerce's benchmark analysis focuses on industrial tariff rates and compares the rates to when Hyundai Steel actually consumes the electricity.

---

[2]     Nucor notes that the program *in Bethlehem Steel* is similar to the subsidy program reviewed in this proceeding named the "Electricity Discounts under Trading of Demand Response Resources Program," where Commerce routinely finds that the program is countervailable, and the respondents do not challenge the specificity analysis there.

BUSINESS PROPRIETARY INFORMATION
                          HAS BEEN DELETED

In this context, it is unreasonable to say that the consumption volumes of a beneficiary industry or enterprise are necessarily or inherently greater than that of other industries or enterprises. That is because consumption volumes are directly tied to prices paid – *i.e.*, an industry or enterprise benefitting from an LTAR subsidy is likely to consume more of the subsidized input than it otherwise would in large part because it is being subsidized. Accepting the argument that a determination of *de facto* specificity based on disproportionate or predominant use may not be based on relative consumption volumes would effectively nullify those provisions for the purpose of adequate remuneration programs.

For the purpose of an adequate remuneration program in a highly diversified economy, the fact that [                                                                    ] of industrial electricity consumption is compelling evidence of disproportionate benefit. GOK Questionnaire Response at 35-36. There is also evidence on the record that certain individual steel producers alone benefitted disproportionately from the provision of electricity for LTAR. In its initial questionnaire response, the GOK provided a list of the top 100 industrial consumers of electricity by facility. *Id.* at Exhibit E-11. While the GOK did not identify any companies on the list other than the respondents or the industries in which they operate, the list shows that [                                    ] accounted for [                    ] of total industrial electricity consumption during the POR. *Id.* According to the Commerce's economic diversification memo, there were more than 400,000 manufacturing establishments operating in Korea during the POR. Memorandum Stephanie Berger, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. III to The File, re: *Administrative Review of the Countervailing Duty Order of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Placement of Korea Economic Diversification Memorandum on the Record* (May 3, 2022) at 2, P.R. 24. That [                                    ] amounted to [                ] of total

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

industrial consumption in an economy of more than 400,000 manufacturing establishments is additional evidence of disproportionate benefit.

The Plaintiffs also suggest that it is unlawful for Commerce to base a disproportionality finding on the combined consumption of a small group of industries or enterprises. Pl. Br. at 18-19; Plaintiff-Intervenor Br. at 5-6. This argument is contrary to the plain language of the statute and should be rejected.  The statute states explicitly that "any reference to an enterprise or industry . . . includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D) (emphasis added).  The GOK does not explain how its argument that Commerce must base its *de facto* specific analysis on the steel industry alone makes sense in light of this clear statutory language.

Plaintiffs accuse Commerce of arbitrary and capricious "gerrymandering to reach a desired result" and argue that, even based on this purportedly "arbitrary grouping" of industries, the record does not support a finding of disproportionality. Pl. Br. at 19-20. Neither argument is persuasive.

First, there is nothing arbitrary or capricious about Commerce conclusion.  Commerce found that four industries in a highly diversified economy is a small enough group to constitute a relevant group of industries or enterprises within the meaning of the statute, and that [

] by such a small number of industries constitutes disproportionate use. IDM at 15-16. These are both reasonable factual determinations that Commerce is required to make in conducting its sequential specificity analysis. 19 C.F.R. § 351.502(a).  *See also id.* § 351.502(b) (explaining that Commerce's analysis of specificity based on a "group" of industries or enterprises does not depend on "whether there are shared characteristics among the enterprises or industries . . . ."). Under Plaintiff's reasoning, effectively any finding of disproportionate use by a group of industries or enterprises would be arbitrary and capricious "gerrymandering."

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Second, Plaintiff bases their arguments on total electricity consumption, rather than on industrial electricity consumption.  They argue that, considering total consumption rather than industrial consumption, the percentage used by the four industries is [      ] of all consumption. Pl. Br. at 20.  As Commerce has recently explained, "this program encompasses the provision of *industrial* electricity for LTAR and our specificity analysis was based on disproportionate consumption of industrial electricity by the steel industry and others." Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) (final results of countervailing duty admin. rev.; 2021) at 25. There is also no basis to conclude that a disproportionality finding requires use exceeding any specific threshold.  The fact that four industries alone account for [          ] of all electricity demand in Korea supports rather than undermines Commerce's finding.

Furthermore, Commerce's disproportionality finding has to be relative to something else. On its face, Commerce's finding that the steel industry is the [          ] consumer of electricity in Korea relative to [      ] other Korean industries is prima facie evidence of disproportionality. IDM at 15-16. That four of those 10 industries consume more than [     ] of Korean industrial electricity is further evidence of disproportionate consumption. GOK Questionnaire Response at 35-36.  Citing to the GOK's initial questionnaire listing the top ten consumers of total electricity and industrial electricity, Commerce's finding of disproportionality is reasonably discerned from the chart showing that the steel industry consumed [      ] more electricity than the [          ] industry, and between [     ]% and [     ]% more electricity than the fifth through tenth largest industries in Korea. *Id.*; IDM at 15-16. By itself, the steel industry consumes a disproportionate amount of subsidized electricity relative to other Korean

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**          NON-CONFIDENTIAL VERSION

manufacturing industries.  By appropriately combining the top four industries and referencing the

[          ] on page 35 of its initial questionnaire response, Commerce demonstrates that no

other combination of industries comes close to the large manufacturing industries consuming

subsidized energy. *See* GOK Questionnaire Response at 35; *see also* IDM at 15.

In its brief, Plaintiff also argues that electricity is broadly available and widely used such that

the subsidy cannot be specific.  Pl. Br. at 16-17. But this line of argumentation seeks to paint the

provision of electricity as general infrastructure or a good/service, which the courts have rejected.

Commerce has found that the provision of electricity for LTAR, as well as other energy inputs, to be

countervailable, and thus specific, in numerous cases, including proceedings involving Korea. *See,*

*e.g.*, Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products*

*from the Republic of Korea*, 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) (final results

of countervailing duty admin. rev.; 2021) at cmt. 4; Issues and Decision Memorandum

accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg.

15,124 (Dep't Commerce Mar. 1, 2024) (final results of countervailing duty admin. rev.; 2021) at

cmt. 4; Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel*

*Products from the Republic of Korea*, 89 Fed. Reg. 6,500 (Dep't Commerce Feb. 1, 2024) (final

results of countervailing duty admin. rev.; 2021) at cmt. 1; Issues and Decision Memorandum

accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*,

88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) (final results of countervailing duty admin.

rev.; 2021) at cmt. 1; Issues and Decision Memorandum accompanying *Large Diameter Welded*

*Pipe from the Republic of Korea*, 88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) (final

results of countervailing duty admin. rev.; 2021) at cmt. 2. Commerce has also found the provision

of electricity for LTAR to be specific in proceedings involving other countries. *See, e.g.,* Issues

and Decision Memorandum accompanying *Certain Steel Nails from Thailand*, 87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022) (final deter. of countervailing duty inv.) at cmt. 2; Issues and Decision Memorandum accompanying *Certain Aluminum Foil from the Sultanate of Oman*, 86 Fed. Reg. 52,888 (Dep't Commerce Sept. 23, 2021) (final deter. of countervailing duty inv.) at cmt. 4; Issues and Decision Memorandum accompanying *Multilayered Wood Flooring from the People's Republic of China*, 79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014) (final deter. of countervailing duty admin. rev.) at cmt. 3.

Furthermore, the courts have sustained Commerce's findings that electricity and other energy inputs have been found to be specific. *See, e.g.*, *Canadian Solar Inc. v. United States*, Consol. Ct. No. 19-00178, slip op. 22-49 at 5 (Ct. Int'l Trade May 19, 2022) (upholding Commerce's finding that the subsidization of electricity for LTAR from the Government of China was specific); *Changzhou Trina Solar Energy Co. v. United States*, 466 F.Supp.3d 1287, 1303 (Ct. Int'l Trade 2020) (sustaining Commerce's finding that the provision of electricity for LTAR is a specific subsidy); *Mosaic Co. v. United States*, 589 F.Supp.3d 1298, 1309 (Ct. Int'l Trade 2022) (finding that substantial evidence supports Commerce's determination that the provision of natural gas was de facto specific).

NON-CONFIDENTIAL VERSION

Thus, the Court should sustain Commerce's final results determining that the GOK's provision of electricity for LTAR to the "group of . . . industries" for which Hyundai Steel belongs is *de facto* specific. 19 U.S.C. § 1677(5A)(D).

Respectfully submitted,

*/s/ Derick G. Holt*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Paul A. Devamithran, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Corporation*

Dated: June 24, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Nucor Corporation's Response to Motions for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,173 words.

*/s/ Derick G. Holt*
(Signature of Attorney)

Derick G. Holt
(Name of Attorney)

Nucor Corporation
(Representative Of)

June 24, 2024
(Date)