**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

HYUNDAI STEEL COMPANY,

                Plaintiff,

      and

GOVERNMENT OF THE REPUBLIC
OF KOREA,

                Plaintiff-Intervenor,

   v.

UNITED STATES,

               Defendant,

      and

NUCOR CORPORATION,

                Defendant-Intervenor.

**NONCONFIDENTIAL VERSION**
Proprietary Information Removed
from Pages 3, 4, 10, 11, and 13

Ct. No. 23-00211

**PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Avenue, N.W.
Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

July 22, 2024

# <u>TABLE OF CONTENTS</u>

Table of Authorities ..................................................................................................... ii

I.     Argument ....................................................................................................... 2

      A.    Commerce's Determination That KEPCO's Provision of Electricity for LTAR Is De Facto Specific Is Unsupported By Substantial Evidence And Is Otherwise Unlawful. ...................................................................................................... 2

      B.    Commerce's Determination Not To Accept The 2021 Cost Data Is Unsupported By Substantial Evidence, Contrary To Law, And An Abuse Of Discretion......... 13

II.    Conclusion .................................................................................................... 24

Certificate Of Compliance .......................................................................................... 25

Exhibit A ..................................................................................................................... 26

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*American Honey Producers Ass'n v. United States*
653 F. Supp. 3d 1329 (Ct. Int'l Trade 2023) .........................................................................23

*Bethlehem Steel Corp. v. United States,*
140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ................................................................. *passim*

*Changzhou Trina Solar Energy Co. v. United States,*
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .........................................................................11

*Consolidated Bearings Company v. United States,*
412 F.3d 1266 (Fed. Cir. 2005)................................................................................14, 20

*Itochu Building Prods. Co., Inc. v. United States,*
163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ...................................................................10, 24

*Linyi Chengen Import and Export Co. v. United States,*
391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) .........................................................................11

*Loper Bright Enters. v. United States,*
No. 22-451, slip op. (U.S. June 28, 2024) ...............................................................................3

*Mosaic Co. v. United States,*
589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) ...........................................................................8

*NTN Bearing Corp. v. United States,*
74 F.3d 1204 (Fed. Cir. 1995).......................................................................... 14, 16-17

*Papierfabrik August Koehler SE v. Unites States,*
843 F.3d 1373 (Fed. Cir. 2016).............................................................................................14

*Samsung Electronics Co., Ltd. v. United States*
973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ................................................................... 8-10

*Samsung Electronics Co., Ltd. v. United States,*
37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014) .......................................................................9, 10

*SKF USA Inc. v. United States,*
263 F.3d 1369 (Fed. Cir. 2001)..............................................................................................19

*Timken U.S. Corp. v. United States,*
434 F.3d 1345 (Fed. Cir. 2006).......................................................................................14, 20

**Statutes**

19 U.S.C. § 1677(5A)(D)(iii) ................................................................ *passim*

19 U.S.C. § 1677(5)(E)(iv) ...................................................................20

19 U.S.C. § 1677m(d) ...........................................................................15

**Other Authorities**

19 C.F.R. § 351.301(c)(1)(v) ...............................................................23

19 C.F.R. § 351.502 ............................................................................5, 6

19 C.F.R. § 351.511(a)(2)(iii) ..............................................................20

*Certain Aluminum Foil from the People's Republic of China Countervailing Duty*
   *Administrative; 2021,*
   88 Fed. Reg. 75,267 (Nov. 2, 2023) ...............................................19

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:*
   *Final Results of Countervailing Duty Administrative Review; 2020,*
   87 Fed. Reg. 74,597 (Dec. 6, 2022) ...............................................7

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:*
   *Preliminary Results and Preliminary Intent To Rescind, in Part, the*
   *Countervailing Duty Administrative Review; 2021,*
   88 Fed. Reg. 13,433 (Mar. 3, 2023) ...........................................7, 16

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:*
   *Preliminary Results Countervailing Duty Administrative Review; 2020,*
   87 Fed. Reg. 11,688 (Mar. 2, 2022) .............................................17

*Certain Cut-to-Lenth Carbon-Quality Steel Plate from the Republic of Korea:*
   *Final Results of Countervailing Duty Administrative Review; 2020,*
   87 Fed. Reg. 53,728 (Sept. 1, 2022) .............................................21

*Cut-to-Lenth Carbon-Quality Steel Plate from the Republic of Korea: Final*
   *Results of Countervailing Duty Administrative Review; 2019,*
   87 Fed. Reg. 79 (Jan. 3, 2022) ......................................................21

*Ripe Olives from Spain: Final Results of Antidumping Duty Administrative*
   *Review; 2018-2019,*
   86 Fed. Reg. 35,068 (July 1, 2021) ................................................19

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the*
   *Republic of Korea: Final Affirmative Countervailing Duty Determination,*
   86 Fed. Reg. 35,267 (July 2, 2021) ................................................16

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 .........................................5, 12

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

HYUNDAI STEEL COMPANY,

               Plaintiff,

     and

GOVERNMENT OF THE REPUBLIC
OF KOREA,

             Plaintiff-Intervenor,

    v.

UNITED STATES,

             Defendant,

     and

NUCOR CORPORATION,

             Defendant-Intervenor.

**NONCONFIDENTIAL VERSION**
Proprietary Information Removed
from Pages 3, 4, 10, 11, and 13

Ct. No. 23-00211

## PLAINTIFF HYUNDAI STEEL COMPANY'S REPLY BRIEF
## IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade ("USCIT R."),

Plaintiff Hyundai Steel Company ("Hyundai Steel" or "Plaintiff") hereby replies to the response

briefs filed by Defendant, the United States, and Defendant-Intervenor, Nucor Corporation

("Petitioner" or "Defendant-Intervenor"). Def.'s Response Brief, *Hyundai Steel Co. v. United

States*, No. 23-00211 (Ct. Int'l Trade June 3, 2024), ECF No. 34 ("Def. Br."); Def.-Intervenor's

Response Brief, *Hyundai Steel Co., v. United States*, No. 23-00211 (Ct. Int'l Trade June 24,

2024), ECF No. 38 ("Pet'r Br."). For the following reasons, Defendant's and Defendant-

Intervenor's arguments are without merit and should be rejected.

I.    *Argument*

    A.    *Commerce's Determination That KEPCO's Provision of Electricity for LTAR Is De Facto Specific Is Unsupported By Substantial Evidence And Is Otherwise Unlawful.*

In the *Final Results*, the U.S. Department of Commerce ("Commerce") found that the Government of Korea's ("GOK") provision of electricity for less than adequate remuneration ("LTAR") was *de facto* specific under section 771(5A)(D)(iii)(III) of the Act, 19 U.S.C. § 1677(5A)(D)(iii)(III). *Certain Cut-To-Length Carbon Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021* (Dep't Commerce Sept. 7, 2023), PR 225 ("*Final Results*"), and accompanying issues and decision mem. ("IDM") at 16, PR 222. 19 U.S.C. § 1677(5A)(D)(iii)(III) provides that a domestic subsidy is *de facto* specific if "{a}n enterprise or industry receives a disproportionately large amount of the subsidy." To support its conclusion, Commerce relied on GOK data that showed the amount of electricity consumed by the top ten industries, including the steel industry. Letter from Yoon and Yang LLP, "Response to the Initial Questionnaire" at 35-36 (June 27, 2022) CR 29-66, PR 60-85 ("GOK IQR"). According to Commerce, this data showed that "the steel industry and three other industries combined, consume a disproportionately large amount of electricity in Korea." IDM at 16. Commerce thus concluded that the "provision of electricity for {less than adequate remuneration ("LTAR")} to the <u>steel industry</u> is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act." *Id.* (emphasis added). As demonstrated in Hyundai Steel's opening brief, this decision is unsupported by substantial evidence and is otherwise not in accordance with law. Defendant and Defendant-Intervenor's arguments do not alter that conclusion.

    The first problem with Commerce's *de facto* specificity determination is that there is a disconnect between the grouping of four unrelated industries and the conclusion that the program

is *de facto* specific to the "steel industry."  That is, Commerce did *not* rely on consumption data

for the steel industry alone, as would be expected, but instead combined the industrial electricity

consumption of the steel industry and three unrelated and disparate industries within the

narrower industrial classification of electricity consumers in Korea.  IDM at 16 (relying on fact

that the steel industry and "thee other industries combined" consume a disproportionate amount

of electricity); GOK IQR at 35-36 (listing top ten largest consumers of electricity and showing

[                                                                                    ]).  As a simple matter of

logic, the fact that a random grouping of four industries consumed a majority of electricity does

not demonstrate that the *steel industry* received a disproportionately large amount of the alleged

subsidy.  The "group" is not the steel industry but is rather some undefined group of unrelated

industries.  To support the conclusion that the *steel industry* consumed a disproportionate amount

of industrial electricity, Commerce logically should have analyzed the consumption data for the

steel industry.  That data shows that the steel industry consumed [      ] percent of the total

industrial electricity consumption in Korea, and only [      ] percent of the total electricity

consumption in Korea.  GOK IQR at 35-36.  These low percentages do not provide substantial

evidence that the steel industry received a disproportionately large amount of the subsidy.

The term "disproportionate" is defined as "being out of proportion."  *Disproportionate*,

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/disproportionate

(last visited July 19, 2024) (attached as Exhibit A).[1]  In order to determine if something is out of

proportion, there must be some logical basis of comparison, *i.e.,* out of proportion in comparison

---

[1] To the extent Defendant suggests that the term "disproportionate" is ambiguous, Def. Br. at 35, such that deference is owed to Commerce's interpretation of that term as applied to the facts of this case, such deference is no longer warranted.  *See Loper Bright Enters. v. United States*, No. 22-451, slip op. at *35 (U.S. June 28, 2024) (overruling *Chevron*).

to what?  Commerce has failed to explain the basis for its conclusion that the electricity consumed by the steel industry is out of proportion to what would otherwise be expected.  The omission is fatal because steel production is an inherently energy intensive process and so the percentage of total electricity consumption by the steel industry would be expected to be large.  *See Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001) ("*Bethlehem Steel*").  The steel industry's consumption of **[          ]** percent of the total industrial electricity consumption in Korea, and only **[       ]** percent of the total electricity consumption in Korea, is not out of proportion given the energy intensive nature of steel production.  *See* GOK IQR at 35–36.

  As discussed in Hyundai Steel's opening brief, Commerce found in *Bethlehem Steel* that a greater percentage of countervailable benefits received by the Korean steel industry did not support a finding of *de facto* specificity under 19 U.S.C. § 1677(5A)(D)(iii).  In that case, the court sustained Commerce's determination that an electricity program pursuant to which the steel industry had received over 51 percent of the benefits was not *de facto* specific.  *Bethlehem Steel*, 140 F. Supp. 2d at 1369.  Commerce found that despite the majority of the benefits going to a single industry, the benefits received were not disproportionate because high electricity usage was an inherent characteristic of the steel industry, all recipients received an identical rate reduction based on a standard pricing mechanism, and the subsidy was not designed to benefit any one industry.  *Id*. at 1368–70.  The court reasoned that:

> In virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group.  To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws.

*Id*. at 1369.

Similarly, while the record demonstrates that the steel industry (or the random group of four industries) may consume a large amount of electricity relative to other industries, the electricity for LTAR program is based on usage and electricity prices are set based on a standard pricing mechanism. GOK IQR at 30, Ex. E-10 (showing that electricity prices were based on standard pricing). Differences in the proportion of electricity consumed by the steel industry (or the random group of four industries) compared to that of other industries is due in part to the fact that the production of steel requires a lot of electricity. *See Bethlehem Steel*, 140 F. Supp. 3d at 1369. The record shows only that there is some disparity in electricity consumption between industries, and Commerce has provided no evidence that the steel industry received a disproportionately large amount of the subsidy. *See id.*

Furthermore, electricity in Korea is sold based on a standard pricing mechanism, whereby industrial users like Hyundai Steel all pay the same rates and no one company or industrial user receives a more preferential rate. GOK IQR at Ex. E-10. The industrial tariff rates are higher than the residential, general, agricultural, and educational tariffs and thus the industrial users are not being singled out for any preferential receipt of a subsidy but pay the highest rates. GOK IQR at Ex. E-10. Not only do industrial users like Hyundai Steel pay higher rates than other users, but the industrial users with the highest usage (contract demand of 300 kW or more) pay the highest electricity rates. *See* GOK IQR at Exhibit E-10. This is an important factor given that this case deals with electricity that is broadly available and widely used by virtually everyone in Korea. As the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") recognizes, finding such widely used programs to be specific would produce absurd results. SAA, H.R. Doc. No. 103-316 at 929 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4242.[2]  The steel industry does not receive a disproportionate amount of the

subsidy because all industrial users pay identical rates pursuant to a standard pricing mechanism.

*See Bethlehem Steel*, 140 F. Supp. 2d at 1369 (discussing fact that electricity being sold pursuant

to standard pricing mechanism with uniform prices further supported finding of no *de facto*

specificity).

Defendant and Petitioner try to distinguish *Bethlehem Steel*.  *See* Def. Br. at 32-36; *see*

Pet'r Br. at 15.  The primary distinguishing factor, according to Defendant, is "the differing

nature of the program."  Def. Br. at 32; Pet'r Br. at 15 (also trying to distinguish because the case

involves a different program).  Certainly, the nature of the two programs differs, but that is a

distinction without a difference.  In *Bethlehem Steel*, the program involved electricity discounts

for companies that agreed to lower their electricity usage during certain designated times of high

electricity demand.  *Bethlehem Steel,* 140 F. Supp. 2d at 1367.  In the instant case, the program

involves the provision of electricity for LTAR.  But this difference in the nature of the program

does not render *Bethlehem Steel* inapposite.  That case stands for the proposition that disparity in

the amount of benefits received based on usage levels alone is not a sufficient basis to find that a

subsidy is *de facto* specific based on disproportionate receipt of the subsidy.  That aspect of the

---

[2] Defendant argues that the predicate for applying the disproportionate test supports treating widely available programs as specific.  *See* Def. Br. at 31-32.  Defendant cites to 19 C.F.R. § 351.502(a), which states that Commerce will examine the *de facto* specificity factors in sequential order and that the "limited number" specificity factor comes before the disproportionate specificity factor in the hierarchy.  Defendant concludes that the disproportionality factor thus only applies when it is established that the number of users are not limited in number and hence applies when the subsidy in question is provided to numerous and diverse industries.  Def. Br. at 32.  This argument is misplaced.  The fact that a subsidy program is not provided to a limited number of industries does not, *ipso facto*, lead to the conclusion that widespread usage is a predicate for the disproportionate specificity factor to apply.

holding is not contingent upon the nature of the program; it applies for any program where benefits are based on usage levels.

Here, the amount of the benefit from the electricity for LTAR program is tied to usage, just as the benefit from the electricity discount program at issue in *Bethlehem Steel* was based on usage. The Korea Electric Power Corporation ("KEPCO") uses a standard pricing mechanism for industrial users who all pay the same rate. GOK IQR at 30, Ex. E-10 (showing that electricity prices were based on standard pricing); *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Preliminary Results and Preliminary Intent To Rescind, in Part, the Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 13,433 (Mar. 3, 2023), PR 186 ("*Preliminary Results*") and accompanying preliminary decision mem. ("PDM") at 11, PR 186 (discussing benefit method and considering, *inter alia*, "whether there is discrimination among various types of users"). The benefit from this program exists only to the extent that KEPCO does not recover costs for the particular category of electricity used by the respondent. PDM at 11; *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 74,597 (Dec. 6, 2022) and accompanying mem. at 21 (discussing that benefit exists for industrial rates where KEPCO did not recover costs).

Although Commerce did not use KEPCO's actual 2021 cost recovery data, Commerce sought to replicate this established method and calculated the benefit by deriving an adjustment rate that reflected how much KEPCO would have had to raise rates to recover costs (*i.e.,* a certain percentage). Mem. from Dep't Commerce, "Analysis and Calculations for the Preliminary Results" at 8 (Feb. 27, 2023), CR 261-62, PR 184 ("Prelim. Calculation Mem.") (discussing that as facts available Commerce sought to replicate normal cost recovery method for

determining benefit).  This adjustment rate was multiplied by the reported tariff rate and monthly electricity consumption.  *Id.* at 8-9 (showing the calculation method).  The more usage of electricity the higher the benefit, *i.e.,* the benefit is tied to usage.  This is just like the electricity discount program in *Bethlehem Steel*, where a larger company with high usage would receive a larger benefit under a program that links the benefit to reduction in usage levels.  Both programs tie the amount of benefit to usage.

Defendant nevertheless disavows the relevance of *Bethlehem Steel* by citing to *Mosaic* and Commerce's own decision in *Brass Rod from Korea*.  See Def't Br. at 33-34.  Defendant's reliance on *Mosaic* is misplaced as the basis for the *de facto* specificity determination in that case was "predominant use" under 19 U.S.C. § 1677(5A)(D)(iii)(II).  *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1309-10 (Ct. Int'l Trade 2022).  To the extent the court distinguished *Bethlehem Steel*, it was the predominant use determination and not the disproportionate specificity determination.  *See id.* at 1310.  While the court relied on differences in the nature of the programs, it did not expound on why this was a distinguishing factor for the predominate use specificity finding.  *Id.*  Further, the nature of the programs in the instant case and *Bethlehem Steel* is the same because in both cases the benefit is tied to usage levels.  The attempt to distinguish *Bethlehem Steel* from the LTAR benefit in *Brass Rod from Korea* suffers from the same flaws discussed above.  Namely, even though the programs are different, the benefit amount in both cases is tied to usage and so *Bethlehem Steel* applies equally to an electricity for LTAR program.

Hyundai Steel also relied upon *Samsung Electronics Co., Ltd. v. United States* ("*Samsung I*") to further support the proposition that disparity alone is not sufficient to support a finding that a respondent received a disproportionately large amount of the subsidy.  973 F.

Supp. 2d 1321 (Ct. Int'l Trade 2014).  In that case, the court held that Commerce failed to adequately address how a tax credit program provided Samsung with a disproportionately large amount of the subsidy.  It was undisputed that respondent Samsung received a larger share of tax credits than the average beneficiary.  *Id*. at 1326.  However, the court admonished Commerce for failing to consider the aspects of the program relevant to disproportionality, namely, that the GOK conferred tax credits based on usage and pursuant to a standard pricing mechanism.  *Id.* Defendant seeks to distinguish the *Samsung* decision by discussing the subsequent decision after remand.  Def. Br. at 36-38 (citing *Samsung Electronics Co., Ltd. v. United States*, 37 F. Supp. 3d 1320, 1324-26 (Ct. Int'l Trade 2014) ("*Samsung II*")).  Defendant also criticizes Hyundai Steel for not acknowledging that the court affirmed Commerce after remand.  Def. Br. at 36.

Hyundai Steel cited to *Samsung I* to support the proposition that in the *Final Results* Commerce had failed in its *de facto* analysis to consider that the GOK conferred benefits under the electricity for LTAR program based on usage and pursuant to a standard pricing mechanism. *See* Hyundai Br. at 17-18.  The *Samsung I* court remanded the disproportionate benefit determination in part on that basis.  The fact that Commerce was able to cure the error in its *de facto* analysis after remand does not alter the proposition for which Hyundai Steel cited it.  Nor does Defendant even attempt to explain why the reasoning in *Samsung I* is not applicable here. Instead, Defendant relies on *Samsung II* where the court held that Commerce had "reasonably addressed its concerns."  Def. Br. at 37 (citing *Samsung II*, 37 F. Supp. 3d at 1325-26).  But in *Samsung II*, Commerce used a different *de facto* analysis that is not supportive of Commerce's *de facto* specificity determination in this case.  As Defendant says, "{o}n remand, Commerce compared Samsung's total benefit from the subsidy with the 100 largest companies that received the benefit, accounting {sic} 'company size and total tax liability.'" Def. Br. at 37 (citing

9

*Samsung II*, 37 F. Supp. 3d at 1324-26).  The fact that the court affirmed this type of *de facto* analysis does not support Commerce's *de facto* specificity analysis in this case.  In the *Final Results*, Commerce did <u>not</u> compare Hyundai Steel's total benefit with the largest 100 companies that received the LTAR benefit.  Nor did Commerce provide any analysis that accounted for the difference in size of industries in Korea, which would naturally lead to disparate – but not disproportionate – electricity consumption.

　　Defendant attempts to tie the instant case to *Samsung II* by stating that "record evidence confirms that Hyundai Steel specifically was amongst the largest industrial users of electricity in Korea during the period of review."  Def. Br. at 37 (citing IDM at 16).  But a review of page 16 of the IDM says nothing about *Hyundai Steel's* usage relative to other industrial users.  Instead, Commerce simply says that the proprietary GOK data shows that the steel industry and three other industries combined consume a disproportionately large amount of electricity in Korea.  To the extent Defendant and Petitioner cite to other record information to support this new theory of *de facto* specificity, the attempt should be rejected.  Def. Br. at 37-38; Pet'r Br. at 16-17.  The Court "may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'" *Itochu Building Prods. Co., Inc. v. United States*, 163 F. Supp. 3d 1330, 1337-38 (Ct. Int'l Trade 2016).

　　Furthermore, Commerce's reliance on an arbitrary grouping of the top four consumers of industrial electricity to support its conclusion that the steel industry received a disproportionate amount of the subsidy from its purchases of industrial electricity is arbitrary and capricious.  Commerce appears to have just aggregated the steel industry's electricity consumption with the electricity consumption of the [                                                    ] industries, the first three other largest and vastly different industries with no relation to each other.  GOK IQR at 35-

36.  Although not explicitly stated by Commerce in the *Final Results*, based on Defendant's brief, it seems that Commerce simply tallied up the fewest number of industries necessary to reach a majority.  *See*, Def. Br. at 24 (citing to the fact that the four industries accounted for more than [      ] percent of industrial electricity).[3]  Commerce's results-oriented aggregation of the electricity use by these unrelated industries is the definition of arbitrary, capricious and an abuse of discretion.  *See Linyi Chengen Import and Export Co. v. United States*, 391 F. Supp. 3d 1283, 1292 (Ct. Int'l Trade 2019) ("An agency acted in an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'").

To be sure, Commerce was not required under its regulations to determine if these four industries had shared characteristics.  *See,* Def. Br. at 26, 29 (citing 19 C.F.R. § 351.502(b)).  However, Commerce did need to explain why it found that this broad and unrelated group of industrial consumers received a disproportionate amount of the subsidy compared to other industrial users.  This is especially true where all industrial consumers paid for electricity based on the same standard pricing and no preference was given to any enterprise or industry.  Commerce needs to explain why this group's consumption shows that the electricity for LTAR program is out of proportion to what would be expected and cannot simply tally up the largest four industrial consumers and call it a day.  *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) (finding that under "limited number" *de facto*

---

[3] Hyundai Steel interprets this to mean that Commerce tallied up the four largest industrial users because based on the GOK data this would result in [        ] percent.  *See* GOK IQR at 35-36 ([                                                                                    ] percent).

analysis Commerce needed to explain how subsidizing broad industries amounts to a specific rather than a generally available subsidy).[4]

Defendant claims that "Plaintiffs are wrong, therefore, in claiming that Commerce was required to identify 'a group of *similar* industries.'" Def. Br. at 30. However, Hyundai Steel did not argue that Commerce was required to identify a group of similar industries or industries with shared characteristics to make a *de facto* specificity determination. Instead, Hyundai Steel made this statement to support its argument that Commerce's creation of its "group" was results-oriented and arbitrary because Commerce did not identify or define what this group represented or how it showed that the steel industry received a disproportionate amount of the subsidy and instead simply tallied up the largest four industries to support its disproportionate determination. *See* Hyundai Br. at 19.

Defendant repeatedly cites to the fact that Korea has a well-diversified economy to try and support the conclusion that the steel industry received a disproportionate amount of benefits. *See,* Def. Br. at 24, 26-28. While Commerce must consider the extent of diversification of economic activities in the country providing the subsidy as per 19 U.S.C. § 1677(5A)(D)(iii), this provision is no panacea for Commerce's *de facto* specific determination. This criterion should "serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors." SAA at 931. Here, Commerce fails to link its finding that the economy of Korea is diverse with its finding that the steel industry, or even the group of industries with

---

[4] Nor is there any limiting principle to Commerce's arbitrary method of just going down the list of the largest industrial consumers until they constitute a majority. Under this method, Commerce could treat the largest 8 of 10 industrial users as a "group" and find that this group consumed a disproportionate amount of the subsidy even though the group accounts for virtually all industrial users. This lack of any limiting principle could lead to absurd results and further demonstrates that it is arbitrary and capricious. *See* SAA at 929.

which Commerce lumped the steel industry together, received a disproportionately large amount

of the subsidy.  The fact that there are 19 industry groupings may show that overall the Korean

economy is diverse, but most of the industry groups such as wholesale and retail trade,

accommodation and food service, education, and membership organizations do not consume

industrial electricity.  *See* Mem. from Dep't Commerce, "Placement of Korea Economic

Diversification Memorandum on the Record" at 2-3 (May 3, 2022), PR 24.  So Commerce's

reliance on this overall diversity provides no context or support to its disproportionate

determination that is based on the group of four industries' consumption of industrial electricity.

Finally, when viewing the steel industry's total electricity consumption (or for that

matter, the electricity consumption of the four largest industrial users) in comparison to the total

electricity consumption in Korea by all users, it is abundantly clear that the steel industry did not

use a disproportionate amount of electricity.  When viewed in relation to the overall

consumption, the steel industry consumes only [        ] percent of all electricity, and the four

industries Commerce has decided to arbitrarily lump together account for only [        ] percent

of all consumption.  GOK IQR at 35-36.  These percentages indicate that neither the steel

industry nor the group of industries Commerce analyzed received a disproportionately large

amount of the subsidy from the electricity for LTAR program.

Accordingly, this Court should find that Commerce's determination that the GOK's

provision of electricity for LTAR was *de facto* specific is not supported by substantial evidence

and is otherwise not in accordance with law.

      B.      *Commerce's Determination Not To Accept The 2021 Cost Data Is Unsupported*
                *By Substantial Evidence, Contrary To Law, And An Abuse Of Discretion.*

In the *Final Results*, Commerce found that it did not abuse its discretion by refusing to

accept 2021 electricity cost recovery data that the GOK offered to provide five months and 19

days before the *Final Results* because it found that there was insufficient time to analyze the data and allow parties to comment.  IDM at 10.  As discussed in Hyundai Steel's opening brief, Commerce's decision not to accept this necessary data was an abuse of discretion because there was plenty of time for Commerce analyze the data and provide an opportunity to comment. None of the arguments made by Defendant or Defendant-Intervenor rebut the conclusion that Commerce abused its discretion.

"An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Consolidated Bearings Company v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005).  Commerce abuses its discretion when it refuses to accept updated data when there is plenty of time for Commerce to consider it, as is the case here. *Papierfabrik August Koehler SE v. Unites States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016).  When assessing whether Commerce's refusal to accept relevant factual information amounts to an abuse of discretion, the court balances the accuracy of the final results with Commerce's need for finality.  *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006).  Doing so recognizes that Commerce has a duty to determine rates as "accurately as possible." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).  In the *Final Results*, Commerce failed to support its claim that the need for finality trumps the need to calculate Hyundai Steel's subsidy as accurately as possible.

Defendant argues that the GOK did not provide the data pursuant to three requests and that requesting the data a fourth time would allegedly impact its ability to conduct the review within the statutory deadlines.  Def. Br. at 14-15, 17-18.  However, the number of times Commerce requested the data does not shield it from its obligation to make the calculation of

accurate subsidy rates paramount if sufficient time remained for it to collect and use the cost

data.  The GOK could not fail to provide what it did not have, and so simply tallying up the

number of times Commerce requested the cost data does not relieve Commerce of the obligation

to use the most accurate data possible as time permits.

In its initial questionnaire response, the GOK explained that the requested cost data was

not complete due to the volume of information required and because the data processing was

complicated.  GOK IQR at 27.  The GOK also explained that data for 2021 would generally be

completed at the end of 2022.  GOK IQR at 27.  Commerce issued a supplemental questionnaire

for the data on January 12, 2023, and the GOK responded on January 30, 2023 that it was unable

to provide the data because the data's verification was taking more time than expected and was

not yet complete.  Letter from Yoon and Yang LLP, "Response to the Supplemental

Questionnaire" at 2 (Jan. 30, 2023), CR 238, PR 170 ("GOK Second Supplemental Response").

Knowing the data was not complete, Commerce requested the data again the very next day, on

January 31, 2023.[5]  Letter from Dep't Commerce, "GOK Third Supplemental Questionnaire" at

4 (Jan. 31, 2023), PR 174.  The GOK explained that the data was being audited by the Board of

Audit and Inspection of Korea and that neither the Ministry of Trade Industry and Energy

("MOTIE") nor KEPCO knew when the audit would be complete.  Letter from Yoon and Yang

LLP, "Response to the Supplemental Questionnaire" at 1-2 (Feb. 6, 2023), PR 175 ("GOK Third

Supplemental Response").  Neither MOTIE nor KEPCO could control when the audit would be

---

[5] Defendant argues that Commerce provided "numerous opportunities" to remedy the deficiency pursuant to 19 U.S.C. § 1677m(d).  Def. Br. at 14-15.  The third request for the data was not a reasonable opportunity to "explain or remedy" the deficiency "to the extent practicable" pursuant to 19. U.S.C. § 1677m(d) because Commerce was aware the information was not ready when it requested it and, as of January 31, 2023, had time to practicably give the GOK opportunity to remedy its response.

complete.  Letter from Yoon and Yang, "Response to Communication with Counsel" (May 12, 2023), PR 198 ("Response to Correspondence Mem.").

The GOK notified Commerce that the data was substantially complete and ready for submission on March 14, 2023, which was five months and 19 days before the *Final Results* were due on August 30, 2023.  Mem. from Dep't Commerce, "Communication with Counsel" at Attachment (May 10, 2023), PR 194 ("Correspondence Mem."); *Preliminary Results*, 88 Fed. Reg. 13,433; Mem. from Dep't Commerce, "Extension of Deadline for Final Results" at 2 (June 7, 2023), PR 211.  Had Commerce accepted the GOK's invitation to submit the data, Commerce would have had plenty of time to at least consider the 2021 cost data, and yet it refused to do so. *See* Def. Br. 22 (failing to distinguish *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,267 (Dep't Commerce July 2, 2021) where Commerce accepted KEPCO cost data less than five months before the final determination, *i.e.*, with less time than was available to Commerce here).

Defendant argues that Commerce would have needed time to determine whether supplemental questionnaires or a post-preliminary analysis may be required.  Def. Br. at 18. Whether Commerce "may" have needed to issue supplemental questionnaires, or a post-preliminary analysis, is not reason to not collect the data in the first instance.  IDM at 11.  There is zero evidence that Commerce would have needed to issue additional supplemental questionnaires or issue a post-preliminary analysis.  Having refused to request and review the 2021 data, Commerce's explanation that it may have needed to issue supplemental questionnaires or issue a post-preliminary analysis is speculative.  The court has rejected such flimsy reasoning from Commerce in similar circumstances and should do so again.  *NTN*

*Bearing Corp.*, 74 F.3d at 1208 ("The agency argues that the information in NTN's submission may not be correct and that it should not be required to consider it for this reason.… ITA's argument is purely speculative.").

Defendant argues that it needed time to evaluate how the data related to the revised 2021 pricing structure given that it would have been an entirely new dataset and Commerce's first time evaluating the revisions to the electricity pricing system. Def. Br. at 18-21. This is a red herring. The revisions to the pricing system consist of separating fuel charges and environmental charges on customer bills where they had previously been part of a single energy cost and quarterly fuel charge adjustments. PDM at 10. These revisions were not relevant to the aggregate annualized cost data that Commerce needed for its determination regarding whether the electricity for LTAR program provided a countervailable benefit. When Commerce is reviewing the electricity for LTAR program it requests the cost data to determine whether the electricity tariffs charged to the respondents exceed the annualized electricity costs plus an additional rate of recovery (profit) for the industrial category, and thus provides for recovery of KEPCO's costs. Prelim. Calculation Mem. at 7-8; *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Preliminary Results Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 11,688 (Dep't Commerce Mar. 2, 2022) and accompanying mem. at 28; GOK IQR at 32-33 & Exhibit E-9 (showing the comparison of the annual costs and revenue to determine the rate of recovery using 2020 cost data). Commerce explained that it needed the data "to evaluate whether the prices charged in 2021 permit cost recovery" and "to confirm that

the explanations provided in the questionnaire responses are consistent with the data" for its analysis of the new price setting philosophy.[6]  PDM at 11, 28.

The data that Commerce refused to accept was thus annual aggregate data that would have been used to determine whether the industrial category B tariff rates provided for recovery of costs at the aggregate level and to confirm the GOK's prior explanations of the new 2021 pricing system.  The fact that revisions to the pricing system related to separating fuel charges and environmental charges on customer bills where they had previously been part of a single energy cost and quarterly fuel charge adjustments does not justify total refusal to consider the 2021 cost data.  It is the aggregate data and resulting cost recovery ratio for the Industrial B class that Commerce needed to perform its normal market principles analysis for the electricity for LTAR program.  Commerce's ability to easily use this aggregate cost recovery data was not made more complex just because there had been some minor changes to the pricing system.

Additionally, the GOK had explained the pricing changes and Commerce even asked questions about the changes to pricing *without* having requested or received the new 2021 cost recovery aggregate data.  GOK IQR at 20-23; GOK Second Supplemental Response at 3-7; PDM at 10.  Commerce did not ask further questions about the new system.  Third Supplemental Questionnaire at 4.  In other words, the record reflects that Commerce did not need to request more information about the new pricing system, but that that it would use the cost data to confirm the GOK's explanations of the new pricing system, as it had already explained. Accordingly, Commerce had time to at least consider the 2021 cost data with the information it

---

[6] This is not a situation like that in *Goodluck India* where, at verification, a coding error rendered control numbers across entire antidumping duty sales and cost databases unusable. *Goodluck India*, 11 F.4th at 1343; *see also* Def. Br. at 20.

already had about the pricing changes and determine whether additional questions may have

been necessary regarding the aggregate data.

Defendant argues that the data was not complete, and no precedent requires Commerce to

collect incomplete, unaudited data.  Def. Br. at 19-23 (citing IDM at 11 ("Had Commerce

collected the unaudited data and then they later changed as the {GOK} finalized them, those

changes may have ultimately resulted in an inaccurate analysis.")).  This is not true.  By way of

example, Commerce has stated: "Although independently audited data may offer some additional

degree of reliability, it is not uncommon for Commerce to rely on information that the

respondent reports using unaudited data." *Ripe Olives from Spain: Final Results of Antidumping

Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 35,068 (July 1, 2021) and accompanying

mem. at Comment 12; *Certain Aluminum Foil from the People's Republic of China

Countervailing Duty Administrative; 2021*, 88 Fed. Reg. 75,267 (Nov. 2, 2023) and

accompanying mem. at Comment 1 (noting "Commerce's practice to request audited financial

statements, but {that} Commerce will accept unaudited financial statements in lieu of audited

statements when the respondent has a reasonable explanation for not having audited

statements").  Commerce's initial questionnaire itself demonstrates that Commerce will accept

data that is being audited and may change pursuant to the audit.  Letter from Dep't Commerce,

"Countervailing Duty Questionnaire" at 5 (May 2, 2022), PR 22 ("It is your responsibility to

contact the officials in charge if, subsequent to your filing, there are events that affect your

response (*e.g.*, *changes as a result of an audit*).") (emphasis added).  Commerce's refusal to

accept the "substantially complete" data is inconsistent with Commerce practice and treats

similar situations differently.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir.

2001).

Commerce's concerns about the accuracy of the cost data are overblown. The GOK informed Commerce that the data was ready for submission because "empirically speaking" the data was "substantially complete," and even though it was still subject to government audit, "not much changes," if any, would be made. Correspondence Mem. at Attachment. Indeed, only "miniscule adjustments" were ultimately made to the "substantially complete" data. Response to Correspondence Mem. at 2. It is also important to keep in in mind that Commerce's other option in lieu of this substantially final 2021 cost data was the facts available method it used in the *Preliminary Results*. As discussed further below, the facts available method was inaccurate compared to Commerce's normal methodology for analyzing benefit in the context of Korean electricity for LTAR programs.

Defendant emphasizes that, when weighing the accuracy and finality factors, it is "*Commerce's* discretion to decide which interest outweighs the other on a case-by-case basis." Def. Br. at 20. The Court, however, must review Commerce's decision to determine whether Commerce's balance of the accuracy and finality factors are based on an erroneous interpretation of law, unsupported by substantial evidence, or represents unreasonable judgment in weighing the relevant factors. *Consolidated Bearings*, 412 F.3d at 1269; *Timken*, 434 F.3d at 1353. Commerce's arguments fail to demonstrate how, on balance, Commerce's determination not to accept the cost data is reasonable, supported by substantial evidence or consistent with law, especially considering that in this review the facts available methodology used by Commerce to evaluate whether KEPCO's pricing was consistent with market principles was imprecise and materially different from its normal methodology.

Commerce has consistently determined whether KEPCO's tariff schedule is consistent with market principles pursuant to 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511(a)(2)(iii)

using the KEPCO cost data to determine whether electricity prices cover costs plus profit for the industrial category used by the respondent steel producers. *Cut-to-Lenth Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 53,728 (Sept. 1, 2022) and accompanying mem. at 35-36. The facts available methodology used in the *Final Results* was different and measures cost recovery by KEPCO's total revenue in its financial statements. But Commerce's consistent analysis "is not based on KEPCO's total revenue" and only "relates to financial performance to the extent income from prices charged for <u>each electricity consumption category</u> covers its costs, plus profit." *Id.* (emphasis added). Commerce has applied this approach consistently when analyzing whether KEPCO's pricing is consistent with market principles. *See, e.g., Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 79 (Jan. 3, 2022) and accompanying mem. at 31.

The facts available methodology used by Commerce was less precise and did not analyze whether KEPCO recovered costs for the industrial category used by Hyundai Steel. Unlike its prior determinations, Commerce compared the cost of sales of goods with the sales of goods from KEPCO's 2021 financial statement to determine whether KEPCO recovered costs overall and used the overall 2020 rate of return (profit) from KEPCO's Form 20-F filed with the U.S. Securities and Exchange Commission. Mem. from Dep't Commerce, "Analysis and Calculations for the Final Results," at Attachment 2 p. "Electr Detail 16," (Aug. 30, 2022) CR 269-70, PR 223 ("Final Calculation Mem.") (citing GOK Third Supplemental Response at Exhibit UFSKEPCO p.3; GOK IQR at Exhibit E-1 p.60). The *Final Results* thus use 2021 data unrelated to whether income from prices charged for each electricity consumption category covers costs and a 2020 profit ratio that is both unrelated to the profit for the industrial electricity

consumption category and not contemporaneous with the period of review ("POR").  Such an approach is inconsistent with Commerce's determinations in other proceedings that the most accurate metric for whether the prices that Hyundai Steel pays for electricity are based on market principles is one based on the cost recovery for its electricity consumption category: Industrial B.  GOK IQR at 40.

Nowhere does Commerce explain in the *Final Results* how its alleged interests in finality justify the use of the 2021 financial statements and Form 20-F that are neither specific to the industrial pricing category nor contemporaneous with the POR or how the use of such data results in an accurate subsidy rate given its consistent past preferences for an industrial-specific cost recovery analysis.  At most, Commerce claims in the *Final Results* that "had {it} collected the unaudited data and then they later changed as the GOK finalized them, those changes may have ultimately resulted in an inaccurate analysis."  IDM at 11.  This remote possibility of minor revisions does not excuse Commerce from seeking to use data that would lead to the calculation of the most accurate subsidy using its established methodology.

In response to Hyundai Steel's arguments regarding the inaccuracy of the *Final Results*, Defendant argues that "Commerce was not required to request the data at that late stage of the proceeding" because Commerce must be able to freeze the record and make findings based on fixed information.  Def. Br. at 23.  Commerce also argues that it used information that was the most detailed and comparable to the cost data.  Def. Br. at 24 n.7.  Neither of Commerce's assertions explain how the alleged need for finality outweighed the inaccuracy caused by its change of methodology for the 2021 POR or its refusal to accept the 2021 cost data.  Commerce was required to balance the alleged need for finality at the time the cost data was ready for submission with its duty to determine the subsidy rate accurately.  The *Final Results* fail to

weigh, with substantial evidence, whether the alleged need for finality outweighs the improved accuracy from the 2021 cost data—data that Commerce's practice has consistently used to analyze whether KEPCO's pricing, by category, is consistent with market principles.  Similarly, the *Final Results* also fail to explain how the alleged need for finality justifies the inaccurate subsidy rate that results from Commerce using data that is not specific to the Industrial B pricing category or entirely contemporaneous with the POR.

Defendant argues that *American Honey Producers Association v. United States*, which Hyundai Steel analogized in its opening brief, is distinguishable from the instant matter because Commerce accepted the financial statements in that case for purposes of verifying previously submitted information, and that Commerce in the instant case would need to afford parties opportunity to comment "whereas no opportunity for comment was required" in *American Honey*.  Def. Br. at 21-22 (citing 653 F. Supp. 3d 1329 (Ct. Int'l Trade 2023)).  Commerce's distinctions are immaterial.  Commerce stated that it needed the cost data to confirm that explanations in prior questionnaire responses are consistent with the data for purposes of the price setting philosophy analysis, not unlike the use of the financial statements in *American Honey* to verify prior responses.  PDM at 28.  Additionally, interested parties would have opportunity to comment on the 2021 cost data as a matter of course.  *See* 19 C.F.R. § 351.301(c)(1)(v) (providing parties 10 days to submit comments on supplemental questionnaire responses).  The short comment period for parties to comment did not prevent Commerce from requesting the data.

For its part, Petitioner argues that the GOK allegedly "slow-rolled" release of the cost data because KEPCO's financial statements were audited in March of 2022.  Pet'r Br. at 10-11.  Petitioner's argument is baseless.  The record reflects that the GOK generally completes the cost

data by the end of each succeeding year because the amount of data necessary is large and the processing of the data is complicated.  GOK IQR at 27.  So the cost data that Commerce requested for 2021 would normally be completed at the end of 2022, notwithstanding the annual preparation of KEPCO's financial statements.  Petitioner's argument that the audit of the 2021 financial statements suggests that the cost data was available for submission contradicts the record.  Further, Petitioner's allegations constitute *post hoc* rationale that was not invoked by the agency in the *Final Results*.  *Itochu*, 163 F. Supp. 3d at 1337-38 (Ct. Int'l Trade 2016).

## II.    Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its motion for judgment on the agency record and reject the arguments of Defendant and Defendant-Intervenor.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Avenue, N.W.
Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

24

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 6,941 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  July 22, 2024

**Exhibit A**

