C-580-837
Remand
Slip Op. 24-135
POR:  1/1/2021 – 12/31/2021
~~Business Proprietary Document~~
E&C/OIII:  KJ
**PUBLIC VERSION**

*Hyundai Steel Company v. United States*,
**Court No. 23-00211, Slip Op. 24-135 (CIT December 12, 2024)**
**Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (the Court) issued on December 12, 2024.[1]  These final results of redetermination concern

Commerce's final results of administrative review of the countervailing duty (CVD) order on

certain cut-to-length carbon-quality steel plate (CTL plate) from the Republic of Korea (Korea)[2]

covering the period of review (POR) January 1, 2021, through December 31, 2021.[3]  The Court

remanded Commerce's *de facto* specificity determination with respect to the Government of

Korea's (GOK) Provision of Electricity for Less Than Adequate Remuneration (LTAR)

(Electricity Program).  Specifically, the Court remanded for Commerce to provide further

explanation or reconsideration of its finding that the steel industry and three other industries

received a disproportionately large amount of the subsidy, and thus, the Electricity Program is *de*

---

[1] *See Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 24-135 (CIT December 12, 2024) (*Remand Order*).
[2] *See Notice of Amended Final Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders:  Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000) (*Order*).
[3] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2021*, 88 FR 61509 (September 7, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

*facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Tariff Act of 1930, as amended (the Act). For these final remand results, Commerce further explains why the steel industry, along with certain other industries, received a disproportionate share of benefits under the Electricity Program when compared to other industries that consumed electricity during the POR.

## II.    BACKGROUND

On April 12, 2022, Commerce initiated an administrative review of the *Order* for the review period January 1, 2021, through December 31, 2021.[4] On May 2, 2022, we selected Hyundai Steel Company (Hyundai Steel) as the mandatory respondent in the administrative review.[5]

In the *Final Results*, Commerce countervailed the Electricity Program and stated with respect to specificity:

> "… section 771(5A)(D)(iii)(III) of the Act establishes that *de facto* specificity exists where an 'enterprise or industry receives a disproportionately large amount of the subsidy.' For the POR, the GOK provided usage data for the steel industry and the top ten largest electricity consuming industries that reflected their consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification. Section 771(5A)(D)(iii) of the Act instructs Commerce when evaluating the factors for *de facto* specificity to take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy. Accordingly, Commerce placed the Korea Economic Diversification Memorandum on the record, which concluded that a wide diversification of economic activities exists in Korea, including 19 industry groupings with a broad range of distinctly different types of economic activities within these groupings. The GOK data on the record are proprietary, but demonstrate the steel industry and three other industries combined, consume a disproportionately large amount of electricity in Korea. Therefore, based on this information, we find that the provision of electricity for LTAR to the steel industry is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act."[6]

---

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 21619, 21635 (April 12, 2022).
[5] *See* Memorandum, "Respondent Selection," dated May 2, 2022.
[6] *See Final Results* IDM at 15-16.

Hyundai Steel and the GOK challenged Commerce's *de facto* specificity determination arguing that the steel industry did not receive a disproportionately large amount of the subsidy alone, or when grouped with three other industries. On December 12, 2024, the Court issued its opinion stating that Commerce's determination that the Electricity Program is *de facto* specific because the steel industry and three other industries received a "disproportionately large amount of the subsidy" within the meaning of section 771(5A)(D)(iii)(III) of the Act is not supported by substantial evidence.[7] The Court remanded the *Final Results* for Commerce to provide further explanation or reconsider whether the Electricity Program is specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.

Below, we provide further analysis of the specificity of the GOK's Electricity Program in compliance with the *Remand Order*.

## III.    ANALYSIS

We reexamined the industrial electricity consumption data for the POR to determine whether the GOK's Electricity Program is specific as a matter of fact, *i.e.*, *de facto* specific, within the meaning of section 771(5A)(D)(iii)(III) of the Act.

Section 771(5A)(D)(iii)(III) of the Act provides that there is reason to believe that a subsidy may be specific as a matter of fact where "an enterprise or industry receives a disproportionately large amount of the subsidy." When evaluating the factors for *de facto* specificity, Commerce is to take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy.[8] Any reference to "an enterprise or

---

[7] *See Remand Order* at 11.
[8] *See* section 771(5A)(D)(iii) of the Act; *see also* Memorandum, "Placement of Republic of Korea Economic Diversification Memorandum on the Record," dated May 3, 2022 (Economic Diversification Memorandum) (containing, "The Extent of Diversification of Economic Activities in the Republic of Korea (South Korea) for the Purpose of Determining Specificity of a Domestic Subsidy for Countervailing Duty (CVD) Purposes," dated September 13, 2018).

industry"—including whether an enterprise or industry receives a disproportionately large amount of the subsidy—"includes a group of such enterprises or industries."[9]  As the Court noted, disproportionality exists when something is too large or too small in relation to something else.[10]  Consequently, an analysis under section 771(5A)(D)(iii)(III) of the Act necessitates a comparison of industries or enterprises, whether or not they are related to one another, because Commerce cannot determine whether an industry or enterprise, or group thereof, received a disproportionate amount of the benefit conferred by the subsidy without comparing the differences in usage between disparate groups.

In its *Remand Order*, the Court stated that disproportionality requires that an enterprise or industry is favored in some way (*i.e.*, it received more than its fair share).[11]  The Court ordered Commerce to explain how the combined industries (*i.e.*, the steel industry and three other industries) that it identified benefits more than would be expected, based on their usage given that the subsidy in question (provision of electricity) is designed to confer benefits on usage levels, or in relation to some other comparator.[12]  The Court also ordered Commerce to explain why these industries (*i.e.*, the steel industry and three other industries) are grouped together for purposes of its analysis.[13]

Commerce reexamined the information on the record and continues to find that its *de facto* specificity analysis is supported by record evidence and in accordance with the statute.  In the underlying administrative review, the GOK provided electricity consumption data for the steel industry and nine other industries for the POR.[14]  We determined that the Electricity

---

[9] *See* section 771(5A)(D) of the Act.
[10] *See Remand Order* at 9-10.
[11] *Id.* at 12.
[12] *Id*.
[13] *Id*.
[14] *See* GOK Letter, "Initial Questionnaire Response," dated June 27, 2022, at 35-36.

Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because the steel industry and *three other industries* received a disproportionately large amount of the subsidy.

For this remand redetermination, we have further examined the record and reevaluated the basis for our decision.  A further examination of the GOK's consumption data for the ten largest electricity consuming industries indicates that, in fact, the steel industry and *two other industries*, [                            ], consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported.  The steel industry along with the [                            ] industries consumed [      ] percent of the industrial class electricity during the POR.[15]  The remaining seven industries, of the ten largest electricity consuming industries, accounted for merely [      ] percent of the total industrial class electricity consumed during the POR.[16]  These top three industries alone thus received nearly [   ] percent more of the subsidy benefits under the program than the seven other industries combined when compared to total industrial class electricity consumption.[17]  The disproportionate distribution of benefits to the top three industries under this program is further evidenced by an examination of the industrial electricity consumed only by the top ten industries.  Commerce determined that the Korean economy consists of at least 19 different industry groupings.[18]  Our analysis demonstrates that the steel, [                            ] industries accounted for [      ] percent of the total electricity consumed by the ten largest industrial consumers of electricity, which constitutes a disproportionate and a majority amount

---

[15] *See* Attachment.
[16] *Id*.
[17] *Id*.
[18] *See* Economic Diversification Memorandum.

among these ten industrial sectors.[19]  Finally, when examining the simple average electricity

consumed by the ten largest industries, the top three industries respectively consumed [

] times that simple average amount.[20]  Together, the top three industries thus consumed

[    ] times the simple average.  These figures thus demonstrate an uneven distribution of the

benefits under the Electricity Program in favor of the steel, [                                    ]

industries in Korea and a sufficient basis to support finding the program to be *de facto* specific

based on disproportionate use by these sectors.

Here, Commerce's rationale for grouping the steel, [                                    ]

industries together is based on a relatively comparable percentage of total industrial electricity

consumption in Korea during the POR.  Steel, [                            ], at [    ] percent,

consumed a comparable percentage of industrial electricity as [            ] at [    ] percent, the

second largest industry, after [                      ] which consumed [    ] percent of the

industrial electricity in the POR.[21]  The data then demonstrate a significant difference between

the electricity consumption of the three largest consumers of industrial class electricity, each

with [                ] percentage levels and the next largest consuming industry, [                ],

at [    ] percent, a difference of [    ] percent.[22]  Each of the remaining seven industries

consumed [                ] levels of industrial electricity on a percent basis, which clearly

distinguishes their relatively smaller levels of consumption from the [                ] percentage

of electricity consumed by the three industrial sectors consuming much higher amounts and thus

receiving much higher amounts of the subsidy benefits under the Electricity Program.  Based on

the characteristic of comparative consumption of industrial electricity during the POR, we find

---

[19] *See* Attachment.
[20] *Id*.
[21] *Id*.
[22] *Id*.

there is a sufficient basis to group the steel, [                                    ] industries

together to conduct an analysis of whether an enterprise or industry, or group thereof, received a

disproportionately large amount of the subsidy.[23]  Further, we find that the industrial electricity

consumption data show that the grouping of steel, [                              ] industries

consumed a disproportionate amount of the electricity in comparison to the grouping of the

remaining seven industries within the ten largest electricity consuming industries in Korea.

Moreover, this grouping of relatively large recipients of the subsidy is consistent with

Commerce's long-standing practice for analyzing *de facto* specificity for the Electricity Program

in Korean CVD proceedings and also for other programs in CVD proceedings.[24]  Here,

Commerce has explained why these industries (*i.e.*, the steel industry and two other industries)

are grouped together for purposes of its *de facto* specificity analysis, and this explanation is

consistent with the concept that "{d}eterminations of disproportionality and dominant use are

not subject to rigid rules, but rather must be determined on a case-by-case basis taking into

account all facts and circumstances of a particular case."[25]  In the *Remand Order*, the Court

further stated that "when analyzing whether an industry or group of industries receives a

disproportionate amount of the benefit conferred by the subsidy, pursuant to {section

771(5A)(D)(iii) of the Act}, receipt of a greater monetary benefit from the program than others is

not determinative of disproportionality," and cited to *AK Steel*.[26]  The Court further stated that

the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in

---

[23] *See Countervailing Duties,* 63 FR 65348, 65357 (November 25, 1998) (*CVD Preamble*) "If the numerous enterprises that received benefits had comprised a limited number of industries, then the program would have been specific."

[24] *See, e.g., Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2022*, 89 FR 99224 (December 10, 2024) (*Cut-to-Length Plate from Korea Final Results 2022*), and accompanying IDM at 22-27.

[25] *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (*AK Steel*).

[26] *See Remand Order* at 10 (citing *AK Steel*).

relation to the benefits of others, but in relation to some other comparator.[27]  In *AK Steel*, the
Court rejected the argument for Commerce to analyze disproportionality by looking at the
percentage of the total benefit of a subsidy program accruing to a particular company or industry,
stating that such an analysis "could produce an untenable result, *i.e.*, that a benefit conferred on a
large company might be disproportionate merely because of the size of the company."[28]

   We find that *AK Steel* is inapplicable to the specificity analysis at issue in this case.  In
*AK Steel*, the Court upheld Commerce's determination in *Certain Steel Products from Korea* that
examined a tax exemption program that allowed some companies to revalue assets without
meeting the requirements in the Asset Revaluation Act.[29]  In *Certain Steel Products from Korea*,
Commerce determined that while the respondent, a steel company, received a large benefit, it
was not disproportionate to the benefit other producers received from the program.[30]  Indeed, in
discussing the benefits received by the respondent, Pohang Iron & Steel Company (POSCO), in
*Certain Steel Products from Korea*, this Court stated,

> POSCO did not receive a disproportionate benefit because in the same year when
> POSCO revalued its assets upward by 94.0%, the average increase in asset value
> was 94.2%.  Moreover, for the companies for which complete data was available,
> 81 out of 181 companies revalued their assets by a greater percentage than POSCO
> . . . Thus, it was not error for Commerce to rely on record evidence demonstrating
> no disproportionality based on the relative percentage benefit rather than on the
> absolute benefit conferred on POSCO.[31]

Thus, Commerce concluded POSCO did not receive a disproportionate amount of benefits under
the relevant tax program because nearly half of the companies eligible to participate in the
program received a greater percentage of benefits than POSCO.

---

[27] *Id.*
[28] *See AK Steel*, 192 F.3d at 1385.
[29] *See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances
Determinations:  Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) (*Certain Steel Products from
Korea*).
[30] *Id.* at 37350-51.
[31] *See AK Steel*, 192 F.3d at 1385.

Furthermore, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) upheld Commerce's reliance on record evidence and the "relative percentage benefit" conferred on POSCO in making its disproportionality determination.[32]  Thus, the Federal Circuit did not preclude Commerce's ability to consider the percentage of the benefit bestowed on a respondent in its disproportionality findings.  Indeed, the Federal Circuit held that "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case."[33]  The Federal Circuit further determined that "it was not error for Commerce to rely on record evidence demonstrating no disproportionality based on the relative percentage benefit rather than on the absolute benefit conferred on POSCO."[34]

We also find *Bethlehem Steel* to be inapplicable to the instant specificity analysis.[35]  In *Bethlehem Steel*, the Court upheld Commerce's determination in *CTL Plate from Korea 1999* that steel companies were not the dominant or disproportionate participants in the Voluntary Curtailment Adjustment, a program involving identical price discounts offered to certain electricity users that agreed to voluntarily limit their electricity consumption.[36]  In reaching its finding in *Bethlehem Steel*, the Court noted the steel industry's large consumption of electricity and concluded that although the steel industry's benefit was "disparate," it was not "disproportionate" to what other industries or entities received based on their usage.[37]

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35]  *See Remand Order* at 11 (citing *Bethlehem Steel Corp. v. United States*, 25 CIT 307 (CIT 2001) (*Bethlehem Steel*)).
[36] *See Notice of Final Affirmative Countervailing Duty Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 64 FR 73176, 73186 (December 29, 1999) (*CTL Plate from Korea 1999*).
[37] *See Bethlehem Steel*, 25 CIT at 322.

Unlike the programs examined in *AK Steel* and *Bethlehem Steel*, here, we are analyzing a government's provision of electricity for LTAR.  Under the Electricity Program here, electricity consumption is directly tied to the amount of subsidy conferred through the pricing of electricity.  Because, in the provision of electricity for LTAR, a benefit is conferred through the respondent's purchases of electricity, it is unnecessary to demonstrate the amount of subsidy conferred was disproportionate to the consumption of electricity; the benefit to the respondent is a direct result of the respondent's consumption of the good purchased for LTAR.  Disproportionate usage because the production of steel requires a lot of electricity, necessarily results in the GOK providing disproportionate value to the industry purchasing electricity for LTAR.  Unlike in *AK Steel* and *Bethlehem Steel*, here Commerce is analyzing the GOK's provision of electricity for LTAR, rather than a grant or tax program, and the usage of the program, *i.e.*, purchasing the good or service, is directly tied to the level of subsidization received by the respondent.

Further, when conducting a disproportionality analysis under section 771(5A)(D)(iii)(III) of the Act, we do not see a requirement in the statute that the group of enterprises or industries at issue must be found to have received more than "would be expected" in relation to some other comparator.[38]  Thus, for the following reasons, we do not agree that a benefit conferred on a large company might be disproportionate merely because of the size of the company.  Here the record supports finding that the steel industry, along with two other industries, consumed a disproportionate amount of the electricity in *comparison* to the remaining seven industries within the ten largest electricity consuming industries in Korea.  Again, the Korean economy consists of at least 19 different industry groupings.[39]

---

[38] *See Remand Order* at 12.
[39] *See* Economic Diversification Memorandum.

First, we find the concern that a benefit conferred on a large company might be disproportionate merely because of the size of the company to be inconsistent with the basic purpose of the specificity test, which is to determine the extent to which the benefit of a subsidy is spread throughout an economy and to remedy those subsidies that are limited or unevenly distributed among the recipients.[40]  To accept such a position would mean that Commerce's ability to countervail subsidies provided to enterprises and industries considered to be "large" would potentially be out of reach simply because the large share of benefits under a program may have resulted from the fact that the enterprise or industry is large.  Under such circumstances, subsidies provided to large enterprises and industries would escape the remedies provided under the statute.

Here, consistent with Commerce's long-standing practice, when analyzing whether the benefits under the Electricity Program are *de facto* specific, we examined the distribution of benefits among the users of the program.[41]  For this analysis, Commerce conducts a comparison of amounts, whether on an absolute or percentage basis.  The logic underpinning our consistent application of the disproportionality analysis is that an industry or enterprise, or groups thereof, must be found to have received a substantially larger amount of the benefits under a program than the relative amounts received by other enterprises or industries, whether based on absolute numbers or calculated percentages.  Commerce finds this analysis is consistent with the statute under section 771(5A)(D)(iii) of the Act.

Indeed, a requirement that Commerce must determine whether receiving a relatively large amount of the subsidy benefits under a program would be expected merely because the enterprise

---

[40] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA) at 929.
[41] *See, e.g., Cut-to-Length Plate from Korea Final Results 2022* IDM at 22-27.

or industry is large and thus reflects a "fair share," could lead to the absurd result that the largest recipients of subsidies under a program, and thus those with the largest ability to distort trade and harm U.S. enterprises and industries, would be excluded from the application of remedial countervailing duties. Such a conclusion would fundamentally undermine the application of the CVD remedy.

This interpretation could also create the perverse situation where a subsidy is found to be specific to an enterprise or industry based on predominant use under section 771(5A)(D)(iii)(II) of the Act, but the same level of benefits is found not to be specific on a disproportionate basis under section 771(5A)(D)(iii)(III) of the Act. For example, predominant use could be found if in year x, Industry A and Industry B received 30 percent and 25 percent of a program's benefits, respectively. However, if in year y, Industry A and Industry C each received 10 percent of the same program's benefits, and Industry B again received 25 percent, Industry B could not be found to have received a *de facto* specific subsidy based on disproportionate use if Industry B received an expected amount of the subsidy due to its large size or without further examination of an external comparator. If additional explanation would be required for a finding of disproportionate use by a large enterprise or industry, it is not clear why additional explanation would not also be required for a finding of predominant use by a large enterprise or industry, or group thereof, merely because they are large, *e.g.*, receipt of over 50 percent of the benefits under a program.

On remand, as discussed above, Commerce further analyzed the amount of industrial electricity consumption under the Electricity Program among only the largest beneficiaries under the program, *i.e.*, the top ten industrial users of electricity. The data show that there is a clear delineation in terms of electricity consumption between the top three industries (steel,

[                                    ]) and the remaining seven industries.[42]  Specifically, the data show a precipitous drop of approximately [    ] percent in terms of electricity consumption between steel and the next largest industrial electricity user.[43]  The record thus contains substantial evidence that the top three industries received a disproportionately large amount of the benefits under the Electricity Program.  Further, by analyzing the ten largest industrial users of the Electricity Program, we conducted an analysis with respect to a pool of only the largest beneficiaries under the program.  As explained above, Commerce's methodology of using the top ten industrial electricity users as the comparator group is consistent with our practice for programs of this nature, the provision of subsidized electricity, as well as other types of programs, such as those conferring grants or tax reductions.[44]  Further, we consider this approach of comparing the relative benefits received by program recipients as a reasonable interpretation of the statutory term "disproportionate," which we determine can mean the receipt of substantially greater amounts by the top three industrial users in relation to the other seven industrial users, which can be established by a comparison of the amount of the subsidy benefits received under a program.  In light of this, we also consider it reasonable to conclude that the statute does not require the disproportionality analysis to be conducted with reference to an external or extrinsic benchmark, such as sales revenue or economic output.  Although Commerce may and has relied on such external benchmarks in very rare circumstances, neither the statute, the regulations, nor the SAA mandate this approach in every instance; thus, the choice of *de facto*

---

[42] *See* Attachment.
[43] *Id.*
[44] *See, e.g., Cut-to-Length Plate from Korea Final Results 2022* IDM at 22-27; *see also Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2022*, 89 FR 73626 (September 11, 2024) (*CTLP from Korea Final Results 2022*), and accompanying IDM at 17-21.

specificity methodologies should lie within Commerce's discretion based upon the facts of a particular case.[45]

Commerce has explained that the facts of a case are determinative of the appropriate methodology Commerce elects.[46]  Further, Commerce has previously rejected the argument that large companies which qualify for more benefits based on their size should not be found to receive a disproportionate share of the benefits.[47]  In response, Commerce stated, that

> the very purpose for the analysis of *de facto* specificity that is set forth in the statute: to ensure that companies that qualify and receive more benefits under a government subsidy program do not escape redress of the countervailing duty law simply because the law implementing the subsidy program does not explicitly limit the benefits to a group of enterprises or industries.[48]

On that basis, Commerce rejected Samsung Electronics Co., Ltd.'s (SEC) argument by stating that, "SEC's argument that large companies uniformly invest more in {research and development} than other companies is speculative because SEC has provided no factual support for this statement."[49]  Commerce concluded in that prior case that respondent SEC provided no reason to "depart from our normal disproportionality analysis."  Similarly, Commerce does not see any methodological rationale to support that an external comparator would result in a more appropriate basis to determine disproportionate use here.

As discussed above, Commerce reexamined the record and provided additional explanation for why it grouped three industries together in its disproportionality analysis. Further, while Commerce is not precluded from utilizing an external comparator for a *de facto*

---

[45] *See Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1309 (CIT 2022), (stating "Commerce has discretion to determine what predominant means in the context of {section 771(5A)(D)(iii)}.") (*Mosaic*), *appeals filed*, Fed. Cir. Nos. 24-1593, 24-1595.

[46] *See, e.g.*, *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea:  Final Affirmative Countervailing Duty Determination,* 77 FR 17410 (March 26, 2012) (*Refrigerator-Freezers from Korea Final*), and accompanying IDM at 46-49.

[47] *Id.*

[48] *Id*. at 48.

[49] *Id.*

specificity finding, we observe that the statute, regulations, and the SAA do not mandate the use of external benchmarks for an analysis of disproportionate use, and we find that our methodology of using the top ten industrial electricity users as the comparator group is consistent with our practice for programs of this nature.  Thus, in this case, we find that our examination of the facts regarding the relative distribution of benefits under the program is, alone, sufficient for such a determination.[50]

We, therefore, determine that those three industries received a disproportionately large amount of the electricity subsidy within the meaning of section 771(5A)(D)(iii)(III) of the Act. Commerce's determination that the GOK's Electricity Program is *de facto* specific is supported by substantial evidence and in accordance with the law.

## IV.    INTERESTED PARTY COMMENTS

We released the Draft Results to interested parties on March 4, 2025.[51]  On March 17, 2025, we received comments from the GOK and Hyundai Steel relating to Commerce's specificity analysis for the Electricity Program.[52]  The arguments submitted are summarized and addressed below.

**Comment 1:  Whether Commerce's *De Facto* Specificity Determination Is Supported By Substantial Evidence and In Accordance With Law**

*GOK's Comments*

The following is a verbatim summary of an argument submitted by the GOK.  For further details, *see* GOK's Comments at 3-11.

> … in its Draft Remand Redetermination, {Commerce} again failed to provide an adequate explanation for its *de facto* specificity finding.  Contrary to the Court's

---

[50] *See* SAA at 932.
[51] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 24-135 (CIT December 12, 2024), Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, released March 4, 2025 (Draft Results).
[52] *See* GOK's Letter, "Comments on Draft Results of Redetermination," dated March 17, 2025 (GOK's Comments); *see also* Hyundai Steel's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated March 17, 2025 (Hyundai Steel's Comments).

directions, {Commerce's} *de facto* specificity analysis continues to conflate the terms "disparity" and "disproportionate" by arguing that the provision of electricity is disproportionate because larger industries consume more electricity than smaller industries.  The Court explicitly required {Commerce} to explain how the higher consumption level of electricity results in a disproportionate benefit relative to the level of consumption itself or other factors.  Mere demonstration of disparate consumption levels of electricity does not satisfy this requirement.

*Hyundai Steel's Comments*

The following is a verbatim summary of an argument submitted by Hyundai Steel.  For further details, *see* Hyundai Steel's Comments at 3-13.

> The Draft Redetermination fails to meaningfully address, let alone remedy, the errors in Commerce's *de facto* specificity determination as identified by {the Court}.  The Court found that Commerce failed to explain its determination that its chosen grouping of industries received a "disproportionate" benefit and failed to identify a comparator for its chosen group.  The Court also made plain that larger consumers receiving proportionally larger benefits under a program where benefits are tied to usage does not evidence disproportionality.  Instead of remedying these issues, Commerce has only slightly revised its disproportionality analysis, reducing the industry grouping from four industries to three, and comparing this group against the remaining seven industries.  But this analysis fails to remedy the fundamental issue raised by the Court, which is that Commerce needed to explain how the combined industries it identifies benefit more than would be expected, based on their usage.  Such an explanation is required to support the conclusion that the industry grouping it relies upon received a "disproportionate" amount of the benefit as required by the plain language of the statute.  Instead, Commerce has just repackaged its prior analysis that simply demonstrates that the largest consumers of electricity consume more than the smaller consumers.  This does not demonstrate disproportionality.

**Commerce Position:**  We disagree with the arguments made by the GOK and Hyundai Steel and continue to find that the GOK's provision of electricity to certain industrial users is *de facto* specific.  In the Draft Results, Commerce provided a further explanation for its determination that the benefits under the Electricity Program received by a group of industries (inclusive of steel) it identified is disproportionate within the meaning of section 771(5A)(D)(iii)(III) of the Act.[53]  In doing so, Commerce addressed the Court's concerns above and further explained how

---

[53] *See supra*, at 3-15.

the higher consumption of electricity results in a disproportionate benefit to the steel industry. The GOK and Hyundai Steel fail to demonstrate that Commerce's decision does not comply with the Court's remand order.

As noted above, in responding to the Court's order, Commerce reexamined the GOK's consumption data for the ten largest electricity consuming industries finding that the steel industry and *two other industries*, [                              ], consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries reported by the GOK.  Specifically, we found that the steel industry along with the [                          ] industries consumed [     ] percent of the industrial class electricity during the POR.[54]  The remaining seven industries, a grouping that meets the definition of a comparator, accounted for merely [     ] percent of the total industrial class electricity consumed during the POR.[55]

Additionally, an analysis of the data shows that there is a clear delineation in terms of electricity consumption between the top three industries (steel, [

]) and the remaining seven industries.[56]  For example, the remaining seven industries consumed [              ] levels of industrial electricity on a percent basis, which clearly distinguishes their relatively smaller levels of consumption from the [            ] percentage of electricity consumed by the three industrial sectors consuming much higher amounts, and thus, receiving much higher amounts of the subsidy benefits under the Electricity Program.[57] The record thus contains substantial evidence that the top three industries received a disproportionately large amount of the benefits under the Electricity Program.

---

[54] *See* Attachment.
[55] *Id*.
[56] *Id*.
[57] *Id*.

Further, by analyzing the ten largest industrial users of the Electricity Program, we conducted an analysis with respect to a pool of only the largest beneficiaries under the program. Commerce's methodology of using the top ten industrial electricity users as the comparator group is consistent with our practice for programs of this nature, the provision of subsidized electricity.[58] We consider this approach of comparing the relative benefits received by program recipients as a reasonable interpretation of the statutory term "disproportionate," which we determine can mean the receipt of substantially greater amounts by the top three industrial users in relation to the other seven industrial users, which can be established by a comparison of the amount of the subsidy benefits received under a program. In light of this, we also consider it reasonable to conclude that the statute does not require the disproportionality analysis to be conducted with reference to an external or extrinsic benchmark, such as sales revenue or economic output. Although Commerce may and has relied on such external benchmarks in rare circumstances, neither the statute, the regulations, nor the SAA mandate this approach in every instance; thus, the choice of *de facto* specificity methodology to apply should lie within Commerce's discretion based upon the facts of a particular case.[59]

Hyundai Steel argues that Commerce's discussion of the consumption percentages, which show that a group of three industries received more of the electricity benefit than the seven other industries, does not remedy the flaw with Commerce's *de facto* analysis, *i.e.*, comparing the largest users to the smaller users on the list does not give meaning to the term "disproportionate."[60] Both the GOK and Hyundai Steel argue that larger consumers of

---

[58] *See, e.g.*, *Cut-to-Length Plate from Korea Final Results 2022* IDM at 22-27; *see also CTLP from Korea Final Results 2022* IDM at 17-21.
[59] *See Mosaic*, 589 F. Supp. 3d 1309, (stating "Commerce has discretion to determine what predominant means in the context of {section 771(5A)(D)(iii)}."), *appeals filed*, Fed. Cir. Nos. 24-1593, 24-1595.
[60] *See* Hyundai Steel's Comments at 5-7.

electricity would be expected to consume more electricity than smaller consumers, and therefore, there is nothing "disproportionate" demonstrated in Commerce's electricity usage groupings.[61] They add that Commerce dismisses the Court's concern that a benefit conferred on a larger company might be disproportionate merely because of the size of the company and that Commerce must show that the industry received more than would be expected.[62]  We disagree.

As explained above, when conducting a disproportionality analysis under section 771(5A)(D)(iii)(III) of the Act, there is no statutory requirement that the group of enterprises or industries at issue must be found to have received more than "would be expected" in relation to some other comparator.  Thus, we do not agree that a benefit conferred on a large company might be disproportionate merely because of the size of the company.  Here the record supports the finding that the steel industry, along with two other industries, consumed a disproportionate amount of the electricity in *comparison* to the remaining seven industries within the ten largest electricity consuming industries in Korea, which has at least 19 different industry groupings in total.[63]

As Commerce explained, the concern that a benefit conferred on a large company might be disproportionate merely because of the size of the company is inconsistent with the basic purpose of the specificity test.[64]  To accept such a position would improperly limit Commerce's ability to countervail subsidies simply because the large share of benefits under a program may have resulted from the fact that the enterprise or industry is large.  Under such circumstances, subsidies provided to large enterprises and industries would escape the remedies provided under the statute.

---

[61] *Id.*; *see also* GOK's Comments at 4-6.
[62] *See* Hyundai Steel's Comments at 9-11; *see also* GOK's Comments 8-9.
[63] *See* Economic Diversification Memorandum.
[64] *See* SAA at 929.

For a disproportionality analysis, Commerce conducts a comparison of usage amounts, whether on an absolute or percentage basis. The logic underpinning Commerce's application of the disproportionality analysis is that an industry or enterprise, or groups thereof, must be found to have received a substantially larger amount of the benefits under a program than the relative amounts received by other enterprises or industries, whether based on absolute numbers or calculated percentages. We find this analysis is consistent with the statute under section 771(5A)(D)(iii)(III) of the Act.

Furthermore, a requirement that Commerce must determine whether the receipt of a relatively large amount of the subsidy benefits under a program would be expected merely because the enterprise or industry is large and thus reflects a "fair share" could lead to the absurd result that the largest recipients of subsidies under a program, and thus those with the largest ability to distort trade and harm U.S. enterprises and industries, would be excluded from the application of remedial countervailing duties. Such a conclusion would fundamentally undermine the application of the CVD remedy.

As noted above, Commerce has previously rejected the argument that large companies which qualify for more benefits based on their size should not be found to receive a disproportionate share of the benefits.[65] As Commerce has previously explained in *Refrigerator-Freezers from Korea Final*,

> the very purpose for the analysis of *de facto* specificity that is set forth in the statute: to ensure that companies that qualify and receive more benefits under a government subsidy program do not escape redress of the countervailing duty law simply because the law implementing the subsidy program does not explicitly limit the benefits to a group of enterprises or industries.[66]

---

[65] *See*, *e.g.*, *Refrigerator-Freezers from Korea Final* IDM at 46-49.
[66] *Id.* at 48.

Additionally, in their comments, the GOK and Hyundai Steel argue that Commerce's position that *AK Steel* and *Bethlehem Steel* are not applicable to this case is incorrect.[67]  They note that, in *AK Steel*, the Federal Circuit found that basing disproportionality on the absolute benefit amount, as opposed to percentage benefit, could produce an untenable result, *i.e.*, that a benefit conferred on a large company might be disproportionate merely because of the size of the company.  With regard to *Bethlehem Steel*, they opine that the case stands for the proposition that disparity in the amount of benefits received based on usage levels alone is not a sufficient basis to find that a subsidy is *de facto* specific based on disproportionate receipt of the subsidy.

As we stated above, however, we disagree and continue to find that *AK Steel* and *Bethlehem Steel* are off point to the specificity analysis at issue in this case.  Neither case considered the program at issue here, or the same comparison of subsidy benefits received by the industry at issue.

Again, unlike the facts under review in *AK Steel* and *Bethlehem Steel*, here, the record shows that the steel industry and two other industries received a disproportionate share of the electricity subsidy as evidence by the fact that the steel, [                              ] industries consumed [      ] percent of the industrial class electricity during the POR, while the remaining seven industries, within the top ten industrial electricity consumers alone, accounted for just [      ] percent of the total industrial class electricity consumed during the POR.[68]

In response to the Court's order, Commerce has provided additional explanation for grouping steel and two other industries together to conduct its disproportionality analysis for the Electricity Program.  The facts of a case are determinative of the appropriate methodology

---

[67] *See* GOK's Comments at 6-7; *see also* Hyundai Steel's Comments at 7-9.
[68] *See* Attachment.

Commerce elects to apply.[69]  Here, the applied methodology of using the industrial electricity

users as the comparator group is consistent with Commerce's approach for programs of this

nature.  Thus, we find that our examination of the facts regarding the relative distribution of

benefits under the Electricity Program is, alone, sufficient for such a determination.[70]

Commerce's determination that the GOK's Electricity Program is *de facto* specific because steel

and two other industries received a disproportionately large amount of the subsidy within the

meaning of section 771(5A)(D)(iii)(III) of the Act is, therefore, supported by substantial

evidence and in accordance with the law.

**Comment 2:  Whether Commerce Provided a Rational Explanation for Grouping
            Industries Together**

*GOK's Comments*

The following is a verbatim summary of an argument submitted by the GOK.  For further details,
*see* GOK's Comments at 11-15.

> … {Commerce} did not follow the Court's directive to explain why four separate
> industries were grouped together for purposes of {Commerce's} specificity
> analysis.  Instead of providing a reasonable explanation for grouping disparate
> industries together, {Commerce} simply changed the number of industries it
> grouped together from four to three, again without offering any plausible reason for
> doing so.  More importantly, {Commerce} grouped the three industries together
> because they are the top industrial users of electricity.  The Court already rejected
> this rationale for grouping industries together where the alleged subsidy is widely
> used, like electricity is in Korea.

*Hyundai Steel's Comments*

The following is a verbatim summary of an argument submitted by Hyundai Steel.  For further
details, *see* Hyundai Steel's Comments at 13-15.

> The Draft Redetermination also fails to provide a rational basis for why Commerce
> grouped the largest three industries together for purposes of its disproportionality
> analysis as required by the Court.  Instead, Commerce grouped certain industries
> together because they consume a large amount of electricity and grouped the
> comparator group of industries together because they consume a small amount of

---

[69] *See, e.g.*, *Refrigerator-Freezers from Korea* IDM at 46-49.
[70] *See* SAA at 932.

electricity. This "relatively comparable percentage" explanation for its grouping is not rational and still results in Commerce basing its disproportionality determination on the size of the industries consuming electricity. The Draft Redetermination thus remains unsupported by substantial evidence.

**Commerce Position:** We disagree with the arguments made by the GOK and Hyundai Steel. Commerce has complied with the Court's order to provide a rational basis for grouping industries together for the purposes of a disproportionality analysis where the subsidy at issue is widely available.

Electricity is a utility that is consumed by an entire economy. In examining whether electricity for LTAR program is specific, it is logical for Commerce to analyze the program by looking at the consumption amount by industries. As indicated above, the Korean economy consists of at least 19 industries. It is also logical for Commerce to examine the top industries, among the 19 known, that consume electricity for the purpose of a disproportionality analysis. As explained above, the rationale for grouping the steel, [                              ] industries together is based on a relatively comparable percentage of total industrial electricity consumption in Korea during the POR.[71] Steel, [                         ], at [      ] percent, consumed a comparable percentage of industrial electricity as [            ] at [      ] percent, the second largest industry, after [                  ] which consumed [     ] percent of the industrial electricity in the POR.[72] The data then demonstrate a notable difference between the electricity consumption of the three largest consumers of industrial class electricity, each with [                ] percentage levels and the next largest consuming industry, [                ], at [     ] percent.[73] Each of the remaining seven industries consumed [                ] levels of industrial electricity on a percent basis, which distinguishes their relatively smaller levels of

---

[71] *See supra,* at 6-7.
[72] *See* Attachment.
[73] *Id.*

consumption from the [                    ] percentage of electricity consumed by the three industrial

sectors consuming much higher amounts and thus receiving much higher amounts of the subsidy

benefits under the Electricity Program.[74]

Based on the characteristic of comparative consumption of industrial electricity during

the POR and the record evidence, we find there is a sufficient basis to group the steel, [

                                    ] industries together to conduct an analysis of whether an enterprise

or industry, or group thereof, received a disproportionately large amount of the subsidy under

section 771(5A)(D)(iii)(III) of the Act.[75]  Commerce, thus, has explained why these industries

(*i.e.*, the steel industry and two other industries) are grouped together for purposes of its *de facto*

specificity analysis, and this explanation is consistent with the concept that "{d}eterminations of

disproportionality and dominant use are not subject to rigid rules, but rather must be determined

on a case-by-case basis taking into account all facts and circumstances of a particular case."[76]

Further, contrary to the arguments of the GOK and Hyundai Steel,[77] Commerce has not

randomly grouped enterprises and industries together to arbitrarily create a set of larger users to

conclude that the Electricity Program disproportionately benefits the steel and two other

industries.  Rather, the methodology presented provides a rationale for grouping industries

together for a disproportionality analysis where a subsidy is widely distributed in compliance

with the Court's order.

---

[74] *Id.*
[75] *See CVD Preamble*, 63 FR at 65357 ("If the numerous enterprises that received benefits had comprised a limited number of industries, then the program would have been specific.").
[76] *See AK Steel*, 192 F.3d at 1385.
[77] *See* GOK's Comments at 12-13; *see also* Hyundai Steel's Comments at 13.

## V.    FINAL RESULTS OF REDETERMINATION

Based on the analysis above, we continue to find the GOK's Electricity Program to be *de facto* specific because the steel industry and two other industries received a disproportionately large amount of the subsidy within the meaning of section 771(5A)(D)(iii)(III) of the Act.

4/11/2025

X 

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott,
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance.

## ATTACHMENT

### *PUBLIC VERSION*

| | a | a/b | a/c | |
|---|---|---|---|---|
| **Industry** | **Electricity Consumption Amount (kWh)** | **Percentage of Electricity Consumed By the Top 10 Consumers** | **Percentage of Industrial Electricity Consumption in Korea** | **Difference in Industrial Electricity Consumption** |
| 1 [ | | | | ] |
| 2 [ | | | | ] |
| 3 [ | | | | ] |
| 4 [ | | | | ] |
| 5 [ | | | | ] |
| 6 [ | | | | ] |
| 7 [ | | | | ] |
| 8 [ | | | | ] |
| 9 [ | | | | ] |
| 10 [ | | | | ] |

**Total Electricity Consumed (kWh) in 2021 by the Top Ten Industries [** **] b**

**Total Industrial Electricity Consumption (kWh) in 2021 [** **] c**

**Total % of Electricity Consumed by the 3 Largest Industrial Consumers [** **]**

**Top 3 Industries % of Industrial Electricity Consumption [** **]**

**Remaining 7 Industries % of Industrial Electricity Consumption [** **]**

*Source*: GOK Letter, "Initial Questionnaire Response," dated June 27, 2022 at 35-36 (barcode: 4255901-01).