**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

HYUNDAI STEEL COMPANY,

               Plaintiff,

     and

GOVERNMENT OF THE REPUBLIC
OF KOREA,

               Plaintiff-Intervenor,

   v.

UNITED STATES,

               Defendant,

     and

NUCOR CORPORATION,

               Defendant-Intervenor.

**NON-CONFIDENTIAL
VERSION**
Proprietary Information removed
from Pages 4 to 7, and 13 to 15

Ct. No. 23-00211

<u>**PLAINTIFF HYUNDAI STEEL COMPANY'S COMMENTS IN OPPOSITION TO
COMMERCE'S FINAL RESULTS OF REDETERMINATION
PURSUANT TO REMAND**</u>

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

May 19, 2025

## <u>TABLE OF CONTENTS</u>

Table of Authorities ........................................................................................................ ii

I.     Argument ........................................................................................................ 2

     A.    Commerce's De Facto Specificity Determination Continues To Be Unsupported By Substantial Evidence And Otherwise Not In Accordance With Law. .............. 2

     B.    Commerce Has Not Provided A Rational Explanation For Its Grouping Of Industries Together For Its Disproportionality Decision. ..................................... 13

II.    Conclusion ................................................................................................... 16

Certificate Of Compliance ........................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp v. United States*,
192 F.3d 1367 (Fed. Cir. 1999).....................................................................2, 3, 4, 7

*Bethlehem Steel Corp. v. United States*,
140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ......................................................7, 8

*Carlisle Tire & Rubber Co. v. United States*,
5 C.I.T. 229, 564 F. Supp. 834 (1983) ...................................................................11

*Frederick v. Shinseki*,
684 F.3d 1263 (Fed. Cir. 2012).............................................................................12

*Hall v. United States*,
677 F.3d 1340 (Fed. Cir. 2012).............................................................................12

*Hyundai Steel v. United States*,
745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ................................................. *passim*

*Mosaic Company v. United States*,
744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ...................................................10, 11

*State Farm Mut. Auto Ins. Co.*, 463 U.S. .................................................................14

**Statutes**

19 U.S.C. § 1677(5A)(D)(iii)................................................................................. *passim*

**Other Authorities**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:
Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed.
Reg. 74,597 (Dec. 6, 2022) .......................................................................................8

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:
Preliminary Results and Preliminary Intent To Rescind, in Part, the
Countervailing Duty Administrative Review; 2021*,
88 Fed. Reg. 13,433 (Mar. 3, 2023).......................................................................8

*Certain Cut-To-Length Carbon-Quality Steel Plate From the Republic of Korea:
Final Results and Rescission, in Part, of Countervailing Duty Administrative
Review; 2021*, 88 Fed. Reg. 61,509 (Sept. 7, 2023) .........................................2, 15

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Partial Recission of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 15,825 (Dep't Commerce Mar. 5, 2024)................................................................................5

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Dep't Commerce Sept. 11, 2024)................................................................5, 15

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 ..................................10, 11, 14

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>    Plaintiff,<br><br>    and<br><br>GOVERNMENT OF THE REPUBLIC<br>OF KOREA,<br><br>    Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>    and<br><br>NUCOR CORPORATION,<br><br>    Defendant-Intervenor. | **NON-CONFIDENTIAL<br>VERSION**<br>Proprietary Information removed<br>from Pages 4 to 7, and 13 to 15<br><br><br><br>Ct. No. 23-00211 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S COMMENTS IN OPPOSITION TO**
**COMMERCE'S FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

Plaintiff Hyundai Steel Company ("Hyundai Steel" or "Plaintiff") hereby comments in

opposition to the U.S. Department of Commerce's ("Commerce") Final Results of

Redetermination Pursuant to Court Remand, *Hyundai Steel Co. v. United States*, Ct. No. 23-

00211 (Ct. Int'l Trade April 11, 2025), ECF No. 62, PRR 3 ("Final Remand").[1]  The

determination at issue is *Certain Cut-To-Length Carbon-Quality Steel Plate From the Republic*

*of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review;*

---

[1] Citations to the administrative record shall be to the public or confidential record document
number ("PR" or "CR") followed by the page or exhibit number.  Citations to the remand
administrative record shall be to the public or confidential remand record document number
("PRR" or "CRR") followed by the page or exhibit number.

*2021*, 88 Fed. Reg. 61,509 (Sept. 7, 2023), PR 225 ("*Final Results*"), and accompanying issues and decision mem., PR 222, ("Final Results IDM").

As discussed below, the Final Remand fails to comply with the Court's instructions and is otherwise unsupported by substantial evidence and not in accordance with law.

I.    *Argument*

    A.    *Commerce's De Facto Specificity Determination Continues To Be Unsupported By Substantial Evidence And Otherwise Not In Accordance With Law.*

In finding Commerce's disproportionate *de facto* specificity determination under 19 U.S.C. § 1677(5A)(D)(iii)(III) for the electricity for less than adequate remuneration ("LTAR") program to be unsupported by substantial evidence, the Court found that "Commerce fails to provide an explanation for its determination that the benefit received by a group of entities and industries it identifies is disproportionate.  Nowhere does Commerce identify the comparator to which the benefit is disproportionate."  *Hyundai Steel v. United States*, 745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024).  The Court also found that the statutory term "disproportionate" should be interpreted based on dictionary definitions that refer to this term as "having or showing a difference that is not fair, reasonable, or expected," and explaining that "disproportionality exists when something is 'too large or too small in relation to something {else}.'"  *Id.* (citing *Disproportionate*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/thesaurus/disproportionate, visited May 14, 2025 (attached as Exhibit A).  Relying on the U.S. Court of Appeals for the Federal Circuit ("CAFC") decision in *AK Steel*, the Court found that when analyzing disproportionality, "receipt of a greater monetary benefit from the program than others is not determinative of disproportionality . . . Rather, the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances."  *Id.* at 1351

(citing *AK Steel Corp v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999)).  Finally, the Court further clarified that programs designed to confer benefits based on usage levels necessarily result in larger users receiving proportionally larger percentages of the subsidy and thus "disproportionate" benefits must be those that are "more than would be expected."  *Id.* at 1353.

In the Final Remand, Commerce has largely ignored the Court's decision on these points and instead simply repackaged the same, already-rejected analysis of "disproportionality."  The only revision Commerce appears to have made to its analysis is to try to offer a supposed "comparator" to the largest users of electricity by rejiggering its grouping of industries from the steel industry and the other largest *three* consumers of electricity to a grouping of the steel industry and the other largest *two* consumers.  Final Remand at 5.  Commerce then claims that this revised group of three received a disproportionate amount of the subsidy as compared to the remaining seven industries.  *Id.*  Although this seven-industry grouping is nominally "some other comparator," it "elides the reality that programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy." *Hyundai Steel,* 745 F. Supp. 3d at 1353.  Commerce's new comparison does not account for this reality and instead the comparison just leads to the obvious conclusion that the three largest industrial users consume more electricity than the seven smaller industrial users from the list of the ten largest industrial energy consumers.

Commerce has simply sliced and diced the usage data to give the impression that it is conducting some type of meaningful comparative analysis.  However, this usage based comparison does not actually address the Court's finding that when analyzing disproportionality, "receipt of a greater monetary benefit from the program than others is not determinative of disproportionality . . . Rather, the disproportionality inquiry involves a case-by-case analysis

3

which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances." *Hyundai Steel,* 745 F. Supp. 3d at 1351 (citing *AK Steel Corp*, 192 F.3d at 1385). Commerce has not done the type of case-by-case analysis needed to demonstrate that its group of three received a disproportionate amount of the alleged electricity for LTAR subsidy. It has just compared a random group of the three largest users to the next seven smaller users. This may show disparity, but it does not show disproportionality.

Furthermore, in its updated analysis, Commerce has confused various sets of data, conflating total electricity consumption with industrial electricity consumption, and even further muddling the analysis by calculating certain percentages based on only the top ten electricity consuming industries. Final Remand at 5-6 and Attachment. Notably, the electricity consumed by the top ten industries represents [                    ] of the total electricity consumed in 2021 as reported by the Government of Korea ("GOK"). *See id.* at 5-6 and Attachment; *see also* Letter from Yoon & Yang LLC, "Response to the Initial Questionnaire," (June 27, 2022) CR 29-66, PR 60-85 ("GOK IQR") at 35-36 (electricity consumption by the top ten industries in 2021 amounted to [                    ] kWh, and total electricity consumption in 2021 amounted to [                    ] kWh ([                    ] MWh multiplied by 1,000). [                    

                    ]). Using the [                    ] denominator for only the top ten industries as the basis for its electricity usage calculation results in inflated consumption percentages and overstates the amount of electricity used by the three-industry grouping. Commerce states that the steel, [                    ] industries accounted for [        ] percent of the total electricity consumed by the ten largest industrial consumers of electricity, which Commerce claims "constitutes a disproportionate and a majority amount among these ten industrial sectors." Final Remand at 5-6. But this percentage is nonsensical

when the appropriate denominator is total electricity – not electricity consumed by ten industries representing **[          ]** of total electricity consumption.  *See id.* at 5-6 and Attachment; *see also* GOK IQR at 35-36.

Although Commerce claims that "using the top ten industrial electricity users as the comparator group is consistent with {its} practice for programs of this nature, the provision of subsidized electricity," its only support is a citation to the same proceeding, for the same exact program, in one review period *later* than the instant review period.  Final Remand at 18 (citing *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Preliminary Results and Partial Recission of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 15,825 (Dep't Commerce Mar. 5, 2024) and accompanying preliminary decision mem. at 12-19 ("CTL Plate from Korea 2022 CVD Preliminary Decision Mem."), unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Sept. 11, 2024) ("CTL Plate from Korea 2022 CVD Issues and Decision Mem.")).  When using total electricity as the denominator, the steel, **[                                    ]** industries consumed only **[        ]** percent of total electricity in 2021.  *See* Final Remand at 5-6 and Attachment; *see also* GOK IQR at 35-36.  Even considering industrial electricity alone, the consumption percentage for these three industries is only **[       ]** percent and not even a majority.  *Id.*[2]

---

[2] Although Commerce does not connect the dots it does point to the fact that the Korean economy consists of at least 19 different industry groupings.  Final Remand at 5.  While the fact that there are 19 industry groupings may show that overall the Korean economy is diverse most of the industry groups such as wholesale and retail trade, accommodation and food service, education, and membership organizations do not consume industrial electricity. *See* Mem. from Dep't Commerce, "Placement of Korea Economic Diversification Memorandum on the Record" at 2-3 (May 3, 2022), PR 24.  So Commerce mentioning this overall diversity provides no context or support to its disproportionate determination that is based on the group of three industries' consumption of industrial electricity.

NON-CONFIDENTIAL

In any event, regardless of the dataset used, comparing the largest users to the smaller users on the list does not give meaning to the term "disproportionate." A subsidy is specific as a matter of fact pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) only if "an enterprise or industry receives a disproportionately large amount of the subsidy." As discussed, the Court found that the term "disproportionate" refers to "having or showing a difference that is not fair, reasonable, or expected." *Hyundai Steel*, 745 F. Supp. 3d at 1351 (citing *Disproportionate*, Merriam-Webster's Dictionary (Exhibit A)). The Court directed Commerce to "explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." *Id.* at 1353. Commerce's discussion of the various percentages that show that the selected group of three industries received more than the seven other industries does not remedy the fundamental flaw with Commerce's *de facto* analysis. Larger consumers of electricity would be expected to consume more electricity than smaller consumers, and therefore there is nothing "disproportionate" demonstrated in Commerce's electricity usage groupings, as Commerce does nothing to show that this grouping "receive{d} more than its fair share." *Id.*[3] Even in its response to parties' comments on its draft remand, Commerce's attempt to bolster its defense of its "comparator group" fails. Commerce's "clear delineation" is simply whether an industry has a [              ] versus a [              ] share of electricity consumption. Final Remand at 17. This delineation merely shows that the larger consumers use more electricity than the smaller consumers. Delineating the larger consumers based on [              ] versus the smaller users

---

[3] Commerce also points out that the top three industries consumption of electricity is higher than the simple average. Final Remand at 6. Again, this is usage based and just shows that the largest consumers consume more than the smaller consumers. This is expected and there is no reason to think that all the top users should consume the same percentages.

NON-CONFIDENTIAL

[                    ] usage does not identify disproportionality but again just shows expected disparity between larger and smaller consumers.

Commerce also argues that the *AK Steel* and *Bethlehem Steel* cases cited by the Court are inapplicable because the instant case deals with an LTAR program and those cases dealt with tax exemption and grant programs, respectively. *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001); Final Remand at 8-9. Commerce is mistaken. Although *AK Steel* involved a tax exemption program, the court found that basing disproportionality on the absolute benefit amount, as opposed to percentage benefit, could produce an untenable result, *i.e.,* that a benefit conferred on a large company might be disproportionate merely because of the size of the company. That principle squarely applies here. The electricity for LTAR program benefit is tied to usage such that the greater percentage consumption the greater the amount of benefit. Larger or energy intensive companies will consume more electricity. Therefore, the untenable result identified by the *AK Steel* court also applies here as Commerce is finding that these three industries received a disproportionate amount of the subsidy because they consume a lot of electricity based on their size.

*Bethlehem Steel* is also on point. In that case, the program involved electricity discounts for companies that agreed to lower their electricity usage during certain designated times of high electricity demand. *Bethlehem Steel,* 140 F. Supp. 2d at 1367. Although not the same program as the electricity for LTAR program at issue in this case, this difference in the nature of the program does not render *Bethlehem Steel* inapposite. That case stands for the proposition that disparity in the amount of benefits received based on usage levels alone is not a sufficient basis to find that a subsidy is *de facto* specific based on disproportionate receipt of the subsidy. That aspect of the holding is not contingent upon the nature of the program; it applies for any program

where benefits are based on usage levels.  Here, the amount of the benefit from the electricity for LTAR program is tied to usage, just as the benefit from the electricity discount program at issue in *Bethlehem Steel* was based on usage.  *See Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Preliminary Results and Preliminary Intent To Rescind, in Part, the Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 13,433 (Mar. 3, 2023) ("*Preliminary Results*"), PR 186 and accompanying preliminary decision mem. at 11, PR 183 (discussing benefit method and considering, *inter alia*, "whether there is discrimination among various types of users").  The benefit from this program exists only to the extent that KEPCO does not recover costs for the category of electricity used by the respondent.  *Id.* at 11; *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 74,597 (Dec. 6, 2022) and accompanying issues and decision mem. at 21 (discussing that a benefit exists for industrial rates where KEPCO did not recover costs).

Although Commerce did not use KEPCO's actual 2021 cost recovery data, Commerce sought to replicate this established method and calculated the benefit by deriving an adjustment rate that reflected how much KEPCO would have had to raise rates to recover costs (*i.e.,* a certain percentage).  Memorandum from Dep't Commerce, "Analysis and Calculations for the Preliminary Results" (Feb. 27, 2023) at 8, CR 261-62, PR 184 ("Prelim. Calculation Mem.") (discussing that as facts available Commerce sought to replicate normal cost recovery method for determining benefit).  This adjustment rate was multiplied by the reported tariff rate and monthly electricity consumption.  *Id.* at 8-9 (showing the calculation method).  The more usage of electricity, the higher the benefit, *i.e.,* the benefit is tied to usage.  This is just like the electricity discount program in *Bethlehem Steel*, where a larger company with high usage would receive a

larger benefit under a program that links the benefit to reduction in usage levels. Both programs tie the amount of benefit to usage. Although Hyundai Steel laid out these arguments in response to Commerce's draft remand, Commerce had virtually nothing to say in response, simply reiterating its continued view that these cases are "off point" because they did not "consider{ } the program at issue here, or the same comparison of subsidy benefits received by the industry at issue." Final Remand at 21. But, as discussed above, the exact same program or industry need not be at issue for these cases to be germane to the Court's analysis. Commerce simply has no defense for its refusal to adhere to the principles set out in these cases.

Commerce next attempts to skirt the Court's decision, saying that it does not see a requirement in the statute that indicates that its disproportionality analysis must find that the group of enterprises or industries have received more than "would be expected" in relation to some other comparator. Final Remand at 10. This ignores the fact that the *de facto* specificity statutory provision includes the term "disproportionate," and so that term must be interpreted and applied based on its plain meaning. As discussed, the Court used dictionary definitions to give meaning to that term and in doing so complied with the plain language of the statute. *See Hyundai Steel*, 745 F. Supp. 3d at 1351. Commerce's Final Remand thus fails to address the Court's concern, as it ignores the meaning found and explained by the Court and instead seeks to re-interpret the statute in a way that supports its *de facto* specificity determination. In fact, in response to parties' comments on the draft remand results, Commerce claims that it has put forth "a reasonable interpretation of the statutory term 'disproportionate,' which we determine can mean the receipt of substantially greater amounts by the top three industrial users in relation to the other seven industrial users." Final Remand at 18 (emphasis added). This flies in the face of the Court's clear instruction to demonstrate "a difference that is not fair, reasonable, or expected"

9

or that "something is 'too large or small in relation to something {else},'" as Commerce does not

use those dictionary definitions at all but instead invents a new definition that suits its purpose.

*Hyundai Steel,* 745 F. Supp. 3d at 1351.

Commerce also "find{s} that the concern that a benefit conferred on a large company

might be disproportionate merely because of the size of the company to be inconsistent with the

basic purpose of the specificity test," which, Commerce says, "is to determine the extent to

which the benefit of a subsidy is spread throughout an economy and to remedy those subsidies

that are limited or unevenly distributed among recipients." Final Remand at 11 (citing Statement

of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-

316, Vol. 1 at 929 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4242 ("SAA")). Commerce

complains that "{t}o accept such a position would mean that Commerce's ability to countervail

subsidies provided to enterprises and industries considered to be 'large' would potentially be out

of reach simply because the large share of benefits under a program may have resulted from the

fact that the enterprise or industry is large." *Id.* Under such circumstances, Commerce posits,

"subsidies provided to large enterprises and industries would escape the remedies provided under

the statute." *Id.* This hypothetical concern is overblown and misrepresents the SAA.

*Mosaic Company v. United States* addressed this erroneous and overly broad

interpretation of specificity. *Mosaic Company v. United States*, 744 F. Supp. 3d 1367, 1379 (Ct.

Int'l Trade 2025). In this case, the court found that even though the respondent's share of

reductions in certain fines and penalties was 82.87 times larger than the average amount received

by other companies did not suffice to support the conclusion that the respondent's benefit was

disproportionate. In doing so, the court offered the following explanation of the SAA:

> Setting forth a guiding principle, the SAA explained that "the specificity test was
> intended to function as a rule of reason and to avoid the imposition of

> countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy." *SAA*, 930. The SAA contrasts such non-countervailable subsidies with those "provided to or used by discrete segments of an economy." *Id.* The SAA quoted approvingly language in *Carlisle Tire & Rubber Co. v. United States*, 5 C.I.T. 229, 233, 564 F. Supp. 834, 838 (1983), opining that "such things as public highways and bridges, as well as a tax credit for expenditures on capital investment" that is "available to all industries and sectors," should not be considered to satisfy the specificity requirement. *SAA*, 929–30 (internal quotation marks omitted).
>
> As the SAA instructs, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those that distribute a benefit throughout the entire economy. Subparagraph (III) of § 1677(5A)(D)(iii) must be interpreted consistently with this guiding principle . . . .

*Id.* So too here, the provision of electricity for LTAR program is widely available and used across virtually every industry in Korea, and Commerce points to no evidence that this program was provided to or used by discrete segments of the economy.  Basing a specificity determination on the mere fact that large users of this widely available program consume a large amount of electricity runs counter to the purpose the specificity test.  Commerce's loose analysis does not even address whether, much less demonstrate that, the benefit is "specific" to any group of enterprises or industries or is limited to any discrete segment of the economy.

Moreover, while Commerce sets up a slippery slope argument to detract from its unlawful specificity determination, the fact of the matter is that most cases before Commerce do not involve such a broadly available and widely used program like electricity.  Final Remand at 11.  Commerce's concerns about undermining the purpose of the countervailing duty ("CVD") law are thus largely hypothetical and not the situation before the Court.  Commerce can still countervail subsidies provided to enterprises and industries considered to be "large," but pursuant to statute and the Court's order, Commerce must demonstrate "disproportionality." 19 U.S.C. § 1677(5A)(D)(iii)(III); *Hyundai Steel*, 745 F. Supp. 3d at 1351-52.  Commerce has not

made such a demonstration here.  Commerce has not shown that the three industries it selected received "more than {their} fair share" of the subsidy or if they "benefit{ted} more than would be expected."  *Hyundai Steel,* 745 F. Supp. 3d at 1353.  Commerce's Final Remand is thus still not supported by substantial evidence.

      Commerce also hypothesizes about "the perverse situation" where a subsidy might be found to be specific based on predominant use under section 771(5A)(D)(iii)(II) of the Tariff Act of 1930, *as amended*, ("the Act") but not found to be specific on a disproportionate basis under section 771(5A)(D)(iii)(III) of the Act.  Final Remand at 12.  This hypothetical simply is not relevant here because Commerce has based its specificity determination on disproportionality. The statute specifies several different bases for a finding of *de facto* specificity. There is thus no reason to think that there must be some consistency between predominant use and disproportionality.

      In its response to parties' comments, Commerce claims that a recipient of a "fair share" of a subsidy actually has "the largest ability to distort trade," simply because they are large. Final Remand at 20.  This is a clear attempt to sidestep the requirements of the statutory specificity provisions.  Commerce's analysis of whether a subsidy exists (by being specific) must start with the text of the statute and not, as Commerce claims, with ensuring that "the largest recipients of a subsidy" are covered by "the application of remedial countervailing duties."  *E.g.*, *Frederick v. Shinseki*, 684 F.3d 1263, 1269-70 (Fed. Cir. 2012) ("Statutory interpretation of course starts with the words of a statute."); *Hall v. United States*, 677 F.3d 1340, 1345 (Fed. Cir. 2012) ("When interpreting a statute, we start with its language.").  Whether a "large amount of the subsidy… would be expected" or "reflects a 'fair share'" is "a requirement" found in the plain meaning of "disproportionately" in 19 U.S.C. § 1677(5A)(D)(iii)(III).

Finally, Commerce says that the statute does not require the disproportionality analysis to be conducted with reference to an external or extrinsic benchmark, such as sales revenue or economic output and that the choice of methodology should be based on Commerce's discretion. *Id.* at 13, 18.  However, the Court did not say that Commerce must conduct its analysis in reference to an external or extrinsic benchmark.  Instead, the Court just stated that: "Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator."  *See Hyundai Steel*, 745 F. Supp. 3d at 1353 (emphasis added).  Furthermore, the Court has merely given meaning to the statutory term "disproportionate" and, using dictionary definitions, has required Commerce to apply a methodology that gives meaning to that term.  Commerce cannot hide behind agency discretion to ignore the Court's interpretation of the statute and the requirements to demonstrate disproportionality.  As discussed above, a [          ] versus a [          ] share of electricity consumption (*i.e.*, usage of the subsidy at issue) is not a comparator that offers the type of explanation required by the Court, as it does not "explain how the combined industries… benefit more than would be expected."  *See Hyundai Steel*, 745 F. Supp. 3d at 1353.

B.    *Commerce Has Not Provided A Rational Explanation For Its Grouping Of Industries Together For Its Disproportionality Decision.*

The Court also found that "Commerce must explain why these industries are grouped together for purposes of its analysis."  *Id.*  In response, Commerce states that that its "rationale for grouping the steel, [                              ] industries together is based on a relatively comparable percentage of total industrial electricity consumption in Korea during the POR."  Final Remand at 6.  This explanation does not rationally justify the arbitrary gerrymandering performed by Commerce.  Commerce simply groups the largest three electricity

consumers because they have larger, "relatively comparable" consumption percentages and groups the remaining seven consumers because they all have smaller consumption percentages. *Id.* This distinction between [            ] and [            ] percentages of consumption is results-oriented and just leads to the foregone conclusion that a grouping of larger consumers uses more industrial electricity than a grouping of the smaller consumers.

As the Court stated, "programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy." *Hyundai Steel*, 745 F. Supp. 3d at 1353. Size alone is thus not a rational basis for Commerce's industry grouping because it does not address the Court's finding that larger users necessarily receive a proportionally larger amount of the subsidy for programs where the benefit arises based on usage. This grouping therefore fails to rationally explain how a group of industries "receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III). As the Court stated clearly, "{w}here a subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping." *Hyundai Steel*, 745 F. Supp. 3d at 1353 (citing 19 U.S.C. § 1677(5A), SAA at 4242, *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 48). Commerce has failed to provide any rational basis for its grouping in the Final Remand.

To justify its cut-off between the top three industries and remaining seven industries, Commerce attempts to create a distinction between the third-ranked industry ([      ]) and the fourth-ranked industry ([            ]), stating that there is a "precipitous drop of approximately [      ] percent in terms of electricity consumption between steel and the next largest industrial electricity user." Final Remand at 12-13. Commerce states that this serves as "clear delineation" between the top three industries and the remaining seven industries. *Id.*

However, almost the [              ] "precipitous drop" exists between the first-ranked and second-ranked industries:  a difference of [      ] percentage points in terms of electricity consumption versus the difference of [      ] percentage points between the third-ranked and fourth-ranked industries.  *Id.*  Thus, Commerce's view that approximately [      ] percentage points is a "clear delineation" undermines its own three-industry grouping, as this [              ] delineation exists *within* the top three industries as well as after it.  Although Commerce ostensibly addresses parties' comments, the reality is that over the course of two pages, Commerce draws out its explanation as to why it believes it has provided a rational explanation for grouping industries together.  But this verbosity boils down to the very same, wholly inadequate distinction:  Commerce separated "big" from "small."  Final Remand at 23-24.  The Court's instructions were explicit that Commerce must provide "more" than simply creating a grouping based on "the top industrial users of electricity in Korea."  *Hyundai Steel*, 745 F. Supp. 3d at 1353.  Commerce's Final Remand is a different way of saying the same thing as it did in the *Final Results*.  Commerce has done no additional analysis, and its "explanation" is entirely devoid of meaning.

Finally, Commerce claims in the Final Remand that its "grouping of relatively large recipients of the subsidy is consistent with Commerce's long-standing practice for analyzing *de facto* specificity for the Electricity Program in Korea countervailing duty ("CVD") proceedings and also for numerous other programs in CVD proceedings."  *Id.* at 7.  Commerce, however, cites to only one decision – the 2022 administrative review of the same *Cut-to-Length Plate* order – which was decided after the *Final Results* at issue here.  *Id.* at 11, n.41 (citing CTL Plate from Korea 2022 CVD Issues and Decision Mem. at 22-27).  Clearly, this does not support that Commerce's practice is long-standing.

II.    *Conclusion*

For the foregoing reasons, Plaintiff respectfully requests that this Court again remand

Commerce's determination with instructions to reconsider the *Final Results*, and for such other

relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Edward J. Thomas III
Nicholas C. Duffey
Ryan R. Migeed

**MORRIS, MANNING & MARTIN, LLP**
1333 New Hampshire Avenue, N.W.
Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff Hyundai Steel Company*

16

*Certificate Of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 4,993 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated:  May 19, 2025

**Exhibit A**



# disproportionate adjective

Definition of *disproportionate* >

Get Custom Synonyms    



**as in *unequal***

having or showing a difference that is not fair, reasonable, or expected; too large or too small in relation to something