# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY

|  |  |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| Plaintiff, | ) |
| and | ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) **Court No. 23-00211** |
| UNITED STATES, | ) **NONCONFIDENTIAL** |
| Defendant, | ) Business Proprietary Information Removed from Pages 5, 7-8, and 13-14. |
| and | ) |
| NUCOR CORPORATION, | ) |
| Defendant-Intervenor. | ) |

### PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S COMMENTS ON THE FINAL RESULTS OF REDETERMINATION

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: May 19, 2025

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... ii

ARGUMENT ............................................................................................................................1

I.  COMMERCE FAILED TO PROVIDE SUFFICIENT EXPLANATION FOR ITS
    *DE FACTO* SPECIFICITY FINDING AS DIRECTED BY THE COURT .........................2

    A.  "Disproportionate" Does Not Mean "Disparate" .......................................................3

    B.  Commerce Continues to Rest Its *De Facto* Specificity Finding Solely on
        Disparate Electricity Consumption ............................................................................5

    C.  Commerce's Attacks on the Court's Reasoning Lack Merit ....................................9

II. COMMERCE HAS NOT EXPLAINED WHY IT GROUPED THREE
    DISPARATE INDUSTRIES TOGETHER .......................................................................12

CONCLUSION .......................................................................................................................16

# TABLE OF AUTHORITIES

**CASES**

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) ......................................... 4, 7, 10

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) .......... passim

*Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) ............. 10

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ...................................... 11

*Mosaic Co. v. United States*, 744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ..................................... 8

*Samsung Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ...... 4

**STATUTES**

19 U.S.C. § 1677(5A)(D) ................................................................................................................ 9

19 U.S.C. § 1677(5A)(D)(iii) ..................................................................................................... 9, 11

19 U.S.C. § 1677(5A)(D)(iii)(III) ................................................................................................ 5, 9

**REGULATIONS**

19 C.F.R. § 351.502(a) .................................................................................................................. 11

**ADMINISTRATIVE DECISIONS**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 99,224 (Dec. 10, 2024), and accompanying Issues and Decision Memorandum ................................................................. 15

# ARGUMENT

The GOK objects to the U.S. Department of Commerce's ("Commerce's") Final Results of Redetermination Pursuant to Court Remand, ECF No. 62-1 ("Final Remand Results"), as it fails to address the Court's directives on remand. Commerce's analyses underlying its *de facto* specificity finding still suffer from the same flaws as Commerce's September 7, 2023 final results that were rejected by the Court.

First, in its Final Remand Results, Commerce again failed to provide an adequate explanation for its *de facto* specificity finding. Contrary to the Court's directions, Commerce's *de facto* specificity analysis continues to conflate the terms "disparity" and "disproportionate" by arguing that the provision of electricity is disproportionate because larger industries consume more electricity than smaller industries. The Court explicitly required Commerce to explain how the higher consumption level of electricity results in a disproportionate benefit relative to the level of consumption itself or other factors. Mere demonstration of disparate consumption levels of electricity does not satisfy this requirement.

Second, Commerce did not follow the Court's directive to explain why four separate industries were grouped together for purposes of Commerce's specificity analysis. Instead of providing a reasonable explanation for grouping disparate industries together, Commerce simply changed the number of industries it grouped together from four to three, again without offering any rational explanation for doing so. To the extent Commerce provided any reasoning for why it grouped the three industries together, the justification ultimately is that the three industries are the top industrial users of electricity. The Court already rejected this rationale for grouping industries together where the alleged subsidy is widely used, like electricity is in Korea.

The Court should deem Commerce's explanations insufficient and hold that Commerce must adopt an interpretation of the statute that accords with the Court's holding and apply that

1

interpretation in a manner consistent with the Court's opinion. A proper interpretation and application of the law will lead to the conclusion that the provision of electricity in Korea is not *de facto* specific.

I. **COMMERCE FAILED TO PROVIDE SUFFICIENT EXPLANATION FOR ITS *DE FACTO* SPECIFICITY FINDING AS DIRECTED BY THE COURT**

The Court expressly rejected Commerce's conclusion in the *Final Results* that greater electricity consumption alone demonstrates disproportionality within the meaning of section 771(5A)(D)(iii)(III) of the Tariff Act of 1930, as amended (the "Tariff Act"). In its opinion remanding the *Final Results* to Commerce, the Court directed Commerce "to explain how the combined industries it identified benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." Court Op. and Order, ECF No. 50 ("Court Op.") at 12. In particular, the Court pointed out that Commerce's conclusion simply ignores "the reality that programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy" and explained that "{d}isproportionality requires that an industry is favored in some way (*i.e.*, *it receives more than its fair share*)." *Id.* (emphasis added). The Court cited *Bethlehem Steel* for the proposition that "disparity alone was insufficient to support a finding of disproportionality," as "a program designed to confer benefits based on usage levels will necessarily result in one or more groups receiving a greater share than another group, simply because of differences in usage." *Id.* at 11 n.11.

Despite the Court's clear instructions, Commerce, in its Final Remand Results, chose to simply repackage the same flawed reasoning from the *Final Results* that prompted the Court to remand the case. Commerce's focus is again on the fact that the steel industry and now two, not three, other industries consumed larger amounts of industrial class electricity than other

2

industries. Final Remand Results at 5-6. As it did in the *Final Results*, Commerce's entire *de facto* specificity analysis is based on the disparity of electricity consumption between the three largest industries and the remaining smaller industries. *Id.* at 5-7. The Court has already found such an analysis to be lacking and should remand again for Commerce to apply an analysis that is based on something more than just differences in the amount of electricity consumed among industries.

### A. "Disproportionate" Does Not Mean "Disparate"

In interpreting 19 U.S.C. § 1677(5A)(D)(iii)(III), the Court explained that "the term disproportionate refers to 'having or showing a difference that is not fair, reasonable, or expected,' and disproportionality exists when something is 'too large or too small in relation to something {else}.'" Court Op. at 9-10; *see also Disproportionate Definition*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/thesaurus/disproportionate. By contrast, the word "disparity" is defined as "a noticeable and usually significant difference or dissimilarity." *Disparity Definition*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/disparity. In other words, "disparity" may occur even if a subsidy is not enterprise-specific or industry-specific due to the fundamental differences across groups. On the other hand, as the Court found, an analysis of "disproportionality" requires some sort of comparison and consideration of context. Court Op. at 10-11. Commerce therefore must consider whether certain enterprises or industries (or groups thereof) received an outsized benefit from the program at issue that is out of proportion. A comparative analysis that is based entirely on the benefits received by one industry or group of industries versus another demonstrates nothing more than "disparity," as the observation of a difference necessarily requires a comparison of one thing to something else. Whether those differences are "disproportionate"

requires consideration of additional factors. As the Court explained citing *AK Steel Corp. v. United States*, under the plain meaning of the statute, Commerce must assess benefits "not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances." Court Op. at 10; *see also AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999).

The Court's interpretation in its initial opinion accords with prior court decisions. For example, the Federal Circuit rejected an argument that Commerce should determine disproportionality simply "by looking at the percentage of the total benefit of a subsidy program accruing to a particular company or industry." *AK Steel Corp.*, 192 F.3d at 1385. The Federal Circuit explained that such a methodology could produce an "untenable result" where a "benefit conferred on a large company might be disproportionate merely because of the size of the company." *Id.* Similarly, this Court in *Samsung Electronics Co., Ltd. v. United States* cited to *AK Steel* to further support the proposition that using just the relative share of the total benefit to determine disproportionality could produce an untenable result. *Samsung Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321, 1326-27 (Ct. Int'l Trade 2014). The court in *Samsung* concluded that more is required by Commerce to support a finding of disproportionality than simply showing that the respondent received a large benefit. *Id.* at 1328. In *Bethlehem Steel*, this Court found that imposing "countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of countervailing duty laws." *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001).

In remanding this case to Commerce, the Court's instructions were clear: Commerce must demonstrate whether the amount of benefit conferred is disproportionate relative to usage

4

levels (i.e., electricity consumption) or in relation to some other comparator, given Commerce's own conclusion that the GOK's provision of electricity is designed to confer benefits on usage levels. Merely showing disparate usage levels of electricity consumption would not satisfy the Court's direction, nor would it establish that the amount of benefit conferred is disproportionate within the meaning of section 771(5A)(D)(iii)(III) of the Tariff Act. Instead, Commerce was required to explain how the higher consumption level of electricity results in a disproportionate benefit relative to the level of electricity consumption itself, or in relation to other factors.

### B. Commerce Continues to Rest Its *De Facto* Specificity Finding Solely on Disparate Electricity Consumption

Despite the Court's clear instructions, Commerce's analysis in the Final Remand Results continues to rest on disparities in electricity consumption without showing that the benefits received by the steel industry and two other industries from the industrial electricity program are "more than would be expected, based on their usage, or in relation to some other comparator." Court Op. at 12.

Commerce provides three sets of explanations that supposedly demonstrate that the steel industry and two other industries received a disproportionate amount of the subsidy. First, Commerce observes that those three industries "consumed **[   ]** percent of the industrial class electricity during the POR," while "{t}he remaining seven industries, of the ten largest electricity consuming industries, accounted for merely **[   ]** percent of the total industrial class electricity consumed during the POR." Final Remand Results at 5. In the *Final Results*, Commerce had based its specificity finding on the fact that the four industries consuming the largest amounts of electricity consumed a majority of the industrial electricity—meaning more than the remaining industries combined. Court Op. 12 n.12. The only thing that has changed in Commerce's analysis is that it compared the electricity used by just the top three electricity-consuming

industries to the electricity used by just the next seven electricity-consuming industries instead of all other industries. Those differences do not change the fundamental nature of the explanation, which considers only the benefit amounts received by two separate groups of industries. As the Court noted in its opinion, "programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy." Court Op. at 12. For this reason, "the disproportionality inquiry involves a case-by-case analysis which assesses benefits, *not in relation to the benefits of others*, but in relation to some other comparator depending on the circumstances." Court Op. at 10 (emphasis added). Because Commerce has assessed the benefit received by the steel industry and the two other industries only "in relation to the benefits of others," *id.*, Commerce has failed to demonstrate that the benefit received by the steel industry and the two other industries was disproportionate.

Commerce also fails to square its reasoning with *Bethlehem Steel*, where Commerce and this Court concluded that the steel industry did not receive a disproportionate benefit from the program at issue even though the steel industry *on its own* received over 51 percent of the benefit. 140 F. Supp. 2d at 1369. Here, the steel industry and two other industries combined received a lower percentage of the benefits. The only half-baked argument that Commerce can offer is that *Bethlehem Steel* did not involve an LTAR program, and electricity for LTAR programs confer benefits through the purchase of electricity. Final Remand Results at 10. But nothing about *Bethlehem Steel* suggested that its analysis of what a finding of "disproportionate" requires depended upon the type of program at issue, and the court's reasoning was focused on

programs "that confer{} benefits based on usage levels," which would also describe the electricity program at issue in this case. 140 F. Supp. 2d at 1369.[1]

Commerce next states that the "{o}ur analysis demonstrates that the steel, **[** **]** industries accounted for **[** **]** percent of the total electricity consumed by the ten largest industrial consumers of electricity, which constitutes a disproportionate and a majority amount among these ten industrial sectors." Final Remand Results at 5-6. This is nothing more than a restatement of the fact that the top three industries consumed **[** **]** percent of the industrial class electricity while the next seven industries accounted for **[** **]** percent. In mathematical terms, **[** **]** percent). As this is simply a restatement of Commerce's first explanation, this explanation suffers from the same deficiency, namely that it does nothing more than compare the benefit amounts received by one group of industries to another.

Third, Commerce explains that "when examining the simple average electricity consumed by the ten largest industries, the top three industries respectively consumed **[** **]** times that simple average amount. Together, the top three industries thus consumed **[** **]** times the simple average." *Id.* at 6 (footnote omitted). Commerce's analysis rests solely on the benefit amounts received by one group of users compared to the benefit amounts received by another group of users. Commerce does nothing to show why these differences are "more than would be expected." Court Op. at 12. Simply examining the usage levels of the top three and top ten industries is not sufficient to demonstrate whether the amount of benefit conferred is disproportionate relative to usage levels or in relation to some other

---

[1] Similarly, nothing about the reasoning in *AK Steel Corp. v. United States* suggests that the Federal Circuit's interpretation of "disproportionality" would not apply to an LTAR program. 192 F.3d at 1385.

comparator. Moreover, Commerce's reasoning seems to be premised upon the assumption that all users are expected to consume the average amount—which can happen only if all users consume the same amount. But there is no evidence to support that assumption, and such an assumption is illogical on its face given the different sizes and natures of the industries in Korea that consume industrial electricity. The fact that the steel industry consumed **[     ]** times the simple average amount of the top ten-electricity consuming industries cannot, on its own, demonstrate disproportionality. *See Mosaic Co. v. United States*, 744 F. Supp. 3d 1367, 1380 (Ct. Int'l Trade 2025) (holding that fact that respondent received benefit that "was *82.87 times larger than the average amount* received by other companies in Morocco" was insufficient to demonstrate disproportionality when Commerce failed to consider that figure within context of Morocco's economy and size of respondent (emphasis added)). To conclude otherwise would effectively read the *de facto* specificity requirement out of the statute whenever benefit amounts vary by usage, as the largest users, as a matter of math, will always consume more than the average amount. *See Bethlehem Steel*, 140 F. Supp. 2d at 1369 ("In virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group.").

Commerce's explanations demonstrate that it continues to define "disproportionate" in a way that contradicts the interpretation of the Court and the dictionary definition of the term. According to Commerce, the "statutory term 'disproportionate' . . . can mean the receipt of substantially greater amounts by the top three industrial users in relation to the other seven industrial users." Final Remand Results at 13. In fact, Commerce expressly rejects the holding of this Court's prior opinion, stating that there is no "requirement in the statute that the group of enterprises or industries at issue must be found to have received more than 'would be expected'

in relation to some other comparator." *Id.* at 10; *see also id.* at 13 ("{T}he statute does not require the disproportionality analysis to be conducted with reference to an external or extrinsic benchmark, such as sales revenue or economic output."). Commerce cannot remedy the shortcomings in the *Final Results* by saying that it disagrees with the holdings of this Court, the Federal Circuit, or the plain meaning of statutory terms. The Court should continue to interpret the statute in accordance with its plain meaning and prior case law, and should therefore remand again for Commerce to reconsider its specificity determination.

  **C. Commerce's Attacks on the Court's Reasoning Lack Merit**

Commerce dismisses the Court's "concern that a benefit conferred on a large company might be disproportionate merely because of the size of the company," stating that the Court's observation is "inconsistent with the basic purpose of the specificity test, which is to determine the extent to which the benefit of a subsidy is spread throughout an economy and to remedy those subsidies that are limited or unevenly distributed among the recipients." *Id.* at 11. There is no support for the "basic purpose" of the specificity test being to remedy subsidies just because the benefit amounts vary throughout the economy. Section 771(5A)(D) of the Tariff Act explicitly provides that a subsidy is *de jure* specific if it is expressly limited to an enterprise or industry as a matter of law, or is *de facto* specific if one of the four factors listed under section 771(5A)(D)(iii) of the Tariff Act exists. Uneven distribution is not among these four factors and cannot be equated with disproportionality under section 771(5A)(D)(iii)(III) of the Tariff Act.

The Statement of Administrative Action ("SAA") explains that the specificity test is meant to "winnow out" subsidies that are broadly available and widely used throughout an economy. *See* Uruguay Round Agreements Act, SAA, H.R. Rep. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040, 4242. Subsidies can be broadly available and widely used without the

9

benefit amounts to each enterprise or industry being even. The SAA favorably cites *Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983), which concluded that countervailing generally available government benefits such as "public highways and bridges, as well as tax credits for expenditures on capital investment even if available to all industries and sectors . . . simply defies reason." Big box retailers will rely on public highways more than social media companies, and large manufacturing companies will use tax credits for capital expenditures more than florists. The fact that the benefit from those programs is not evenly distributed does not somehow make the benefit "specific." Like those programs, electricity is available to and used by essentially every business in Korea, and Commerce has no basis to conclude that electricity is specific just because some enterprises or industries consume more electricity than others. In fact, it is Commerce's suggestion that subsidies used by large industries or companies must be countervailable precisely because the industries or companies are large[2] that the courts have rejected as "untenable" and "anathema to the purpose of countervailing duty laws." *AK Steel Corp.*, 192 F.3d at 1385; *Bethlehem Steel*, 140 F. Supp. 2d at 1369.

Commerce also claims that the Court's interpretation could "create the perverse situation where a subsidy is found to be specific to an enterprise or industry based on predominant use under section 771(5A)(D)(iii)(II) of the Act, but the same level of benefits is found not to be specific on a disproportionate basis under section 771(5A)(D)(iii)(III)." Final Remand Results at

---

[2] "Indeed, a requirement that Commerce must determine whether receiving a relatively large amount of the subsidy benefits under a program would be expected merely because the enterprise or industry is large and thus reflects a 'fair share,' could lead to the absurd result that the largest recipients of subsidies under a program, and thus those with the largest ability to distort trade and harm U.S. enterprises and industries, would be excluded from the application of remedial countervailing duties. Such a conclusion would fundamentally undermine the application of the CVD remedy." Final Remand Results at 11-12.

10

12. Commerce does not explain how this result is a "perverse situation." Section 771(5A)(D)(iii) lists four *different* ways in which Commerce can find *de facto* specificity. The statute expressly differentiates "predominant use" and "disproportionality," demonstrating that these two concepts are not the same. Commerce's regulations, which provide that Commerce will examine the four bases for finding "de facto" specificity in sequential order, similarly recognize that "predominant use" and "disproportionality" are separate and distinct concepts. 19 C.F.R. § 351.502(a). Commerce has no basis to distort the plain meaning of "disproportionate" so that its meaning accords with an entirely different statutory term.

Finally, Commerce justifies its faulty analysis as "long-standing practice" in which it "conducts a comparison of amounts, whether on an absolute or percentage basis." Final Remand Results at 11. Commerce similarly states that its "methodology of using the top ten industrial electricity users as the comparator group is consistent with our practice for programs of this nature." *Id.* at 13. "{A}n agency's statement of what it normally does or has done before . . . is not, by itself, an explanation of why its methodology comports the statute. Whether it does so in a particular agency decision or in a cited earlier decision, the agency must ground such a normal or past practice in the statutory standard." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (internal quotation marks and citations omitted). Regardless of the consistency of Commerce's determination with its past practice, Commerce's analysis fails to comport with the plain meaning and the courts' interpretation of the word "disproportionate," which requires Commerce to identity more than just a disparity in the receipt of benefits under a subsidy program.

11

## II. COMMERCE HAS NOT EXPLAINED WHY IT GROUPED THREE DISPARATE INDUSTRIES TOGETHER

The Court explicitly directed Commerce, on remand, to explain why four separate industries were grouped together for purposes of Commerce's specificity analysis. Court Op. at 12. The Court explained that, in this case, the recipients of electricity "are not limited" and "{w}here a subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping." *Id.* at 13-14. The Court rejected Commerce's conclusory assertion in the *Final Results* that "it chose the four industries because they were the top industrial users of electricity in Korea," finding that, "{w}ithout more, Commerce's explanation is insufficient." *Id.* at 13.

Commerce must exercise any discretion it has under the statute in a reasonable manner and support its determinations with substantial evidence. The SAA explains that "{t}he specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy. Conversely, the specificity test was not intended to function as a loophole through which narrowly focused subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law." SAA, 1994 U.S.C.C.A.N. at 4242. Commerce's practice is unreasonable if it groups together random enterprises and industries to arbitrarily create a set of larger users of a particular program and concludes that the program disproportionately benefits certain enterprises and industries.

In its Final Remand Results, Commerce continues to fail to offer a reasoned basis for its grouping of disparate industries together for its analysis. Commerce simply repeats the same conclusion from the *Final Results*, changing only the number of industries it arbitrarily selected

from four to three. Final Remand Results at 5. Commerce attempts to justify its grouping of the three industries based on their "relatively comparable percentage of total industrial electricity consumption in Korea during the POR," noting that the top three industries each consumed [          ] percentages of electricity while the remaining industries consumed [          ] percentages. *Id.* at 6. Commerce's nonsensical focus on [          ] versus [          ] percentages of electricity consumption between the top three industries and the next seven does nothing to elevate Commerce's explanation to the level requested by the Court. This explanation is just another repetition of what Commerce has said previously—it grouped the industries together solely because they consumed more electricity during the POR than other industries. The Court already rejected this reasoning. Court Op. at 14 (finding insufficient Commerce's grouping of four industries because they were the top industrial users of electricity).

In a case like this, where the alleged subsidy is widely distributed, Commerce must offer some sort of qualitative assessment for why industries should be grouped together for the specificity analysis. *Cf.* Court Op. at 13 (concluding that 19 C.F.R. § 351.502(b), which provides that Commerce need not determine whether there are "shared characteristics" among industries grouped together for specificity analysis, obviates such an explanation "only when the subsidiaries are not widely available"). Commerce cannot just rely on arbitrary quantitative cut-offs based on usage levels. In any scenario in which usage differs among industries or enterprises, the top users as a group necessarily will receive more of the benefit than other groups of users. That is basic math. Grouping industries or enterprises together just because they are bigger users of a program (e.g., industries consuming [          ] percentages of electricity) does nothing more than amplify the fact that there is disparity in usage. It does not somehow transform disparity in usage of electricity into the steel industry receiving a

13

disproportionate amount of the benefit when usage of the program at issue (electricity) is widespread.

Even if Commerce could group industries based just on the benefit amounts they received—which it cannot—Commerce's reasoning for grouping the top three industries together would still be arbitrary. The difference in electricity consumption between the industry consuming the third most electricity (i.e., the **[    ]** industry) and the fourth most electricity is roughly the same as the difference in consumption between the industry consuming the most electricity and the second most electricity. *See* Letter from Yoon & Yang LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire" (June 27, 2022) ("GOK IQR") at 35 (C.R.29/P.R.60). The difference in consumption by the steel industry versus the fourth industry is actually smaller than the difference between the first industry and the steel industry. *Id.* There is no logical reason why the steel industry should be grouped with the industry consuming the most electricity instead of the group that now contains the industry consuming the fourth largest amount of electricity.

Finally, Commerce claims that its grouping is "consistent with Commerce's long-standing practice for analyzing *de facto* specificity for the Electricity Program in Korean CVD proceedings and also for other programs in CVD proceedings" as if this would somehow make its decision reasonable. Final Remand Results at 7. Contrary to Commerce's belief, however, this attempted justification remains flawed and misleading.

There is nothing "long-standing" about Commerce's *de facto* specificity analysis for the provision of electricity in Korean CVD proceedings. *Id.* The *Final Results* marked the first instance in which Commerce rested upon its flawed finding that the provision of electricity is *de*

*facto* specific. Memorandum from James Maeder to Lisa Wang, "Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review; 2021: Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea" (Aug. 30, 2023) at 15-16 ("Final Results IDM") (P.R.222) at 15-16. Commerce then merely—but consistently— repeated this flawed analysis in subsequent Korean CVD proceedings. *See, e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 99,224 (Dec. 10, 2024), and accompanying Issues and Decision Memorandum at 22-27. Citing cases that merely replicate Commerce's original error in the *de facto* specificity analysis of the provision of electricity from the *Final Results* is inherently circular reasoning. A flawed analysis does not become valid through repetition. Commerce cannot retroactively create a "long-standing practice" by relying on its own subsequent misapplication of the law, nor can a repeated misapplication of the law redeem the fact that it is a misapplication of the law.

Moreover, Commerce's reference to "other programs in CVD proceedings" provides no justification for its flawed grouping. Final Remand Results at 7. Apart from the fact that Commerce fails to identify or explain the specific "other programs" it purports to rely on, the mere existence of such programs is irrelevant. *See id.* The fact that Commerce previously grouped relatively large recipients of a subsidy for its *de facto* specificity analysis in some other proceeding does not justify its approach here. The Court specifically required Commerce to provide "a rational basis for the grouping" where "a subsidy is widely distributed," as is the case with the provision of electricity in Korea. Court Op. at 13-14. If the "other programs" Commerce obliquely references involve subsidies with a limited number of recipients, then its reasoning for grouping large recipients in those programs has no bearing on this administrative

review, where the provision of electricity is broadly available and widely used. Conversely, if these "other programs" do involve widely used subsidies, then all Commerce has demonstrated is that it has repeated the same faulty analysis elsewhere.

In sum, despite the Court's clear instructions, Commerce has failed to offer a valid basis for grouping the steel industry with the two other industries for purposes of the specificity analysis.

## **CONCLUSION**

For the reasons discussed above, the GOK requests the Court to reject Commerce's Final Remand Results and require Commerce to adopt an interpretation of the statute that accords with the Court's holding and apply that interpretation in a manner consistent with the Court's opinion.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: May 19, 2025

*Counsel for the Government of the Republic of Korea*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the forgoing brief complies with paragraph 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 4,764 words including text, headings, footnotes, and quotations and excluding the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing software used to prepare this submission.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: May 19, 2025         *Counsel for the Government of the Republic of Korea*