### UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| ———————————————————— )<br><br>HYUNDAI STEEL COMPANY, )<br> )<br>Plaintiff, )<br> )<br>and )<br> )<br>GOVERNMENT OF THE REPUBLIC )<br>OF KOREA, )<br> )<br>Plaintiff-Intervenor, )<br> )<br>v. )<br> )<br>UNITED STATES, )<br> )<br>Defendant, )<br> )<br>and )<br> )<br>NUCOR CORPORATION, )<br> )<br>Defendant-Intervenor. )<br>———————————————————— ) | **PUBLIC VERSION**<br>Proprietary Information Omitted<br>on Pages 7-9, 13, 25-29<br><br><br>Court No. 23-00211 |

### DEFENDANT'S RESPONSE TO COMMENTS
### ON COMMERCE'S REMAND REDETERMINATION

Of Counsel:

JESUS N. SAENZ
Senior Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

EMMA E. BOND
Senior Trial Counsel
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-305-2034 | emma.e.bond@usdoj.gov

July 2, 2025

*Attorneys for Defendant*

## TABLE OF CONTENTS

**PAGE**

BACKGROUND ................................................................................................ 1

ARGUMENT ..................................................................................................... 5

I.     Standard Of Review ............................................................................ 5

II.    Commerce Complied With This Court's Remand Order, And The Remand Results Are Lawful And Supported By Substantial Evidence .............................................. 5

A.    Standards Governing *De Facto* Specificity ................................. 5

B.    Commerce Complied With The Court's Remand Order In Determining That The Provision Of Electricity For LTAR Subsidy Was *De Facto* Specific ........................................................................ 6

C.    Commerce's Determination That A Group Of Industries Received A Disproportionately Large Amount Of The Benefit Compared To Other Users Of Industrial Electricity Is Lawful And Supported By Substantial Evidence ................................................................ 12

1.    Plaintiffs Have Not Shown That The Term "Disparity"—Which Does Not Appear In The Statute—Is Relevant To The Statutory Analysis ..................................................................... 12

2.    Commerce's Methodology Complies With The Statutory Text .... 18

3.    Commerce's Reasoning Is Consistent With The Purposes Of The Specificity Test And The Countervailing Duty Statute ................ 22

4.    Substantial Evidence Supports Commerce's Finding Of Disproportionality ....................................................................... 25

D.    Commerce's Grouping Of The Steel Industry And Two Other Industries Is Lawful And Supported By Substantial Evidence .................................. 27

CONCLUSION ................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

<b><u>Page(s)</u></b>

### <u>Cases</u>

*AK Steel Corp. v. United States*,
   192 F.3d 1367 (Fed. Cir. 1999)................................................................ 6, 20, 21, 22

*Am. Silicon Techs. v. United States*,
   261 F.3d 1371 (Fed. Cir. 2001)........................................................................ 30

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
   589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022),
   *aff'd*, 102 F.4th 1252 (Fed. Cir. 2024) ........................................................... 3

*Bethlehem Steel Corp. v. United States*,
   140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ..................................... passim

*Carlisle Tire and Rubber Co. v. United States*,
   564 F. Supp. 834 (Ct. Int'l Trade 1983) ............................................... 23

*Consol. Edison v. NLRB*,
   305 U.S. 197 (1938)........................................................................... 26, 27

*Crawfish Processors Alliance v. United States*,
   483 F.3d 1358 (Fed. Cir. 2007)........................................................... 26, 27

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)........................................................................ 30

*Hyundai Steel Co. v. United States*,
   745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ................................... passim

*Koyo Seiko Co. v. United States*,
   95 F.3d 1094 (Fed. Cir. 1996)........................................................................ 11

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 ........................................................................... 5

*Mosaic Company v. United States*,
   744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ....................................... 24

*Nucor Corp. v. United States*,
   927 F.3d 1243 (Fed. Cir. 2019)................................................... 16, 23, 24

*POSCO v. United States*,
   977 F.3d 1369 (Fed. Cir. 2020)...................................................................... 4, 16, 17

*Samsung Elecs. Co. v. United States*,
   37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014) .............................................................. 22

*Samsung Electronics Co., Ltd., v. United States*,
   973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ............................................................ 22

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)............................................................................................. 11

## **Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................... 5, 8, 11

19 U.S.C. § 1671 ................................................................................................. 23

19 U.S.C. § 1677(5) .............................................................................................. 5

19 U.S.C. § 1677(5)(D)(iii)...................................................................................... 3

19 U.S.C. § 1677(5)(E) .......................................................................................... 4

19 U.S.C. § 1677(5)(E)(iv) ...................................................................................... 4

19 U.S.C. § 1677(5A) ...................................................................................... 13, 14

19 U.S.C. § 1677(5A)(D) ............................................................................... 6, 27, 28

19 U.S.C. § 1677(5A)(D)(iii)..................................................................................... 5

19 U.S.C. § 1677(5A)(D)(iii)(III) ...................................................................... passim

## **Regulations**

19 C.F.R. § 351.502(a).......................................................................................... 6, 24

19 C.F.R. § 351.502(b) .......................................................................................... 28

## **Other Authorities**

*Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium
   from Canada (Magnesium from Canada 1992)*,
   57 Fed. Reg. 30,946 ((Dep't of Commerce, July 14, 1992) ............................................ 15, 16

*Final Affirmative Countervailing Duty Determinations and Final Negative Critical
   Circumstances Determinations: Certain Steel Products from Korea*,
   58 Fed. Reg. 37,338 (Dep't of Commerce, July 9, 1993)............................................... 21

*Countervailing Duties*,
   63 Fed. Reg. 65,348 (Dep't of Commerce, Nov. 25, 1998).......................................... 6, 8, 24, 28

*Notice of Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*,
   64 Fed. Reg. 73,176, 73,186 (Dep't of Commerce, Dec. 29, 1999) ......................................... 15

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2021*,
   88 Fed. Reg. 61,509 (Dep't of Commerce, Sept. 7, 2023) ........................................................ 2

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*,
   89 Fed. Reg. 73,626 (Dep't of Commerce, Sept. 11, 2024) ..................................................... 18

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Korea: Final Results of Countervailing Duty Administrative Review; 2022*,
   89 Fed. Reg. 99,224 (Dep't of Commerce, Dec. 10, 2024) ..................................................... 18

Uruguay Round Administrative Act,
   Pub. L. No. 103-465, 108 Stat. 4809 (1994) ........................................................................... 16

Uruguay Round Agreements Act, Statement of Administrative Action, H. R. Rep. No. 103-316,
   vol. 1, at 931 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 (SAA) ............................ 17

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,     ) | |
|         ) | |
|     Plaintiff,     ) | |
|         ) | |
|   and     ) | |
|         ) | **PUBLIC VERSION** |
| GOVERNMENT OF THE REPUBLIC     ) | Proprietary Information Omitted |
| OF KOREA,     ) | on Pages 7-9, 13, 25-29 |
|         ) | |
|     Plaintiff-Intervenor,     ) | |
|         ) | |
|   v.     ) | Court No. 23-00211 |
|         ) | |
| UNITED STATES,     ) | |
|         ) | |
|     Defendant,     ) | |
|         ) | |
|   and     ) | |
|         ) | |
| NUCOR CORPORATION,     ) | |
|         ) | |
|     Defendant-Intervenor.     ) | |

**DEFENDANT'S RESPONSE TO COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments filed by

plaintiff, Hyundai Steel Company (Hyundai), and plaintiff-intervenor, the government of the

Republic of Korea (government of Korea) (collectively, plaintiffs), regarding the final results of

redetermination filed by the Department of Commerce in this case. *See* Hyundai Comments,

ECF Nos. 67, 68 (Hyundai Br.); Government of Korea Comments, ECF Nos. 69, 70 (GOK Br.).

On remand, Commerce continued to determine that the provision of electricity for less than

adequate remuneration (LTAR) program was *de facto* specific pursuant to 19 U.S.C.

§ 1677(5A)(D)(iii)(III), because a group of industries, including the steel industry, received a disproportionately large amount of the subsidy.  *See* Final Results of Remand Redetermination Pursuant to Court Order, ECF Nos. 62, 63 (Remand Results).  Commerce's remand redetermination complies with the Court's remand order and is otherwise lawful and supported by substantial evidence.  Thus, we respectfully request that the Court sustain the remand redetermination.

## **BACKGROUND**

In September 2023, Commerce issued the final results of the administrative review of the countervailing duty order covering certain cut-to-length carbon-quality steel plate from the Republic of Korea.  *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Dep't Commerce Sept. 7, 2023) (*Final Results*) (P.R. 225) and accompanying issues and decision memorandum (IDM), (P.R. 222).  The Court remanded, in part, Commerce's determination that the provision of electricity for less than adequate remuneration (LTAR) program was *de facto* specific, ordering further explanation or reconsideration on that issue.  *Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345, 1357 (Ct. Int'l Trade 2024).

In the underlying administrative review, Commerce determined that Hyundai received a countervailable subsidy from the provision of electricity for LTAR program.  *See* IDM at 8 (calculating a subsidy rate of 0.51 percent *ad valorem*).  A countervailable subsidy exists when (1) "a government or public authority has provided a financial contribution"; (2) "a benefit is thereby conferred upon the recipient of the financial contribution"; and (3) "the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries."

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 589 F. Supp. 3d 1346, 1349 (Ct. Int'l Trade 2022), *aff'd*, 102 F.4th 1252 (Fed. Cir. 2024) (citing 19 U.S.C. § 1677(5)).

Applying these statutory criteria, Commerce determined that the Korea Electric Power Company (KEPCO) provided "a financial contribution" to producers of subject merchandise "in the form of the provision of a good or service{.}"  *See* Prelim. Decision Mem. (PDM) at 26 (P.R. 183) (citing section 771(5)(D)(iii) of the Tariff Act of 1930, as amended, *codified at* 19 U.S.C. § 1677(5)(D)(iii)).  Relying on facts available in light of incomplete 2021 cost data, Commerce also determined that the 2021 electricity pricing was not based on market principles, and thus, a benefit was conferred.  IDM at 14.  Finally, Commerce determined that the subsidy was "specific" to a group of four industries, including the steel industry, which received a disproportionately large amount of the subsidy.  IDM at 15-16.

Plaintiffs filed complaints in this Court, challenging Commerce's application of facts available and determination of *de facto* specificity.  *See Hyundai Steel*, 745 F. Supp. 3d at 1349-1350.  The Court sustained Commerce's application of facts available, *id.* at 1354-1356, thereby sustaining Commerce's determination that the provision of electricity for LTAR program conferred a benefit.  The Court held, however, that that Commerce's *de facto* specificity determination was not "supported by substantial evidence and . . . remanded for further explanation or reconsideration."  *Id.* at 1353.  Specifically, the Court held that "Commerce must explain" why it grouped certain industries for purposes of its analysis, and that "Commerce

fail{ed} to provide an explanation for its determination that the benefit received by a group of entities and industries it identifies is disproportionate." *Id.* at 1352-1353.[1]

In compliance with the Court's remand order, Commerce issued the draft remand redetermination on March 4, 2025, reevaluating its specificity analysis and continuing to find that the electricity program was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III). *See* Draft Redetermination at 1-2 (Remand C.R. 1, Remand P.R. 1). As an initial matter, Commerce reconsidered the relevant group of industries, finding that "the steel industry and *two other industries*" consumed a disproportionately large amount of industrial electricity. *Id*. at 5-7. Commerce explained that these industries consumed comparable percentages of industrial electricity, with a significant decrease in use for the remaining users of industrial electricity. *Id.* at 6-7. Commerce determined that this group of three industries received a disproportionately large amount of the benefit in comparison with the remaining industries reported. *Id*. at 5-6.

In their comments on the draft remand redetermination, plaintiffs argued that Commerce failed to comply with the Court's remand order and failed to explain the grouping of industries or determination of disproportionality. *See generally* Hyundai Steel Comments on Draft Results of Remand Redetermination (Remand C.R. 2, Remand P.R. 4); GOK Comments on Draft Results

---

[1]  The Court noted that "the provision of general infrastructure does not constitute a financial contribution for the purposes of 19 U.S.C. § 1677(5)(E), *Hyundai Steel*, 745 F. Supp. 3d at 1350–51, but no party has disputed that the provision of electricity by an authority conferred a financial contribution to Hyundai. The Court also cited the government of Korea's initial questionnaire response that "electricity prices are set using a standard pricing mechanism ensuring that no one company or industrial user receives a more *preferential rate for electricity*." *Id.* at 1352-1353 (citation omitted, emphasis added). As a result of the Uruguay Round Agreements Act, however, Congress amended the statute by "expressly replacing 'preferential rate' with 'less than adequate remuneration'" as the standard for determining whether a benefit is conferred. *See POSCO v. United States*, 977 F.3d 1369, 1371–72 (Fed. Cir. 2020) (citing 19 U.S.C. § 1677(5)(E)(iv)). By sustaining Commerce's determination with respect to the 2021 cost data, the Court sustained Commerce's determination that a benefit was conferred through the provision of electricity for less than adequate remuneration. *See* IDM at 13-14.

4

of Redetermination (Remand P.R. 6).  In the final remand results, Commerce adhered to its *de facto* specificity determination.  Remand Results at 25.  Addressing plaintiffs' arguments, Commerce explained that it grouped the top three industries given their comparable consumption of industrial electricity, and that this group of industries received a disproportionately large amount of the provision of electricity for LTAR subsidy.  *See generally* Remand Results at 15-24.

## ARGUMENT

### I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law."  *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

### II.    Commerce Complied With This Court's Remand Order And The Remand Results Are Lawful And Supported By Substantial Evidence

On remand, Commerce continued to find that the benefit conferred by the electricity of LTAR program was *de facto* specific because a group of industries—the steel industry and two other industries—received a disproportionately large amount of the subsidy.  *See, e.g.*, Remand Results at 4-7.  As discussed below, Commerce's remand redetermination is lawful, supported by substantial evidence, and complies with the Court's remand order.

#### A.    Standards Governing *De Facto* Specificity

A domestic subsidy is *de facto* specific if: (1) the actual recipients "are limited in number," (2) "{a}n enterprise or industry is a predominant user of the subsidy," or (3) "{a}n enterprise or industry *receives a disproportionately large amount of the subsidy*."  19 U.S.C. § 1677(5A)(D)(iii) (emphasis added) (also listing a fourth criteria not applicable here).  "{A}ny

reference to an enterprise or industry"—including whether an enterprise or industry receives a disproportionately large amount of the subsidy—"includes a group of such enterprises or industries."  19 U.S.C. § 1677(5A)(D).

"{T}he weight accorded to particular factors" for assessing *de facto* specificity "will vary from case to case"  Uruguay Round Agreements Act, Statement of Administrative Action, H. R. Rep. No. 103-316, vol. 1, at 931 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 (SAA).  As the Federal Circuit has explained, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case."  *AK Steel Corp. v. United States*, 192 F.3d 1367, 1384 (Fed. Cir. 1999) (citation omitted).  Commerce examines the factors for *de facto* specificity "in sequence," and "may find a domestic subsidy to be specific based on the presence of a single *de facto* specificity factor."  *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,355 (Dep't of Commerce, Nov. 25, 1998); 19 C.F.R. § 351.502(a).

> B.    Commerce Complied With The Court's Remand Order In Determining That The Provision Of Electricity For LTAR Subsidy Was *De Facto* Specific

Commerce's remand redetermination complied with the Court's remand order.  The Court remanded "Commerce's determination that the Electricity Program is de facto specific . . . for further explanation or reconsideration."  *Hyundai Steel*, 745 F. Supp. 3d at 1356.  The Court did not order Commerce to reach a specific result on remand, but instead ordered "further explanation or reconsideration consistent with this opinion."  *Id.*  Commerce complied with the Court's directive by providing "further explanation or reconsideration" of its assessment of *de facto* specificity in the remand redetermination.  *See, e.g.*, *id.* at 1356; Remand Results at 4-7.

With respect to Commerce's grouping of industries in the final results, the Court stated that "Commerce must explain why these industries are grouped together for purposes of its

analysis." *Hyundai Steel*, 745 F. Supp. 3d at 1353.  The Court  explained that "{w}here a subsidy is widely distributed," Commerce must provide "a rational basis" for grouping industries together when assessing *de facto* specificity.  *Id.* at 1353 (citations omitted).  In compliance with this order, Commerce reconsidered its prior determination grouping the steel industry with three other industries.  *See* Remand Results at 4-5.  On reconsideration, Commerce determined that a group consisting of "the steel industry and *two other industries*, [███████████████ ██████]," received a disproportionately large amount of benefits.  Remand Results at 5.

As relevant to this grouping, Commerce explained that the government of Korea "provided usage data for the steel industry and the top ten largest electricity consuming industries that reflected their consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification."  Remand Results at 2 (quoting IDM at 15-16).  The top three users of industrial electricity all had [██████] percentage levels—with the steel industry, at [████] percent, consuming a comparable amount of industrial electricity as the [████████████████] industries at [█████] and [█████] percent, respectively.  Remand Results at 6 (citing Attachment).  The remaining industries consumed [████████] percentage levels of industrial electricity.  *Id.* (citing Attachment).

Indeed, after the top three consumers of industrial electricity, there was a "significant difference" with the remaining seven industries in the top ten.  Remand Results at 6 (citing Attachment).  There was a significant drop in use between the third and fourth highest users—with the fourth listed industry consuming [████] percent of the industrial class electricity, [████] percent less than the third largest consuming industry—supporting the basis for grouping the top three industries together.  Remand Results at 6-7 (citing Attachment); *see also id.* at 7 (citing *Countervailing Duties,* 63 Fed. Reg. at 65,357).  The gap in the percentage of industrial

electricity consumed by the fourth to tenth industries in the top ten users of industrial electricity "clearly distinguishe{d} their relatively smaller levels of consumption from the [████████] percentage of electricity consumed by" the top three industries, which consumed "much higher amounts." *Id.* at 6, 17.  In sum, Commerce found "a sufficient basis to group the steel, [████ ████████████] industries together" for purposes of analyzing whether a group of industries received a disproportionately large share of the subsidy.  Remand Results at 6-7. Accordingly, Commerce provided a rational explanation for its decision to group the steel industries with two other industries when assessing *de facto* specificity, and thus complied with the Court's remand order.

The Court also held that "Commerce fail{ed} to provide an explanation for its determination that the benefit received by a group of entities and industries it identifies is disproportionate." *Hyundai Steel*, 745 F. Supp. 3d at 1352 (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Nowhere {did} Commerce identify to what the benefit is disproportionate." *Id.*  The Court explained that "{t}he term disproportionate refers to 'having or showing a difference that is not fair, reasonable, or expected,' and disproportionality exists when something is '*too large or too small in relation to something {else}*.'" *Id.* at 1351 (citing *Disproportionate*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/thesaurus/disproportionate)) (emphasis added).  In compliance with this order, Commerce determined that the group of three industries received "a disproportionately large amount of the subsidy," "*in comparison to* the other industries reported" in the top ten users of industrial electricity.  Remand Results at 5, 7 (emphasis added).  Citing the Court's statement that "disproportionality exists when something is too large or too small in relation to something else," Remand Results at 4 (citing *Hyundai Steel*, 745 F. Supp. at 1351), Commerce explained

8

CONFIDENTIAL MATERIAL OMITTED

that the group of industries "consumed a disproportionately larger amount of industrial class electricity in Korea *in comparison to the other industries reported*" in the list of the top ten users of industrial electricity.  *Id.* at 5 (emphasis added).

Specifically, the group of top three industries alone consumed [████] of the industrial class electricity in Korea during the period of review, with the remaining seven industries in the top ten consuming only [████] percent.  Remand Results at 5 (citing Attachment).  Thus, the top three industries alone received "nearly [███] percent more of the subsidy benefits under the program" compared to the seven remaining industries in the top ten users of industrial electricity.  *Id.* at 5 (citing Attachment).  Commerce determined that these figures "demonstrate an uneven distribution of the benefits under the Electricity Program in favor of the steel, [████████ ████████] industries in Korea and a sufficient basis to support finding the program to be *de facto* specific based on disproportionate use by these sectors."  *Id.* at 6.

The government of Korea and Hyundai argue that Commerce failed to comply with the portion of the Court's opinion discussing the meaning of disproportionality as "more than would be expected."  *See, e.g.*, GOK Br. at 2 (citation omitted); Hyundai Br. at 6.  However, Commerce specifically addressed this portion of the Court's decision, Remand Results at 4, 10-11 (citations omitted), and provided "further explanation" regarding its determination of *de facto* specificity in compliance with the Court's order, *see Hyundai Steel*, 745 F. Supp. 3d at 1356; Remand Results at 10-12, 19-20.

The Court stated that "the term disproportionate refers to 'having or showing a difference that is not fair, reasonable, or expected,' and disproportionality exists when something is 'too large or too small in relation to something {else}.'"  *Hyundai Steel*, 745 F. Supp. 3d at 1351 (*c*iting *Disproportionate*, Merriam-Webster's Thesaurus, https://www.merriam-

webster.com/thesaurus/disproportionate).  In support of this meaning, the Court cited a thesaurus

entry from Merriam-Webster's online dictionary, *id.*, listing "{s}ynonyms of *disproportionate*

. . . as in *unequal*," including synonyms such "unequal," "distinct," "different," "divergent," and

"disparate," among others.  *See* Attachment A, *Disproportionate*, Merriam-Webster's Thesaurus,

https://www.merriam-webster.com/thesaurus/disproportionate (emphases added).  These are

synonyms of the meaning of disproportionate as "having or showing a difference that is not fair,

reasonable, or expected; *too large or too small in relation to something*{.}"  *Id.* (emphasis

added).  As the semicolon dividing the two clauses makes clear, the second clause stands

alone—referring to one meaning of disproportionate as "too large or too small in relation to

something."  *Id.*

     Consistent with this understanding, Commerce explained that the group of three

industries received a benefit that was too large in relation to the other industries receiving

industrial electricity.  *See, e.g.*, Remand Results at 4-6.  As Commerce explained, when assessing

disproportionality for purposes of *de facto* specificity, Commerce examines "the distribution of

benefits among users of the program" and "conducts a comparison of amounts, whether on an

absolute or percentage basis."  *Id.* at 11 (citation omitted).  "{A}n industry or enterprise, or

groups thereof, must be found to have received a substantially larger amount of the benefits

under a program than the relative amounts received by other enterprises or industries, whether

based on absolute numbers or calculated percentages."  *Id.*

     Commerce's application of the term is not only consistent with the thesaurus definition of

"disproportionate" cited by the Court, *see* Attachment A, but also with the Merriam-Webster

dictionary definition, as well as dictionary definitions from Black's Law Dictionary and the

Oxford English Dictionary.  According to the Merriam-Webster online dictionary,

disproportionate simply means "being out of proportion." "Disproportionate," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/disproportionate (last accessed July 2, 2025), Attachment B. Black's Law Dictionary similarly defines "disproportionate" as "{h}aving too much or too little in relation to something else; not suitable in comparison with something else in size, amount, importance, etc." Disproportionate, Black's Law Dictionary (12th ed. 2024), Attachment C. Similarly, the Oxford English Dictionary defines "disproportionate" as "{o}ut of proportion; failing to observe or constitute due proportion; inadequately or excessively proportioned." *See* "Disproportionate, Adj." Oxford English Dictionary, Oxford UP, July 2023, https://doi.org/10.1093/OED/8564931145 (last visited July 2, 2025), Attachment D. All of these definitions (including the second clause in the Merriam-Webster online thesaurus entry cited by the Court) are consistent with Commerce's "long-standing practice" of assessing whether "an industry or enterprise, or groups thereof . . . received a substantially larger amount of the benefits under a program than the relative amounts received by other enterprises or industries, whether based on absolute numbers or calculated percentages." *See* Remand Results at 11. Commerce's remand results comply with the Court's order by providing further explanation of Commerce's determination regarding *de facto* specificity and thereby facilitating judicial review of Commerce's determination pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i).[2]

    In sum, by reconsidering its determination with respect to the "group," and by providing further explanation regarding disproportionality, Commerce complied with the Court's remand

---

[2] There is no prohibition on the Court considering dictionary definitions to interpret the plain meaning of the statutory term "disproportionately large," 19 U.S.C. § 1677(5A)(D)(iii)(III), which is not a determination that the "administrative agency alone is authorized to make." *See Koyo Seiko Co. v. United States*, 95 F.3d 1094, 1100 (Fed. Cir. 1996) (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 199 (1947)).

order to provide "further explanation or reconsideration" of *de facto* specificity. *Hyundai Steel*,

745 F. Supp. 3d at 1356.

      B.      Commerce's Determination That A Group Of Industries Received A
               Disproportionately Large Amount Of The Benefit Compared To Other Users Of
               Industrial Electricity Is Lawful And Supported By Substantial Evidence

Plaintiffs' challenges to Commerce's determination of disproportionality are likewise

unpersuasive. *See, e.g.*, Hyundai Br. at 2-13; GOK Br. at 2-12. Plaintiffs argue that Commerce

(1) wrongly equated disproportionality with "disparate" use, *see, e.g.*, GOK Br. at 2-8; Hyundai

Br. at 3-4; (2) failed to show a difference greater than would be expected for large users of

electricity, Hyundai Br. at 6-10, GOK Br. at 8-9; (3) failed to comply with the purposes of the

specificity test, *see, e.g.*, Hyundai Br. at 10-12, GOK Br. at 9-11; and (4) reached a determination

that is unsupported by substantial evidence, Hyundai Br. at 4-5. As discussed below, these

arguments are incorrect. Instead, Commerce engaged in a case-specific analysis—considering

the facts of this subsidy scheme in determining that a group of industries received a

disproportionately large amount of the benefit compared to other users of industrial electricity.

*See* Remand Results at 4-7, 16-22.

      1.      Plaintiffs Have Not Shown That The Term "Disparity"—Which Does Not
               Appear In The Statute—Is Relevant To The Statutory Analysis

Plaintiffs argue that Commerce incorrectly applied the term "disproportionate" in a way

that amounted to a "disparity." *See, e.g.*, GOK Br. at 3; Hyundai Br. at 4. However, consistent

with the Court's opinion, Commerce applied an understanding of "disproportionate" as reflecting

an amount of benefits that is "*too large or too small in relation to something else*{.}" Remand

Results at 4 (citing Remand Order at 9-10). In light of this meaning, Commerce examined the

distribution of benefits among the users of the subsidy program, and determined whether the

CONFIDENTIAL MATERIAL OMITTED

group of industries received "a substantially larger amount of the benefits under {the} program than the relative amounts received by other enterprises or industries{.}" *Id.* at 11.

Commerce engaged in this comparison by assessing the "electricity consumption data for the steel industry and nine other industries for the {period of review}," as provided by the government of Korea. Remand Results at 4 (citing GOK Initial Questionnaire Resp. at 35-36 (P.R. 60, C.R. 29)). Reviewing these data, Commerce determined that the steel industry and two other industries "consumed [███] percent of the industrial class electricity during the {period of review}." Remand Results at 5. By comparison, the "remaining seven industries . . . accounted for merely [███] percent of the total industrial class electricity consumed during the {period of review}." *Id.* at 5, 17 (citing Attachment). Mathematically, this amounts to "nearly [██] percent more of the subsidy benefits under the program than the seven other industries combined" in the top ten users of industrial electricity. *Id.* at 5.

Commerce also compared the benefits consumed by the group of the top three industrial electricity-consuming industries to the simple average electricity consumed by the top ten users of industrial electricity. *Id.* at 5-6. Commerce determined that the three largest industries, the steel, [██████████████] industries, consumed [███████████] times that simple average amount. *Id.* at 6 (citing Attachment) (explaining that collectively, the group of top three industries consumed [███] times the simple average). In light of this analysis, Commerce determined that the provision of electricity for LTAR program was "*de facto* specific based on disproportionate use" by a group of industries, including the steel industry. *Id.* at 5-6.

Plaintiffs claim that Commerce's analysis reflects nothing more than a "disparity"—not disproportionality. *See, e.g.*, Hyundai Br. at 6-7; GOK Br. at 3-5. This argument distracts from the relevant statutory analysis, *i.e.*, whether Commerce lawfully determined that a

"disproportionately large" amount of the subsidy was received by the relevant group of industries. *See* 19 U.S.C. § 1677(5A)(D)(iii)(III). The term "disparity" does not appear in the statute, *id.*, and there is no reason to introduce that term into the statutory analysis. In support of its argument that Commerce's analysis shows nothing more than a disparity, the government of Korea cites the definition of disparity on Merriam-Webster's online dictionary, namely, "a noticeable and usually significant difference or dissimilarity." GOK Br. at 3 (quoting *Disparity Definition*, Merriam-Webster's Dictionary, https://www.merriamwebster.com/dictionary/disparity). However, as reflected in the Merriam-Webster online thesaurus cited by the Court, *see Hyundai Steel*, 745 F. Supp. 3d at 1351 (citing https://www.merriam-webster.com/thesaurus/disproportionate), "disparate" is a synonym of disproportionate, *see* Att. A at 1, 4.

Thus, the term "disparate" does not appear in the statute, 19 U.S.C. § 1677(5A)(D)(iii)(III), and is a synonym of the statutory term that does. *See* Att. A at 1. According to the Merriam-Website.com dictionary, the dictionary meaning of disproportionate is "being out of proportion." Att. B. at 1. Meanwhile, as cited by the government of Korea, disparity means "a noticeable . . . difference." *See* GOK Br. at 3 (citation omitted). In light of these similar meanings, it is no surprise that the Merriam-Webster.com thesaurus cited by the Court lists the two terms as synonyms. *See* Att. A at 1; *Hyundai Steel*, 745 F. Supp. 3d at 1351 (citing *Disproportionate*, Merriam-Webster's Thesaurus, https://www.merriam-webster.com/thesaurus/disproportionate). Accordingly, to the extent the meaning of disparity has any relevance to the statutory analysis, any disparity in the amount of subsidy provided supports Commerce's determination of *de facto* specificity.

Plaintiffs nonetheless argue that this Court's prior decision in *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001), "stands for the proposition that disparity in the amount of benefits received based on usage levels alone is not a sufficient basis to find that a subsidy is *de facto* specific based on disproportionate receipt of the subsidy." Hyundai Br. at 7-8; GOK Br. at 4, 6-7. As Commerce explained, however, "{i}n *Bethlehem Steel*, the Court *upheld* Commerce's determination" that steel companies "were not the dominant or disproportionate participants in the Voluntary Curtailment Adjustment{.}" Remand Results at 9 (emphasis added). In sustaining Commerce's decision, the Court held that Commerce's "methodology for determining a 'dominant' or 'disproportionately' large consumer of electricity" was not "unreasonable." *Bethlehem Steel*, 140 F. Supp. 2d at 1369 (bracketing omitted). In light of the case-specific facts in that case, Commerce reasonably concluded that it was "inapplicable to the instant specificity analysis" involving "a government's provision of electricity for LTAR." Remand Results at 9-10.

Unlike the provision of electricity for LTAR program in this case, the program at issue in *Bethlehem Steel* was "the Voluntary Curtailment Adjustment, a program involving identical price discounts offered to certain electricity users that agreed to voluntarily limit their electricity consumption." Remand Results at 9 (citing *Notice of Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 64 Fed. Reg. 73,176, 73,186 (Dep't of Commerce, Dec. 29, 1999)). In defending Commerce's determination of non-specificity in *Bethlehem Steel*, the United States explained that Commerce's determination was "consistent with a prior determination in which a similar Canadian program was found to be non-specific." *Bethlehem Steel*, 140 F. Supp. at 1368 (citing *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium*

*from Canada* (*Magnesium from Canada 1992*)*, 57 Fed. Reg. 30,946 (July 14, 1992)) (other

citation omitted).  In *Magnesium from Canada 1992*, "Commerce stated 'if the rate charged is

consistent with the standard pricing mechanism and the company under investigation is, in all

other respects, *essentially treated no differently than other industries* which purchase comparable

amounts of electricity, we would probably not find a countervailable duty.'"  *Bethlehem Steel*,

140 F. Supp. at 1368 (citing *Pure Magnesium from Canada 1992*, 57 Fed. Reg. 30,950)

(emphasis added).  In sustaining Commerce's reasoning in *Bethlehem Steel*, the Court explained

that the record shows that "all eligible participants receive the same discount regardless of

industry," thus indicating "uniformity of treatment among all parties and {providing} substantial

record support for Commerce's conclusion that the {Voluntary Curtailment Adjustment}

program was non-specific."  *Id.* at 1369.

Although discussed in the context of specificity, this analysis in *Bethlehem Steel* echoes

the preferential treatment analysis that was in effect when Commerce issued the determination in

*Magnesium from Canada 1992*, but was later superseded by the less-than-adequate-remuneration

standard enacted in the Uruguay Round Administrative Act, Pub. L. No. 103-465, 108 Stat. 4809

(1994).  *See Nucor Corp. v. United States*, 927 F.3d 1243, 1252 (Fed. Cir. 2019) (discussing the

change from the preferential rates requirement to less than adequate remuneration).  Indeed, the

Court of Appeals for the Federal Circuit explained that a similar analysis—inquiring whether a

company was "treated no differently than other companies and industries which purchase

comparable amounts of electricity"— erroneously "turned on whether respondents were given

*preferential* treatment."  *POSCO v. United States*, 977 F.3d 1369, 1374 (Fed. Cir. 2020) (citing,

*e.g.*, *Magnesium from Canada 1992*, 57 Fed. Reg. 30,946) (citation to joint appendix omitted)

(emphasis added).  Overall, the Court in *Bethlehem Steel* held that the steel industry's receipt of

16

benefits was not "disproportionately higher than would be expected," and that the steel industry was "essentially treated no differently than similarly situated consumers." *Bethlehem Steel*, 140 F. Supp. 2d at 1369.  In this context, the Court reasoned that the "disparity" demonstrated in the Voluntary Curtailment Adjustment did not establish that the "benefit was industry specific." *Id.*

Plaintiffs have not shown that the decision in *Bethlehem Steel* is relevant or controlling in this case.  As the Court explained, "prior CIT cases do not bind this Court," although "they can be persuasive based upon their reasoning where they confront similar records." *Hyundai Steel*, 745 F. Supp. 3d at 1352 n.11.  *Bethlehem Steel* is not persuasive authority.  Not only does the *Bethlehem Steel* Court rely on reasoning that the Federal Circuit has held echoes the superseded preferentiality standard, *see POSCO*, 977 F.3d at 1374, but, as Commerce explained, the benefit at issue in this case differs from the one considered in *Bethlehem Steel*, *see* Remand Results at 9-10.

Under the provision of electricity for LTAR program, "a benefit is conferred through the respondent's purchases of electricity," and thus, "it is unnecessary to demonstrate the amount of subsidy conferred was disproportionate to the consumption of electricity."  Remand Results at 10.  As Commerce explained, "the benefit to the respondent is a direct result of the respondent's consumption of the good purchased for LTAR." *Id.*  "Disproportionate usage because the production of steel requires a lot of electricity, necessarily results in the {government of Korea} providing disproportionate value to the industry purchasing electricity for LTAR." *Id.*  In providing this reasoning, Commerce engaged in a fact-specific analysis based on the subsidy program at issue, consistent with the case-by-case assessment of *de facto* specificity contemplated by the Statement of Administrative Action.  *See* SAA at 931.  In sum, plaintiffs

have not shown that the term "disparity" or any other discussion in *Bethlehem Steel* alters the statutory analysis applied in this case.

2. Commerce's Methodology Complies With The Statutory Text

Plaintiffs also argue that Commerce's methodology "does not give meaning to the term 'disproportionate,'" by failing to assess whether the benefits provided are more than would be expected. *See, e.g.*, Hyundai Br. at 6-7; GOK Br. at 7 (arguing "Commerce does nothing to show why {the identified} differences are 'more than would be expected'") (citation omitted). As discussed below, however, Commerce's methodology complies with the plain language of the statute.

As Commerce explained, it "conducted an analysis with respect to a pool of only the largest beneficiaries" under the provision of electricity for LTAR program." Remand Results at 13, 18. This "methodology of using the top ten industrial electricity users as the comparator group is consistent with {Commerce's} practice for programs of this nature, the provision of subsidized electricity." *Id.* at 18 (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 99,224 (Dep't of Commerce, Dec. 10, 2024) (*Cut-to-Length Plate from Korea Final Results 2022*), and accompanying IDM at 22-27; see also *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 73,626 (Dep't of Commerce, Sept. 11, 2024) (*CTLP from Korea Final Results 2022*), and accompanying IDM at 17-21). Commerce considered "this approach of comparing the relative benefits received by program recipients as a reasonable interpretation of the statutory term 'disproportionate,'" which Commerce determined could be established by "the

receipt of substantially greater amounts by the top three industrial users in relation to the other seven industrial users{.}"  Remand Results at 18.

Commerce's methodology is consistent with the meaning of disproportionate as reflected in the thesaurus entry cited by the Court.  *Hyundai Steel*, 745 F. Supp. 3d at 1351 (citing *Disproportionate*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/thesaurus/disproportionate)).  In addition to describing "disproportionate" as "having or showing a difference that is not fair, reasonable, or expected," the thesaurus independently describes disproportionate as "*too large or too small in relation to something*." Att. A (emphasis added).  As an example of "disproportionate" used in a sentence, the thesaurus states "{a} *disproportionate* number of the students are poor"—comparing the number of students that are poor with the number of students that are not poor.  *See* Att. A at 1.  Consistent with this understanding of "disproportionate," Commerce determined that the amount of benefits provided to the group of top three industries—including the steel industry—was too large in comparison with the benefits received by the remaining seven industries in the top ten users of industrial electricity.  *See, e.g.*, Remand Results at 11-12, 18.

Commerce's methodology also aligns with the Merriam-Webster dictionary definition, as well as dictionary definitions from Black's Law Dictionary and the Oxford English Dictionary, defining "disproportionate" as:

1. "{B}eing out of proportion," *see* "Disproportionate," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/disproportionate, Attachment B.

2. "Having too much or too little in relation to something else; not suitable in comparison with something else in size, amount, importance, etc.," *see* Disproportionate, Black's Law Dictionary (12th ed. 2024), Attachment C.

3. "Out of proportion; failing to observe or constitute due proportion; inadequately or excessively proportioned," *see* "Disproportionate, Adj." Oxford English

Dictionary, Oxford UP, July 2023, https://doi.org/10.1093/OED/8564931145, Attachment D.

Thus, the meaning of disproportionate supports Commerce's "long-standing practice" of assessing whether "an industry or enterprise, or groups thereof . . . received a substantially larger amount of the benefits under a program than the relative amounts received by other enterprises or industries{.}"  Remand Results at 11.

Plaintiffs nonetheless contend that Commerce must also consider whether the group received more than its fair share or more than would be expected, given the electricity-intensive nature of the steel industry.  *See, e.g.*, Hyundai Br. at 6; GOK Br. at 7-8.  As Commerce explained, however, "the statute does not require the disproportionality analysis to be conducted with reference to an external or extrinsic benchmark, such as sales revenue or economic output."  Remand Results at 13, 18.  Instead, the statute provides that a benefit is *de facto* specific when "a disproportionately large amount of the subsidy" is provided to an enterprise, industry, or group of enterprises or industries.  19 U.S.C. § 1677(5A)(D)(iii)(III).  Commerce determined that the group of three industries, including the steel industry, received a substantially larger amount of the subsidy benefits than the amounts received by the remaining seven industries in the top ten users of industrial electricity.  *See* Remand Results at 4-7, 11-2, 18.  This analysis complies with the statute.

Citing *AK Steel Corp. v. United States*, plaintiffs argue that Commerce's approach would produce the "untenable" result "that subsidies used by large industries or companies must be countervailable precisely because the industries or companies are large{.}"  GOK Br. at 10 (citing, *e.g.*, *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999)) (other citation omitted); *see also* Hyundai Br. at 7 (referencing *AK Steel*).  Here, however, Commerce did not determine *de facto* specificity based only on the *size* of the industry or companies;

instead, Commerce compared the amount of benefits received pursuant to the subsidy program.

*See, e.g.*, Remand Results at 4-7.  Hyundai attempts to link this case to the reasoning in *AK Steel*

by arguing that "{l}arger *or* energy intensive companies will consume more electricity."

Hyundai Br. at 7 (emphasis added).  But *AK Steel* never suggested that it would be "untenable"

to countervail a subsidy providing more benefits to electricity-intensive industries.  Instead, such

an analysis falls under the case-specific determinations that are assigned to Commerce as the

agency responsible for administering the countervailing duty laws.  *See* SAA at 931 (highlighting

the case-specific analysis for determining *de facto* specificity).

Indeed, the *AK Steel* decision highlights the importance of case-by-case assessment of

specificity.  *AK Steel*, 192 F.3d at 1385.  As the court explained, "{d}eterminations of

disproportionality and dominant use are not subject to rigid rules, but rather must be determined

on a case-by-case basis taking into account all the facts and circumstances of a particular case."

*Id.* (citation omitted).  Commerce performed such a case-by-case analysis in this case.  *See*

*generally* Remand Results at 4-7.  Unlike the tax benefits at issue in *AK Steel*, this case involves

the provision of electricity for LTAR.  *See* Remand Results at 10.  Thus, "the benefit to the

respondent is a direct result of the respondent's consumption of the good purchased for LTAR."

*Id.*  There is nothing untenable about recognizing the disproportionately large amount of benefits

provided to a group of industries pursuant to a program that confers greater benefits based on

greater use, and thereby favors the industries that use the most electricity.

Moreover, *AK Steel* did not reach any legally binding interpretation of the current statute.

The appeal reviewed Commerce's pre-URAA determination that a tax exemption program was

not a countervailable subsidy.  *AK Steel*, 192 F.3d at 1369-1370 (citing *Final Affirmative*

*Countervailing Duty Determinations and Final Negative Critical Circumstances*

*Determinations: Certain Steel Products from Korea,* 58 Fed. Reg. 37,338 (Dep't Commerce

1993)).  Domestic producers appealed this Court's decision, which held (among other things)

"that the Korean government did not provide preferential treatment to POSCO concerning the

revaluation" in the tax exemption program.  *AK Steel*, 192 F.3d at 1383.  On appeal, the court

agreed with Commerce that "POSCO did not receive a disproportionate benefit because in the

same year when POSCO revalued its assets upward by 94.0%, the average increase in asset value

was 94.2%."  *Id.* at 1384-1385.  Highlighting the case-specific analysis required for *de facto*

specificity, the court rejected the domestic industry's argument that Commerce must rely on "the

percentage of the total benefit of a subsidy program accruing" to a particular company or

industry.  *Id.* at 1385.  Nothing more was required to resolve the case, and the court's *dicta*

regarding a potentially "untenable result" in that pre-URAA determination, *see id.*, does not

meaningfully inform whether Commerce complied with the current statute.  As discussed above,

Commerce's methodology complies with the plain meaning of 19 U.S.C.

§ 1677(5A)(D)(iii)(III).[3]

        3.     Commerce's Reasoning Is Consistent With The Purposes Of The
              Specificity Test And The Countervailing Duty Statute

Plaintiffs also disagree with Commerce's analysis with respect to the purpose of the

specificity test.  *See, e.g.*, GOK Br. at 9-10; Hyundai Br. at 10.  However, Commerce's reasoning

---

[3] The government of Korea also relies on *Samsung Electronics Co., Ltd., v. United States*, 973 F. Supp. 2d 1321, 1326-27 (Ct. Int'l Trade 2014), *see* GOK Br. at 4.  In *Samsung Electronics*, however, the Court held that Commerce's method failed to account for the facts of the case, including aspects of the subsidy program, 973 F. Supp. 2d at 1327, and ultimately sustained Commerce's remand determination after further analysis and explanation, *Samsung Elecs. Co. v. United States*, 37 F. Supp. 3d 1320, 1324-26 (Ct. Int'l Trade 2014) (sustaining Commerce's remand redetermination comparing Samsung's total benefit from the subsidy with the 100 largest companies that received the benefit, accounting "for company size and total tax liability").

advances the purpose of the specificity test and the countervailing duty statute.  *See, e.g.*, Remand Results at 11.  The SAA provides that "{t}he specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, *the benefit of the subsidy is spread throughout an economy*."[4]  SAA at 930 (second emphasis added).  As Commerce explained, the "basic purpose of the specificity test" is to "remedy those subsidies that are limited *or unevenly distributed among the recipients*."  Remand Results at 11 (citing SAA at 929) (emphasis added). In this case, the provision of electricity for LTAR is not spread "throughout" the economy, but, instead, a disproportionately large amount of the subsidy is provided to a group consisting of three industries.  *See* Remand Results at 11; *see also id.* at 5-6.

Moreover, "{t}he express point of the subsidy determination is to specify when U.S. firms need the protection of a countervailing duty, which Commerce is directed to impose if a defined subsidy exists."  *Nucor Corp.*, 927 F.3d at 1251 (citing 19 U.S.C. § 1671).  "As a logical matter, when the statutory purpose is borne in mind, the existence of a 'benefit' of an unjustifiably low price, creating a 'subsidy' to the producer or exporter, cannot depend on finding that the producer is being discriminatorily favored compared to others in the exporting country."  *Id.*  "The harm to U.S. firms does not depend on such discrimination within the exporting country."  *Id.*  Despite that holding, plaintiffs argue that Commerce must engage in additional analysis before making a specificity finding that a group of industries received a disproportionality large amount of the benefits.  *See, e.g.*, Hyundai Br. at 9-11.  To the extent

---

[4]  *See also* SAA at 929 (quoting *Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983)) (stating the purpose of the specificity requirement is to serve as "an initial screening mechanism to winnow out *only* those foreign subsidies which truly are broadly available and widely used throughout an economy," such as "'public highways and bridges'").

plaintiffs advocate for a *de facto* disproportionality test that would require a government or authority to intentionally single out a particular enterprise, industry, or group, there is no support for such a result. *Nucor*, 927 F.3d at 1251; SAA at 930-931.

The government of Korea argues that Commerce's reasoning "would effectively read the *de facto* specificity requirement out of the statute whenever benefit amounts vary by usage, as the largest users, as a matter of math, will always consume more than the average amount." GOK Br. at 8 (citing *Bethlehem Steel*, 140 F. Supp. 2d at 1369). This argument ignores the case-specific analysis required by the statute and the requirement that a "disproportionately large" amount of the subsidy is received by the relevant industry, enterprise, or group thereof. *See, e.g.*, SAA at 931; 19 U.S.C. § 1677(5A)(D)(iii)(III). In this case, for example, Commerce did not simply find that some industries received more benefits than others. Instead, Commerce carefully quantified the extent of the disproportionality and concluded that it satisfied the statutory standard. *See, e.g.*, Remand Results at 5-6, 11. Adopting plaintiffs' reasoning, by contrast, could mean that "subsidies provided to large enterprises and industries would escape the remedies provided under the statute." Remand Results at 11.

To the extent plaintiffs argue that there can be no finding of *de facto* specificity whenever a subsidy "is widely available and used," it is plaintiffs that attempt to rewrite the statute by deleting (5A)(D)(iii)(III). *See* Hyundai Br. at 10-11 (citing *Mosaic Company v. United States*, 744 F. Supp. 3d 1367, 1379 (Ct. Int'l Trade 2025)); *see also* GOK Br. at 8 (citing *Mosaic*, 744 F. Supp. 3d at 1379). Again, Commerce applies a "sequential approach" to specificity, 19 C.F.R. § 351.502(a), and thus only applies the disproportionality test for *de facto* specificity when "the subsidy in question {is} provided to numerous and diverse industries," *see Countervailing Duties*, 63 Fed. Reg. at 65,359. As Commerce explained, to accept plaintiffs' argument that the

disproportionality test must always control for size could mean that "subsidies provided to large enterprises and industries would escape the remedies provided under the statute." Remand Results at 11. At bottom, the categorical approach proposed by plaintiff would prevent Commerce from assessing disproportionality based on comparative benefits received by industries, enterprises, or groups thereof. Plaintiffs' proposed approach is therefore inconsistent with the statute and the SAA. *See* SAA at 931. "{G}iven the purpose of the specificity test as a screening mechanism, the weight accorded to particular factors will vary from case to case." SAA at 931. Commerce's case-specific analysis in this case complies with the statute.

3. <u>Substantial Evidence Supports Commerce's Finding Of Disproportionality</u>

Finally, Commerce's determination is supported by substantial evidence, and plaintiffs' arguments to the contrary are unpersuasive. *See, e.g.*, Hyundai Br. at 4-5. For example, Hyundai argues that Commerce "confused various sets of data," citing total electricity consumption overall, industrial electricity consumption, and consumption by the top ten consumers of electricity. Hyundai Br. at 4. There was no such confusion. Commerce explained that its analysis considered "the *industrial* electricity consumption data for the {period of review}." Remand Results at 3 (emphasis added). Within this data, Commerce particularly focused on "consumption data for the ten largest electricity consuming industries," provided by the government of Korea.[5] Remand Results at 5. Commerce found that the group of three industries consumed [▮] percent of the total industrial class electricity during the period of review, and

---

[5] These top ten industries do not account for all users of industrial electricity, but rather the industries that the government of Korea reported. *See* GOK Questionnaire Response at 35-36 (P.R. 60, C.R. 29). Notably, although the government of Korea reported usage data for the top ten industries, record evidence indicates that at least 19 different industrial groupings exist in Korea. Remand Results at 10; *see also* Republic of Korea Economic Diversification Memorandum at 2-3 (P.R. 24).

CONFIDENTIAL MATERIAL OMITTED

that the "remaining seven industries" in the top ten accounted for only [   ] percent of the

total industrial class electricity during the period of review.  Remand Results at 5 (citing

Attachment).  Thus, the top three industries alone received "nearly [  ] percent more of the

subsidy benefits under the program that the seven other industries combined" based on total

industrial class electricity consumption.  *Id.*  Accordingly, Commerce clearly explained the data

set that it was considering, and the data provide substantial evidence supporting Commerce's

determination that a group of industries, including the steel industry, received a

disproportionately large amount of the benefits during the period of review.

Hyundai's remaining critiques reflect nothing more than disagreement with Commerce's

findings.  Based on the evidence considered by Commerce, *see* Remand Results at 4-7, a

"reasonable mind" could conclude that the group of three industries received a disproportionately

large amount of the provision of electricity for LTAR subsidy.  *See Crawfish Processors*

*Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v.*

*NLRB*, 305 U.S. 197, 229 (1938)).  For example, Hyundai argues that the [          ]

percentages in the group of the top three industries and the [        ] percentages for the other

industries "does not identify disproportionality but again just shows expected disparity{.}"

Hyundai Br. at 6-7.  However, a reasonable mind could conclude that the [

    ] percentages—along with the percentages consumed by the group of industries compared to

others in the top ten—support Commerce's determination that the group of top three industries

consumed a disproportionately large amount of the benefit from the provision of electricity for

LTAR subsidy program.  *See, e.g.*, Remand Results at 4-6.  Hyundai also argues that the focus

should be on electricity usage as a whole—instead of the usage of industrial electricity— but

provides no support for this argument.  Instead, Commerce reasonably considered industrial

CONFIDENTIAL MATERIAL OMITTED

electricity—which is the type of electricity consumed by the mandatory respondent, Hyundai. *See* Hyundai Initial Questionnaire Resp. at 41, 205-206 (P.R. 113).

Thus, a "reasonable mind" could conclude that the group of three industries received a disproportionately large amount of the provision of electricity for LTAR subsidy. *Crawfish Processors Alliance*, 483 F.3d at 1361 (quoting *Consol. Edison*, 305 U.S. at 229). Nothing more is required for Commerce's determination to be supported by substantial evidence. *Id.*

C.    Commerce's Grouping Of The Steel Industry And Two Other Industries Is Lawful And Supported By Substantial Evidence

Finally, Commerce's grouping of the steel industry and two other industries is lawful and supported by substantial evidence. *See* Remand Results at 4-5, 6-7. "{A}ny reference to an enterprise or industry . . . includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D). As the Court explained, Commerce must provide "a rational basis" for grouping industries or enterprises together. *Hyundai Steel*, 745 F. Supp. 3d at 1353 (citation omitted).

Consistent with the remand order, Commerce provided a rational basis for its grouping. *Contra* Hyundai Br. at 14; GOK Br. at 12-13. Commerce explained that the steel, [███] ] industries had "relatively comparable percentage of total industrial electricity consumption in Korea during the {period of review.}" Remand Results at 6, 23. These three industries were the top consumers of industrial electricity during the period of review and, thus, were also the top recipients of the benefits conferred by the provision of electricity for LTAR program. *See* Remand Results at 6-7.

Moreover, Commerce determined that there was a "clear delineation" of the electricity consumption between the top three industries (steel, [███████]) and the remaining seven industries. *Id.* at 12, 17. "Steel, [███████], at [███] percent, consumed a comparable percentage of industrial electricity as [███] at [███] percent, the

CONFIDENTIAL MATERIAL OMITTED

second largest industry, after [███████████] which consumed [██████] percent of the industrial electricity in the {period of review}." *Id*. at 6 (citing Attachment).  There was a stark difference in the consumption of the users of industrial electricity—with the steel, [██████ ██████████████████] industries consuming [████████████] percentages of industrial electricity and the remaining seven industries consuming [████████████] levels of industrial electricity on a percentage basis.  *Id*. at 6.  Commerce thus provided a rational explanation for its grouping of the steel industry along with two other industries.

Plaintiffs have not shown that Commerce's grouping is unlawful or unsupported by substantial evidence.  Neither the statute, Commerce's regulations, nor the preamble to Commerce's countervailing duties regulations limit such grouping to any particular set of characteristics.  *See generally* 19 U.S.C. § 1677(5A)(D); 19 C.F.R. § 351.502(b); *Countervailing Duties,* 63 Fed. Reg. at 65,357.  Commerce reasonably determined that the grouped industries' relative consumption of electricity was a shared characteristic and treated these industries as a group when conducting its disproportionality analysis.

The government of Korea argues that the Court has "already rejected" Commerce's reasoning.  GOK Br. at 13 (citation omitted).  That is not correct.  Instead, the Court considered the explanation that Commerce chose the top industrial users of electricity in Korea, and held that "{w}ithout more, Commerce's explanation is insufficient." *Hyundai Steel*, 745 F. Supp. 3d at 1353 (emphasis added).  On remand, Commerce reconsidered and provided "more" reasoning, *see id.*, including an analysis of the similarities between the top three users of industrial electricity and the significant decrease in use after the third industry.  *See* Remand Results at 6-7. The Court's remand order did not foreclose Commerce's additional analysis on remand.

CONFIDENTIAL MATERIAL OMITTED

According to Hyundai, moreover, "{s}ize alone is . .. not a rational basis for Commerce's industry grouping." Hyundai Br. at 14. It is unclear what Hyundai means by "size" in this context, given that Commerce did not group the industries based on sales revenue, the number of employees, or other measures of size of the industries. Instead, Commerce grouped these industries based on shared characteristics relating to use of electricity and corresponding receipt of the benefit from the provision of electricity for LTAR program. *See* Remand Results at 6-7. Considering the statutory exercise to determine whether an enterprise, industry, *or group thereof* has received a disproportionately large *amount of the subsidy*, *see, e.g.*, 19 U.S.C. § 1677(5A)(D)(iii)(III), Commerce rationally considered the amount of subsidy received when grouping the industries to together.

Plaintiffs also critique the basis for Commerce's determination that there is a difference between the top three industries and the remaining industries in the top ten. Hyundai Br. at 14-15; GOK Br. at 14. For example, Hyundai argues that the [█] percent difference between the first two industries is not meaningfully different than the [█] percent points between the third and the fourth. Hyundai Br. at 14-15. But Commerce's determination is supported by substantial evidence. Specifically, Commerce reasonably determined that the first three industries reflected comparable amounts of industrial electricity use on a percentage basis—at [████████████] percent, respectively—and that there was a significant decrease in the fourth largest consuming industry at [███] percent. Remand Results at 6-7 (citing Attachment). Even if a contrary conclusion could be drawn from the evidence of record, "such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)).

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand

redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Emma E. Bond
EMMA E. BOND
Senior Trial Counsel
Commercial Litigation Branch
OF COUNSEL:                              U.S. Department of Justice
Jesus N. Saenz                           Civil Division
Senior Attorney                          P.O. Box 480
Office of the Chief Counsel              Ben Franklin Station
  for Trade Enforcement and Compliance   Washington, D.C. 20044
U.S. Department of Commerce              Tel: (202) 305-2034
Washington, D.C.                         Email: Emma.Bond@usdoj.gov

July 2, 2025                             *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 8,606 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Emma E. Bond</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| Plaintiff, | ) |
| and | ) |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) |
| Plaintiff-Intervenor, | ) |
| v. | )    Court No. 23-00211 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| NUCOR CORPORATION, | ) |
| Defendant-Intervenor. | ) |

## <u>ORDER</u>

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, all responses thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety; and it is further

ORDERED that final judgment is entered in favor of the United States.


Dated: _____, 2025
      New York, NY                                         _____
                                                      JUDGE