C-580-837<br>
Remand<br>
Slip Op. 25-102<br>
POR:  1/1/2021 – 12/31/2021<br>
~~Business Proprietary Document~~<br>
E&C/OIII:  KJ<br>
**PUBLIC VERSION**

*Hyundai Steel Company v. United States*,
**Court No. 23-00211, Slip Op. 25-102 (CIT August 12, 2025)**
**Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.      SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the second remand opinion and order of the U.S. Court of International Trade (the Court) issued on August 12, 2025.[1]  These final results of redetermination concern Commerce's final results of administrative review of the countervailing duty (CVD) order on certain cut-to-length carbon-quality steel plate (CTL plate) from the Republic of Korea (Korea) covering the period of review (POR) January 1, 2021, through December 31, 2021.[2]  In the *Final Results*, Commerce determined that the Government of Korea's (GOK) Provision of Electricity for Less Than Adequate Remuneration (LTAR) (Electricity Program), which provided a benefit to Hyundai Steel Company (Hyundai Steel), was *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Tariff Act of 1930, as amended (the Act).[3]

---

[1] *See Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 25-102 (CIT August 12, 2025) (*Hyundai Steel II*).
[2] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2021*, 88 FR 61509 (September 7, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Final Results* IDM at 15-16.

On December 12, 2024, the Court issued its first remand for Commerce to provide further explanation or reconsideration of its finding that the steel industry and three other industries received a disproportionately large amount of the subsidy, and thus, the Electricity Program is *de facto* specific.[4]  On April 11, 2025, Commerce issued its final results of redetermination to the Court's remanded order in *Hyundai I*, continuing to find the Electricity Program to be *de facto* specific because the steel industry and two other industries received a disproportionately large amount of the subsidy.[5]  On August 12, 2025, the Court issued a second remand regarding Commerce's *de facto* specificity determination for the Electricity Program.[6]  Specifically, the Court remanded the *Final Remand-Hyundai I* and instructed Commerce to either apply the disproportionality standard required by the statute as explained by the Court, and explain any grouping it makes in connection with its determination, or reconsider the basis for its determination, consistent with the Court's opinion.[7]

For these final results of redetermination, Commerce has reconsidered the basis for its determination that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of Act in compliance with the Court's instruction.

---

[4] *See Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 24-135 (CIT December 12, 2024) (*Hyundai I*).
[5] *See Final Results of Redetermination Pursuant to Court Remand*, *Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 24-135 (CIT December 12, 2024), dated April 11, 2025 (*Final Remand-Hyundai I*), available at https://access.trade.gov/public/FinalRemandRedetermination.aspx.
[6] *See Hyundai Steel II*.
[7] *Id*. at 6.

## II.     BACKGROUND

On April 12, 2022, Commerce initiated an administrative review of the *Order*[8] for the review period January 1, 2021, through December 31, 2021.[9] On May 2, 2022, we selected Hyundai Steel as the mandatory respondent in the administrative review.[10] In the *Final Results*, Commerce determined that the Electricity Program is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act because the steel industry and three other industries combined consumed a disproportionately large amount of the electricity in Korea.[11]

Hyundai Steel and the GOK challenged Commerce's *de facto* specificity determination arguing that the steel industry did not receive a disproportionately large amount of the subsidy alone, or when grouped with three other industries. On December 12, 2024, the Court issued its opinion in *Hyundai Steel I* stating that Commerce's determination that the Electricity Program is *de facto* specific because the steel industry and three other industries received a "disproportionately large amount of the subsidy" within the meaning of section 771(5A)(D)(iii)(III) of the Act is not supported by substantial evidence.[12] In its ruling, the Court stated that disproportionality requires that an enterprise or industry is favored in some way (*i.e.*, it received more than its fair share).[13] The Court ordered Commerce to explain how the combined industries that it identified benefit more than would be expected, based on their usage given that the subsidy in question (provision of electricity) is designed to confer benefits on usage levels, which necessarily results in larger users receiving a proportionally larger

---

[8] *See Notice of Amended Final Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders:  Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000) (*Order*).
[9] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 21619, 21635 (April 12, 2022).
[10] *See* Memorandum, "Respondent Selection," dated May 2, 2022.
[11] *See Final Results* IDM at 15-16.
[12] *See Hyundai Steel I* at 11.
[13] *Id.* at 12.

3

percentage of the subsidy, or in relation to some other comparator.[14]  The Court also ordered Commerce to explain why these industries (*i.e.*, the steel industry and three other industries) are grouped together for purposes of its analysis.[15]

In *Final Remand-Hyundai I*, Commerce found that a further examination of the GOK's consumption data for the ten largest electricity consuming industries indicated that the steel industry and two (not three) other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other seven industries reported, and thus, the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of Act.[16]  Commerce explained that the rationale for grouping steel and two other industries together is based on a relatively comparable percentage of total industrial electricity consumption in Korea.  Specifically, the POR data demonstrate a significant difference between the electricity consumption of the three largest consumers of industrial class electricity and the remaining seven industries.  Thus, based on the characteristic of comparative consumption of industrial electricity during the POR, Commerce found a sufficient basis to group the steel and two other industries together to conduct an analysis of whether an enterprise or industry, or group thereof, received a disproportionately large amount of the subsidy,[17] and explained that "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case."[18]

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *See Countervailing Duties,* 63 FR 65348, 65357 (November 25, 1998) (*CVD Preamble*) "If the numerous enterprises that received benefits had comprised a limited number of industries, then the program would have been specific."
[18] *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999).

In *Hyundai Steel II*, the Court remanded the *Final Remand-Hyundai I* instructing Commerce to either apply the disproportionality standard required by the statute as explained by the Court, and explain any grouping it makes in connection with its determination, or reconsider the basis for its determination, consistent with the Court's opinion.[19] The Court held that "greater benefit alone does not equate with disproportionality,"[20] and that Commerce again simply grouped industries together for its specificity analysis, but did not explain its reasoning for doing so beyond finding that the companies all consumed similar amounts of electricity during the POR.[21] The Court thus concluded that Commerce's explanation of its grouping is deficient and requires remand for further explanation or reconsideration consistent with its opinion.

On September 26, 2025, Commerce placed on the record of this remand the Gross Domestic Product (GDP) 2021 data for Korea and provided an opportunity for interested parties to comment on the data.[22] No interested party submitted comments on the GDP data.

As discussed below, for these final results of redetermination, Commerce has reconsidered the basis for its determination that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of Act.

### III.   ANALYSIS

Section 771(5A)(D)(iii)(III) of the Act provides that there is reason to believe that a subsidy may be specific as a matter of fact where "an enterprise or industry receives a disproportionately large amount of the subsidy." As the Court stated in *Hyundai I* and *Hyundai*

---

[19] *See Hyundai Steel II* at 6.
[20] *Id*. at 14.
[21] *Id*. at 15.
[22] *See* Memorandum, "Second Remand in the Administrative Review of the Countervailing Duty Order on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; 2021: Placing Factual Information on the Record," dated September 26, 2025 (GDP Memorandum).

*Steel II*, disproportionality exists when something is too large or too small in relation to something else.[23] The Court further stated that the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator (*i.e.*, "disproportionality" requires a comparison of the amount of subsidy and an attribute of industry, not a comparison of the amount of a subsidy given to different industries).[24] For these draft results of redetermination, Commerce has conducted its disproportionality analysis to determine if Hyundai Steel received more benefits than would be expected under the Electricity Program by applying a comparator other than the consumption of electricity by industrial sectors, consistent with the Court's opinion.

To determine whether the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act, we applied Korea's GDP for 2021 as a comparator to Hyundai Steel's consumption of industrial class electricity. Specifically, we compared Hyundai Steel's share of total industrial class electricity consumed in 2021 to Hyundai Steel's share of Korea's GDP for 2021. As indicated in the Attachment, Hyundai Steel's share of total industrial class electricity consumed in Korea during 2021 was [    ] percent, whereas the company's share of Korea's GDP for 2021 was [    ] percent. The data show that Hyundai Steel's consumption of industrial class electricity was [            ] its contribution to GDP. Because Hyundai Steel's share of total industrial class electricity consumption is [                ] in relation to the company's share of GDP, we find that disproportionality exists as Hyundai Steel received more than expected of the electricity subsidy during the POR. We thus determine that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of

---

[23] *See Hyundai Steel I* at 9-10; *see also Hyundai Steel II* at 9.
[24] *See Hyundai Steel I* at 10; *see also Hyundai Steel II* at 9 and 11-13.

the Act because Hyundai Steel received a disproportionately large amount of the electricity subsidy in comparison to its share of GDP.

## IV.  INTERESTED PARTY COMMENTS

We released the Draft Results to interested parties on November 26, 2025.[25]  On December 5, 2025, we received comments from the GOK, Hyundai Steel, and Nucor Corporation (Nucor) concerning Commerce's specificity analysis for the Electricity Program.[26]  The arguments submitted are summarized and addressed below.

**Comment 1:   Whether Commerce's Use of an External Comparator To Find Disproportionate Use of the Electricity Program by Hyundai Steel Is Reasonable**

*GOK's Comments*

The following is a verbatim summary of an argument submitted by the GOK (internal citations omitted).  For further details, *see* GOK's Comments at 4-11.

> {Commerce's} Draft Second Remand Redetermination erroneously concludes that Hyundai Steel received a disproportionately large amount of the alleged electricity subsidy.  {Commerce} erred in the following ways.  {Commerce's} comparison of Hyundai Steel's share of industrial electricity consumption to Hyundai Steel's share of Korea's {GDP} is unreasonable.  The denominators for the two ratios that {Commerce} compared are fundamentally different.  Hyundai Steel's share of industrial electricity consumption compares Hyundai Steel to certain Korean economic actors that contribute to only a portion of Korea's total GDP, while Hyundai Steel's relative share of Korea's total GDP compares Hyundai Steel to the entirety of Korea's economy.  To the extent a comparison of electricity consumption to GDP might provide any probative value, {Commerce} should compare Hyundai Steel's share of total electricity consumption to its share of total GDP so that the denominators are at least similar.  The two resulting percentages are both very small and very similar, demonstrating that Hyundai Steel did not receive a disproportionately large amount of the subsidy.

---

[25] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 25-102 (CIT August 12, 2025), Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, released November 26, 2025 (Draft Results).
[26] *See* GOK's Letter, "Comments on Draft Results of Redetermination," dated December 5, 2025 (GOK's Comments); *see also* Hyundai Steel's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated December 5, 2025) (Hyundai Steel's Comments); and Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated December 5, 2025 (Nucor's Comments).

7

> Disparity between a company's or industry's electricity consumption and its relative share of GDP should not be the basis for a *de facto* specificity finding. There is no basis in law or fact to conclude that a company's electricity consumption should somehow correlate to GDP. Therefore, comparing electricity consumption to GDP does not provide a valid basis for determining whether an enterprise or industry is favored and receives more of the subsidy than would be expected. The usage of essentially any subsidy program will depend upon the nature of the program and the traits of the users, not just the user's contributions to GDP. {Commerce's} analytical framework would find that indisputably non-specific programs like bridges and roads are in fact specific and would write the specificity requirement out of the statute.
>
> The provision of electricity pursuant to a standard pricing mechanism is not a specific subsidy. {Commerce's} practice is to find that electricity provided pursuant to a standard pricing mechanism is not specific. Hyundai Steel purchased electricity pursuant to tariffs established via a standard pricing mechanism, and the program is therefore non-specific. Moreover, electricity is broadly available and widely used in Korea. It is not the type of government program that the countervailing duty statute was meant to address.

*Hyundai Steel's Comments*

The following is a verbatim summary of an argument submitted by Hyundai Steel (internal citations omitted). For further details, *see* Hyundai Steel's Comments at 3-8.

> The Draft Redetermination is fundamentally flawed. The Court directed Commerce to demonstrate, with substantial evidence, that the industries it grouped together received a disproportionate amount of the subsidy from the electricity for LTAR program. Although not directing Commerce to use any particular methodology the Court was clear that any comparison must show that the group of industries' receipt of the alleged subsidy is more than would be expected, as the definition of disproportionate demands. In response, Commerce has abandoned its grouping of random industries and has instead provided an entirely new analysis that compares Hyundai Steel's percentage contribution to Korea's {GDP} with Hyundai Steel's percentage of consumption of industrial electricity. This comparison method is essentially meaningless, as there is no correlation between Hyundai Steel's contribution to GDP and its consumption of industrial electricity. GDP is a measure of the total monetary value of all goods and services produced in a country and has no relationship to how much electricity the various enterprises that contribute to GDP consume. Moreover, GDP is a measure of the value of all goods and services and is not limited to industrial enterprises, and so comparing Hyundai Steel's contribution to GDP to its consumption of industrial electricity is an apples-to-oranges comparison. Finally, Commerce's new methodology fails to grapple with the fundamental fact that the alleged electricity for LTAR subsidy is tied to usage, electricity prices are based on standard pricing mechanism, and electricity is the type of broadly available and widely used input that is generally

8

not subject to the countervailing duty law. In sum, Commerce's new comparison method does not demonstrate that Hyundai Steel received more than would be expected of the electricity for LTAR subsidy. The Draft Redetermination thus fails once again to comply with the Court's instruction to give meaning to the statutory term disproportionate. In the Final Redetermination, Commerce should abandon its attempt to find that the provision of electricity for LTAR is *de facto* specific and find this generally available and broadly used program is not countervailable.

*Nucor's Comments*

The following is a verbatim summary of an argument submitted by Nucor (internal citations omitted). For further details, *see* Nucor's Comments at 4-26.

> {Commerce} properly continued to find in its draft remand results that the GOK's provision of electricity for LTAR, which provided a benefit to Hyundai Steel, was *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act because "an enterprise or industry receives a disproportionately large amount of the subsidy." According to the Court of Appeals for the Federal Circuit, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis. . . ." On remand, {Commerce} reasonably compared Hyundai Steel's share of subsidized industrial class electricity consumed in 2021 with the company's share of Korea's {GDP} the same year. {Commerce} found that the former share of industrial electricity use, [     ] percent, was indeed disproportionate ([             ]) to the latter share of Korea's GDP [     ] percent. This was a reasonable method of determining disproportionality because it illustrates how Hyundai Steel is receiving more of a benefit from the subsidy than its corresponding share of the Korean economy.

> In the alternative, {Commerce} could reach the same disproportionality finding by further explaining its decision on first remand, *i.e.*, in the *Hyundai I Remand Results*, to group the top three industrial users of electricity together and find that the group of three received a disproportionate amount of the benefit from subsidized industrial electricity compared to other Korean industrial users of electricity. In an economy with 19 diversified economic industry sectors, the steel industry was the [     ] largest recipient of the benefit from subsidized industrial electricity in Korea. The top 10 industries consuming electricity in the same industrial class represented [     ] of total receipt of the benefit, and the steel industry represented [     ] of that figure. The steel industry was among the top three electricity consuming industries, which consumed almost [     ] (*i.e.*, a disproportionate amount) of the subsidized electricity under this tariff category. {Commerce} could also find, in the alternative, that the provision of electricity for LTAR is *de facto* specific because a group of industries or enterprises is a predominant user of the subsidy. Notably, {Commerce's} finding of specificity for this electricity for LTAR program is itself lawful on either basis and is not a widely available subsidy akin to general infrastructure falling under the exception to countervailable subsidies.

9

**Commerce Position:** We disagree with the GOK and Hyundai Steel that Commerce's Draft Remand is unsupported by substantial evidence and not in accordance with law. As discussed below, the information on the record supports a finding that Hyundai Steel received a disproportionately large amount of the subsidy under the Electricity Program within the meaning of section 771(5A)(D)(iii)(III) of the Act.

  As an initial matter, contrary to Hyundai Steel's claim, the Court did not direct Commerce to demonstrate that the industries it grouped together received a disproportionate amount of the subsidy from the Electricity Program.[27] The Court remanded the *Final Remand-Hyundai I* instructing Commerce to either apply the disproportionality standard required by the statute as explained by the Court, and explain any grouping it makes in connection with its determination, *or reconsider the basis for its determination*.[28] For this remand, Commerce choose to reconsider the basis for its specificity finding, consistent with the Court's opinions. As the Court explained in *Hyundai Steel I* and *Hyundai Steel II*, a "disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances."[29] Consequently, for this remand, Commerce determined to not conduct a comparison of the amount of the electricity consumed by different industries, but rather to apply an external comparator that would allow a comparison of the amount of electricity subsidy and an attribute of industry. On September 26, 2025, pursuant to the Court's suggestion to use an external comparator, Commerce placed on the record of this remand the GDP 2021 data for Korea and provided an opportunity for interested parties to comment on the data.[30] As discussed in the Draft Remand, Commerce selected

---

[27] *See* Hyundai Steel's Comments at 2.
[28] *See Hyundai Steel II* at 6 (emphasis added).
[29] *See Hyundai Steel I* at 10; *see also Hyundai Steel II* at 9.
[30] *See* GDP Memorandum.

Korea's GDP as the comparator to determine whether Hyundai Steel's consumption of industrial class electricity was disproportionate.[31]

The GOK and Hyundai Steel disagree with Commerce's use of Korea's GDP as a comparator claiming that it is unreasonable and inappropriate.[32] They argue that total GDP reflects the entirety of Korea's economy and not just the portion contributed by companies that consume industrial class electricity. However, neither the GOK nor Hyundai Steel provided any comments on the GDP data or argued for the use of alternative comparator data for Commerce's consideration in the Draft Remand.

To conduct the disproportionality analysis, we compared Hyundai Steel's share of the subsidized industrial class electricity consumed in 2021, with Hyundai Steel's share of Korea's GDP for 2021.[33] As indicated in the Attachment, Hyundai Steel's share of total industrial class electricity consumed in Korea during 2021 was [    ] percent, whereas the company's share of Korea's GDP for 2021 was [   ] percent.[34]

We find that the comparison conducted is a reasonable method for determining disproportionality because it illustrates how Hyundai Steel is using more industrial class electricity than its corresponding share of the economy, and therefore, receiving more benefits under the Electricity Program than would be expected. In the context of the provision of electricity, the comparison demonstrates that the benefits from Electricity Subsidy are not evenly distributed across the Korean economy in a way that would be expected if the purpose of the subsidy was to benefit all enterprises equally. As the percentages above indicate, Hyundai Steel received [                    ] the share of electricity benefit than its contribution to the economy.

---

[31] *See* Draft Remand at 6.
[32] *See* GOK's Comments at 4-6; *see also* Hyundai Steel's Comments at 5-6.
[33] *See* Draft Remand at 6.
[34] *See* Attachment to this final remand.

We find that Hyundai Steel's circumstance equates to the scenario that the Court contemplated in *Hyundai Steel II*, where it discussed a "situation where an enterprise received more of the subsidy than would be expected by some comparator such that its receipt could be considered disproportionate."[35]

Contrary to the GOK's and Hyundai Steel's claims, we did not make an assumption that there should be a "one-to-one" correlation between a company's or industry's contribution to GDP and its consumption of electricity.[36] In conducting our analysis, we relied on the definition of "disproportionate" and found that Hyundai Steel's consumption of industrial class electricity was too large in relation to its share of Korea's GDP for 2021. Hyundai Steel itself notes that "disproportionate" means "having or showing a difference that is not fair, reasonable, or expected: too large or too small in relation to something."[37] Given the nature of steel production, it is not illogical to expect that a steel company's consumption of industrial electricity would track its contribution to the economy. But here, as noted above, Hyundai Steel's consumption of the subsidized industrial class electricity was [      ] its contribution to the Korean economy.

Additionally, the GOK and Hyundai Steel assert that the comparison of Hyundai Steel's consumption of industrial class electricity to its contribution to GDP is inapt because total GDP reflects output from the entire economy, including activity of entities that consume electricity in all classes, and thus, the two denominators, which comprise different universes of economic actors, are not comparable.[38] They argue that Commerce should instead compare Hyundai

---

[35] *See Hyundai Steel II* at 12-13.
[36] *See* GOK's Comments at 7 and 9; *see also* Hyundai Steel's Comments at 6.
[37] *See* Hyundai Steel's Comments at 5 (citing Britannica Dictionary).
[38] *See* GOK's Comments at 4-5; *see also* Hyundai Steel's Comments at 6-7.

Steel's share of total electricity consumption to its share of total GDP.[39] We disagree. Under the Electricity Program, the type of electricity being examined is industrial class electricity,[40] and thus, in the comparison we must consider only Hyundai Steel's consumption of industrial class electricity and not any other type of electricity[41] the company may have used during the POR.

Further, in making its argument that there is a mismatch in Commerce's comparison (because the denominator for Hyundai Steel's electricity consumption percentage is limited to industrial electricity whereas the denominator for its contribution to GDP is based on total economy-wide activity), Hyundai Steel cites to *Mosaic*, where the Court found a comparison conducted by Commerce's to be "essentially meaningless from the standpoint of determining the 'specificity' of the program because the numerator and denominator were not logically comparable."[42] We find Hyundai Steel's reliance on *Mosaic* to be off point. As an initial matter, the litigation is ongoing; thus, the Court's decision is not final and conclusive and remains subject to appeal at the Federal Circuit after remand proceedings complete. More importantly, for the program at issue in *Mosaic* – a tax penalty program – the Court found Commerce's "limited in number" specificity analysis, under section 771(5A)(D)(iii)(I) of the Act, flawed because it did not consider whether the denominator used reflected the universe of the group of potential recipients.[43] As noted above, we are conducting a "disproportionality" specificity analysis for the Electricity Program under section 771(5A)(D)(iii)(III) of the Act.[44] As such, in

---

[39] *See* GOK's Comments at 5-6; *see also* Hyundai Steel's Comments at 6-7.
[40] *See Final Results* IDM at Comments 1-4.
[41] The other types of electricity are general, residential, educational, and agricultural. *See* GOK's Letter, "Initial Questionnaire Response," dated June 27, 2022 (GOK IQR) at 27.
[42] *See* Hyundai Steel's Comments at 7-8 (citing *Mosaic Co. v. United States*, 659 F.Supp.3d 1285, 1314-15 (CIT 2023) (*Mosaic*)).
[43] *See Mosaic,* 659 F. Supp. 3d 1314-15.
[44] The Federal Circuit has recently and consistently found that "Commerce has reasonable flexibility in carrying out the *de facto* specificity inquiry." *See Mosaic Company v. United States*, Case No. 24-1593, slip op. at 12 (Fed. Cir. Dec. 5, 2025) (*Mosaic Company*) (citing *AK Steel Corp*, 192 F.3d at 1385 ("{d}eterminations of . . . dominant use

compliance with the Court's order, we conducted a comparison of the amount of industrial electricity subsidy received by Hyundai Steel to an attribute of the industry.[45] Given that the design of Korea's Electricity Program is to benefit heavy users of the subsidized input, such as steel companies,[46] the use of GDP as a comparator, and Hyundai Steel's contribution to the Korean economy, is reasonable. Because we continue to apply Korea's GDP as the external comparator for our disproportionality analysis, we need not consider the alternative methodologies proposed by Nucor.[47]

Finally, we disagree with the GOK and Hyundai Steel that the Electricity Program is not specific because the provision of electricity in Korea is a broad-based, nationwide program pursuant to a standard pricing mechanism, under which Hyundai Steel was not singled-out for favorable treatment.[48] First, with regard to a "standard pricing mechanism," Commerce determined for 2021 that KEPCO's prices for certain industrial tariff classification were

---

are not subject to rigid rules, but rather must be determined on a case-by case basis taking into account all the facts and circumstances of a particular case"); *Gov't of Quebec v. United States*, 105 F.4th 1359, 1375 (Fed. Cir. 2024); *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335-36 (Fed. Cir. 2006)).

[45] *See Hyundai Steel II* at 11-12.

[46] In the *Final Results*, Commerce found, based on facts available, that KEPCO's electricity prices were not set in accordance with market principles during 2021, because the GOK did not provide the KEPCO cost data. *See Final Results* IDM at Comment 2. However, in other CVD Korea steel cases, which also examined the Electricity Program for the 2021 review period, Commerce was able to evaluate KEPCO's 2021 cost data and determined that for certain industrial class tariff rates KEPCO did not recover costs (inclusive of a rate of return) during 2021. *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 FR 86318 (December 13, 2023) (*Cut-to-Length Plate from Korea 2021 Final*), and accompanying IDM at Comment 1a; *see also Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 89 FR 6501 (February 1, 2024) (*CORE from Korea 2021 Final*), and accompanying IDM at Comment 1a; *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 89 FR 15124 (March 1, 2024) (*CRS from Korea 2021 Final*), and accompanying IDM at Comment 3; and *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 89 FR 41380 (May 13, 2024) (*HRS from Korea 2021 Final*), and accompanying IDM at Comment 3. Coupled with these findings, we note that, in its Form 20-F Filing (2022), KEPCO reported that the "industrial sector represents the largest segment of electricity consumption in Korea." *See* GOK IQR at Exhibit E-2 (p. 58).

[47] *See* Nucor's Comments at 8-25.

[48] *See* GOK's Comments at 10-11; *see also* Hyundai Steel's Comments at 8.

14

insufficient to recover costs plus a reasonable rate of return.[49]  Second, the provision of subsidized industrial class electricity is neither widely available nor is it general infrastructure (*i.e.*, like the provision of roads, bridges, and similar facilities that benefit society as a whole).[50]  Unlike public infrastructure, Commerce can determine the entities that receive a predominant or disproportionate share of the subsidized electricity since the use of the electricity is tracked on an enterprise and industry level.  Not only does Commerce have precedent for finding the provision of electricity and other similar utilities to be countervailable, and thus specific, but the courts have affirmed Commerce's determination.[51]  Here, based on the evidence that Hyundai Steel's share of total industrial class electricity consumption is [          ] in relation to the company's share of GDP for 2021, we find the Electricity Program to be *de facto* specific because Hyundai Steel received a disproportionately large amount of the subsidy.

---

[49] *See Cut-to-Length Plate from Korea 2021 Final* IDM at Comment 1a; *see also CORE from Korea 2021 Final* IDM at Comment 1a; *CRS from Korea 2021 Final* IDM at Comment 3; and *HRS from Korea 2021 Final* IDM at Comment 3.

[50] *See* 19 CFR 351.511(d); *see also CVD Preamble*, 63 FR at 65379; and *Royal Thai Government v. United States*, 441 F. Supp. 2d 1350, 1356-57 (CIT 2006).

[51] *See, e.g., Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2021*, 89 FR 41380 (May 13, 2024), and accompanying IDM at Comment 4; *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Recission of Countervailing Duty Administrative Review; 2021*, 89 FR 6501 (February 1, 2024), and accompanying IDM at Comment 1; *Certain Steel Nails from Thailand:  Final Negative Countervailing Duty Determination*, 87 FR 51343 (August 22, 2022), and accompanying IDM at Comment 2; *Jiangsu Zhongji Lamination Materials Co., Ltd. v. Unites States*, 405 F.Supp.3d 1317, 1337 (CIT 2019) ("although the electricity service may be available to the public, the subsidy at issue is the electricity provided . . . at LTAR to respondents. Accordingly, Commerce properly concluded that the provision of electricity at LTAR, the subsidy at issue, was not general infrastructure"); *Canadian Solar Inc. v. United States*, 23 F.4th 1372  (CIT 2022) (finding an electricity program constituted a countervailable subsidy); and *Mosaic Company*, Case No. 24-1593 slip op. at 13 (finding a natural gas subsidy countervailable).

## V.  FINAL RESULTS OF REDETERMINATION

Based on the analysis above, we continue to find the GOK's Electricity Program to be *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because Hyundai Steel received than would be expected of the electricity subsidy during the POR.

12/23/2025

X

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

**ATTACHMENT**
*Public Version*

Comparison of Hyundai Steel's Share of Industrial Electricity Consumption
to Hyundai Steel's Share of GDP

| 2021 - Electricity Consumption | KWh | |
|---|---|---|
| Total Amount of Industrial Class Electricity Consumed in Korea* | [ ] | A |
| Hyundai Steel's Consumption of Industrial Class Electricity** | [ ] | B |
| **Hyundai Steel's Share of Total Industrial Class Electricity Consumption** | [ ] | B/A |

| 2021 - GDP | Korean Won | |
|---|---|---|
| Korea GDP (Real)*** | 2,153,423,000,000,000 | C |
| Hyundai Steel Sales**** | [ ] | D |
| **Hyundai Steel's Share of Real GDP** | [ ] | D/C |

\* *Source*: GOK IQR at 36.
\*\* *Source*: Hyundai Steel's Letter, "Initial Questionnaire Response," dated June 27, 2022 at Exhibit E-1.
\*\*\*Using Real GDP (not nominal GDP) as Real GDP is often a more accurate reflection of the output of an economy than nominal GDP. *Source*: International Financial Statistics; *see also* Memorandum, "Second Remand in the Administrative Review of the Countervailing Duty Order on Certain Cut-to-Length Carbon Quality Steel Plate from the Republic of Korea; 2021: Placing Factual Information on the Record," dated September 26, 2025.
\*\*\**Source*: Hyundai Steel's Letter, "Affiliation Companies Response," dated May 31, 2022 at Exhibit 21 (Unconsolidated Financial Statement 2021), p. 8.