UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY

| | |
|---|---|
| HYUNDAI STEEL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| GOVERNMENT OF THE REPUBLIC OF ) KOREA, ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | **Court No. 23-00211** |
| ) | |
| UNITED STATES, ) | **NONCONFIDENTIAL** |
| ) | |
| Defendant, ) ) | Business Proprietary Information Removed from Pages 3, 5, 9, and 11. |
| and ) | |
| ) | |
| NUCOR CORPORATION, ) | |
| ) | |
| Defendant-Intervenor. ) ) | |

**PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S COMMENTS ON THE SECOND FINAL RESULTS OF REDETERMINATION**

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: January 29, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ........................................................................................................................1

ARGUMENT ................................................................................................................................1

I.  COMMERCE'S SELECTION OF HYUNDAI STEEL'S SHARE OF TOTAL GDP AS THE EXTERNAL COMPARATOR IS UNREASONABLE ...........................3

II. DISPARITY BETWEEN INDUSTRIAL ELECTRICITY CONSUMPTION AND RELATIVE SHARE OF GDP SHOULD NOT BE THE BASIS FOR A *DE FACTO* SPECIFICITY FINDING .........................................................................10

III. THE PROVISION OF ELECTRICITY PURSUANT TO A STANDARD PRICING MECHANISM IS NOT A SPECIFIC SUBSIDY ........................................13

CONCLUSION ............................................................................................................................15

# **TABLE OF AUTHORITIES**

**CASES**

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ........... 12, 15

*Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) ....... 12, 14

*Carpenter Tech. Corp. v. United States*, 662 F. Supp. 2d 1337 (Ct. Int'l Trade 2009) .................... 9

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ............................................ 7

*Evolutions Flooring, Inc. & Struxtur, Inc. v. United States*, 776 F. Supp. 3d 1271 (Ct. Int'l Trade 2025) ........................................................................................................................ 7

*Hyundai Steel Company v. United States*, 745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) .............. 14

*Hyundai Steel Company v. United States*, 798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) ................ 8

*Mosaic Co. v. United States*, 774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025)............................. 13, 14

*Mosaic Co. v. United States*. 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023).............................. 7, 13

*OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375 (Fed. Cir. 2019).............................................. 10

*Schaeffler Italia S.r.l. v. United States*, 781 F. Supp. 2d 1358 (Ct. Int'l Trade 2011) ..................... 9

*Zhejiang Native Produce & Animal By-Product Imp. & Exp. Corp. v. United States*, 637 F. Supp. 2d 1260 (Ct. Int'l Trade 2009) ................................................................................................ 9

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................................................... 8

19 U.S.C. § 1677(5A)(D)....................................................................................................... 6, 7, 9

**ADMINISTRATIVE DECISIONS**

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying Issues and Decision Memorandum ...... 15

**OTHER AUTHORITIES**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040................................................................................... 12

**INTRODUCTION**

In its opinion remanding the *Final Results* to Commerce for a second time, the Court directed the U.S. Department of Commerce ("Commerce") to either apply the disproportionality standard as required by the statute consistent with the Court's instructions or reconsider its basis of finding that the alleged provision of electricity for less than adequate remuneration ("LTAR") is *de facto* specific. Court Op. and Order, ECF No. 79 ("Court Op.") at 6. In its Second Final Results of Redetermination Pursuant to Court Remand, ECF No. 93 ("Second Final Remand Results"), Commerce reconsidered its basis for concluding that the alleged provision of electricity for LTAR is specific, finding that Hyundai Steel Company ("Hyundai Steel") received a disproportionately large amount of the alleged electricity subsidy. Second Final Remand Results at 6-7. Because Commerce's new basis for finding *de facto* specificity in its Second Final Remand Results continues to be unsupported by substantial evidence or otherwise not in accordance with the law, the GOK objects.

**ARGUMENT**

In its Second Final Remand Results, Commerce erroneously concludes that Hyundai Steel received a disproportionately large amount of the alleged electricity subsidy. For the following reasons, Commerce's analysis is incorrect.

First, Commerce compared Hyundai Steel's share of industrial electricity consumption to Hyundai Steel's share of Korea's total real gross domestic product ("GDP"). This comparison, however, is unreasonable because the denominators for the two ratios are fundamentally different. Hyundai Steel's share of industrial electricity consumption compares Hyundai Steel to certain Korean economic actors that contribute to only a portion of Korea's total GDP, while Hyundai Steel's relative share of Korea's total GDP compares Hyundai Steel to the entirety of Korea's economy. To the extent a comparison of electricity consumption to a company or

1

industry's share of GDP might provide any probative value, Commerce should have compared (i) Hyundai Steel's share of industrial class electricity consumption to its share of GDP attributable to only industrial class electricity users or (ii) Hyundai Steel's share of total electricity consumption to its share of total GDP.  Absent a valid "external comparator," Commerce's disproportionality analysis cannot support its finding of *de facto* specificity.

 Second, disparity between a company's industrial electricity consumption and its relative share of GDP cannot be the basis for a *de facto* specificity finding because there is no basis in law or fact to conclude that a company's industrial electricity consumption normally would closely correlate or "track" to its contribution to GDP.  Therefore, comparing industrial electricity consumption to GDP does not provide a valid basis for determining whether an enterprise or industry is favored and receives more of the subsidy than would be expected.  The usage of essentially any subsidy program will depend upon the nature of the program and the traits of the users, not just the user's contributions to GDP.  Commerce's analytical framework would find that indisputably non-specific programs like bridges and roads are in fact specific and would write the specificity requirement out of the statute.

 Lastly, the provision of electricity pursuant to a standard pricing mechanism is not a specific subsidy.  Commerce's practice, which was sustained by this Court, is to find that electricity provided pursuant to a standard pricing mechanism is not specific.  Because Hyundai Steel purchased electricity pursuant to tariffs established via a standard pricing mechanism, the program is not specific.  Moreover, contrary to Commerce's contention, electricity is broadly available and widely used in Korea.  It is not the type of government program that the countervailing duty statute was meant to address.

### I.   COMMERCE'S SELECTION OF HYUNDAI STEEL'S SHARE OF TOTAL GDP AS THE EXTERNAL COMPARATOR IS UNREASONABLE

Following the Court's order to reconsider the basis of finding that the alleged provision of electricity for LTAR is *de facto* specific, Commerce, in the Second Final Remand Results, compared Hyundai Steel's share of consumption among industrial class electricity consumers to a proxy for Hyundai Steel's relative contribution to Korea's total GDP.[1]  Second Final Remand Results at 6-7.  Despite objections from Hyundai Steel and the GOK, Commerce insisted that the company's share of industrial class electricity consumption should be used in its specificity analysis because "the type of electricity being examined is industrial class electricity" and "not any other type of electricity the company may have used during the POR."  *Id.* at 12-13.  Finding that Hyundai Steel's share of the consumption of industrial class electricity ([     ] percent) was [               ] its relative contribution to the total GDP ([     ] percent), Commerce concluded that "Hyundai Steel received a disproportionately large amount of the electricity subsidy in comparison to its share of GDP" and thus that the provision of electricity for LTAR was specific.  *Id.* at 6.  The basis for Commerce's comparison is flawed and unreasonable.

The primary defect of Commerce's specificity analysis is that the "external comparator" selected by Commerce uses a fundamentally different denominator, rendering the entire comparison worthless.  On the one hand, Hyundai Steel's share of industrial electricity consumption compares Hyundai Steel to only a subset of Korea's economy—*i.e.*, companies that consume industrial class electricity—which contributes to only a portion of Korea's total GDP.  On the other hand, Hyundai Steel's relative share of Korea's total GDP compares Hyundai Steel to the entirety of Korea's economy, including activities of entities beyond companies that

---

[1] Commerce assumed that Hyundai Steel's sales reflected its contribution to GDP, although GDP measures the output of an economy.  *See* Final Remand Results at Attachment.

3

consume industrial class electricity, such as those in the financial services, legal services, information technology, and agricultural sectors. These entities generate economic output primarily through financial services, real estate transactions, and the deployment of intellectual capital and skilled labor, rather than through the operation of relatively more electricity-intensive production facilities. Moreover, these entities do not consume industrial class electricity but instead consume electricity in one of the other classes, *e.g.*, general, residential, educational, or agricultural. Letter from Yoon & Yang LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire" (June 27, 2022) ("GOK IQR") at 27 (C.R.29/P.R.60) (identifying the different classes of electricity). Commerce's comparison of industrial electricity usage to total GDP is therefore nothing more than an apples-to-oranges comparison.

      Commerce's persistent insistence on limiting one side of its comparison to Hyundai Steel's share of industrial class electricity consumption only underscores the deficiencies in its specificity analysis. The GOK does not concede that a comparison of the share of a company's electricity consumption to its share of GDP should be the relevant test for a *de facto* specificity analysis, regardless of how those shares are calculated. However, to the extent that such an analysis may shed any light on the question of whether the receipt of an alleged subsidy is disproportionate, Commerce should at least conduct a comparison that uses similar denominators. Otherwise, the comparison is facially unreasonable because the baselines in the comparison are completely different, and the comparison cannot provide substantial evidence for a determination as to whether an enterprise or industry received more of the subsidy than would reasonably be expected.

If Commerce restricts its analysis to *industrial class* electricity consumption, then it must likewise confine the comparator to a metric that corresponds to that same subset of Korea's economy. Assuming *arguendo* that GDP is an appropriate comparator, the only reasonable comparison based upon GDP for Hyundai Steel's share of *industrial class* electricity consumption would be Hyundai Steel's share of GDP attributable to only *industrial class* electricity users. As the GOK explained, sectors such as legal services, real estate, and financial services, which are major contributors to the GDP, must be excluded from the GDP denominator because these sectors do not use industrial electricity. For example, if industrial class electricity users account for 40 percent of GDP, then—under Commerce's contested sales-to-GDP calculation—simple arithmetic shows that Hyundai Steel's corresponding share of GDP attributable to industrial class electricity users would be 2.5 times Commerce's calculation of Hyundai Steel's share of total GDP (*i.e.*, Hyundai Steel's sales ÷ (total GDP × 0.4)). An apples-to-apples comparison of Hyundai Steel's share of industrial class electricity consumption to its share of GDP attributable to just industrial class electricity users logically would eliminate much, if not all, of the discrepancy between the ratios.

Conversely, if Commerce were to use *total* GDP as the basis for comparison in order to determine how much electricity Hyundai Steel would be expected to consume, the only reasonable comparison would be Hyundai Steel's share of *total* electricity consumption relative to its share of total GDP. The GDP data placed on the record by Commerce permits this comparison. As the GOK argued to Commerce in commenting on the draft remand results, when rounded to the nearest percentage point, [                    ]. *See* Letter from Akin to Sec'y of Commerce, "Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Comments on Draft Results of Redetermination" (Dec. 5, 2025) ("GOK

5

Draft Results Comments") at 6 (REM – SLIP OP. 25-102 C.R.3/P.R.7); *see also* Second Final Remand Results at Attachment (citing Hyundai Steel's Initial Questionnaire Response at Exhibit E-1); GOK IQR at 36 (C.R.29/P.R.60). The fundamental question under the statute is whether the subsidy is "specific" to an enterprise or injury, which may be satisfied if "{a}n enterprise or industry receives a disproportionately *large* amount of the subsidy." 19 U.S.C. § 1677(5A)(D) (emphasis added). Any discrepancy in these two very small percentages is minimal, and it certainly does not demonstrate that the alleged provision of electricity for LTAR is *de facto* "specific" to Hyundai Steel.

      Commerce asserts that it was reasonable to limit the specificity analysis to Hyundai Steel's share of industrial class electricity consumption, because the alleged subsidy involves industrial class electricity, instead of electricity generally. Second Final Remand Results at 12-13. Regardless of whether it would be reasonable in a vacuum for Commerce to compare Hyundai Steel's electricity consumption to the consumption of other industrial class users instead of all electricity users, this explanation does not address the fundamental flaw in Commerce's analysis. Commerce did not compare Hyundai Steel's share of industrial class electricity consumption to a GDP figure based on only industrial class users. Commerce compared it to a GDP figure that reflected the entire Korean economy. In other words, the external comparator that Commerce used for its analysis was not limited to industrial class electricity users, and it therefore cannot provide substantial evidence as to the amount of industrial class electricity that Hyundai Steel would be expected to consume, even assuming that there should be some relationship between electricity consumption and GDP. Commerce cannot narrow the universe on one side of the comparison, *i.e.*, to industrial class electricity consumption, while expanding it

6

on the other, *i.e.*, total GDP, and then claim that the resulting mismatch between two fundamentally difference universes demonstrates disproportionality.

The Court has already rejected this type of mismatched-universe comparator in *Mosaic Co. v. United States*. 659 F. Supp. 3d 1285, 1315 (Ct. Int'l Trade 2023). In *Mosaic Co.*, Commerce sought to demonstrate that a tax program was *de facto* specific by comparing the number of companies receiving penalty relief to the total number of corporate taxpayers nationwide, rather than to the subset of corporate taxpayers that had actually incurred penalties. *Id*. at 1314–15. The Court held Commerce's specificity determination as "essentially meaningless from the standpoint of determining the 'specificity' of the program because the numerator and denominator were not logically comparable." *Id*. at 1315. Commerce makes fundamentally the same methodological error here by comparing Hyundai Steel's share of industrial class electricity consumption to its share of total GDP—metrics that are not logically comparable because they have been drawn from different universes. Because the comparator includes GDP contributions from sectors outside the relevant set of industrial class electricity users, the resulting comparison cannot support a *de facto* specificity finding under 19 U.S.C. § 1677(5A)(D)(iii).

Commerce also claims that the GOK's and Hyundai Steel's objections pertaining to the use of the GDP data as a comparator are inappropriate because neither the GOK nor Hyundai Steel commented on the GDP data or argued for the use of an alternative comparator. Second Final Remand Results at 11. This argument, however, is a complete *non sequitur* because it ignores the statutory requirement for Commerce to support its determination with substantial evidence and articulate a reasoned explanation for its choices. *Evolutions Flooring, Inc. & Struxtur, Inc. v. United States*, 776 F. Supp. 3d 1271, 1278 (Ct. Int'l Trade 2025) (citing *CS*

*Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016)).  The fact that the GOK or Hyundai Steel did not comment on the GDP data before Commerce used the data in any analysis does not somehow obviate Commerce's obligation to provide evidence-based reasons for its decision.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).  As already discussed, record evidence clearly demonstrates that Commerce failed to meet these tests in reaching its *de facto* specificity finding.

Moreover, when it placed the GDP data on the record, Commerce did not explain how it intended to use the GDP data or what the analysis would be that required the GDP data.  *See* Memorandum from Kristen Johnson to the File, "Second Remand in the Administrative Review of the Countervailing Duty Order on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; 2021: Placing Factual Information on the Record" (Sept. 26, 2025) (REM – SLIP OP. 25-102 P.R.1).  And even if Commerce had explained how it intended to use the GDP data, it did not invite comments regarding how Commerce should use the data at that time.  Rather, Commerce simply provided "an opportunity for interested parties to submit factual information to rebut, clarify, or correct . . . the GDP data." *Id.*  Commerce's intention for the GDP data did not become apparent until it issued the draft results of redetermination wherein it used the GDP data for the apples-to-oranges comparison discussed above.  *Hyundai Steel Company v. United States*, 798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025), Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea – Draft Results of Redetermination Pursuant to Court Remand (Nov. 26, 2025) at 6.  Once the purpose of the GDP data was clear, the GOK (and Hyundai Steel) properly addressed the flaws in Commerce's comparison in its comments on the draft results of redetermination.  *See* GOK Draft Results Comments at 4-9 (REM – SLIP OP. 25-102 C.R.3/P.R.7).  More importantly, the GOK did not submit factual

information to rebut the GDP data in response to the opportunity to submit rebuttal factual information because the GOK does not argue that the GDP data Commerce submitted on the record are incorrect. Rather, the GOK's position is that Commerce's *use* of the GDP data is unreasonable.

      Finally, regardless of whether Commerce compares Hyundai Steel's electricity consumption to the overall consumption of industrial class electricity or to the overall consumption of all classes of electricity, the statute requires that an enterprise or industry receive "a disproportionately *large* amount of the subsidy" in order for there to be de facto specificity." 19 U.S.C. § 1677(5A)(D)(iii)(III) (emphasis added). However, even a share of **[    ]** percent of industrial class electricity consumption cannot be considered "large" as that word is normally understood. *Cf. Schaeffler Italia S.r.l. v. United States*, 781 F. Supp. 2d 1358, 1362-63 (Ct. Int'l Trade 2011) (rejecting Commerce's conclusion that two exporters and producers is a "large number" for purposes of limiting the number of mandatory respondents); *Zhejiang Native Produce & Animal By-Product Imp. & Exp. Corp. v. United States*, 637 F. Supp. 2d 1260, 1128-29 (Ct. Int'l Trade 2009) (same reasoning that four exporters and producers is not a "large number of respondents"); *Carpenter Tech. Corp. v. United States*, 662 F. Supp. 2d 1337, 1343-44 (Ct. Int'l Trade 2009) (same reasoning that eight respondents is not a "large number"). Ultimately, the overall specificity inquiry under the statute is whether the subsidy at issue is "specific" to an enterprise or industry. 19 U.S.C. § 1677(5A)(D)(iii). Commerce's finding that the subsidy is "specific" to Hyundai Steel when more than **[    ]** percent of such electricity is provided to other enterprises is unreasonable and not supported by substantial evidence.

## II. DISPARITY BETWEEN INDUSTRIAL ELECTRICITY CONSUMPTION AND RELATIVE SHARE OF GDP SHOULD NOT BE THE BASIS FOR A *DE FACTO* SPECIFICITY FINDING

In its Second Final Remand Results, Commerce identified Hyundai Steel's relative share of total GDP as a comparative benchmark for determining whether Hyundai Steel's industrial electricity consumption is disproportionate. Second Final Remand Results at 6. Commerce, however, does not explain why the company's relative share of GDP is a relevant benchmark or why it should be treated as defining the company's "fair share" of industrial electricity consumption. Rather, it baldly concludes, without any supporting evidence or analysis, that "{g}iven the nature of steel production, it is not illogical to expect that a steel company's consumption of industrial electricity would track its contribution to the economy." *Id.* at 12. But under the substantial evidence standard, even logic must give way to substantial evidence and cannot rest on pure speculation. *See, e.g.*, *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("Mere speculation is not substantial evidence." (cleaned up)). Commerce did not support its "tracking" premise with record evidence, nor did it test across different industries whether a company's share of GDP predicts the company's industrial class electricity consumption. Indeed, nothing in the record establishes that industrial electricity consumption "tracks" contribution to GDP. Industrial electricity consumption is driven by the nature of the business, production processes, capacity utilization, and product mix—factors that do not necessarily correlate with share of GDP. Commerce did not analyze any of these factors, nor did it explain why any difference between an enterprise's share of industrial class electricity consumption and its share of GDP would indicate that the enterprise is "favored in some way." And that lack of explanation is particularly problematic given the mismatch in denominators in the ratios that Commerce compared, with one denominator reflecting a subset of economic actors and the other denominator reflecting all economic actors. Absent a proper explanation supported

10

by substantial evidence, Commerce's inference bears the hallmarks of result-driven reasoning, not reasoned decision-making. Accordingly, the GDP-based comparison cannot serve as a lawful benchmark for a disproportionality determination.

But more importantly, there is no reason to expect that industrial electricity consumption, or the usage of and benefits from any other subsidy program, would closely track a company's or industry's share of GDP, even if the subsidy is broadly available and widely used throughout the economy. Although Commerce acknowledged that there may not be "a 'one-to-one' correlation between a company's or industry's contribution to GDP and its consumption of electricity," it argued that Hyundai Steel's consumption of industrial class electricity was **[           ]** its contribution to Korea's GDP and, thus, disproportionate. Second Final Remand Results at 12. But at least some of that disparity between the two ratios would be expected, given that Commerce compared Hyundai Steel's industrial electricity consumption to the electricity consumed by just industrial class electricity users while Commerce compared Hyundai Steel's sales to the combined GDP of the entire Korean economy. Furthermore, Commerce's reasoning completely ignores the fact that electricity consumption will vary not just on a company's size, but also on basic traits of the company. One would naturally expect manufacturing companies to use more electricity than farms or service companies like financial institutions, even if they contribute similar or even less amounts to the country's GDP. As Commerce and this Court explained when concluding that that the steel industry's receipt of more than 51 percent of the benefit of an electricity-related program was not disproportionate, the inherent characteristics of certain industries means that they will consume larger amounts of electricity, and their relatively greater electricity usage does not, by itself, mean that they receive a disproportionate benefit from electricity-related programs. *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354,

11

1369 (Ct. Int'l Trade 2001). Commerce therefore should consider the program at issue and the "commercial realities of the industry in question." *Id.*

The fact that program usage will not directly correlate to a company or industry's contribution to GDP is not unique to electricity. The same would likely be true for all potential subsidy programs, even those that are recognized as non-specific, because the usage levels of any program will depend at least in part on the basic characteristics of the program and the relevant industry or company. For example, the Statement of Administrative Action ("SAA") favorably cites *Carlisle Tire and Rubber Co. v. United States*, which concluded that countervailing generally available government benefits such as "public highways and bridges, as well as tax credits for expenditures on capital investment even if available to all industries and sectors. . . . simply defies reason." Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040, 4241; *Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983). Yet, one would not expect the usage of such programs to correlate closely with a company's or industry's share of GDP. A retailer or manufacturer almost certainly would use and benefit from public highways and bridges more than a digital marketing firm, even if they contribute the same amount to GDP. Similarly, manufacturers in capital-intensive industries undoubtedly would be bigger users of tax credits for expenditures on capital investments than insurance companies, even if they account for the same portion of GDP.

The SAA describes the specificity requirement as a "screening mechanism to winnow out . . . broadly available and widely used" subsidies and recognizes that "all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results." SAA at 929.

As the CIT recently explained, "{u}nder the guiding principle addressed in the SAA, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those . . . that distribute a benefit throughout the entire economy." *Mosaic Co. v. United States*, 774 F. Supp. 3d 1362, 1382 (Ct. Int'l Trade 2025). Any requirement that a company's or industry's share of the benefit closely match the company's or industry's share of GDP in order to be non-specific would fail to winnow out broadly available and widely used subsidies. Instead, such a test would produce the absurd result of deeming specific essentially every government touchpoint with the economy, including the provision of bridges and highways. This would violate the principles reflected in the SAA and essentially write the specificity requirement out of the statute.

Before basing a *de facto* specificity finding on the mere fact that benefit amounts do not "track" GDP contributions, Commerce must analyze the characteristics of the program at issue and the program users to establish whether benefit amounts would be expected to closely correlate with each user's contribution to GDP. If such an expectation is unreasonable—like it is in this case—then a bare comparison of benefit amounts to GDP will fail to perform the basic function of the specificity test, which is to winnow out programs that distribute benefits throughout an economy.

## III.  THE PROVISION OF ELECTRICITY PURSUANT TO A STANDARD PRICING MECHANISM IS NOT A SPECIFIC SUBSIDY

Again, Commerce must apply the specificity test to winnow out subsidies that are broadly available and widely used throughout an economy. In applying that test, this Court has warned that Commerce must not make an "overreaching and indiscriminate type of specificity finding." *Mosaic Co.*, 659 F. Supp. 3d at 1316. Yet, Commerce in the Second Final Remand Results reached just such a finding.

Commerce asserted that the provision of industrial class electricity is neither widely available nor general infrastructure because the "use of the electricity is tracked on an enterprise and industry level." Second Final Remand Results at 14-15. However, the ability to track usage of a subsidy or to characterize it as something other than "general infrastructure" does not mean that the subsidy is specific as a matter of fact. This Court in *Carlisle Tire and Rubber Co.* specifically used broadly available "tax credits for expenditures on capital investment" as an example of non-specific subsidy, *Carlisle Tire and Rubber Co.*, 564 F. Supp. at 838, and that decision was cited approvingly in the SAA. Yet, the usage and non-usage of such tax credits could be certainly tracked on an enterprise and industry level by the government, and no one would describe such tax credits as general infrastructure. Commerce's reasoning is therefore in direct disagreement with this Court's precedent and the SAA. The key issue is whether the subsidy is broadly available and widely used.

Electricity in Korea is available to any person upon request, such that it is widely available and used. *See* GOK IQR at 204 (C.R.29/P.R.60). The provision of electricity in Korea is not "provided to or used by discrete segments of the economy"; rather, it is a program that "distribute{s} a benefit throughout the entire economy." *Mosaic*, 774 F. Supp. 3d at 1382. This Court has emphasized that a "broad-based, nationwide program … is not the type of program that satisfies the specificity requirement in the statute." *Id.* at 1382-83. The provision of electricity in Korea is a "broad-based, nationwide program," and it therefore is not specific or countervailable.

The Court has made clear that *de facto* specificity based on disproportionality "requires that an enterprise or industry is favored in some way (*i.e.*, it receives more than its fair share)." *Hyundai Steel Company v. United States*, 745 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2024).

Even when looking at the provision of industrial class electricity, Commerce's own practice establishes that there is no *de facto* specificity when industrial users of electricity are "treated in a manner consistent or even less favorable than other consumers with respect to the electricity tariff schedule." *Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying Issues and Decision Memorandum at 13. This Court has sanctioned that practice, holding that a program is not *de facto* specific "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers." *Bethlehem Steel*, 140 F. Supp. 2d at 1369-70 (upholding Commerce's finding of no *de facto* specificity because there is "no exercise of discretion and no favorable treatment afforded to any one industry"). KEPCO provided electricity to all enterprises and industries in Korea that use electricity, and electricity was provided under a standard pricing mechanism, *i.e.*, KEPCO's electricity tariff schedule. *See* GOK IQR at 14-31, 204 (C.R.29/P.R.60), and Exhibit E-10 (C.R.43/P.R.70). Nothing in the record demonstrates that the steel industry or Hyundai Steel was treated favorably. In fact, record evidence indicates that KEPCO also enforced a standard pricing mechanism and provided electricity to customers in other classifications, such as residential, educational, and agricultural, at lower rates than industrial customers. *Id.* at Exhibit E-10. According to the standards previously set by Commerce, KEPCO's provision of electricity to Hyundai Steel pursuant to a standard pricing mechanism is not specific.

## CONCLUSION

For the reasons discussed above, the GOK respectfully requests that the Court reject Commerce's Second Final Remand Results and remand again for Commerce to reach the only

decision supported by the law and the record, which is that the alleged provision of electricity for LTAR in Korea is not *de facto* specific.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated:  January 29, 2026

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the forgoing brief complies with paragraph 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 4,584 words including text, headings, footnotes, and quotations and excluding the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing software used to prepare this submission.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: January 29, 2026    *Counsel for the Government of the Republic of Korea*