NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

HYUNDAI STEEL COMPANY,

                    **Plaintiff,**

     **and**

GOVERNMENT OF THE REPUBLIC OF KOREA,

                 **Plaintiff-Intervenor,**

   **v.**

UNITED STATES,

               **Defendant,**

     **and**

NUCOR CORPORATION,

               **Defendant-Intervenor.**

</td></tr>
</table>

Before: Hon. Claire R. Kelly,
         Judge

Court No. 23-00211

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information Removed from Pages: 1-2, 6-10, 12-14, 17-18, 22

## DEFENDANT-INTERVENOR'S COMMENTS IN SUPPORT OF THE FINAL RESULTS OF REDETERMINATION PURSUANT TO SECOND REMAND

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Paul A. Devamithran, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Corporation*

Dated: January 29, 2026

Ct. No. 23-00211                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

**Page**

I.     Introduction........................................................................................................ 1

II.    Argument ........................................................................................................... 1

    A.    Commerce's Revised Analysis, Using an External Comparator to Determine the Disproportionate Use of the Program by Hyundai Steel Alone, is Supported by Substantial Evidence .................................................1

    B.    In the Alternative, Commerce Could Find Disproportionate Use Without an External Comparator by Examining the Relative Use of the Program by a Group of Korean Industries Including the Korean Steelmaking Industry ...............................................................................6

        1.    Commerce Could Reasonably Group the Top Three Industrial Users of Electricity ......................................................................... 9

        2.    Commerce Can Support a Disproportionality Finding Based on the Relative Use of Industrial Electricity by the Group of Top-Three Users . 12

    C.    Commerce Could Also Reach the Same De Facto Specificity Conclusion by Finding That a Group of Industries or Enterprises Is a Predominant User of the Subsidy........................................................................16

    D.    The Electricity for LTAR Subsidy At Issue is Not Widely-Available ...............................................................................................18

III.    Conclusion ...................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999)...................................................................8, 15, 16

*Bethlehem Steel Corp. v. United States*,
26 CIT 1003, 223 F.Supp.2d 1372 (2002) ...............................................................18

*Carlisle Tire & Rubber Co. v. United States*,
5 CIT 229, 564 F. Supp. 834 (1983) ................................................................18, 19

*Changzhou Trina Solar Energy Co. v. United States*,
466 F.Supp.3d 1287 (Ct. Int'l Trade 2020) ...........................................................21

*Mosaic Co. v. United States*,
589 F.Supp.3d 1298 (Ct. Int'l Trade 2022) ..............................................17, 18, 21

*Royal Thai Government v. United States*,
30 CIT 1072, 441 F.Supp.2d 1350 (2006) ............................................................19

*Royal Thai Government v. United States*,
436 F.3d 1330 (Fed. Cir. 2006)........................................................................15, 16

**Statutes**

19 U.S.C. § 1677(5A)(D)...........................................................................7, 9, 10, 16

1994 Uruguay Round Agreements Act........................................................................19

Trade Agreements Act of 1979, Pub. L. 96-39, § 771(5), 93 Stat. 177-178.................19

**Regulations**

19 C.F.R. § 351.502 ............................................................................................10, 12 16

19 CFR § 351.511(d) ................................................................................................18

**Administrative Materials**

*Certain Aluminum Foil from the Sultanate of Oman*,
86 Fed. Reg. 52,888 (Dep't Commerce Sep. 23, 2021)........................................21

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*,
88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023.........................................20

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
   89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024 ............................................20

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
   89 Fed. Reg. 6,501 (Dep't Commerce Feb. 1, 2024)............................................20

*Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea*,
   88 Fed. Reg. 61,509 (Dep't Commerce Sep. 7, 2023)....................................7, 8, 12

*Certain Epoxy Resins from Taiwan*,
   90 Fed. Reg. 14,618 (Dep't Commerce Apr. 3, 2025)............................................11

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
   89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) ......................................20

*Certain Steel Nails from Thailand*,
   87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022).......................................21

*Countervailing Duties*,
   62 Fed. Reg. 8,818 (Dep't Commerce Feb. 26, 1997)....................................10, 12

*Countervailing Duties*,
   63 Fed. Reg. 65,348, (Dep't Commerce Nov. 25, 1998)....................10, 12, 15, 20

*Forged Steel Fluid End Blocks from Italy*,
   85 Fed. Reg. 80,022 (Dep't Commerce Dec. 11, 2020) ....................................11

*Large Diameter Welded Pipe from the Republic of Korea*,
   88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) ......................................20

*Multilayered Wood Flooring from the People's Republic of China*,
   79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014)......................................21

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*,
   86 Fed. Reg. 28,566 (Dep't Commerce May 27, 2021) ....................................11

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

## I.    <u>INTRODUCTION</u>

On behalf of Defendant-Intervenor Nucor Corporation ("Nucor"), we hereby submit the following comments in support of the December 23, 2025 remand determination issued by the U.S. Department of Commerce ("Commerce"). Final Results of Redetermination Pursuant to Ct. Remand (Dec. 23, 2025), ECF Nos. 93-94, C.R.R.R. 5, P.R.R.R. 10 ("Second Remand Redetermination"). Commerce continues to properly find that the Government of Korea's provision of electricity for less than adequate renumeration ("LTAR") constitutes a countervailable subsidy. Specifically, Commerce correctly determines that the Government of Korea's provision of electricity for LTAR constitutes a *de facto* specific subsidy and Commerce reconsidered the basis for reaching this conclusion. In this regard, the Remand Determination is consistent with the Court's August 12, 2025 opinion. *Hyundai Steel Co. v. United States*, No. 23-00211, slip op. 25-102 (Ct. Int'l Trade Aug. 12, 2025), ECF Nos. 79, 85 ("*Hyundai Steel II*"). Therefore, the Court should sustain Commerce's determination as it is supported by substantial evidence and in accordance with law.

## II.    <u>ARGUMENT</u>

Commerce continues to properly find that the provision of electricity for LTAR is *de facto* specific, and the Court should sustain the agency's remand determination.

### A.    <u>Commerce's Revised Analysis, Using an External Comparator to Determine the Disproportionate Use of the Program by Hyundai Steel Alone, is Supported by Substantial Evidence</u>

On remand, Commerce reasonably compared Hyundai Steel's share of the benefit received from total Korean subsidized industrial class electricity in 2021 with the company's share of Korea's GDP the same year. Second Remand Redetermination at 5-6. In 2021, Korean industries received [            ] KWh of subsidized industrial class electricity. *Id.* at Attachment. Of

that, Hyundai Steel alone received [            ] KWh or [       ] percent. *Id.* During the same year, the real gross domestic product ("GDP") of Korea was 2,153,423,000,000,000,000 won. *Id.* Of that Hyundai Steel's sales accounted for [                ] won or [       ] percent. *Id.* Commerce reasonably found that the former share of subsidized industrial electricity use and corresponding stake of the benefit, [        ] percent, was disproportionate ([                    ]) to the latter share of Korea's GDP [        ] percent. *Id.* at 5-6.

This was a reasonable method of determining disproportionality because it illustrates how Hyundai Steel is using more industrial electricity, and thereby receiving more of a benefit, than its corresponding share of the Korean economy. In the context of the provision of electricity for LTAR, this demonstrates that the benefit of the subsidy is not evenly distributed across the economy in a way that you would expect if the purpose of the subsidy was to benefit all enterprises equally. Instead, certain enterprises –in this case Hyundai Steel – are receiving [                ] the share of the benefit than their contribution to the economy. This leaves a disproportionately smaller share of the remaining benefit for other Korean enterprises. This is precisely the scenario that the Court contemplated in *Hyundai Steel II*, *i.e.*, "a situation where an enterprise received more of the subsidy than would be expected by some comparator such that its receipt could be considered disproportionate." *Hyundai Steel II* at 12-13.

Put another way, electricity is an important input for industrial manufacturers, and industrial electricity usage is a rough proxy for manufactures' production and participation in the economy. The provision of this input is being subsidized by the GOK, and the more of the input a company uses, the more you would expect the company's production and contributions to the economy to be. To determine whether Hyundai Steel as a stand-alone enterprise is receiving a disproportionate amount of that subsidy, Commerce reasonably compared the relative amount of

the subsidized input Hyundai Steel consumes (which corresponds directly with the relative amount of benefit received) with the relative amount Hyundai Steel contributes to GDP. One could expect those figures to track closely, given the nature of the industry and input, but in this case, Commerce's analysis reveals that Hyundai Steel's share of the subsidized input is disproportionate to its contributions to the economy. Thus, Hyundai Steel is capturing a disproportionate amount of the industrial electricity subsidy relative to other Korean enterprises.

Commerce's use of Korean GDP as a comparator is appropriate because it illustrates who the electricity for LTAR subsidy was designed to benefit. Undoubtably, some industries receive disproportionately less of the benefit from subsidized industrial class electricity and yet contribute disproportionately more to the Korean GDP. The LTAR program was clearly not designed to benefit those enterprises. It was designed, however, to benefit heavy users of the subsidized input, such as steelmakers. Commerce's use of GDP as a comparator is a reasonable proxy for making that comparison and illustrating that disproportionality.

The record supports the link between electricity use (or demand), GDP, and industry and/or manufacturing, specifically – as opposed to other segments of the Korean economy. In the GOK's initial questionnaire response, "GDP" and "Industrial Structure" are two of just four factors feeding KPX's electricity demand forecasts. Letter from Yoon & Yang LLP to Sec'y Commerce re: *Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire* (June 27, 2022), C.R. 29-64, P.R. 60-85, at Exhibit DRR-3 (PDF pp. 6560) ("GOK Questionnaire Response"). The other two factors are population and electricity price. *Id.* Additionally, in the electricity verification report placed on the record by the GOK, the GOK representative stated "{f}or the forecast data (*e.g.*, "II. Sales plan for 2013"), Mr. Kim stated that it is based on future sales that are influenced by *gross domestic product (GDF)*.

3

Thus, this can be used to review the forecast data. Moreover, Mr. Kim noted that if there is a question on the forecast basis or the GDP values used, MOTIE can request the information from KEPCO." *See Id.* at Exhibit E-19. Thus, the state-owned entity providing subsidized industrial electricity to Hyundai Steel and the steel industry uses GDP in its demand forecast analysis, which renders Commerce's selection of GDP as an external comparator reasonable.

Moreover, other GOK generated documents demonstrate that GDP is an appropriate external comparator for this subsidy. In particular, the Republic of Korea's Economic Bulletin for 2021 (*i.e.*, the calendar year comprising the period of review), published by the Korean Ministry of Economy and Finance and included as Exhibit Gen-1 of the GOK's initial questionnaire response maps the strong correlation between "GDP" and "industrial production," which holds true for all recorded localities. GOK Questionnaire Response at Exhibit Gen-1 (PDF pp. 529-531). The same Bulletin compares Korea's real GDP with just two national accounts: "agriculture, forest, fisheries," and "manufacturing." *Id.* at Exhibit Gen-1 (PDF pp. 569). Korean GDP year-on-year change was highly correlated with manufacturing (much more so than with agriculture, *etc.*). In the last year recorded, *i.e.*, 2020, the year-on-year change for Korean GDP and Korean manufacturing was identical – a point reduction in manufacturing correlated with a point reduction in GDP. *Id.* In its October 2021 Economic Bulletin, the GOK explains its "GDP by production and expenditure" chart by explicitly noting "{m}anufacturing fell 1.3 percent as both transportation equipment and *fabricated metal products declined*" and "imports rose 2.8 percent backed by *primary metal products* and chemical products." *Id.* at Exhibit Gen-1 (PDF pp. 1075). Notably, every Economic Bulletin placed on the record by the GOK analyzes Korean GDP relative to production and expenditures using manufacturing activity, which includes the steel industry, in the same manner. *Id.* at Exhibit Gen-1 (PDF pp. 693, 757, 889, 954, 1075, 1131).

The use of Korean GDP as a reasonable external comparator is also supported by the Korea Energy Agency's ("KEA") use of Korean GDP as reflected in its Demand Side Management Policy. GOK Questionnaire Response at Exhibit LTKEA-3 (PDF pp. 5319). In fact, KEA uses GDP in measuring energy intensity. *Id.* In explaining Korea's reliance on fuel imports, KEPCO's annual report states that "20% of total import costs were spent on energy import, which amounted to what Korea earned from top four exporting products . . . *The energy intensity (energy used per unit of GDP) of the Korean economy is relatively high due to a large proportion of energy-intensive industries compared to other countries.*" *Id.* Commerce's analysis of Hyundai's Steel energy use relative to its contribution to GDP essentially confirms that the respondent is receiving a disproportionate amount of the benefit (*i.e.*, subsidized industrial electricity) based on its energy-intensity, and is the same measure that the GOK uses to compare energy-intensity on an international level.

It is worth noting that Commerce put Korean GDP information on the record in this proceeding pursuant to the Court's suggestion to use an external comparator. Second Remand Redetermination at 10-11. When putting this information on the record, Commerce provided all parties an opportunity to rebut, clarify, or correct the data. *Id.* Neither Hyundai Steel nor the GOK submitted comments questioning the data or arguing for the use of alternative data, and the parties therefore waived any objection to its use for these purposes. *Id.* As discussed in more detail below, use of a comparator like shares of GDP is not required to support Commerce's finding of disproportionality. *See infra* Section II-B. In this case, it is a sufficient – albeit not necessary – condition for a finding of specificity by virtue of Hyundai Steel's disproportionate use of the subsidy.

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

As an alternative external comparator, Commerce could compare Hyundai Steel's industrial electricity use to the industrial electricity use of the other 400,000 manufacturing establishments in Korea. The record demonstrates that Hyundai Steel alone received a disproportionate amount of the benefit from subsidized Korean industrial electricity during the period of review. In its initial questionnaire response in the underlying review, the GOK provided a list of the top 100 industrial consumers of electricity by facility. GOK Questionnaire Response at Exhibit E-11. While the GOK did not identify any companies on the list other than the respondents or the industries in which they operate, the list shows that [                  ] accounted for [                  ] of *total industrial electricity consumption* during the POR. *Id.* According to Commerce's economic diversification memo, there were more than *400,000* manufacturing establishments operating in Korea during the POR. Memorandum from Stephanie Berger, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. III, to The File, re: *Administrative Review of the Countervailing Duty Order of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Placement of Korea Economic Diversification Memorandum on the Record* (May 3, 2022), P.R. 24, at Attachment pp. 2. That [                  ] amounted to [                  ] of total industrial consumption in an economy of more than 400,000 manufacturing establishments is *prima facie* evidence of disproportionate benefit via use of an external comparator, *i.e.*, the number of manufacturing establishments in Korea.

### B.  In the Alternative, Commerce Could Find Disproportionate Use Without an External Comparator by Examining the Relative Use of the Program by a Group of Korean Industries Including the Korean Steelmaking Industry

In the alternative, Commerce could also comply with the Court's instructions to further explain any grouping of industries and continue to find that the group of three Korean industries, including the steel industry, receives a disproportionately large amount of subsidized industrial

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

electricity in Korea, without the use of an external comparator or a second (non-statutorily prescribed) benchmark analysis.

The record demonstrates that the Korean steelmaking industry, as part of a lawfully and logically constructed group of three industries, receives a disproportionate amount of the benefit from subsidized Korean industrial electricity. The statute provides that a subsidy is *de facto* specific when: (i) the actual recipients are limited in number; (ii) and enterprise or industry is a predominant user of the subsidy; (iii) an enterprise or industry receives a disproportionate amount of the subsidy; or (iv) the subsidizing authority favors an enterprise or industry over others in granting the subsidy. 19 U.S.C. § 1677(5A)(D)(iii). For the *de facto* specificity analysis, the term "enterprise or industry" includes a group of enterprises or industries. *Id.* § 1677(5A)(D). The statute also requires Commerce to consider "the extent of diversification of economic activities within the jurisdiction . . . ." *Id.*

By the GOK's own admission in the underlying review, the steel industry in Korea [

                                                                            ]. GOK Questionnaire Response at 35-36. Accordingly, Commerce found that, in an economy with at least [                    ] economic industry sectors, the steel industry was the [        ] largest consumer of electricity in Korea, and thus received the third largest amount of the benefit relative to other industry sectors. Issues and Decision Memorandum accompanying *Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea*, 88 Fed. Reg. 61,509 (Dep't Commerce Sep. 7, 2023), P.R. 222, at 16 ("CTL Plate 2021 Final Results IDM"). Commerce also found that the steel industry was among the [

   ] electricity consuming industries (all of which were [                        ]), which consumed more than [        ] percent (*i.e.*, a disproportionate amount) of the subsidized electricity

under this tariff category. *Id.*; GOK Questionnaire Response at 35. Commerce can reasonably group these top three industries and determine that they are consuming a disproportionate amount of industrial electricity relative to the other industrial users of electricity in Korea.

As the Federal Circuit has explained, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999). The program at issue in this case is an LTAR subsidy in which the benefit amounts are necessarily tied to the individual pricing and consumption patterns of individual companies and the type of electricity consumed. Benefits will vary, for example, depending on which industrial tariff classification applies to a certain enterprise or industry or what times of day or times of year the enterprise or industry consumes electricity. *See* GOK Questionnaire Response at Exhibit E-10. Indeed, that is why Commerce's benchmark analysis focuses on industrial tariff rates and compares the rates to when Hyundai Steel actually consumes the electricity.

In this context, consumption volumes are directly tied to prices paid – *i.e.*, an industry or enterprise benefitting from an LTAR subsidy is likely to consume more of the subsidized input than it otherwise would in large part because the input is being subsidized. If electricity was priced fairly, then these large industrial manufacturers would consume less electricity and receive less of a benefit. For example, Hyundai consumes [      ] electricity in off-peak periods where it receives the [      ] benefit during those hours relative to mid-peak and on-peak hours, where it receives [   ] of a benefit. Memorandum from David Lindgren, Program Manager, AD/CVD Operations, Off. III, to the File, re: *Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea: Analysis and Calculations for the Final Results* (August 30, 2023), C.R. 269, P.R. 223, at

Attachment 2 (PDF pp. 22-24) ("Analysis and Cal Memo"). In fact, while there are only [

          ], Hyundai's consumption and in turn, receipt of the benefit of subsidized electricity, is

[          ] than Hyundai's consumption of electricity [

          ]. *Id.* Specifically, Hyundai Steel consumed [

                                                                                              ].

*Id.* Even within the subsidy, it is clear that Hyundai receives a disproportionate amount of the

subsidy when the benefit is largest. That is, the structure of an LTAR subsidy itself creates the

incentive to consume more of the subsidy when the benefits are the largest. As Commerce

explained in prior submissions, the steel industry's receipt of the benefit is greater than what other

manufacturing industries are receiving if all things were equal. A determination that *de facto*

specificity based on disproportionate or predominant use may not be based on relative

consumption volumes effectively nullifies those provisions for the purpose of adequate

remuneration programs.

    For the purpose of an adequate remuneration program in a highly diversified economy, the

fact that [                                                                          ] of industrial electricity

consumption is compelling evidence of disproportionate benefit. GOK Questionnaire Response at

35.

    1.  **Commerce Could Reasonably Group the Top Three Industrial Users of
        Electricity**

    Furthermore, examining the disproportionate use of those industries together as a group is

reasonable. The statute states explicitly that "any reference to an enterprise or industry . . . includes

*a group* of such enterprises or industries." 19 U.S.C. § 1677(5A)(D) (emphasis added). As

Commerce found in the *Hyundai Steel I Remand Results*, three industries in a highly diversified

economy is a small enough group to constitute a relevant group of industries or enterprises within

the meaning of the statute, and that [                                    ] by such a small number of industries constitutes disproportionate receipt of the total benefits provided under this subsidy. *Final Results of Redetermination Pursuant to Ct. Remand* (Apr. 11, 2025), ECF 62-63, C.R. 8, P.R.R. 3, at 5 ("First Remand Redetermination"). These are both reasonable factual determinations that Commerce is required to make in conducting its sequential specificity analysis. 19 C.F.R. § 351.502(a)*; see also id.* § 351.502(b) (explaining that Commerce's analysis of specificity based on a "group" of industries or enterprises does not depend on "whether there are shared characteristics among the enterprises or industries . . .").

The statute provides explicitly that, notwithstanding the "general availability" of a subsidy, the subsidy nevertheless "may be specific as a matter of fact" if any of four conditions are satisfied. 19 U.S.C. § 1677(5A)(D)(iii). Each of these conditions provides a basis for finding that a subsidy is *de facto* specific to "an enterprise or industry," which "includes a group of such enterprises or industries." *Id.* at 1677(5A)(D)(iv). Commerce's rules regarding specificity, in turn, provide that the agency "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy." 19 C.F.R. § 351.502(b). In proposing and promulgating this rule, Commerce explained that "{i}n determining whether a subsidy is de jure or *de facto* specific, Commerce is not required to evaluate the actual make-up of those firms that are eligible for, or actually receive, a subsidy." *Countervailing Duties*, 62 Fed. Reg. 8,818, 8,825 (Dep't Commerce Feb. 26, 1997) (proposed rule); *see also Countervailing Duties*, 63 Fed. Reg. 65,348, 65,357 (Dep't Commerce Nov. 25, 1998) (final rule) ("There is no requirement that the members of a group share similar characteristics. The purpose of the specificity test is simply to ensure that subsidies that are distributed very widely throughout an economy are not countervailed. There is no basis for adding

the further requirement that subsidies that are not widely distributed are also confined to a group of enterprises or industries that share similar characteristics.") (emphasis added).

Commerce has repeatedly rejected arguments that it must consider the makeup of the industries that constitute a group and has found that "{t}he recipients of a subsidy . . . can be limited in number within the meaning of the Act even when they come from a diverse set of industries and even when they share no common characteristics." *See, e.g.*, Issues and Decision Memorandum accompanying *Forged Steel Fluid End Blocks from Italy*, 85 Fed. Reg. 80,022 (Dep't Commerce Dec. 11, 2020) (final affirm. countervailing duty deter.) at 18; *see also*, Issues and Decision Memorandum accompanying *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 86 Fed. Reg. 28,566 (Dep't Commerce May 27, 2021) (final affirm. countervailing duty deter.) at 19-20 ("Because there need not be shared characteristics among the enterprises that comprise a 'group,' it does not matter if these enterprises represent unrelated industries."); Issues and Decision Memorandum accompanying *Certain Epoxy Resins from Taiwan*, 90 Fed. Reg. 14,618 (Dep't Commerce Apr. 3, 2025) (final affirm. countervailing duty deter.) at 20-21 ("{T}here is no requirement under section 771(5A)(D) of the Act that requires Commerce to analyze whether the industries within a group are related in the manner Nan Ya claims."). In light of Commerce's explicit rule and longstanding practice Commerce's decision to group three industries together in *Hyundai Steel I* was reasonable, the Court could – as an alternative to sustaining Commerce's use of an external comparator – allow Commerce to reach the same *de facto* specificity conclusion pursuant to this analysis. As noted above, Commerce's rules provide that the agency "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy," and Commerce has explained that it codified this rule because the agency "is not required to evaluate

the actual make-up of those firms that are eligible for, or actually receive, a subsidy."
19 C.F.R. § 351.502(b); *Countervailing Duties*, 62 Fed. Reg. at 8,825; *see also*,
*Countervailing Duties*, 63 Fed. Reg. at 65,357. Commerce's longstanding practice is to treat a
small enough number of industries or enterprises as a specific "group" thereof, whether or not
there are any conceptual similarities among them. To the extent that any explanation or evidence
regarding the "make-up" of the industries or enterprises in a group is necessary, it should be
sufficient for the purpose of an energy subsidy that a small group of energy-intensive
manufacturing industries receive a disproportionate amount of the subsidy.

### 2. Commerce Can Support a Disproportionality Finding Based on the Relative Use of Industrial Electricity by the Group of Top-Three Users

Commerce's disproportionality finding has to be relative to something else and Commerce
can reasonably and logically define that "something else" as the *other* users of industrial electricity.
Subsidized electricity is not a right to which some companies receive more or less than their fair
share. Subsidized electricity is a countervailable benefit to which some companies are receiving a
disproportionate share. In this context, Commerce's prior finding that the steel industry received
the [          ] benefit from subsidized electricity of any industry of electricity in Korea relative
to [      ] other Korean industries is evidence of disproportionality. CTL Plate 2021 Final
Results IDM at 16. That [                    ] received [          ] of the benefit from
subsidized Korean industrial electricity is further evidence of disproportionate receipt of the
subsidy. GOK Questionnaire Response at 35-36. According to the GOK's initial questionnaire
listing the top ten recipients of subsidized industrial electricity, the steel industry consumed [      ]
more electricity than the [               ] industry, and between [    ]% and [    ]% more
electricity than the fifth through tenth largest industries in Korea. *Id.* By itself, the steel industry
consumes a disproportionate amount of subsidized electricity relative to other Korean

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

[                                    ] therefore receives a disproportionate amount of the benefit from subsidized electricity. By appropriately [                              ], Commerce can demonstrate that no other combination of industries comes close to receiving a similar amount of subsidized industrial energy as these [                                ].

Because there is a one-to-one correlation between usage (*i.e.*, consumption) of electricity and the amount of the subsidy conferred, all Commerce needs to do is assess the relative usage per industry compared to the total amount consumed. That is precisely what Commerce did in *Hyundai Steel I*, citing to the GOK's questionnaire response which demonstrates that the steel making industry alone used [      ] percent of all industrial electricity consumed during the POR and that the top-three industries used [      ] percent of all industrial electricity consumed during the POR. First Remand Determination at Attachment; GOK Questionnaire Response at 35-36. Since there are 19 industry groupings, one could expect that each industry would consume [      ] of industrial electricity. Any more than the mean of [      ] is disproportionate; therefore, the steel industry, both when considered alone and when considered as part of the group of top-three industrial electricity users, used disproportionate amount and received a disproportionate amount of the subsidy compared to other industries.

Put another way, the tenth largest industrial user of electricity in Korea consumed only [      ] percent of industrial electricity, compared to [      ] percent for the steel industry alone. GOK Questionnaire Response at 35-36. The other industries that are not in the top ten presumably consumed less than [      ] percent of the subsidized industrial electricity provided by the Korean government. Comparing these figures to each other as well as to the [      ] expected average if industrial electricity was consumed evenly among the 19 industries in Korea demonstrates that some producers consumed disproportionately less electricity and some, like steelmakers,

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

consumed disproportionately more.[1] Since the amount of the subsidy is tied directly to usage, the amounts of the subsidies received among industries was likewise disproportionate.

Importantly, a finding of disproportionality does not require the agency to measure certain industries' use of electricity against something other than other industries' use of electricity. To find otherwise would effectively require Commerce to conduct a second benchmark analysis in addition to the benchmark analysis that the agency already conducts when calculating a benefit. The incongruity caused by creating this requirement for an additional benchmark test is easily illustrated in the context of the provision of a "good" like steel for less than adequate renumeration. In that context, Commerce is still permitted to make a *de facto* specificity finding for enterprises or industries (or groups of enterprises or industries) that receive a disproportionate amount of the subsidy. But what would purchasers of government-subsidized steel "deserve" to receive? How much is "too much"? No such benchmark requirement exists in the statute because no such benchmark should exist in practice. Regardless of whether the respondents characterize electricity as widely available, no company or industry is entitled to *subsidized* electricity, which is the issue here. Commerce can and would assess whether a company receives a disproportionate amount of the subsidy based on the relative shares of the subsidy received by the enterprises and/or industries.

As the Federal Circuit explained in *Royal Thai Government v. U.S.,*

> In AK Steel, this court recognized that "{d}eterminations of disproportionality and dominant use are not subject to rigid rules." *Id.* In particular, this court found that *Commerce did not err by comparing relative percentage benefits rather than absolute benefits,* as requiring a comparison of absolute benefits "could produce an

---

[1]      Assuming that the information the GOK provided and certified to be accurate is true, then the eleventh through nineteenth largest users of industrial electricity should account for less than [      ] percent of industrial electricity usage, *i.e.,* the share of the tenth largest user. *See* GOK Questionnaire Response at 35-36. When dividing the remaining electricity consumption of [      ] percent by 9 industries [            ], and assuming those 9 industries consumed an equal amount of electricity, the share of the total subsidy received by those 9 industries would be [      ] percent. If 12 of the 19 Korean industries received between [      ] – [      ] percent of the amount of the benefit from subsidized electricity, and the steel industry received essentially [            ] as much, this too is clear evidence of disproportionate receipt of the amount of the subsidy. *Id.*

14

untenable result, *i.e.*, that a benefit conferred on a large company might be disproportionate merely because of the size of the company." *Id*. Thus, this court determined that Commerce had properly exercised the latitude afforded it in determining the appropriate method by which to determine the specificity of benefits conferred by subsidies. Of course, that latitude does not excuse Commerce from choosing a reasonable method for determining the specificity of benefits. Indeed, Commerce itself has recognized that "the analysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under, a subsidy program *should normally focus on the level of benefits provided," even if sometimes "it may be impracticable or impossible to determine the relative level of benefits*."

*Royal Thai Government v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006) (emphasis added); *Countervailing Duties*, 63 Fed. Reg. at 65,359. Indeed, in *AK Steel,* the Federal Circuit rejected the argument that "when analyzing disproportionality, Commerce *must* compare the industry's benefit to some reasonable benchmark of a non-specific distribution of government benefits, *e.g.*, comparing an industry's share of benefits to its contribution to the gross domestic product (GDP) of the economy as a whole." *AK Steel Corp*., 192 F.3d at 1384 (In AK Steel, the domestic producers were calling for this additional benchmark analysis, which the Federal Circuit rejected as unnecessary. The Court found that the Commerce's methodology of relying on the relative percentage benefit to find no disproportionality was reasonable). Instead, the Federal Circuit emphasized that "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case," and that "the specificity test cannot be reduced to a precise mathematical formula. Instead, the Department must exercise judgment and balance various factors in analyzing the facts of a particular case." *Id.* at 1385 (internal quotation marks omitted) (internal citation omitted).

While, in its Second Remand Redetermination, Commerce was able to compare an enterprise's share of benefits to its contribution to the gross domestic product (GDP) of the

economy as a whole, Commerce was not *required* to conduct this analysis in order to find disproportionate use. Pursuant to the Federal Circuit's opinion in *Royal Thai Government v. U.S.,* excerpted above, Commerce could also simply have "focus{ed} on the level of benefits provided." *Royal Thai Government v. U.S.*, 436 F.3d at 1336. Commerce could assess the "relative percentage benefit" of the steelmaking industry as part of a permissible group of industries. *Id.* The Federal Circuit sustained Commerce's analysis pursuant to this practice in *AK Steel*, and as an alternative to Commerce's lawful and reasonable use of an external comparator, this Court could allow Commerce to reach the same *de facto* specificity conclusion for the GOK's electricity for LTAR program under that analysis.

### C.      Commerce Could Also Reach the Same De Facto Specificity Conclusion by Finding That a Group of Industries or Enterprises Is a Predominant User of the Subsidy

As a final alternative, Commerce could also reach the same conclusion – *i.e.*, that the provision of electricity for LTAR is *de facto* specific – by assessing whether a group of industries or enterprises is a predominant user of the subsidy. As noted above, the statute provides that a subsidy may be de facto specific if any of the following is satisfied: (i) the actual enterprise or industry recipients of the subsidy are limited in number, (ii) an enterprise or industry is a predominant user of the subsidy, (iii) an enterprise or industry receives a disproportionate amount of the subsidy, or (iv) the authority granting the subsidy exercises its discretion in a manner that benefits certain enterprises or industries over others. 19 U.S.C. § 1677(5A)(D)(iii). Commerce "examine{s} the{se} factors . . . sequentially in order of their appearance," and "{i}f a single factor warrants a finding of specificity, {it} will not undertake further analysis." 19 C.F.R. § 351.502(a). In its First Remand Redetermination, Commerce determined that a group of industries including the steel industry received a disproportionately large amount of the subsidy. However, Commerce

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

has not yet expressly considered whether this group of industries is also a predominant user of the subsidy.

In remanding the Commerce's disproportionate receipt determination, this Court emphasized that the predominant use and disproportionate receipt provisions are distinct and that one may exist even if the other does not. *See, e.g., Hyundai Steel II* at 12 n. 9 ("The statute provides separately for the inquiry of whether a recipient or recipients received more than other recipients. . . . Congress's inclusion of these two distinct criteria indicates that they are separate inquiries and should not be conflated."); *POSCO v. United States*, Court No. 24-00006, Slip. Op. 25-100 (Ct. Int'l Trade Aug. 8, 2025) at 10 n. 5 ("Slip. Op. 25-100") (distinguishing *Mosaic Co. v. United States*, 589 F.Supp.3d 1298 (Ct. Int'l Trade 2022) because that case addressed predominant use and not disproportionate receipt). This Court explained that "{d}isproportionate means too large or too small in relation to something," while "{p}redominant means more important, powerful, successful, or noticeable than other people or things." *Hyundai Steel II* at 8-9. The Court's holding that Commerce must establish a "baseline of comparison" other than the industry's consumption of an input in relation to others is thus limited to the disproportionate receipt provision and does not apply to the predominant use provision. In *Mosaic*, the court sustained a finding of predominant use based *solely* on the industry's consumption of an energy input in relation to other industries. *Mosaic*, 589 F.Supp.3d at 1309-10. Here, the record supports a finding of predominant use because a small group of industries consumes a far greater share of the subsidized input than other industries. Specifically, the [                                    ] consumed [

] of total industrial electricity during the POR. *See* GOK Questionnaire Response at 35. As Commerce noted in its first remand results, "{t}he remaining seven industries, of the ten largest electricity consuming industries, accounted for merely [        ] percent of the total industrial class

**BUSINESS PROPRIETARY INFORMATION**
                                          **HAS BEEN DELETED**

electricity consumed during the POR. These top three industries alone thus received nearly [    ]

percent more of the subsidy benefits under the program than the seven other industries combined

when compared to total industrial class electricity consumption." First Remand Redetermination

at 5. Similar to *Mosaic*, a small group of industries "purchased a far greater amount than any other

{group of industries}," and the record therefore supports a finding of predominant use.

*Mosaic*, 589 F.Supp.3d at 1310.

      **D.**      <ins>**The Electricity for LTAR Subsidy At Issue is Not Widely-Available**</ins>

      Finally, it is worth noting that the provision of electricity is not a widely available public

program akin to general infrastructure like a public highway or bridge, which cannot be

countervailed pursuant to Commerce's regulations under 19 CFR § 351.511(d). *See*

*Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 564 F. Supp. 834 (1983). Commerce's

regulations define "general infrastructure" as "infrastructure that is created for the broad societal

welfare of a country, region, state or municipality." 19 CFR § 351.511(d). The provision of

electricity does not fall within this category since subsidized industrial electricity is neither widely

available nor is it general infrastructure. In fact, the court has already dealt with this exact question.

In *Royal Thai Government v. U.S.,* this Court found that the governmental provision of electricity

is not general infrastructure noting that

> {t}he alleged infrastructure at issue here was the electricity itself and "not the
> physical plant associated with the generation, transmission and distribution of the
> electricity." This is an important distinction. *Commerce generally views electricity*
> *facilities—but not their issue—as constituting general infrastructure. See Bethlehem*
> *Steel Corp. v. United States*, 26 CIT 1003, 1011, 223 F.Supp.2d 1372, 1379 (2002)
> (upholding Commerce's finding of no financial contribution from electricity facilities
> constituting general infrastructure). This is because an electric power facility or
> distribution grid is used repeatedly by the entire consuming public; in contrast, once
> used by a single consumer, a kilowatt of electricity is gone forever.

*Royal Thai Government v. United States*, 30 CIT 1072, 1077, 441 F.Supp.2d 1350, 1356-57 (2006) (internal citations omitted) (emphasis added).

In addition to the repeated-use distinction between public infrastructure like highways and bridges and the provision of electricity, the two categories are logically dissimilar in that use of public infrastructure like highways and bridges is free, which presents unique challenges for determining the relative benefit received by users of public infrastructure. By contrast, electricity is sold, albeit at subsidized rates, and it is relatively easy to determine who is enjoying a predominant or disproportionate share of subsidized electricity since the use of electricity is tracked on an enterprise and industry level. In that way, electricity in Korea is more akin to a non-public road, like a subsidized toll road, where a benefit is both conferred and calculable.

The evolution of the general infrastructure exception further illustrates that the provision of electricity is *not* the type of "widely used program" that is not intended to be countervailed as Plaintiffs claimed in their *Hyundai I* Reply Brief.[2] Pl.'s Reply Br. in Supp. of its Mot. For J. on the Agency Rec. (July 22, 2024), ECF No. 40, at 5-6. The *Trade Agreements Act of 1979* first distinguished between broadly available and specific programs. Trade Agreements Act of 1979, Pub. L. 96-39, § 771(5), 93 Stat. 177-178. In 1983, the CIT decided in *Carlisle Tire & Rubber Co. v. United States,* that to countervail "such things as public highways and bridges as well as a tax credit for expenditures on capital investment even if available to all industries and sectors" would lead to absurd results. *Carlisle Tire & Rubber Co.*, 55 CIT at 233, 564 F. Supp. at 838. The SAA accompanying the 1994 Uruguay Round Agreements Act (URAA) quoted this language from *Carlisle*. Commerce amended its regulations, added a definition of "general infrastructure" and

---

[2]    Because industrial electricity is not widely available, and because it is not akin to general infrastructure, the CIT's recent remand order in another case involving this program on the grounds that electricity is like general infrastructure is inapposite. *See* Slip. Op. 25-100.

explained in the Preamble that "interstate highways . . . would constitute general infrastructure if we found that they were provided for the good of the public and were available to all citizens or to all members of the public." *See Countervailing Duties*, 63 Fed. Reg. at 65,378. The archetype for the general infrastructure exception has therefore always been roads and other capital expenditures/public infrastructure. At no point in the forty-five year history of this provision and its predecessors has the provision been understood to preclude countervailing a government's provision of electricity for less than adequate renumeration. And for the reasons discussed above, the scope of what was meant to be a narrow exception should not be expanded now.

    Furthermore, decades of agency and court precedent confirm that the general infrastructure exception does not apply to the provision of electricity. Commerce has found that the provision of electricity for LTAR, as well as other energy inputs, to be countervailable, and thus specific, in numerous cases, including proceedings involving Korea. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) (final results of countervailing duty admin. rev.; 2021) at cmt. 4; Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024) (final results and partial recission of countervailing duty admin. rev.; 2021) at cmt. 4; Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 89 Fed. Reg. 6,501 (Dep't Commerce Feb. 1, 2024) (final results and partial recission of countervailing duty admin. rev.; 2021) at cmt. 1; Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) (final results of countervailing duty admin. rev.; 2021) at cmt. 1; Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe*

*from the Republic of Korea*, 88 Fed. Reg. 85,236 (Dep't Commerce Dec. 7, 2023) (final results of countervailing duty admin. rev.; 2021) at cmt. 2. Commerce has also found the provision of electricity for LTAR to be specific in proceedings involving other countries. *See, e.g.,* Issues and Decision Memorandum accompanying *Certain Steel Nails from Thailand*, 87 Fed. Reg. 51,343 (Dep't Commerce Aug. 22, 2022) (final negative countervailing duty inv.) at cmt. 2; Issues and Decision Memorandum accompanying *Certain Aluminum Foil from the Sultanate of Oman*, 86 Fed. Reg. 52,888 (Dep't Commerce Sep. 23, 2021) (final affirm. countervailing duty deter.) at cmt. 4; Issues and Decision Memorandum accompanying *Multilayered Wood Flooring from the People's Republic of China*, 79 Fed. Reg. 45,178 (Dep't Commerce Aug. 4, 2014) (final results and partial recission of countervailing duty admin. rev.; 2011) at cmt. 3. Furthermore, the courts have sustained Commerce's findings that electricity and other energy inputs have been found to be specific. *See, e.g., Canadian Solar Inc. v. United States*, Consol. Ct. No. 19-00178, Slip Op. 22-49, at 5 (Ct. Int'l Trade 2022) (upholding Commerce's finding that the subsidization of electricity for LTAR from the Government of China was specific); *Changzhou Trina Solar Energy Co. v. United States*, 466 F.Supp.3d 1287, 1303 (Ct. Int'l Trade 2020) (sustaining Commerce's finding that the provision of electricity for LTAR is a specific subsidy); *Mosaic Co. v. United States*, 589 F.Supp.3d 1298, 1309 (Ct. Int'l Trade 2022) (finding that substantial evidence supports Commerce's determination that the provision of natural gas was de facto specific). In each and every one of these cases, Commerce and the courts implicitly affirmed that the provision of electricity and other energy inputs did not meet the definition of general infrastructure because, if they did, they would not have been countervailable. In short, this is settled law and need not be revisited.

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**    NON-CONFIDENTIAL VERSION

## III.    <u>CONCLUSION</u>

For the reasons above, Hyundai Steel as an enterprise is receiving a larger share of the benefit of electricity for LTAR than other enterprises when comparing relative shares of industrial electricity and corresponding shares of Korean GDP, and the Court should therefore sustain Commerce's remand redetermination on this basis. Commerce could reach the same conclusion when comparing Hyundai Steel industrial electricity use with the external comparator of the 400,000 other manufacturing establishments in Korea. Furthermore, Hyundai Steel as a steelmaker and as a member of the group of top-three industrial users of industrial electricity is receiving a larger share of the benefit of electricity for LTAR than other industries when comparing their relative shares of industrial electricity without the use of an external comparator. Alternatively, the Court could also allow Commerce to reach the same specificity determination by finding that a small group of industries is using enjoying a predominant share – *i.e.*, [          ] – of *all*

Ct. No. 23-00211                                    NON-CONFIDENTIAL VERSION

industrial electricity in Korea. Thus, there are numerous ways for Commerce to reach the inevitable conclusion that the provision of electricity for LTAR subsidy program is *de facto* specific.

For all of these reasons, and others described in Commerce's remand determination, the Court should sustain Commerce's remand results determining that the GOK's provision of electricity for LTAR to Hyundai Steel is *de facto* specific.

*        *        *

Respectfully submitted,

*/s/ Derick G. Holt*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Paul A. Devamithran, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Corporation*

Dated: January 29, 2026

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Nucor Corporation's Comments in Support of the Final Results of Redetermination Pursuant to Second Remand, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,814 words.

*/s/ Derick G. Holt*
(Signature of Attorney)

Derick G. Holt
(Name of Attorney)

Nucor Corporation
(Representative Of)

January 29, 2026
(Date)
