**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>                          Plaintiff,<br><br>     and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>                          Plaintiff-Intervenor<br>          v.<br><br>UNITED STATES,<br><br>                          Defendant,<br><br>          and,<br><br>NUCOR COPRORATION,<br><br>                          Defendant-Intervenor. | Court No. 23-00211<br><br>**PUBLIC VERSION**<br><br>(BPI removed from pp. 4, 10, 17, 20, 21) |

## <u>DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION</u>

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:

KARL MUELLER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

March 16, 2026

TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov
Attorneys for Defendant United States

## **TABLE OF CONTENTS**

BACKGROUND ..................................................................................................................2

    I.      Administrative Determination Under Review ..........................................................2

    II.    The Court's First Remand Order and Commerce's First Remand
          Redetermination ......................................................................................................2

    III.   The Court's Second Remand Order .........................................................................3

    IV.   Commerce's Second Remand Redetermination.......................................................3

SUMMARY OF THE ARGUMENT ...................................................................................5

ARGUMENT .....................................................................................................................6

    I.      Standard of Review.................................................................................................6

    II.    Commerce's Remand Redetermination is in Accordance with the Remand Order,
          is Supported by Substantial Evidence, and Otherwise in Accordance with Law .....7

          A.  Provision of Electricity May Represent a Countervailable Subsidy Under
              CVD Law ....................................................................................................7

          B.  GDP is a Reasonable Comparator for Analyzing Whether Usage of a Subsidy
              Program is Disproportionately Large under
              19 U.S.C. § 1677(5A)(D)(iii)(III) ....................................................................10

          C.  Commerce's Comparison of Industrial Class Electricity Consumption to
              Korea's Total GDP is Reasonable and there is no Denominator Mismatch .....15

          D.  The GOK Failed to Raise its Argument that The Percentage Of Hyundai
              Steel's Consumption Total Industrial Class Electricity Cannot be
              Disproportionately "Large" ..............................................................................17

          E.  A Single Firm Using [      ] Percent of All Industrial Class Electricity in a
              Country Can Be "Large" When Compared to an External Comparator ...........20

CONCLUSION................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999) ..................................................................... 12, 13

*Ashley Furniture Industries, LLC v. United States*,
607 F. Supp. 3d 1210 (Ct. Int'l Trade 2022) ........................................................ 7

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .......................................................................... 6

*Bethlehem Steel Corp. v. United States*,
140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ..................................................... 7, 9

*Canadian Solar, Inc. v. United States*,
23 F.4th 1372 (Fed. Cir. 2022) ........................................................................... 9

*Carlisle Tire & Rubber Co. v. United States*,
564 F. Supp. 834 (Ct. Int'l Trade 1983) .............................................................. 8

*Ceramark Technology, Inc. v. United States*,
61 F.Supp.3d 1371 (Ct. Int'l Trade 2015) .......................................................... 19

*Consol. Bearings Co. v. United Statees*,
348 F.3d 997 (Fed. Cir. 2003) .......................................................................... 19

*Consolidated Edison v. NLRB*,
305 U.S. 197 (1938) .......................................................................................... 6

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1996) .......................................................................................... 6

*Corus Staal BV v. United States Steel Corporation*,
502 F.3d 1370 (Fed. Cir. 2007) .............................................................. 18, 19, 20

*Deacero S.A.P.I. de C.V. v. United States*,
996 F.3d 1283 (Fed. Cir. 2021) .......................................................................... 6

*Gov't of Quebec v. United States*,
105 F.4th 1359 (Fed. Cir. 2024) ....................................................................... 12

*Hyundai Steel Co. v. United States*,
798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) ................................................. *passim*

*Hyundai Steel Company v. United States*,
  745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ................................................................... 2, 14, 17

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ................................................................... 7

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*,
  405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ................................................................. 9

*Jiaxing Brother Fastener Co. v. United States*,
  822 F.3d 1289 (Fed. Cir. 2016) ................................................................................... 7

*Krupp Stahl A.G. v. United States*,
  822 F. Supp. 789 (1993) ............................................................................................ 7

*MacLean-Fogg Co. v. United States*,
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ................................................................. 6

*Matsushita Electrical Industrial Co. v. United States*,
  750 F.2d.927 (Fed. Cir. 1984) ................................................................................... 6

*Mosaic Company v. United States*,
  160 F.4th 1340 (Fed. Cir. 2025) ......................................................................... *passim*

*Mosaic Company v. United States*,
  659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ......................................................... 15, 16

*Ninestar Corp v. United States*,
  687 F.Supp.3d 1308 (Ct. Int'l Trade 2024) ................................................................. 18

*Nippon Steel v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ................................................................................... 6

*Royal Thai Gov't v. United States*,
  436 F.3d 1330 (Fed. Cir. 2006) ................................................................................... 12

**Statutes**

19 U.S.C. § 1644(5A) ................................................................................................... 12

19 U.S.C. § 1677(5A)(D)(iii)(III) ......................................................................... *passim*

19 U.S.C. § 3512(d) ................................................................................................... 13

28 U.S.C. § 2637(d) ................................................................................................... 18

**Administrative Determinations**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*,
    88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023) ........................................................... 14

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*,
    89 Fed. Reg. 15,124 (Dep't Commerce Mar. 1, 2024) ............................................................. 14

*Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results and Partial Recission of Countervailing Duty Administrative Review; 2021*,
    89 Fed. Reg. 6,501 (Dep't Commerce Feb. 1, 2024).................................................................. 14

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*,
    88 Fed. Reg. 61,509 (Dep't Commerce Sep. 7, 2023)................................................................. 2

*Certain Hot-Rolled Steel Flat Products form the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2021*,
    89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024) ............................................................ 15

**Other Authorities**

Statement of Administrative Action to the Uruguay Round Agreements Act (SAA),
    H.R. Doc. No. 103-316 at 930 (1994).................................................................................. *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, )<br><br>Plaintiff, )<br><br>and )<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA, )<br><br>Plaintiff-Intervenor )<br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and, )<br><br>NUCOR COPRORATION, )<br><br>Defendant-Intervenor. ) | Court No. 23-00211<br><br>**PUBLIC VERSION**<br><br>(BPI removed from pp. 4, 10, 17, 20, 21) |

## DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to Hyundai Steel Company (Hyundai Steel) and the government of Korea's (GOK) comments in opposition to the Department of Commerce's second remand redetermination, filed in accordance with this Court's order in *Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) (Second Remand Order). *See* Comments on Remand Results, ECF No. 99-100 (Hyundai Steel Comments); Comments on Remand Results, ECF No. 101-102 (GOK Comments); Final Remand Redetermination, ECF No. 93-94 (Second Remand Results). For the reasons described below, we respectfully request that the Court sustain the remand results and enter judgement for the United States.

## BACKGROUND

### I.     Administrative Determination Under Review

The administrative determination under review is the final results of the administrative review of the countervailing duty order covering cut-to-length carbon-quality steel plate for the Republic of Korea (Korea) for the period of review (POR) January 1, 2021, through December 31, 2021. *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Dep't Commerce Sep. 7, 2023) (P.R. 224) (*Final Results*), and accompanying Issues and Decision Memorandum (P.R. 222) (IDM).[1]  In the final results, Commerce found that the GOK's Provision of Electricity for Less Than Adequate Remuneration (LTAR) (Electricity Program) was *de facto* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III) because the top four industrial groups used a disproportionately large amount of industrial class electricity.  IDM at 15-16.

### II.     The Court's First Remand Order and Commerce's First Remand Redetermination

Hyundai Steel filed a complaint challenging Commerce's determination.  On December 12, 2024, the Court remanded for Commerce to provide further explanation or reconsider its determination that the GOK's provision of industrial class electricity for LTAR was *de facto* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III) on the basis that the top four industries used a disproportionately large amount of industrial class electricity but where Commerce did not sufficiently explain the basis for grouping those four industries.  *Hyundai Steel Company v. United States*, 745 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2024) (First Remand Order).  On remand, Commerce reevaluated the basis for its decision, modified its analysis, and

---

[1]  The record citations with P.R./C.R. designate citation to the initially filed administrative record index, *see* ECF No. 24, and P.R.R./C.R.R. designate citation to the second remand record index, *see* ECF No. 97.

determined that the largest three industries consumed a disproportionately large amount of electricity because of the percentage of industrial class electricity consumed by those industries. Final Results of Redetermination Pursuant to Court Remand, ECF No. 62-63 (First Remand Results).  Commerce grouped these industries "based on a relatively comparable percentage of total industrial electricity consumption in Korea during the POR."  *Id.* at 6.

### III.    The Court's Second Remand Order

On August 12, 2025, this Court remanded the first remand results.  The Court held that Commerce had again misapplied the statute's "disproportionality" requirement and that it must compare:

> the amount of subsidy and an attribute of the industry, not a comparison of the amount of a subsidy given to different industries.  For example, {this Court opined that} one could imagine a situation where an enterprise received more of the subsidy than would be expected by some comparator such that its receipt could be considered disproportionate.

*Second Remand Order*, 798 F. Supp. 3d at 1289-91 (internal citations omitted).  The Court remanded for further explanation of Commerce's grouping of industries or to reconsider the basis of Commerce's determination.  *Id.* at 1291.

### IV.    Commerce's Second Remand Redetermination

On remand, Commerce placed on the record the Gross Domestic Product (GDP) data for Korea in 2021 and provided an opportunity for interested parties to comment on the data.  No party responded.  Commerce Memorandum Placing Factual Information on the Record (P.R.R. 1-2) (GDP Memorandum).  Commerce released the draft results of redetermination on November 26, 2025, and provided interested parties an opportunity to comment.  Draft Results of Second Remand Redetermination (P.R.R. 3, C.R.R. 1).

Commerce reconsidered the basis for its determination. Commerce found that, when comparing Hyundai Steel's consumption of industrial class electricity with Hyundai Steel's contribution to Korea's GDP, Hyundai Steel received a disproportionately large amount of the subsidy. Commerce concluded that the subsidy was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III). *Id.* at 6-7. Hyundai Steel and the GOK submitted comments contending Commerce should alter its specificity analysis, and Nucor Corporation submitted comments in support of Commerce's specificity analysis. Hyundai Steel Comments on Draft Remand (P.R.R. 6, C.R.R. 2); GOK Comments on Draft Remand, (P.R.R. 7, C.R.R. 3) (GOK Draft Comments); Nucor Comments on Draft Remand (P.R.R. 9, C.R.R. 4).

In the final second remand results, Commerce explained that it had selected total GDP as a comparator to industrial class electricity consumption to determine whether the benefits received correlated with Hyundai Steel's share of the economy to determine if the subsidy was "evenly distributed across the Korean economy in a way that would be expected if the purpose of the subsidy was to benefit all enterprises equally." Second Remand Results at 11. The result of this analysis was Commerce's finding that "Hyundai Steel's consumption of the subsidized industrial class electricity was [                    ] its contribution to the Korean economy." *Id.* at 12. Therefore, Commerce determined that Hyundai Steel received a disproportionately large amount of the subsidy on an enterprise basis, and the subsidy was therefore *de facto* specific. *Id.* at 15.

## SUMMARY OF THE ARGUMENT

Commerce's finding that the Electricity Program is *de facto* specific due to disproportionately large use by Hyundai Steel is in accordance with the second remand order, supported by substantial evidence, and in accordance with law. In determining that usage by Hyundai Steel is disproportionate, Commerce compared Hyundai Steel's usage of industrial class electricity under the program to Hyundai Steel's share of Korea's GDP, an external comparator as directed by this Court.

Hyundai Steel and the GOK contend that a comparison between Hyundai Steel's share of industrial class electricity and share of Korea's total GDP is unlawful. In the alternative, they argue that a comparison between industrial class electricity consumption and GDP involves different denominators and is therefore unreasonable. Hyundai Steel and the GOK also contend that electricity cannot be a countervailable subsidy because it is widely available. The GOK further contends that an electricity program is not countervailable where the rate charged is set pursuant to a standard pricing mechanism. However, a good provided for LTAR, even where nationally available and subject to a standard pricing mechanism, may still be *de facto* specific. Commerce's determination to use GDP as a comparator was reasonable because GDP shows how the GOK's subsidy program provides a greater benefit to heavy users of the subsidized input, such as Hyundai Steel, than would be expected given Hyundai Steel's participation in the economy. Because Commerce's determination is lawful and in accordance with the remand order, the Court should sustain the second remand redetermination and enter judgment in favor of the United States.

**ARGUMENT**

I.    **Standard of Review**

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015). Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support the conclusion reached. *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996); *see also Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1297 (Fed. Cir. 2021). To hold a decision supported by substantial evidence, the Court need only find evidence "which could reasonably lead to {Commerce's} conclusion," so that the conclusion was a "rational decision." *Matsushita Electrical Industrial Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984). A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quote marks omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some record evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

**II.**    **Commerce's Remand Redetermination is in Accordance with the Remand Order, is Supported by Substantial Evidence, and Otherwise in Accordance with Law**

The Court should sustain Commerce's remand redetermination.  Commerce complied with the remand order by reconsidering its specificity analysis and using an objective comparator (GDP) against which to measure whether Hyundai Steel received disproportionate benefits from the provision of electricity for LTAR program. None of the arguments raised by Hyundai and the GOK demonstrate any error in law or evidence.

A.    Provision of Electricity May Represent a Countervailable Subsidy Under CVD Law

Hyundai Steel and the GOK contend that, because electricity prices in Korea are set according to a standard pricing mechanism and electricity is broadly available, provision of electricity for LTAR is not specific and not the type of subsidy that the countervailing duty law is designed to address.  Hyundai Steel Comments at 10; GOK Comments at 13-15.  The GOK argues that this Court has previously held that "a program is not *de facto* specific 'if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers.'" GOK Comments at 15 (quoting *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369-70 (Ct. Int'l Trade 2001)).  However, each administrative proceeding stands on its own record, and this investigation has its own distinct factual record.  *See Ashley Furniture Industries, LLC v. United States*, 607 F. Supp. 3d 1210, 1237 n.9 (Ct. Int'l Trade 2022) (citing *Krupp Stahl A.G. v. United States*, 822 F. Supp. 789, 795 (Ct. Int'l Trade 1993); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317, 1336 (Ct. Int'l Trade 2014)); *see also Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016)

(recognizing that Commerce may reach "different conclusions based on different facts in the record") (quote marks omitted).

As a general matter, Commerce must find a subsidy is *de facto* specific where one of the following factors exist:

(I)     The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
(II)    An enterprise or industry is a predominant user of the subsidy.
(III)   An enterprise or industry receives a disproportionately large amount of the subsidy.
(IV)    The manner in which the authority providing the subsidy has exercised in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).  In evaluating these factors, Commerce "shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation."  *Id.*

The Statement of Administrative Action to the Uruguay Round Agreements Act (SAA), H.R. Doc. No. 103-316 at 930 (1994) states that the specificity test "is to function as an initial screening mechanism to winnow out only those foreign subsidies which are truly and broadly available and widely used throughout an economy."  *Id.* at 929.  The SAA further observes that not all government interventions in the economy, for example benefits for certain public highways and bridges, would be appropriate to treat as a countervailable subsidy.  *Id.* at 929 (citing *Carlisle Tire & Rubber Co. v. United States,* 564 F. Supp. 834 (Ct. Int'l Trade 1983)). However, the SAA emphasizes:

> {t}he specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy.  Conversely, the specificity test was not intended to function as a loophole through which narrowly focused subsides provided to or used by discrete segments of the economy could escape the purview of the CVD law.

*Id.* at 930.

Consistent with that purpose, in this administrative review, Commerce examined the benefit provided by the use of industrial class electricity, a specific type of electricity within the GOK's tariff schedule that does not have broad, economy-wide use.  *See* Second Remand Results at 13.

Relevant here, the statute does not direct Commerce to consider the mechanism (such as a standard tariff pricing schedule) used to provide a subsidy as part of its *de facto* specificity analysis.  *See* 19 U.S.C. § 1677(5A)(D)(iii); c*f.* § 1677(5A)(D)(ii) (directing that a subsidy is not *de jure* specific where eligibility for the subsidy is automatic, and criteria or conditions for eligibility are strictly followed and set forth in official, verifiable documents).  The portion of *Bethlehem Steel* that the GOK cites to support its contention that a standard pricing mechanism alone would render a subsidy non-specific cannot be read as covering all future and different electricity provision programs.  Rather, it is appropriate to limit what "Commerce stated" to the facts of that case.  *See* 140 F. Supp. 2d at 1369.

Further, more recently, both the Federal Circuit and this Court have found that utilities, including electricity, provided for LTAR may be specific subsidies depending on the facts of the case even where prices were standardized.  *See, e.g.*, *Mosaic Company v. United States*, 160 F.4th 1340, 1342-43, 1348 (Fed. Cir. 2025) (affirming Commerce's determination that natural gas for LTAR sold under regulated prices constituted a countervailable subsidy which was *de facto* specific); *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d 1317, 1337 (Ct. Int'l Trade 2019) (sustaining Commerce's determination that "the provision of electricity at LTAR to the respondents, the subsidy at issue, was not general infrastructure"); *Canadian Solar, Inc. v. United States*, 23 F.4th 1372, 1380 (Fed. Cir. 2022) (finding an electricity program was *de jure* specific due to regional pricing constituted a countervailable subsidy, even

9

though electricity was available in every region and prices within each region were standardized).

In sum, a subsidy of a broadly available product such as electricity for LTAR that includes a "standard pricing mechanism" and involves services to the public can therefore be countervailed where the facts on the record indicate the subsidy is *de facto* specific to an enterprise or industry.

### B. GDP is a Reasonable Comparator for Analyzing Whether Usage of a Subsidy Program is Disproportionately Large under 19 U.S.C. § 1677(5A)(D)(iii)(III)

In the *second remand order*, this Court held that "'disproportionality' requires a comparison of the amount of subsidy and an attribute of the industry{.}"  798 F. Supp. 3d at 1289 (citation omitted).  Accordingly, Commerce selected as an external comparator GDP, an attribute of how much Hyundai Steel contributes to the Korean economy.  Second Remand Results at 6.  Consideration of the overall economy of the subsidy country is consistent with the statute, which directs Commerce, when analyzing disproportionality, to "take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation."  19 U.S.C. § 1677(5A)(D)(iii).  Commerce found that Hyundai Steel received a disproportionately large amount of the subsidy because "Hyundai Steel received [                    ] the share of electricity benefit {compared to} its contribution to the economy."  Second Remand Results at 11.

Hyundai Steel and the GOK both contend that a comparison to GDP is inappropriate to determine whether a company has received a disproportionately large amount of a subsidy. Hyundai Steel Comments at 4-5; GOK Comments at 3-13.  Hyundai Steel further contends that "Commerce has failed to explain how its comparison of Hyundai Steel's consumption of

10

industrial electricity to GDP demonstrates that the electricity for LTAR program is providing the type of enterprise or industry specific subsidy that the countervailing duty law is designed to address." Hyundai Steel Comments at 10. However, GDP was identified by this Court as a potentially appropriate comparator. *See Second Remand Order*, 798 F. Supp. 3d at 1290, n.11 ("It is also possible that depending upon the subsidy at issue Commerce might measure disproportionality by other comparators, such as size, number of employees, *or value of production*, as the {SAA} directs that 'Commerce can only make this determination on a case-by-case basis'" (emphasis added) (quoting SAA at 873)).

The Federal Circuit has recently confirmed that Commerce has "reasonable flexibility in carrying out the *de facto* specificity inquiry." *Mosaic*, 160 F.4th at 1347. At issue in *Mosaic* was Commerce's determination that an industry was a "predominant user" of a subsidy by comparing that industry to other industrial users. *Id*. at 1346. The Federal Circuit considered that the statute did not define "predominant user," and that the statutory language did not require Commerce to compare subsidy usage in a particular way and "does not prescribe any method that Commerce must employ when assessing whether an 'enterprise or industry' is 'a predominant user.'" *Id*. at 1346–47 (quoting 19 U.S.C. § 1677(5A)(D)(iii)(II)).

The Federal Circuit also examined the legislative purpose of the statute, concluding that in making specificity determinations, "Congress clearly intended Commerce to have flexibility{.}" *Id*. at 1347. The Federal Circuit noted that the SAA stated the specificity test, "including *de jure* and *de facto* specificity, 'was intended to function as a rule of reason,'" and instructed Commerce to "seek and consider information relevant to all … {four *de facto* specificity} factors." *Id*. (quoting SAA, at 929, 931 (alterations in original)). The Federal Circuit held that the SAA grants Commerce "reasonable flexibility" in assessing whether a *de*

11

*facto* subsidy exists, and noted its own "clear and consistent position that Commerce has reasonable flexibility in carrying out the de facto specificity inquiry." *Id*. (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999); *Gov't of Quebec v. United States*, 105 F.4th 1359, 1374 (Fed. Cir. 2024); *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335–36 (Fed. Cir. 2006)).  Moreover, the court rejected the argument that Commerce was *required* to compare the use of the widely available subsidy by the industry in question against all consumers of natural gas (rather than all industrial users), holding Commerce has flexibility "to determine the comparator group." *Id*. at 1348.

Although *Mosaic* concerned a finding of *de facto* specificity due to predominant use under 19 U.S.C. § 1677(5A)(D)(iii)(II), not disproportionality under 19 U.S.C. § 1677(5A)(D)(iii)(III), its holding is applicable.  The *Mosaic* court underscored its "clear and consistent position that Commerce has reasonable flexibility in carrying out the *de facto* specificity inquiry." *Id.* at 1347.  Thus, *Mosaic*'s reasoning equally applies to disproportionality determinations, another statutory basis for finding *de facto* specificity under 19 U.S.C. § 1644(5A)(D)(iii).

Like "predominant use," the statute does not define "a disproportionately large amount." Just as the statutory language "does not prescribe any method that Commerce must employ when assessing whether an 'enterprise or industry' is 'a predominant user,'" *Mosaic,* 160 F.4th at 1347, the statute also does not prescribe any method for assessing whether "{a}n enterprise or industry {is} receiv{ing} a disproportionately large amount" of a subsidy.  19 U.S.C. § 1677(5A)(D)(iii). Furthermore, the SAA's statements relied upon by the Federal Circuit apply to both predominance and disproportionality analyses, even grouping those analyses together.  *See*, *e.g.*, SAA at 931 ("The Administration intends that Commerce seek and consider information relevant

12

to all of these factors . . . where the number of users of a subsidy is very large, *the predominant use and disproportionality factors* would have to be assessed." (emphasis added)).[2]  Finally, the court cited, with approval, cases that concerned determinations of disproportionate use.  *Mosaic*, 160 F.4th at 1347-48 (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999)).

Applying *Mosaic's* reasoning here, the question is whether Commerce made a reasoned decision in determining how to compare subsidy use, 160 F.4th at 1348 ("Commerce must engage in reasoned decision making" when selecting comparisons for a *de facto* subsidy analysis).  The Federal Circuit looked to the record to see if Commerce's selection of comparator groups was "sufficiently reasonable" and "within Commerce's reasonable discretion."  *Id*.  Here, the record evidence showed that Korea had a widely diversified economy, but Hyundai Steel consumed disproportionately larger amount of energy than would be expected based on Hyundai Steel's contribution to Korea's GDP.  *See* Second Remand Results at 11-13.  Consistent with the flexibility recognized in *Mosaic*, Commerce's selection of a comparator group was based on record evidence showing that Korea's electricity program is designed "to benefit heavy users of the subsidized input" and GDP was therefore an appropriate comparator, consistent with this Court's guidance in the Second Remand Order.  *Id.* at 12, 14.  Therefore, Commerce's selection GDP as a comparator to perform its comparison as part of the *de facto* subsidy analysis was "sufficiently reasonable."  *See Mosaic*, 160 F.4th at 1348.

---

[2]  The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {enacting legislation} in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

Hyundai Steel contends that "{t}here is no evidence that the electricity for LTAR program is designed to benefit heavy users of the subsidized input such as steel companies. To the contrary, the record shows that industrial users like steel companies pay the highest tariff rates and have the highest cost recovery rates." Hyundai Steel Comments at 9-10 (internal citation omitted). However, whether other non-industrial types of electricity are even further subsidized is irrelevant. Instead, the relevant inquiry is whether industrial class electricity provided to the respondents for LTAR disproportionately benefits Hyundai Steel, a heavy user of the subsidized electricity. Commerce found that industrial class electricity was provided for LTAR and that Hyundai Steel received a disproportionately large amount of the subsidy. Second Remand Results at 12.

Further, Hyundai Steel asks this Court to ignore Commerce's consistent finding in this proceeding and others "that KEPCO's electricity prices were not set in accordance with market principles" for industrial class electricity and therefore provided a benefit to heavy users of industrial class electricity.[3] Second Remand Results at 14, n.46 (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 86,318 (Dep't Commerce Dec. 13, 2023), and accompanying IDM at Comment 1a; *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 6,501 (Dep't Commerce Feb. 1, 2024), and accompanying IDM at Comment 1a; *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 89 Fed.

---

[3] This Court has already sustained Commerce's application of facts available to make this finding in the final results. *First Remand Order*, 745 F. Supp. 3d at 1353-56.

14

Reg. 15,124 (Dep't Commerce Mar. 1, 2024), and accompanying IDM at Comment 3; *Certain Hot-Rolled Steel Flat Products form the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,380 (Dep't Commerce May 13, 2024), and accompanying IDM at Comment 3).  As such, Commerce's determination that the provision of industrial class electricity for LTAR is designed to benefit heavy users of industrial class electricity, and that GDP is therefore an apt comparator as a measure of participation in the economy relative to industrial electricity use, is supported by substantial evidence and in accordance with law.

C. Commerce's Comparison of Industrial Class Electricity Consumption to Korea's Total GDP is Reasonable and there is no Denominator Mismatch

Hyundai Steel and the GOK contend, in the alternative, that the denominators of the two ratios being compared were fundamentally different.  They argue that Commerce should either have: (1) limited the GDP comparator group to those enterprises using industrial class electricity, or (2) included in electricity consumption all electricity types in Korea.  Hyundai Steel Comments at 6-9; GOK Comments at 3-7.

As support for the idea that mismatched denominators are unusable for specificity determinations, both Hyundai Steel and the GOK cite *Mosaic Company v. United States*, 659 F. Supp. 3d 1285, 1315 (Ct. Int'l Trade 2023) (*Mosaic CIT*).  *See* Hyundai Steel Comments at 8-9; GOK Comments at 7.  *Mosaic CIT* is inapposite.  In *Mosaic CIT*, the Court examined Commerce's finding that a tax penalty relief program was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I) because the actual recipients of the subsidy, considered on an enterprise or industry basis, were limited in number.  *Mosaic CIT*, 659 F. Supp. 3d at 1314.  In making that determination, "Commerce compared the number of corporate taxpaying *recipients* of penalty relief, 8,761, to the total number of corporate *taxpayers*, 262,165, not the total number of

corporate taxpayers who incurred penalties." *Id.* (emphasis in original).  The Court opined that this comparison was "essentially meaningless" for determining specificity "because the numerator and denominator were not logically comparable." *Id.* at 1315.  The Court considered that "{t}he only corporate taxpayers who could have applied for relief under the program during the POI, i.e., the 'potential' recipients, were those that had incurred a tax penalty and had satisfied the requirement to pay all taxes they owed." *Id.*

Commerce in *Mosaic CIT* did not "compare the actual recipients to the universe or composition of the group of potential recipients, or {} ascertain whether any identifiable group of taxpayers benefited disproportionately." *Id*.  However, here, Hyundai Steel and the GOK suggest a comparison to the GDP of industrial class electricity users; not a comparison to the group of *potential* recipients of the subsidy, but the group of *actual* recipients.  Hyundai Steel Comments at 8, GOK Comments at 5.  As such, the comparison Hyundai Steel and the GOK advocate is not what the Court contemplated in *Mosaic CIT*.  Further, the Court expressly considered that an analysis of disproportionality might involve different considerations, and *Mosaic CIT* is not on point here.  *See Mosaic* CIT, 659 F. Supp. 3d at 1315; Second Remand Results at 13; *see also Mosaic*, 160 F.4th at 1347 (emphasizing the "reasonable flexibility" Commerce holds to "carry{} out the *de facto* specificity inquiry").

Hyundai Steel and the GOK further contend that national GDP is an inapt comparator because not all sectors of the economy use industrial class electricity.  Hyundai Steel Comments at 8, GOK Comments at 11.  This, however, is precisely the point of a disproportionate use *de facto* specificity finding: that the attributes of certain industries may lead to disproportionately large use of the subsidy.  *See Second Remand Order*, 798 F. Supp. 3d at 1289-90 ("'disproportionality' requires a comparison of the amount of subsidy and an attribute of the

16

industry{.} . . . For example, one could imagine a situation where an enterprise received more of the subsidy than would be expected by some comparator such that its receipt could be considered disproportionate" (citing *First Remand Order*, 745 F. Supp. 3d at 1351-52)).

As Commerce described, "the design of Korea's Electricity Program is to benefit heavy users of the subsidized input, such as steel companies{.}" Second Remand Results at 14. Further, "Commerce has reasonable flexibility in carrying out the *de facto* specificity inquiry." *Mosaic*, 160 F.4th at 1347. It was reasonable for Commerce to compare use of the subsidized input to the universe of the entire Korean economy, to include in the comparison industries which also contribute to the economy but are not heavy users of industrial class electricity.

Commerce additionally explained how expanding the other side of the comparison to include consumption of all electricity in Korea, not just industrial class electricity, would not be reasonable. Second Remand Results at 13. Specifically, the type of electricity being examined as a subsidy is industrial class electricity; including all electricity consumption in the comparison would provide no insight into whether Hyundai Steel's consumption of industrial class electricity was disproportionately large. *Id.*

Commerce's decision to use total GDP as a comparator to industrial class electricity consumption was therefore in accordance with the remand order, supported by substantial evidence, and in accordance with law.

D. The GOK Failed to Raise its Argument that The Percentage Of Hyundai Steel's <u>Consumption Total Industrial Class Electricity Cannot be Disproportionately "Large"</u>

The GOK argues that, under 19 U.S.C. § 1677(5A)(D)(iii)(III), a usage rate of [     ] percent of the total industrial class electricity by Hyundai Steel cannot be "large." GOK Comments at 9. Here, the GOK commented on Commerce's draft remand redetermination but did not raise its argument that using [     ] percent of total industrial class electricity

17

consumption by Hyundai Steel cannot be considered "large" under the statute. Because the GOK failed to present this argument before Commerce it failed to exhaust its administrative remedies. It cannot now argue error for the first time in this Court. *Corus Staal BV v. United States Steel Corporation*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Under 28 U.S.C. § 2637(d), Congress mandated that the Court of International Trade "{s}hall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's countervailing duty determinations. The statute reflects "a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal BV v. United States Steel Corp.*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). Exhaustion is "a requirement explicitly imposed by the agency as a prerequisite for judicial review." *Id.* at 1379. This Court "generally takes a strict view of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Id.*

Parties may only avoid the requirement to exhaust their administrative remedies if their argument falls into one of a few limited exceptions: "(1) plaintiff's argument involves a pure question of law; (2) there is a lack of timely access to the confidential record; (3) a judicial decision rendered subsequent to the administrative determination materially affected the issue; or (4) raising the issue at the administrative level would have been futile." *Ninestar Corp v. United States*, 687 F.Supp.3d 1308, 1326 (Ct. Int'l Trade 2024) (quote marks & citation omitted); *see also Corus Staal,* 502 F.3d at 1378 n.4. None of these exceptions apply.

The GOK does not suggest, nor could it, that whether a percentage of industrial electricity consumption is disproportionately large is a pure question of law. Indeed, whether consumption is "large" is inherently fact-specific, as this Court has previously observed. *See*

18

*Second Remand Order*, 798 F. Supp. 3d at 1289-90 n.11 ("the {SAA} directs that 'Commerce can only make this determination on a case-by-case basis'" (citing SAA at 873)).  Determining whether the amount of industrial class electricity consumed by Hyundai Steel is disproportionately "large" requires consideration of the factual record.  *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003) (finding no pure question of law where resort to the factual record was needed to decide the issue).

The GOK does not argue there was any delay in accessing the confidential record or any intervening judicial decision.  Finally, it would not have been futile for the GOK to raise this issue before Commerce.  The futility exception "is a narrow one{,}" and "{t}he mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust its administrative remedies."  *Corus Staal*, 502 F.3d at 1379 (internal quotation omitted).  In this remand, Commerce reconsidered the basis for its determination and explained why it found provision of industrial class electricity for LTAR was *de facto* specific based on the facts on the record on an enterprise, rather than industry, basis.  *See* Second Remand Results at 5-7.  Arguments about how the percentage determined should not be considered "large" in the context of industrial electricity consumption by a single enterprise under Commerce's new analysis using an external comparator could have influenced Commerce's decision-making.[4]  However, the GOK made no such arguments.  As such, the futility exception

---

[4]  Whether or not Commerce would have changed its decision is not relevant to the futility exception analysis.  *See, e.g.*, *Ceramark Technology, Inc. v. United States*, 61 F. Supp. 3d 1371, 1375-76 (Ct. Int'l Trade 2015) (finding in a circumvention proceeding "{i}t is possible, indeed likely, that if Ceramark had simply re-submitted its previous comments, Commerce would not have changed its position. . . . But repetition is not what the Plaintiff was required to do here.  Rather, Plaintiff was required to comment on new factual findings, and the resultant new balance of evidence, that Commerce undertook specifically for this redetermination. . . . While Commerce still might not have agreed with Ceramark's arguments on remand, the 'mere

19

to the exhaustion requirement does not apply.  Because there is no exception to excuse the

GOK's failure to exhaust administrative remedies applies, this Court should decline to entertain

the GOK's argument on this issue.

E.  A Single Firm Using [      ] Percent of All Industrial Class Electricity in a Country Can Be "Large" When Compared to an External Comparator

Even if the Court were to entertain this argument, the argument lacks merit.  The GOK

argues that, on the facts of this record, provision of [      ] percent of industrial class electricity

consumption cannot be considered "large" as contemplated in the statute.  GOK Comments at 9.

The GOK makes the same error that the Court remanded Commerce for in comparing the [      ]

percent of electricity consumed by Hyundai Steel to the [      ] percent of such electricity

consumed by other enterprises.  As this Court held, determining whether a subsidy is

disproportionately large requires comparison to "an attribute of the industry" including "by some

comparator such that its receipt could be considered disproportionate."  *Second Remand Order* at

1289-90.  This same logic applies when determining whether industrial electricity consumption

was disproportionately "large."

Even focusing on the absolute percentage, when such number is compared to an external

comparator, (in this case, GDP,) the benefit is "disproportionately large" at [               ]

the comparator.  While we acknowledge that a minor difference *between* electricity consumption

and contribution to GDP might not be "disproportionately large" depending on the facts of the

case, *see* Second Remand Results at 12 ("{Commerce} did not make an assumption that there

should be a 'one-to-one' correlation between a company's or industry's contribution to GDP"),

the difference *between* electricity consumption and contribution to GDP was [               ],

---

fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies.'").

or phrased another way [          ] percent.  This difference is "disproportionately large" within

the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III).

Commerce's remand redetermination is therefore supported by substantial evidence and

is in accordance with law.  This Court should uphold Commerce's analysis finding the provision

of electricity for LTAR was a *de facto* specific subsidy because Hyundai Steel received a

disproportionately large amount of the subsidy.

## **CONCLUSION**

For these reasons, we respectfully request that this Court sustain Commerce's second

remand redetermination and enter final judgment in favor of the United States.

<div style="margin-left:45%">

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

*Attorneys for Defendant*

</div>

Of Counsel:
KARL MUELLER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

March 16, 2026

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief contains **5,914** words and therefore complies with the word

limitations set forth in Standard Chambers Order ¶ 2(b)(1).


/s/Tara K. Hogan