C-580-837
Remand
Slip Op. 26-52
POR: 1/1/2021 – 12/31/2021
**Public Document**
E&C/OIII: KJ

***Hyundai Steel Company v. United States*,**
**Court No. 23-00211, Slip Op. 26-52 (CIT May 18, 2026)**
**Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the third remand opinion and order of the U.S. Court of International Trade (the Court) issued on May 18, 2026.[1] These final results of redetermination concern Commerce's final results of administrative review of the countervailing duty (CVD) order on certain cut-to-length carbon-quality steel plate (CTL plate) from the Republic of Korea (Korea) covering the period of review (POR) January 1, 2021, through December 31, 2021.[2] In the *Final Results*, Commerce determined that the Government of Korea's (GOK) Provision of Electricity for Less Than Adequate Remuneration program (Electricity Program), which provided a benefit to Hyundai Steel Company (Hyundai Steel), was *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Tariff Act of 1930, as amended (the Act).[3]

In *Hyundai Steel III*, the Court remanded to Commerce for further explanation or reconsideration of whether Korea's gross domestic product (GDP) is an appropriate comparator to assess disproportionality for electricity consumption, and further holding that the comparison of industrial class electricity to total GDP is impermissible as the two sides of the comparison

---

[1] *See Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 26-52 (CIT May 18, 2026) (*Hyundai Steel III*).
[2] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 FR 61509 (September 7, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Final Results* IDM at 15-16.

operate in different "universes" and therefore do not "align logically."[4] The Court upheld, however, that a standard pricing mechanism is not dispositive in the *de facto* specificity analysis stating that "nothing in the statute directs Commerce to treat the existence of a uniform tariff schedule as sufficient to render a subsidy non-specific."[5]

For these final results of redetermination, Commerce has reconsidered the *de facto* specificity finding for the Electricity Program. Commerce continues to determine that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.

## II. BACKGROUND

On April 12, 2022, Commerce initiated the 2021 administrative review of the *Order*[6] and subsequently selected Hyundai Steel as the mandatory respondent.[7] In the *Final Results*, Commerce determined that the Electricity Program was *de facto* specific under section 771(5A)(D)(iii)(III) of the Act because the steel industry and three other industries combined consumed a disproportionately large amount of the industrial class electricity in Korea.[8]

Hyundai Steel and the GOK challenged Commerce's *de facto* specificity determination, arguing that the steel industry did not receive a disproportionately large amount of the electricity subsidy alone, or when grouped with three other industries. On December 12, 2024, the Court issued its first remand for Commerce to provide further explanation or reconsideration of its specificity finding under section 771(5A)(D)(iii)(III) of the Act.[9] In *Hyundai Steel I*, the Court stated that "[d]isproportionality requires that an enterprise or industry is favored in some way

---

[4] *See Hyundai Steel III* at 15-20.
[5] *Id*. at 14-15.
[6] *See Notice of Amended Final Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders: Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000) (*Order*).
[7] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 21619, 21635 (April 12, 2022); *see also* Memorandum, "Respondent Selection," dated May 2, 2022.
[8] *See Final Results* IDM at 15-16.
[9] *See Hyundai Steel Company v. United States*, 745 F.Supp.3d 1345 (CIT 2024) (*Hyundai Steel I*).

(*i.e.*, it received more than its fair share)."[10] The Court ordered Commerce to explain how the combined industries that it identified benefitted more than would be expected, based on their usage given that the subsidy in question (provision of electricity) is designed to confer benefits on usage levels, which necessarily results in larger users receiving a proportionally larger percentage of the subsidy, or in relation to some other comparator.[11] The Court also ordered Commerce to explain why these industries (*i.e.*, the steel industry and three other industries) are grouped together for purposes of its analysis.[12]

On April 11, 2025, Commerce issued its final results of redetermination to the Court's remanded order in *Hyundai Steel I*, continuing to find the Electricity Program to be *de facto* specific because the steel industry and two other industries received a disproportionately large amount of the subsidy.[13] In *Final Remand-Hyundai Steel I*, Commerce found that a further examination of the GOK's consumption data for the 10 largest electricity consuming industries indicated that the steel industry and two (not three) other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other seven industries reported, and thus, the Electricity Program was *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of Act.[14] Commerce explained that the rationale for grouping steel and two other industries together is based on a relatively comparable percentage of total industrial class electricity consumption in Korea. Specifically, the POR data demonstrate a significant difference between the electricity consumption of the three largest consumers of industrial class electricity and the remaining seven industries. Thus, based on the characteristic of comparative consumption of industrial class electricity during the POR, Commerce found a

---

[10] *Id.*, 745 F.Supp.3d at 1353.
[11] *Id.*
[12] *Id.*
[13] *See Final Results of Redetermination Pursuant to Court Remand*, *Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 24-135 (CIT December 12, 2024), dated April 11, 2025 (*Final Remand-Hyundai Steel I*), available at https://access.trade.gov/FinalRemandRedetermination.
[14] *Id*. at 3-15.

sufficient basis to group the steel and two other industries together to conduct an analysis of whether an enterprise or industry, or group thereof, received a disproportionately large amount of the subsidy.

On August 12, 2025, the Court issued a second remand regarding Commerce's *de facto* specificity determination for the Electricity Program.[15] In *Hyundai Steel II*, the Court remanded *Final Remand-Hyundai Steel I* instructing Commerce to either apply the disproportionality standard required by the statute as explained by the Court, and explain any grouping it makes in connection with its determination, or reconsider the basis for its determination.[16] The Court held that "greater benefit alone does not equate with disproportionality,"[17] and that Commerce again simply grouped industries together for its specificity analysis, but did not explain its reasoning for doing so beyond finding that the companies all consumed similar amounts of electricity during the POR.[18]

In its final results of redetermination issued on December 23, 2025, Commerce reconsidered the basis for its specificity determination by conducting the disproportionality analysis relying on an external comparator, and not the consumption of electricity by industrial sectors, to determine whether Hyundai Steel received more benefits than would be expected under the Electricity Program.[19] Specifically, in *Final Remand-Hyundai Steel II*, Commerce compared Hyundai Steel's share of total industrial class electricity consumed in 2021, to Hyundai Steel's share of Korea's GDP for 2021.[20] Based on this comparison, Commerce determined that the Electricity Program was *de facto* specific within the meaning of section

---

[15] *See Hyundai Steel Company v. United States*, 798 F.Supp.3d 1283 (CIT 2025) (*Hyundai Steel II*).
[16] *Id.*, 798 F.Supp.3d at 1287.
[17] *Id.*, 798 F.Supp.3d at 1291.
[18] *Id.*
[19] *See Final Results of Redetermination Pursuant to Court Remand*, *Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 25-102 (CIT August 12, 2025), dated December 23, 2025 (*Final Remand-Hyundai Steel II*), available at https://access.trade.gov/FinalRemandRedetermination.
[20] *Id*. at 6.

771(5A)(D)(iii)(III) of the Act because Hyundai Steel received a disproportionately large amount of the electricity subsidy in comparison to its share of GDP.[21]

On May 18, 2026, the Court issued a third remand regarding Commerce's *de facto* specificity determination for the Electricity Program.[22] The Court remanded for further explanation or reconsideration of whether Korea's GDP is an appropriate comparator to assess disproportionality for electricity consumption, holding that comparison of industrial class electricity to total GDP is impermissible as the two sides of the comparison operate in different "universes" and therefore do not "align logically."[23]

On June 30, 2026, Commerce issued a questionnaire to the GOK requesting information on the number of users of industrial class electricity during 2021, and the number of users of electricity (all classes) during 2021.[24] On July 9, 2026, Commerce placed on the record factual information sourced from the Bank of Korea and Korea Electric Power Corporation (KEPCO) regarding GDP and electricity consumption in Korea, respectively, and invited interested parties to comment on the data.[25] On July 14, 2026, Commerce received the GOK's questionnaire response.[26] On July 16, 2026, Commerce received comments on the factual information from the GOK[27] and Hyundai Steel.[28] Commerce addressed the comments in the analysis section of the Draft Results,[29] which are included below.

---

[21] *Id*. at 6-7.
[22] *See Hyundai Steel III*.
[23] *Id*. at 15-20.
[24] *See* Commerce's Letter, "Countervailing Duty Order on Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea; Remand (2021 POR): GOK Questionnaire," dated June 30, 2026.
[25] *See* Memorandum, "Third Remand in the Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea (Korea); 2021: Placing Factual Information on the Record," dated July 9, 2026 (Data Memorandum).
[26] *See* GOK's Letter, "Response to the Department's June 30, 2026 Questionnaire," dated July 14, 2026.
[27] *See* GOK's Letter, "Rebuttal Comments on the Department's New Factual Information," dated July 16, 2026 (GOK NFI Letter).
[28] *See* Hyundai Steel's Letter, "Hyundai Steel's Comments on the Factual Information Regarding GDP Data Placed on the Record," dated July 16, 2026 (Hyundai Steel NFI Letter).
[29] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Court No. 23-00211, Slip Op. 26-52 (CIT May 18, 2026), Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, released August 3, 2026 (Draft Results).

## III. ANALYSIS

As discussed in the SAA, "{t}he Administration intends to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy."[30] The specificity test is not intended to function as a loophole through which narrowly focused subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law.[31] In particular situations, a generally available subsidy can benefit an industry or sub-sector more than another. In such circumstances, a government's subsidy does not have a neutral, uniform effect on the economy, but rather affects an industry or sub-sector more favorably than would be expected. That is to say, an industry or sub-sector receives more than its fair share (*i.e.*, a disproportionate amount) of the benefits of the generally available subsidy.

As the Court stated in *Hyundai Steel I* and *Hyundai Steel II*, disproportionality exists when something is too large or too small in relation to something else.[32] The Court further stated that a disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some external comparator, *i.e.*, disproportionality requires a comparison of the amount of subsidy and an attribute of an industry.[33]

In light of the fact that a generally available subsidy, such as the provision of electricity, may not benefit all industries or sub-sectors in an economy uniformly even in a situation where there is a standard pricing mechanism, Commerce placed on the record factual information regarding GDP and electricity consumption in Korea.[34] Commerce finds that GDP is a relevant

---

[30] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) (SAA), at 929.
[31] *Id*.
[32] *See Hyundai Steel I*, 745 F.Supp.3d at 1351; *see also Hyundai Steel II*, 798 F.Supp.3d at 1288.
[33] *See Hyundai Steel I*, 745 F.Supp.3d at 1351; *see also Hyundai Steel II*, 798 F.Supp.3d at 1288, 1289-91.
[34] *See* Data Memorandum.

comparator for analyzing specificity in this case because the GOK's provision of electricity is a broadly available domestic subsidy by its nature provided across the Korean economy, and thus measuring an industry/sub-sector's share of electricity consumption relative to its GDP contribution (an attribute measuring the industry's participation in the economy) allows us to measure whether disproportional usage exists.

Within the factual information, Commerce identified the following data points for the year 2021:

- Total Electricity Consumption: 533,431 in millions of kWh
- Electricity Consumption – Basic Metals: 35,044 in millions of kWh
- Total Production: 2,039,703 in billions of Korean Won
- Production – Basic Metals: 42,579 in billions of Korean Won.[35]

Commerce selected the electricity consumption and production data for basic metals because this sub-sector is inclusive of the steel industry to which Hyundai Steel belongs.[36] Using these data points, Commerce compared the basic metals' share of total electricity consumed in 2021, to its share of total production in 2021 to determine whether this sub-sector received more of the electricity subsidy than would be expected.

Commerce finds that, if the GOK's electricity subsidy affected all industries uniformly, then each industry would absorb the subsidy proportionately to its contributing share of GDP, and thus, the resulting ratio would roughly equal one for any industry/sub-sector. As such, an industry/sub-sector that receives a large portion of the benefit relative to the contribution of that sector towards GDP would have a high ratio (greater than one). This rationale allows Commerce to treat generally available subsidies in a manner consistent with the intent of the CVD law, but it limits the application of countervailing duties to only those industries/sub-sectors that receive a disproportionate share of the subsidy.

---

[35] *Id*. at Excel tabs "i_RawData(2)" and "i_RawData(3)" (describing electricity consumption and total production under various sub-sectors as classified by the Bank of Korea); *see also* GOK NFI Letter at 2.

[36] For a list of the sub-sector's contained within the KEPCO and Bank of Korea data, *see* Excel tabs "i_RawData(2)" and "i_RawData(3).

An examination of the data for basic metals indicates that the sub-sector's electricity consumption as a share of total electricity consumption was 6.6 percent and its production as a share of total GDP was 2.1 percent for 2021. *See* Attachment. These figures illustrate that the basic metals' consumption of electricity was three times greater than its share of Korea's GDP during 2021, and therefore, the basic metals sub-sector received more than its fair share of the electricity subsidy.

Section 771(5A)(D)(iii)(III) of the Act provides that there is reason to believe that a subsidy may be specific as a matter of fact where "an enterprise or industry receives a disproportionately large amount of the subsidy." Based on the evidence that the basic metals' share of total electricity consumption is three times greater in relation to its share of GDP for 2021, Commerce finds that disproportionality exists with the GOK's provision of the electricity subsidy. Commerce, thus, determines that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because basic metals, which includes the steel industry to which Hyundai Steel belongs, received a disproportionately large amount of the electricity subsidy in 2021.

As noted above, the GOK submitted comments on the factual information that Commerce placed on the record of this remand.[37] Hyundai Steel made a submission, but stated that it was adopting and incorporating the GOK's comments.[38] The GOK's comments on the new factual information are two paragraphs covering two topics: (1) that the electricity consumption by industry data reflect all classes of electricity and not just industrial class electricity and (2) that the KEPCO electricity consumption data and the Bank of Korea GDP data manufacturing sub-groupings are not consistent between the data sources.[39]

---

[37] *See* GOK NFI Letter.
[38] *See* Hyundai Steel NFI Letter.
[39] *See* GOK NFI Letter.

Regarding the first point on electricity consumption reflecting total electricity, Commerce acknowledges that the electricity consumption data reflects total electricity consumption and not simply consumption of industrial class electricity. Since Commerce is using GDP, which is an economy-wide comparator, per the Court's reasoning, it was necessary for Commerce's evaluation of consumption to be based on total electricity consumption and not solely industrial class electricity to ensure the comparison is in the same "universe," an economy-wide measure.[40]

As for the divergent breakdown of the manufacturing sector's sub-groups in the KEPCO and Bank of Korea data, Commerce acknowledges that the KEPCO breakdown includes 25 sub-sectors of manufacturing, while the Bank of Korea data includes 13 manufacturing sub-sectors.[41] The fact that the electricity consumption data may be more granular (broken into 25 different sub-sectors) than the GDP data (into 13 sub-sectors) indicates that Commerce is making a conservative comparison, as the electricity consumption by the, potentially, more narrowly defined, basic metals sub-sector, is still more than three times the sector's share of GDP in the potentially broader definition of basic metals in the Bank of Korea definition.

An analysis of the manufacturing sub-categories between the two data sets indicates that the majority of the additional sub-categories in the KEPCO data appear to be more detailed breakdowns of other sectors of the economy unrelated to basic metals. For example, the Bank of Korea GDP data has one category for "Food, Beverages & Tobacco," while the KEPCO data has separate categories for each of "beverage," "food," and "tobacco."[42] In another example, the GDP data has a manufacturing sub-sector for "Wood, Paper, Publishing, & Printing," while the KEPCO data has separate categories for "pulp and paper," "printing and media," "wood and lumber," and "furniture."[43] There is no information on the record indicating that the basic metals

[40] *See Hyundai Steel III* at 20.
[41] *See* Data Memorandum at Attachment at tabs "i_RawData(2)" and "i_RawData(3)".
[42] *Id.*
[43] *Id.*

sub-sectors in the datasets are mismatched. Beyond basic metals, the GDP data has "fabricated metal products," while the electricity consumption data has "metal processing," which appear to cover the same sector of the economy.

It should be noted that no party has placed on the record any actual information which indicates that the KEPCO and the Bank of Korea groupings for Basic Metals are defined in a way that would not allow for a comparison. As noted above, Commerce received two paragraphs of rebuttal comments on the new factual information it placed on the record prior to the draft remand, despite extending the deadline for rebuttal comments and information at the parties' request.[44] Commerce is limited to the information it has on the record and based on the information on this record, as discussed above, Commerce determines that the basic metals sub-sector received a disproportionately large amount of the electricity subsidy in 2021.

## IV. INTERESTED PARTY COMMENTS

Commerce released the Draft Results to interested parties on August 3, 2026.[45] On August 13, 2026, Commerce received comments from the GOK, Hyundai Steel, and Nucor Corporation (Nucor) concerning Commerce's specificity analysis for the Electricity Program.[46] The arguments submitted are summarized and addressed below.

**Comment: Whether Commerce Properly Continued to Find the Electricity Program to Be Specific**

*GOK's Comments*

The following is a verbatim summary of an argument submitted by the GOK. For further details, *see* GOK's Comments at 3-10.

> {Commerce's} Draft Third Remand Redetermination erroneously concludes that the basic metals sub-sector, which includes {Hyundai Steel}, received a disproportionately large amount of the alleged electricity subsidy. {Commerce's}

---

[44] *See* Commerce's Letter, "Partial Extension of Time to File Rebuttal Comments on Factual Information," dated July 13, 2026.
[45] *See* Draft Results.
[46] *See* GOK's Letter, "Comments on Draft Third Remand Redetermination," dated August 13, 2026 (GOK's Comments); *see also* Hyundai Steel's Letter, "Comments on the Third Draft Remand Results," dated August 13, 2026) (Hyundai Steel's Comments); and Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated August 13, 2026 (Nucor's Comments).

> analysis suffers from the same deficiencies identified in its prior remand redetermination. Specifically, contrary to the instructions of the {CIT}, {Commerce} has not adequately explained why {GDP} is an appropriate comparative benchmark for evaluating *de facto* specificity, much less why it is reasonable to require a one-to one ratio between electricity consumption and contribution to GDP. As previously established, there is simply no legal or factual basis for assuming that an industry's electricity consumption should correlate with its contribution to GDP. Absent a reasoned explanation, {Commerce's} reliance on GDP as a comparator is unreasonable.
>
> Moreover, {Commerce's} use of total electricity consumption in its comparisons, rather than industrial class electricity consumption, fails to demonstrate that an enterprise or industry "receive{d} a disproportionately large amount of the subsidy," which in this case is industrial class electricity.
>
> Finally, the existence of a standard pricing mechanism demonstrates that the GOK's provision of electricity was not specific. The fact that Hyundai Steel purchased electricity pursuant to the same generally applicable pricing structure available to other users weighs strongly against a finding of specificity.

*Hyundai Steel's Comments*

The following is a verbatim summary of an argument submitted by Hyundai Steel. For further details, *see* Hyundai Steel's Comments at 3-9.

> Commerce has failed to demonstrate that the basic metals sub-sector or Hyundai Steel received a disproportionately large amount of the subsidy pursuant to section 771(5A)(D)(iii)(III) {of the Act} because Commerce's analysis in the Draft Remand is inconsistent with the statutory term "disproportionate." Commerce claims that, in circumstances where "a generally available subsidy can benefit an industry or sub-sector more than another," that subsidy "does not have a neutral, uniform effect on the economy but rather affects an industry or sub-sector more favorably than would be expected" and the industry or sub-sector therefore "receives more than its fair share." Such an interpretation does not reflect the meaning of disproportionate pursuant to section 771(5A)(D)(iii)(III) {of the Act} and is inconsistent with previous decisions from the Court in this matter.
>
> Commerce's logic in the Draft Remand makes the faulty assumption that there should be a one-to-one correlation between the consumption of electricity by the basic metals' sub-sector and its share of GDP. There is no logical correlation between an enterprise or industry's consumption of electricity and its contribution to GDP such that a one-to-one correlation should be expected. Commerce's conclusion in this case would lead to absurd results such as the situation where public highways or tax credits for capital expenditures would be countervailable as neither would so "uniformly" affect all industries throughout a given economy.
>
> The record demonstrates that Hyundai Steel's consumption of electricity and its contribution to the Korean economy share an approximately one-to-one ratio. Accordingly, even assuming for purposes of argument that electricity consumption by the basic metals sub-sector is disproportionate (a conclusion which Hyundai

> Steel contends is not supported by the record or consistent with law), the electricity program in Korea is nonetheless not specific to Hyundai Steel. Therefore, Commerce should determine that the electricity program is not specific to Hyundai Steel in the Final Remand, irrespective of the supposed disproportionate consumption by the basic metals sub-sector writ large.

*Nucor's Comments*

The following is a verbatim summary of an argument submitted by Nucor (internal citations omitted). For further details, *see* Nucor's Comments at 3-10.

> {Commerce} properly continued to find in its draft remand results that the GOK's provision of electricity for {less than adequate remuneration (LTAR)}, which provided a benefit to Hyundai Steel, was *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act because "an enterprise or industry receives a disproportionately large amount of the subsidy." According to the Court of Appeals for the Federal Circuit, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis…." On remand, {Commerce} reasonably compared the share of subsidized electricity consumed in 2021, by the sub-sector of the Korean economy that includes Hyundai Steel, *i.e.*, "basic metals," with that sub-sector's share of Korea's {GDP} the same year. {Commerce} found that the former share of electricity use, *i.e.*, 6.6 percent, was indeed disproportionate (more than triple) to the latter share of Korea's GDP *i.e.*, 2.1 percent. This was a reasonable method of determining disproportionality because it illustrates how the sub-sector of the Korean economy to which Hyundai Steel belongs is receiving more of a benefit from the subsidy than its corresponding share of the Korean economy.
>
> {Commerce} could also find, in the alternative, that the provision of electricity for LTAR is *de facto* specific because a group of industries or enterprises is a predominant user of the subsidy. Notably, {Commerce's} finding of specificity for this electricity for LTAR program is itself lawful on either basis.

**Commerce Position:** For the reasons discussed below, Commerce disagrees with the arguments raised by the GOK and Hyundai Steel and continue to find the Electricity Program to be *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because the basic metals sub-sector, which includes the steel industry to which Hyundai Steel belongs, received a disproportionately large amount of the electricity subsidy in 2021.

The GOK and Hyundai Steel each argue that GDP is not an appropriate comparator to determine whether the consumption of electricity by the basic metals sub-sector is

disproportionately large.[47] To be clear, GDP is not necessarily an apt comparator for electricity in all contexts. However, in this administrative review, Commerce has investigated the provision of electricity, an input good in the production of subject merchandise, for LTAR. GDP measures the "total value of final goods and services produced within a country during a specified time period, such as one year."[48] The reliance on GDP as an output comparator reflects the basic relationship between production inputs and economic scale. Electricity is a key input for manufacturing, and GDP provides a consistent measure of each sector's contribution to national output. Comparing electricity consumption to GDP therefore offers a practical way to assess whether a sector's use of the subsidized input aligns with its relative economic footprint.

This benchmark does not assume uniform electricity intensity across industries. Different production technologies may naturally lead some sectors to consume more electricity per unit of output. Instead, the comparison establishes a neutral reference point. When a sector's share of electricity consumption far exceeds its share of GDP, it indicates disproportionately large electricity use relative to value added.

In the LTAR context, this proportionality analysis is especially relevant because the benefit arises through electricity consumption itself. A sector that uses a disproportionate share of electricity necessarily receives a disproportionate share of the subsidized input. GDP thus serves a meaningful scale metric that allows us to distinguish between high absolute consumption and consumption that is outsized relative to the sector's economic output. Thus, Commerce continues to find that GDP is an appropriate comparator to electricity consumption in this case as a comparison between input and output.

---

[47] *See* GOK's Comments at 3-8; Hyundai Steel's Comments at 5-7.
[48] *See* International Monetary Fund, "IMF Glossary," available at http://www.imf.org/en/about/glossary (last accessed August 26, 2026).

Hyundai Steel further argues that GDP is affected by market price fluctuations potentially unrelated to electricity consumption, and as such should not be used as a comparator.[49] However, this appears to misunderstand the purpose of the *de facto* specificity inquiry. Under section 771(5A)(D)(iii) of the Act, Commerce is required to investigate whether a subsidy is specific as a matter of fact. Thus, in each administrative review, Commerce requests specificity information for programs which may be *de facto* specific during the relevant POR.[50] Commerce asks for this information in each administrative review in part precisely *because* the facts of a subsidy's distribution may change, rendering that subsidy specific or non-specific in different periods of review. For example, one could easily imagine a subsidy which is found to have actual recipients which are limited in number under section 771(5A)(D)(iii)(I) of the Act, and is therefore *de facto* specific, gaining more recipients over time, eventually leading to a finding the subsidy is not *de facto* specific.[51] Here, Commerce has investigated the information available on the record and determined that, during *this* POR, the provision of electricity for LTAR was disproportionately large for the basic metals sub-sector under section 771(5A)(D)(iii)(III) of the Act when compared to the basic metals sub-sector's output. Commerce intends to continue to review *de facto* specificity information for the relevant time period regarding this program in ongoing and future administrative reviews to determine whether the subsidized input continues to be both a) subsidized and b) specific.

The GOK and Hyundai Steel also argue that Commerce improperly requires a one-to-one ratio between electricity consumption and contribution to GDP.[52] To be clear, Commerce does

[49] *See* Hyundai Steel's Comments at 6-7.
[50] *See, e.g.*, Commerce's Letter, "Countervailing Duty Questionnaire," dated May 2, 2022 at Section II for "Provision of Electricity for LTAR" at questions 34 and 35 and "Grant Programs" requesting a response to the *Standard Questions Appendix* (inclusive of question M(2)).
[51] *See Cf. Magnola Metallurgy, Inc. v. U.S.*, 508 F.3d 1349, 1355 (Fed. Cir. 2007) ("Commerce's policy is to require 'new facts or evidence of changed circumstances' before it will revisit an earlier specificity determination{.}" (quoting *Pure And Alloy Magnesium from Canada: Final Results of the First (1992) Countervailing Duty Administrative Reviews*, 62 FR 13857 (March 24, 1997)).
[52] *See* GOK's Comments at 4-6; Hyundai Steel's Comments at 5-7.

not assume that industries must consume electricity in perfect proportion to their GDP contribution. The one-to-one ratio simply offers a neutral point of reference grounded in the relationship between inputs and output. As production expands, input use normally expands with it, including electricity. Comparing an industry's share of electricity consumption with its share of GDP helps determine whether its use of the subsidized input aligns with the economic value it generates.

A ratio of one indicates proportional use of electricity relative to economic scale. A ratio greater than one shows that the industry draws more electricity per Korean won of value added than the economy-wide average. Because the subsidy confers benefits through electricity consumption, a higher ratio also reflects a greater concentration of the subsidy benefit. The size of the ratio therefore helps identify whether consumption of the LTAR subsidy in that sector is disproportionately large.

To be clear, Commerce is not making any value judgement, normative economic statement, or social assessment regarding what the relationship between energy consumption share and GDP contribution "should" be absent subsidization. Rather, energy in Korea is being subsidized[53] as an input good in the production of subject merchandise.[54] As such, the Court has ruled Commerce must consider whether the benefit is disproportionately large when compared to an external comparator.[55] As such, as a factual matter, Commerce finds that a measure of input contribution to output is a relevant comparator to determine whether relative consumption of the subsidized input is disproportionately large. Here, that comparison demonstrates that provision of the subsidized input for LTAR is *de facto* specific in Korea during the POR because, when the

[53] We note that neither the GOK nor Hyundai Steel argue that electricity provided for LTAR is not a financial contribution which confers a benefit. As such, under section 771(5), electricity provided for LTAR is a subsidy; the only question which remains is whether the subsidy is specific.
[54] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Preliminary Intent To Rescind, in Part, the Countervailing Duty Administrative Review; 2021*, 88 FR 13433 (Mar. 3, 2023), and accompanying preliminary decision memorandum at 24-30.
[55] *See Hyundai Steel I*, 745 F.Supp.3d at 1351; *see also Hyundai Steel II*, 798 F.Supp.3d at 1288, 1289-91.

proportion of the input consumed is compared to the proportion of the output production, the basic metals sub-sector consumes three times more of the input good than its contribution to Korea's total GDP.

Hyundai Steel additionally argues that Commerce's analysis is inconsistent with the statutory term "disproportionate" and is inconsistent with this Court's prior decisions in *Hyundai Steel I-III*.[56] Specifically, Hyundai Steel takes issue with Commerce's description that the benefit of subsidized electricity is not "uniformly" distributed throughout the Korean economy, and thus is disproportionate.[57] Hyundai Steel argues that a uniformity requirement is "flatly inconsistent with the Court's prior finding that 'receipt of a greater monetary benefit from the program than others is not determinative of disproportionality.'"[58] However, this ignores both Commerce's analysis of the facts of this case and the Court's surrounding discussion of the definition of disproportionality.

As the Court previously ruled, the term disproportionate "refers to having or showing a difference that is not fair, reasonable, or expected, and *disproportionality exists when something is too large or too small in relation to something else*."[59] The Court further explained that "one could imagine a situation where an enterprise received more of the subsidy than would be expected by some comparator such that its receipt could be considered disproportionate."[60] Further, the Court clarified that, in determining disproportionality using an external comparator, "Commerce may compare relative percentages rather than absolute amounts{.}"[61] The Court additionally held that, "{i}n general, Commerce may use an economy-wide comparator in

---

[56] *See* Hyundai Steel's Comments at 3-5.
[57] *Id.* (citing Draft Results at 6).
[58] *Id.* (citing *Hyundai Steel 1*, 745 F.Supp.3d at 1351).
[59] *See Hyundai Steel I*, 745 F.Supp.3d at 1351 (quotation omitted) (emphasis added).
[60] *See Hyundai Steel II*, 798 F.Supp.3d at 1290.
[61] *See Hyundai Steel III* at 13.

assessing *de facto* specificity because the inquiry turns on whether a subsidy 'is broadly available and widely used throughout the economy.'"[62]

Commerce's analysis is in line with this definition of disproportionality and the Court's determinations. As described in greater detail above, use of economy-wide GDP as an external comparator to determine whether electricity consumption is proportionate or, in this case, disproportionate, is reasonable; for consumption of an input, such as electricity, which is truly widely used throughout the economy, Commerce expects that consumption by an industry to be related to the output, *i.e.*, contribution to GDP. For a subsidized input used as widely as electricity, Commerce expects *some* level of uniformity between consumption of a subsidized input and output if usage levels are "proportional." To measure this, Commerce used the relative percentages of total electricity consumption and contribution to total GDP for the same industrial sector, the basic metals sub-sector. However, comparing relative usage of electricity and contribution of GDP for the basic metals sub-sector's consumption and output reveal that electricity consumption and share of GDP are not proportional, with the basic metals sub-sector's relative consumption of electricity constituting three times its contribution to Korea's GDP, or a 300 percent difference between consumption of the input and value of production. Thus, Commerce determined that the basic metal sector's electricity consumption is disproportionate to its output, as measured by contribution to GDP. This is entirely in line with the definition of disproportionality as explained by the Court, and thus Commerce continues to apply this analysis.

The GOK argues that the difference between electricity consumption and GDP does not measure disproportionality because it is "not a measure of whether a particular industry sector received more than its fair share or benefits more than would be expected."[63] As evidence, the

[62] *Id.* at 16 (quoting *Gov't of Quebec v. United States*, 105 F.4th 1359, 1375 (Fed. Cir. 2024) (quoting SAA at 929)).
[63] *See* GOK's Comments at 5.

GOK points to other sectors for which the ratio tilts the other way, such as the "Service and Others" sector.[64] The GOK argues that Commerce's metric "merely reflects differences in electricity intensity across sectors."[65] However, this is precisely the point Commerce has made throughout this case: provision of subsidized electricity, an input good used by Hyundai Steel, disproportionately benefits those enterprises or industries which are heavy consumers of the good when measured against those enterprises' or industries' output. That is, Commerce would find that the "Service and Others" sector is not a disproportionate recipient of the electricity subsidy.

Commerce uses GDP as an external comparator because it provides a consistent measure of each sector's relative contribution to the economy. Electricity is a production input, and, when production methods remain generally constant, increases in output typically require increased use of inputs. Again, this relationship does not mean that all industries should consume identical amounts of electricity per dollar of GDP. However, it serves as a reference point for evaluating whether consumption of the subsidized input is proportionate to the industry's economic scale.

Measured against this comparator, the basic metals sub-sector stands out. The sector accounts for 6.6 percent of nationwide electricity consumption but only 2.1 percent of GDP, meaning its share of electricity usage is 3.1 times higher than its share of economic activity. Comparisons with other relevant manufacturing sectors reinforce that this degree of concentration is disproportionately large. Electronic and Electrical Equipment, another manufacturing sub-sector, has a ratio of 0.89 (1.4 percent electricity consumed to 1.6 percent of GDP). *See* Attachment. Basic metal's ratio is therefore approximately 3.6 times that of Electronic and Electrical Equipment.

[64] *Id.*
[65] *Id.*

This is different from the situation described in *Carlisle* and as contemplated in the SAA.[66] *Carlisle* considered that public highways and bridges, as well as a tax credit for expenditures on capital investment available to all industries and sectors, should not be considered specific bounties or grants.[67] The Court in *Carlisle* explained that this would lead to "an absurd result" because "almost every product which enters international commerce" would be countervailed and that "measurement of the exact extent of the net subsidy falling on any given product line would be unusually difficult."[68] However, provision of electricity is a fundamentally different issue, because rather than providing infrastructure which may be disproportionately used but would be near impossible to measure, here the government is providing a good,[69] *i.e.* electricity, which is used as an input for production and can be readily measured, as displayed by the wealth of record information in this case regarding electricity consumption and applicable tariff rates. As such, the GOK's appeal to *Carlisle* is inapposite, as sale of a good such as electricity to producers in various sectors is measurable and will not lead to the "absurd results" contemplated by *Carlisle*. Indeed, record information shows that Commerce would not find disproportionate use in either the services sector or the electrical equipment sector. Thus, Commerce's determination is consistent with the statutory definition of "disproportionate" and this Court's decisions.

Additionally, within its comments, the GOK states that the Electricity Program involves subsidized industrial class electricity, however, Commerce relied on total electricity consumption

---

[66] *See Carlisle Tire and Rubber Co. v. United States*, 564 F.Supp. 834 (CIT 1983) (*Carlisle*); *see also* SAA at 929-31.

[67] *See Carlisle*, 564 F.Supp. at 838.

[68] *Id.*; *see also* SAA at 929-30.

[69] *See, e.g., Certain Softwood Lumber Products from Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 FR 50103 (Aug. 1, 2023), and accompanying IDM at 221 ("Commerce has consistently determined that electricity is a good and not a service."); *Certain Softwood Lumber Products from Canada: Final Results of the Countervailing Duty Administrative Review, 2019*, 86 FR 68467 (Dec. 2, 2021), and accompanying IDM at Comment 3 (same); *Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (Oct. 3, 2001), and accompanying IDM at Comment 10 (finding the same); *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2014*, 82 FR 26907 (June 12, 2007), and accompanying IDM at 25 (finding the same).

of the basic metals sub-sector in the Draft Results.[70] The GOK argues that, by including the consumption of other classes of electricity in the numerator and denominator, Commerce cannot accurately assess whether the basic metals sub-sector received a disproportionately large amount of the alleged industrial class electricity subsidy.

As noted by the GOK, in *Final Remand-Hyundai Steel II*, Commerce stated that "{u}nder the Electricity Program, the type of electricity being examined is industrial class electricity, and thus, in the comparison Commerce must consider only Hyundai Steel's consumption of industrial class electricity and not any other type of electricity the company may have used during the POR."[71] The Court remanded the second final results of redetermination to Commerce holding that the comparison of industrial class electricity to total GDP is impermissible as the two sides of the comparison operate in different "universes" and therefore do not "align logically."[72] Specifically, the Court stated that "GDP measures economy-wide output, not output generated by only the relevant class of industrial-class electricity consumers. If the 'industrial-class' limit defines the relevant universe on the electricity side, the comparator on the output side must likewise be tied to that universe."[73]

To comply with the Court's remand, and conduct a comparison that aligns logically, Commerce sourced total electricity consumption by economic sub-sector, as reported by KEPCO, and total production by economic sub-sector, as reported by the Bank of Korea.[74] Usage of "total electricity consumption" and "total production" allows a comparison of relevant universes, where the GDP comparator is tied to the consumption of all classes of electricity by the various economic sub-sectors which contribute to Korea's economy. As discussed above,

[70] *See* GOK's Comments at 8-9.
[71] *Id*. at 9 (citing *Final Remand-Hyundai Steel II* at 13).
[72] *See Hyundai Steel III* at 15-20.
[73] *Id*. at 20.
[74] *See* Data Memorandum.

Commerce's analysis focused on the basic metals sub-sector because this sub-sector is inclusive of the steel industry to which Hyundai Steel belongs.[75]

Commerce invited interested parties to comment on the data as well as an opportunity to file rebuttal factual information in response to the data,[76] and received comments from the GOK.[77] The GOK remarked that the electricity consumption by industry data reflect all classes of electricity and not just industrial class electricity. Because Commerce is using GDP, which is an economy-wide comparator, per the Court's reasoning, it is necessary for Commerce's evaluation of consumption to be based on total electricity consumption and not solely industrial class electricity to ensure the comparison is in the same "universe," an economy-wide measure.[78] Moreover, the GOK did not provide alternate data that would permit Commerce to compare industrial class electricity consumption to a comparator that is tied to a universe particular to solely industrial class electricity.[79] There are no data on the record that would allow for Commerce to make a comparison in the "same universe" when using industrial class electricity consumption as one of the comparators. Finally, total electricity consumption is further diluted by uses which do not directly contribute to GDP data, such as consumption of electricity by households or street lamps.[80] Thus, the use of total electricity consumption allows for a more conservative comparison to GDP as it represents the basic metal sub-sector's consumption of all types of electricity (such as, general) beyond simply the industrial class. As noted above, this approach, which is more favorable to the basic metals sub-sector, demonstrates that basic metals received a disproportionately large amount of the electricity subsidy in 2021.

---

[75] For a list of the sub-sector's contained within the KEPCO and Bank of Korea data, *see* Data Memorandum at Excel tabs "i_RawData(2)" and "i_RawData(3)."
[76] *Id*. at coversheet.
[77] *See* GOK NFI Letter. Hyundai Steel made a submission, but stated that it was adopting and incorporating the GOK's comments. *See* Hyundai Steel NFI Letter.
[78] *See Hyundai Steel III* at 20.
[79] *See* GOK NFI Letter.
[80] *See* Data Memorandum at Excel tabs "i_RawData(2)" and "i_RawData(3)."

In their comments, both Hyundai Steel and Nucor present alternate comparisons for Commerce's consideration when conducting its specificity analysis in these final results of redetermination.[81] For the reasons discussed below, Commerce determines that the alternative approaches proposed by the parties are not permissible.

Hyundai Steel suggests that Commerce should apply the comparison from the Draft Results but with Hyundai Steel's electricity consumption and sales instead of the basic metals sub-sector's data.[82] Hyundai Steel claims that this revised comparison shows Hyundai Steel did not consume a disproportionately large amount of the electricity subsidy as the ratio of the company's electricity consumption to its GDP contribution is approximately one-to-one.[83] Commerce disagrees with Hyundai Steel's comparison because this comparison only uses the company's consumption of industrial class electricity.[84] On the record of the underlying review, Hyundai Steel reported its "electricity purchases made only under the industrial tariff classification and not other tariff classifications."[85] Thus, using Hyundai Steel's proposed comparison would result in comparing two different "universes"—industrial electricity purchases vs. economy-wide GDP—which is the same logical error that the Court has already remanded.[86]

To comply with the Court's remand, it is necessary to ensure that the comparators "align logically." Hyundai Steel's proposal to compare industrial electricity usage to total sales does not result in a logical comparison, as expressed by the Court, because it falls victim to the same issue of asymmetrical comparators. In making the comparison, Hyundai Steel first determines its percentage of electricity consumed by taking its consumption of industrial class electricity,

---

[81] *See* Hyundai Steel's Comments at 8-9; *see also* Nucor's Comments at 6-9.
[82] *See* Hyundai Steel's Comments at 8-9.
[83] *Id*. (citing Hyundai Steel's Letter, "Affiliated Companies Response," dated May 31, 2022 at Exhibit 21; and Hyundai Steel's Letter, "Initial Questionnaire Response," dated June 27, 2022 at Exhibit E-1).
[84] *Id*. at 8-9.
[85] *See* Hyundai Steel's Letter, "Initial Questionnaire Response," dated June 27, 2022 at 41.
[86] *See Hyundai Steel III* at 15-20.

not all electricity, to total electricity consumed in Korea to create a "percentage of electricity consumed" comparator. Hyundai Steel then compares this to a percentage created by dividing its total sales by Korea's GDP. This comparison does not establish a correct comparison, as Hyundai Steel has not included its consumption of non-industrial class electricity to establish a "same universe" comparison for determining the ratio of Hyundai Steel's total electricity consumed to all electricity consumed in Korea. As Hyundai Steel's consumption of all classes of electricity during 2021 is not on the record, the comparison proposed by Hyundai Steel is not possible. Without including Hyundai Steel's consumption of all classes of electricity in the first comparator, this comparison falls victim to the exact concerns the Court raised in its remanding opinion in *Hyundai Steel III* by comparing industrial class electricity consumption as a percentage of overall electricity consumption to Hyundai Steel's share of Korea's GDP. These comparators do not "align logically" nor do they operate within the same "universe" as explained by the Court.

Nucor suggests that Commerce could rely on the list of the top 100 industrial consumers by facility that was submitted by the GOK in the underlying review to conduct a disproportionality analysis.[87] Commerce disagrees. In *Hyundai Steel I*, the Court remanded Commerce to explain how the combined industries that it identified in the *Final Results* benefited more than would be expected based on their usage given that the subsidy in question is designed to confer benefits on usage levels, which necessarily results in larger users receiving a proportionally larger percentage of the subsidy, or in relation to some other comparator.[88] Because Nucor's proposal relies on a usage comparison based on the electricity consumption reported for the top 100 industrial facilities without an external comparator, Commerce does not find the approach viable in light of the Court's previous remand orders. In *Hyundai Steel I* and

[87] *See* Nucor's Comments at 6-7 (citing GOK's Letter, "Response to the Initial Questionnaire," dated June 27, 2022 at Exhibit E-11).
[88] *See Hyundai Steel I*, 745 F.Supp.3d 1351.

*Hyundai Steel II*, the Court discussed that a disproportionality inquiry involves a case-by-case analysis which assesses benefits, *not in relation to the benefits of others*, but in relation to some external comparator, *i.e.*, disproportionality requires a comparison of the amount of subsidy and an attribute of an industry.[89] As discussed above, Commerce finds that GDP contribution, an attribute measuring an industry's participation in the economy, is a proper comparator to measure whether disproportional usage of the electricity subsidy exists.

Nucor also suggests that Commerce could consider whether a group of industries or enterprises is a predominant user of the subsidy under section 771(5A)(D)(iii)(II) of the Act.[90] Nucor states the Court's holding that Commerce must establish a "baseline of comparison" other than the industry's consumption of an input in relation to others is limited to the disproportionate receipt provision and does not apply to the predominate use provision.[91] Nucor notes that, within the listing of the 10 largest industrial consumers of electricity, the top three industries received more of the electricity benefits than the remaining seven industries combined when compared to total industrial class electricity consumption.[92] Nucor thus claims that similar to *Mosaic*, here, a small group of industries "purchased a far greater amount than any other {group of industries}," supporting a finding of predominant use.[93]

Commerce does not agree with Nucor that it should apply a predominant use analysis for the Electricity Program. First, Commerce finds Nucor's reference to *Mosaic* off-point in light of the Court's prior remand orders. In the CVD case at issue in *Mosaic*, Commerce determined that one industry—the agrochemical sector— was the single largest industrial consumer of natural gas, and thus, used a predominant amount of the subsidy when compared to the other industrial

---

[89] *Id.*; *see also Hyundai Steel II*, 798 F.Supp.3d at 1288, 1289-91 {emphasis added}.
[90] *See* Nucor's Comments at 7-9.
[91] *Id*. at 8 (quoting *Hyundai Steel II*, 798 F.Supp.3d at 1288).
[92] *Id*. at 9 (citing *Final Remand-Hyundai I* at 5)
[93] *Id*. at 8-9 (citing *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1309-10 (CIT 2022) (*Mosaic*)).

users of natural gas.[94] However, here, Nucor suggests that Commerce examine the top three industrial consumers of electricity as a group in a predominant use analysis.[95] The Court ruled in *Hyundai Steel I,* that because the "subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping.[96] Nucor did not provide a rational basis other than usage amounts for combing three industries together in a predominant use analysis of the Electricity Program which is widely available.[97] Consequently, Commerce is not adopting Nucor's proposed predominant use approach for these final results of redetermination.

Lastly, the GOK continues to maintain that KEPCO's provision of electricity to Hyundai Steel under a standard pricing mechanism is not specific, similar to Commerce's findings in *Bethlehem Steel*.[98] However, the Court has already held that "Commerce may find specificity as a matter of fact even if the subsidy is widely available or set according to a standard pricing mechanism, if an enterprise or industry receives a disproportionately large amount of the subsidy," pursuant to section 771(5A)(D)(iii)(III) of the Act.[99] The Court stated that "nothing in the statute directs Commerce to treat the existence of a uniform tariff schedule as sufficient to render a subsidy non-specific."[100] The Court further stated that "the statute requires a fact-based inquiry into how a program operates in practice. Thus, Commerce is required to look beyond the structure of the pricing mechanism and assess the factual circumstances of the subsidy's distribution."[101] Relatedly, the GOK's reference to *Bethlehem Steel* is inapposite, as the GOK analogizes a pure usage comparison of the relative electricity consumption here to the usage of

---

[94] *See Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 FR 9479 (February 16, 2021), and accompanying IDM at 44.
[95] *See* Nucor's Comments at 9.
[96] *See Hyundai Steel I*, 745 F.Supp.3d 1353.
[97] *See* Nucor's Comments at 7-9.
[98] *See* GOK's Comments at 5, 9-10 (citing *Bethlehem Steel Corp v. United States*, 140 F.Supp.2d 1354, 1369 (Ct. Int'l Trade 2001) (*Bethlehem Steel*)).
[99] *See Hyundai Steel III* at 11.
[100] *Id*. at 14.
[101] *Id*. at 14-15.

an energy reduction credit used in that case.[102] These two cases involve entirely different types of programs, and due to the difference in the nature of the two programs, a specificity analysis for an energy reduction credit program is inherently different from a specificity analysis for the provision of a good for LTAR. Commerce's disproportionality analysis under section 771(5A)(D)(iii)(III) of the Act revolves around an enterprise or industry receiving "a disproportionately large amount of the subsidy." Thus, the analysis is intrinsically linked to what benefit companies are receiving, as well as the method through which that benefit is being provided and the context within which said benefit is being provided. This case deals with the direct consumption of government-provided electricity, not the use of an electricity rate reduction program.[103] As a result, Commerce must consider the facts on the record of this proceeding for the program at issue and come to a determination of whether any enterprise or industry receives a disproportionately large amount of the subsidy.

In line with the Court's reasoning, Commerce analyzed the facts of this case including the basic metals' electricity consumption for 2021, in relation to the sub-sector's contribution to the Korean economy for 2021. As discussed above, the data show that the basic metals sub-sector, which includes the steel industry to which Hyundai Steel belongs, received a disproportionately large amount of the electricity subsidy in 2021. Thus, on the basis of that evidence, Commerce determines that the Electricity Program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act, even if there is a standard pricing mechanism in place.

## V. FINAL RESULTS OF REDETERMINATION

Based on the analysis above, Commerce continues to find the GOK's Electricity Program to be *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act because

[102] *See* GOK's Comments at 5.
[103] *See Bethlehem Steel*, 140 F.Supp.2d at 1367.

basic metals, which includes the steel industry to which Hyundai Steel belongs, received a disproportionately large amount of the electricity subsidy in 2021.

8/31/2026

X

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance.

# ATTACHMENT

## Korea's Basic Metals Sub-Sector Is Disproportionally Dependent on Electricity Consumption (2021)

| Level Data | Economy-Wide | Electronic & Electrical Equipment | Basic Metals |
|---|---|---|---|
| Electricity Consumption *(in millions of kWh)* | 533,431 | 7,710 | 35,044 |
| Total Production *(in billions of Korean Won)* | 2,039,703 | 33,142 | 42,579 |
| | | | |
| As Share of Total in Economy | | | |
| Electricity Consumption *(as share of total electricity consumption)* | 100% | 1.4% | 6.6% |
| Total Production *(as share of GDP)* | 100% | 1.6% | 2.1% |
| | | | |
| Depth of Overreliance on Electricity | | 0.89 | 3.1 |