**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | **Court No. 23-00211**<br><br>**PUBLIC** |

**PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S COMMENTS ON THE THIRD FINAL RESULTS OF REDETERMINATION**

Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel to the Government of the Republic of Korea*

Dated: September 30, 2026

# TABLE OF CONTENTS

## CONTENTS

TABLE OF CONTENTS ........................................ i

TABLE OF AUTHORITIES ........................................ ii

INTRODUCTION ........................................ 1

ARGUMENT ........................................ 1

I. COMMERCE FAILED TO SUFFICIENTLY EXPLAIN WHY THE SHARE OF TOTAL GDP IS AN APPROPRIATE COMPARATOR ........................................ 2

II. COMMERCE'S RELIANCE ON TOTAL ELECTRICITY CONSUMPTION INSTEAD OF INDUSTRIAL CLASS ELECTRICITY ARBITRARILY DISTORTS THE SPECIFICITY ANALYSIS ........................................ 9

III. THE BROAD AVAILABILITY AND USAGE OF ELECTRICITY COMBINED WITH THE EXISTENCE OF A STANDARD PRICING MECHANISM DEMONSTRATE THAT THE PROVISION OF ELECTRICITY IS NOT SPECIFIC ........................................ 12

CONCLUSION ........................................ 14

# TABLE OF AUTHORITIES

## CASES

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ............ 5, 13

*Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) ............... 7

*Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025).......................... 6

*POSCO v. United States*, 794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) ........................................ 13

*POSCO v. United States*, 829 F. Supp. 3d 1298 (Ct. Int'l Trade Apr. 17, 2026) .......................... 11

## STATUTES

19 U.S.C. §1677(5A)(D)(iii)(III) ........................................................................... 2, 10, 12

19 U.S.C. 1516a(b)(1)(B) ......................................................................................... 12

## OTHER AUTHORITIES

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ......................................................... 7, 8, 13

## INTRODUCTION

In its opinion remanding the *Final Results* to the U.S. Department of Commerce ("Commerce") for a third time, the Court directed Commerce to explain or reconsider why gross domestic product ("GDP") is an appropriate comparator in the instant case. Court Op. and Order, ECF No. 126 ("Court Op.") at 16-17. In its Final Third Results of Redetermination Pursuant to Court Remand, ECF No. 135 ("Final Third Remand Results"), Commerce continued to find that GDP is an appropriate comparative benchmark for its *de facto* specificity analysis based on disproportionality and concluded that the basic metals sub-sector, which includes Hyundai Steel Company ("Hyundai Steel"), received a disproportionately large amount of the alleged electricity subsidy. Final Third Remand Results at 6-9. Commerce's Final Third Remand Results continue to be unsupported by substantial evidence or otherwise not in accordance with the law because Commerce (1) failed to adequately explain why GDP is an appropriate comparator; (2) erroneously relied on *total* electricity consumption when the alleged subsidy is the provision of *industrial class* electricity; and (3) ignored the fact that the GOK provides electricity, a public utility service broadly available and widely used, pursuant to a standard pricing mechanism.

## ARGUMENT

Commerce's Final Third Remand Results erroneously conclude that the basic metals sub-sector, which includes Hyundai Steel, received a disproportionately large amount of the alleged electricity subsidy. Commerce's analysis continues to suffer from the same deficiencies identified in its prior remand results. Specifically, contrary to the Court's instructions, Commerce has failed to adequately explain why GDP is an appropriate comparative benchmark for assessing *de facto* specificity, let alone why it is reasonable to require some level of uniformity between electricity consumption and contribution to GDP to avoid the provision of

electricity being considered *de facto* specific. As previously established, neither the statute nor the record provides a legal or factual basis for assuming that an industry's electricity consumption should correlate with its contribution to GDP. Absent a reasoned explanation, Commerce's reliance on GDP as a comparator is unsupported and unreasonable.

Commerce's analysis is further flawed because it relies on *total* electricity consumption, rather than industrial class electricity consumption, when evaluating whether an enterprise or industry "receive{d} a disproportionately large amount of the subsidy." 19 U.S.C. §1677(5A)(D)(iii)(III). The alleged subsidy at issue is the provision of industrial class electricity. Accordingly, Commerce's comparison fails to measure whether recipients of that subsidy received a disproportionate benefit relative to other industrial-class users. The Court's directive to use the same universe for comparison does not cure this fundamental defect in Commerce's methodology.

Finally, the record demonstrates that the GOK's provision of electricity was not specific. Electricity is broadly available and widely used across the economy pursuant to a standard, generally applicable pricing structure. Hyundai Steel purchased electricity under the same pricing structure available to other users, a fact that weighs strongly against a finding of specificity. In light of the uniform pricing mechanism and the widespread availability of electricity, Commerce's conclusion that the GOK's provision of electricity was specific is unsupported by substantial evidence and contrary to law.

## I. COMMERCE FAILED TO SUFFICIENTLY EXPLAIN WHY THE SHARE OF TOTAL GDP IS AN APPROPRIATE COMPARATOR

Following the Court's order to "explain why GDP is an appropriate comparator to assess disproportionality in these circumstances," Commerce, in the Final Third Remand Results, simply asserted that GDP is an appropriate comparator because "the GOK's provision of

electricity is a broadly available domestic subsidy {…} and thus measuring an industry/sub-sector's share of electricity consumption relative to its GDP contribution {…} allows {Commerce} to measure whether disproportional usage exists." Final Third Remand Results at 7. Commerce then compared the basic metals sub-sector's share of electricity consumption with its share of GDP and concluded that disproportionality existed because the sub-sector consumed electricity at a rate approximately three times greater than its contribution to GDP. *Id.* at 7-8.

Commerce's explanation ends there. It offers no meaningful rationale for why an industry's contribution to GDP constitutes an appropriate benchmark against which to measure "its fair share" of electricity consumption. Nor does it identify any analytical basis for assuming that the two should move in tandem or reasonably explain why an industry's consumption of electricity in excess of its GDP contribution means that it received more than its fair share of the alleged subsidy. Instead, Commerce simply states that, "if the GOK's electricity subsidy affects all industries uniformly, then each industry would absorb the subsidy proportionately to its contributing share of GDP, and thus, the resulting ratio would roughly equal one for any industry/sub-sector." *Id.* at 7. This assertion is conclusory at best and rests on unsupported assumptions rather than record evidence or economic analysis.

Commerce's response to the GOK's comments on the Draft Results of Redetermination Pursuant to the Third Court Remand does not cure this deficiency. Commerce contends that GDP "offers a practical way to assess whether a sector's use of the subsidized input aligns with its relative economic footprint" because electricity is a key input for manufacturing subject merchandise and GDP measures a sector's contribution to economic output. *Id.* at 13. Although Commerce stated that it does not assume industries to "consume electricity in perfect proportion to their GDP contribution," it nevertheless asserted that there should be "*some* level of

uniformity between consumption of a subsidized input and output if usage levels are 'proportional.'" *Id.* at 15, 17. These statements merely rephrase, rather than explain, Commerce's underlying assumption that electricity consumption should track GDP contribution and that GDP contribution therefore represents an appropriate benchmark to measure an enterprise or industry's fair share of the subsidy.

Indeed, Commerce's explanation not only fails to satisfy the Court's directive but simply repeats the same reasoning the Court previously rejected. The Court remanded Commerce's Final Second Results of Redetermination Pursuant to Court Remand, ECF No. 93, specifically because Commerce assumed, without any explanation, that "Hyundai's proportional share of the industrial-class electricity subsidy should track its contribution to Korea's overall national economic output." Court Op. at 17. Commerce's latest explanation, however, rests on precisely that same premise. By characterizing a ratio of one as "proportional" and a higher ratio as reflecting a "greater concentration" of the subsidy benefit, Commerce assumes without reasonable explanation that an industry's fair share of the subsidy equates to its share of GDP contribution—the very premise that the Court required Commerce to justify. Final Third Remand Results at 15.

As the GOK has consistently explained, electricity consumption depends not only on the size of an industry but also on the nature of its production processes and other inherent characteristics. Given these differences, the premise that higher electricity consumption should correspond directly to a larger contribution to GDP is unreasonable. Although Commerce itself acknowledged that "{d}ifferent production technologies may naturally lead some sectors to consume more electricity per unit of output," it nevertheless concluded that disproportionality exists whenever a sector's electricity consumption significantly exceeds its share of GDP. Final

Third Remand Results at 13. Commerce's substitution of the basic metals sub-sector's ***total*** electricity consumption data for Hyundai Steel's industrial electricity consumption data does nothing to address the fundamental flaw in its analysis: Commerce still has not explained why GDP is an appropriate comparator or why a one-to-one relationship between electricity usage and GDP contribution should be presumed.

Industries with similar contributions to GDP may have dramatically different energy requirements. Manufacturing industries, such as the basic metals sub-sector, are inherently more electricity-intensive than service industries, such as financial services, legal services, and information technology. As a result, the basic metals sub-sector may consume significantly more electricity than those sectors even where their respective contributions to GDP are comparable. Because such service sectors contribute substantially to GDP while consuming comparatively little electricity, a more electricity-intensive industry may naturally account for a larger share of total electricity consumption than of total GDP. Both Commerce and the Court have previously recognized this principle. In concluding that the steel industry's receipt of more than 51 percent of the benefit of an electricity-related program was not disproportionate, they acknowledged that certain industries inherently consume greater amounts of electricity and that higher electricity usage, standing alone, does not establish a disproportionate benefit from electricity-related programs. *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001). Commerce's approach thus risks distorting the specificity analysis by treating ordinary differences in electricity intensity as evidence that an industry received a disproportionately large amount of the alleged subsidy.

In fact, Commerce's purported "Depth of Overreliance on Electricity" metric is nothing more than a mathematical calculation of an industry sector's electricity-intensity, not a measure

of whether a particular industry sector "receive{d} more than its fair share" or "benefit{s} more than would be expected." *Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283, 1288 (Ct. Int'l Trade 2025). The ratio of 3.1 that Commerce calculated for the basic metals sub-sector merely indicates that the sub-sector consumes more electricity per unit of economic output than other sectors. Final Third Remand Redetermination at Attachment.

The same point is illustrated by applying Commerce's methodology to the "Service and Others" sector. According to Commerce's data, the "Service and Others" sector consumed 148,181.598 million kWh of electricity in 2021, representing approximately 27.78 percent of Korea's total electricity consumption of 533,430.810 million kWh. *See* Memorandum from Kristen Johnson "Administrative Review of the Countervailing Duty Order on Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea (Korea); 2024: Placing Factual Information on the Record" at Attachment (July 13, 2026) (P.R.R.4). During the same year, the "Services" sector accounted for KRW 1,264,278.3 billion, or approximately 61.98 percent, of Korea's total gross value added of KRW 2,039,703.2 billion. *Id.* Applying Commerce's formula yields a ratio of 0.45. Contrary to Commerce's suggestion, however, this result does not indicate that the services sector received less than its fair share of the alleged subsidy. *See* Final Third Remand Results at 18. Rather, it demonstrates only that the services sector consumes comparatively less electricity per unit of economic output than more electricity-intensive industries, which is to be expected. The disparity between the basic metals-sector ratio and the services-sector ratio therefore underscores that electricity consumption does not necessarily track, and in fact should not be expected to track, an industry's contribution to GDP. Commerce's metric thus measures differences in electricity intensity across sectors, not the relative distribution of subsidy benefits.

The GOK identified additional examples demonstrating that participation in, or use of, a broadly available government program beyond electricity does not correlate directly with an industry's contribution to GDP, and that GDP is therefore not a reasonable benchmark for determining specificity, especially if Commerce requires a one-to-one ratio (or close to that ratio) between GDP contribution and program usage. *See* Pl.-Intervenor's Comments on the Second Final Results of Redetermination, ECF No. 101, at 12-13. As the Court recognized in *Carlisle Tire and Rubber Co. v. United States*, which is cited approvingly in the Statement of Administrative Action ("SAA"), treating generally available government benefits as countervailable merely because usage differs among industries "simply defies reason." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 929-30 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4242-43; *Carlisle Tire and Rubber Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983). The Court specifically cited, as examples, public highways and bridges, as well as tax credits for capital investment that are available across industries and sectors. *Carlisle Tire*, 564 F. Supp. at 838. Yet utilization of these broadly available programs would rarely, if ever, correspond exactly to relative GDP contributions. A retailer or manufacturer, for example, is likely to rely on and benefit from public highways and bridges to a far greater extent than a digital marketing firm, even where both contribute comparable amounts to GDP. Similarly, tax credits for expenditures on capital investment available to all industries and sectors—the other example of a clearly non-specific program identified by *Carlisle Tire*—logically would be used more by manufacturing companies that require large facilities and expensive equipment compared to a retailer or service provider, notwithstanding comparable GDP contributions. Such differences in program usage therefore

often reflect distinct operational characteristics, inputs, and resource requirements of various industries, not preferential access to government benefits.

Commerce attempted to distinguish *Carlisle Tire* on the ground that electricity is a measurable good, unlike public infrastructure. Final Third Remand Results at 19. However, Commerce is missing the point. The issue is not whether electricity usage can be accurately measured. Commerce wholly ignored the fact that the ability or inability to measure usage does not distinguish electricity from the other program identified in *Carlisle Tire* and the SAA as an example of a non-specific program, namely tax credits for capital investment expenditures, which certainly could be measured. Rather, the relevant question is whether deviations between program usage and GDP contribution establish that a broadly available program is specific. Under Commerce's logic, any generally available government program could become countervailable whenever different industries use the program or receive its benefit at different rates, which is exactly what one would expect to happen in the context of tax credits for capital investment expenditures. Such a result would be untenable, and Commerce did not even attempt to address how its reasoning would avoid treating a program like tax credits for capital investment expenditures, which *Carlisle Tire* and the SAA recognize as an example of a non-specific subsidy, as specific and countervailable. Commerce's approach would transform ordinary differences in industrial operations and resource requirements into evidence of specificity in effectively every case, thereby undermining the purpose of the specificity requirement itself. As the SAA explains, specificity serves as "a screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy." SAA at 929-30, 1994 U.S.C.C.A.N. at 4242-43.

Commerce has not meaningfully addressed why the examples identified by the GOK differ from the program at issue, nor has it explained why GDP remains an appropriate benchmark despite the significant differences in industries' inherent characteristics and resource requirements. Accordingly, Commerce has failed to provide the reasoned explanation the Court expressly required.

## II. COMMERCE'S RELIANCE ON TOTAL ELECTRICITY CONSUMPTION INSTEAD OF INDUSTRIAL CLASS ELECTRICITY ARBITRARILY DISTORTS THE SPECIFICITY ANALYSIS

On remand, Commerce relied on the *total* electricity consumption of the basic metals sub-sector, which includes Hyundai Steel. Final Third Remand Results at 7. Although Commerce acknowledged that these data encompass consumption across all electricity classes, not merely industrial class electricity, it maintained that reliance on total electricity consumption was appropriate because it compared electricity consumption to the sector's total GDP output. Final Third Remand Results at 9. Commerce further asserted that this approach was consistent with the Court's order because using total electricity consumption ensured that the comparison was drawn from the same universe as the GDP output. Final Third Remand Results at 20-21. Commerce also contended that the GOK failed to provide alternative data that would have allowed Commerce to compare industrial class electricity consumption to a comparative benchmark tied exclusively to industrial class electricity. *Id.* at 21.

This rationale is flawed for several reasons. First, as discussed above, Commerce's reliance on GDP as the comparative benchmark is itself misplaced. Second, even under Commerce's methodology, the comparison is problematic because it relies on electricity consumption and GDP data organized under different industry classification systems. *See* Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, "Rebuttal Comments on the Department's New Factual Information" (July 16, 2026) (P.R.R.9). As a result, Commerce's

comparison of an industry's share of electricity consumption with its share of GDP may reflect differences in the scope of the underlying industry classifications, rather than a meaningful difference in the industry's relative use of electricity. Commerce characterizes the comparison as "conservative" based on the supposed greater granularity of the electricity consumption data with respect to certain sectors or industries, but that characterization does not resolve the incomparability arising from the use of different industry classification systems. Final Third Remand Results at 9. Third, the basic metals sub-sector's 6.6 percent share of total electricity consumption does not appear unusually high to warrant the conclusion that the sub-sector consumed a disproportionately high amount of electricity, such that the provision of electricity can be considered "specific" to the basic metals industry. Fourth, and most fundamentally, the alleged program concerns purportedly subsidized industrial class electricity.

For Commerce to find that a program is *de facto* specific based upon disproportionality, Commerce must find that "an enterprise or industry receive{d} a disproportionately large amount of *the subsidy*." 19 U.S.C. §1677(5A)(D)(iii)(III) (emphasis added). The subsidy in this case is the provision of industrial class electricity, not electricity generally. Commerce itself recognized that "{u}nder the Electricity Program, the type of electricity being examined is industrial class electricity, and thus, in the comparison we must consider only Hyundai Steel's consumption of industrial class electricity and not any other type of electricity the company may have used during the POR." Final Second Results of Redetermination Pursuant to Court Remand, ECF No. 93, at 13 (footnotes omitted). If it is inappropriate to consider Hyundai Steel's consumption of other classes of electricity, it follows that it is equally inappropriate to consider the consumption of other classes of electricity by the basic metals sub-sector. By including the consumption of other classes of electricity in both the numerator and the

denominator, Commerce cannot accurately determine whether either the basic metals sub-sector or Hyundai Steel received a "disproportionately large amount" of the alleged *industrial-class electricity* subsidy.

Nor does the Court's instruction that Commerce use the same universe cure this defect. Commerce cannot invoke the Court's order to justify the inclusion of electricity consumption data that are fundamentally mismatched to the program under review. Likewise, Commerce cannot rely on the absence of alternate data. Commerce acknowledged that "{t}here are no data on the record" that would permit a comparison in the "same universe" using industrial class electricity consumption. Final Third Remand Results at 21. The alleged subsidy concerns the provision of *industrial-class electricity*. Because Commerce acknowledged that the record lacks sufficient evidence to demonstrate that the provision of *industrial-class electricity* was disproportionate, it necessarily lacks evidence to support a finding of specificity. *See POSCO v. United States*, 829 F. Supp. 3d 1298, 1304 (Ct. Int'l Trade Apr. 17, 2026) (Commerce determined that it lacked record evidence to demonstrate that the provision of electricity for LTAR program was specific, and thus program was not countervailable).

Moreover, when Commerce placed the GDP and electricity data on the record, it never explained the purpose for which those data would be used. As the GOK noted in its rebuttal comments, without knowing how Commerce intended to employ the data, the GOK was not in a position to provide alternative information tailored to Commerce's eventual methodology, assuming that such information even exists. *See* Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, "Rebuttal Comments on the Department's New Factual Information" (July 16, 2026) (P.R.R.9). Regardless of whether there were alternative data on the record, Commerce cannot support its determination with substantial evidence and accord with

the law, *see* 19 U.S.C. 1516a(b)(1)(B), by conducting an analysis and reaching a specificity finding that departs from "the subsidy" it is actually investigating, *see* 19 U.S.C. §1677(5A)(D)(iii)(III).

## III. THE BROAD AVAILABILITY AND USAGE OF ELECTRICITY COMBINED WITH THE EXISTENCE OF A STANDARD PRICING MECHANISM DEMONSTRATE THAT THE PROVISION OF ELECTRICITY IS NOT SPECIFIC

Although the Court has recognized that Commerce may find *de facto* specificity even when a subsidy is provided pursuant to a standard pricing mechanism, the existence of such a mechanism remains highly relevant to the specificity analysis, particularly where the program at issue is generally available and widely used, such as electricity.

The defining characteristic of the Korean electricity program is that access to electricity is not limited to discrete segments of the economy but rather is widely and uniformly available throughout Korea. Letter from Yoon & Yang LLC to Sec'y of Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from Korea: Response to the Initial Questionnaire" (June 27, 2022) ("GOK IQR") at 204 (C.R.29/P.R.60). Indeed, any person or entity in Korea can access electricity, provided they pay the applicable rates established under KEPCO's standard pricing mechanism. *See id.* at 14-31, 204, and Exhibit E-10 (C.R.43/P.R.70). Access to electricity is therefore governed by transparent, generally applicable rate schedules rather than by any discretionary or preferential criteria targeting particular users or industries.

The record further demonstrates that Hyundai Steel did not receive preferential pricing under this system. To the contrary, Hyundai Steel paid higher electricity rates than those charged to customers in other classifications, such as residential, educational, and agricultural. *Id.* at Exhibit E-10. These facts underscore the fundamentally broad-based nature of Korea's electricity program and weigh against a finding of specificity.

Where a utility service is made available economy-wide under transparent and generally applicable pricing schedules, the mere fact that an electricity-intensive industry consumes a greater volume of electricity does not, without more, establish specificity within the meaning of the statute. Such consumption reflects the operational characteristics and energy requirements of the industry rather than preferential access to, or preferential treatment under, the electricity pricing regime. Indeed, the Court has already observed that Commerce's assertion that the electricity program was designed to benefit heavy users of electricity, such as the steel industry, was unsupported. Court Op. at 17 n.5. In other words, differing usage is attributable to the different nature of various industries' production processes, not to any limitation of the program to certain enterprises or industries.

The Korean electricity program therefore bears little resemblance to the type of subsidy program that the specificity test is intended to identify as countervailable. Electricity is broadly available throughout the economy on uniform terms and conditions, not as a benefit reserved for or disproportionately directed to a discrete segment of the economy. As the SAA explains, the specificity inquiry is designed to identify "narrowly focussed {sic} subsid{y} provided to or used by discrete segments of an economy." SAA at 930, 1994 U.S.C.C.A.N. at 4243. The record evidence demonstrates that the Korean electricity program is the opposite: a universally available public utility service, administered through generally applicable standard pricing mechanism, that is in fact widely used, rather than a narrowly targeted subsidy program. In other words, it is a program that is "broadly available and widely used throughout {the} economy" and not the type of program that the CVD law was intended to countervail. *Id.*; *see also POSCO v. United States*, 794 F. Supp. 3d 1402, 1410-11 (Ct. Int'l Trade 2025) (citing *Bethlehem Steel Corp.*, 140 F. Supp. 2d at 1369) (the Court rejected Commerce's conclusion that the provision of

electricity was *de facto* specific as "untenable," finding that it would effectively render *de facto* specificity meaningless by treating "virtually every" generally available and widely used subsidy as specific to large companies, simply because such companies inevitably will use, and therefore benefit from, those subsidies more than smaller companies).

## CONCLUSION

For the reasons discussed above, the GOK respectfully requests that the Court reject Commerce's Final Third Remand Results and remand again for Commerce to reach the only decision supported by the law and the record, which is that the alleged provision of electricity for LTAR in Korea is not *de facto* specific.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel to the Government of the Republic of Korea*

Dated: September 30, 2026

**CERTIFICATE OF COMPLIANCE**

Undersigned counsel hereby certifies that the forgoing brief complies with paragraph 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 3,889 words including text, headings, footnotes, and quotations and excluding the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing software used to prepare this submission.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Devin S. Sikes
Daniel M. Witkowski
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel to the Government of the Republic of Korea*

Dated: September 30, 2026