**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor<br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and,<br><br>NUCOR COPRORATION,<br><br>Defendant-Intervenor. | Court No. 23-00211 |

ORDER

Upon consideration of the Department of Commerce's final results of remand redetermination, ECF No. 135, and all comments thereto, it is hereby ORDERED that the remand redetermination is sustained. Judgment shall be entered in favor of the defendant United States.

Dated: ___________________, 2026
New York, NY

_________________________________
JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br>Plaintiff-Intervenor<br>v.<br><br>UNITED STATES,<br>Defendant,<br><br>and,<br><br>NUCOR COPRORATION,<br>Defendant-Intervenor. | Court No. 23-00211<br><br>**PUBLIC DOCUMENT** |

**DEFENDANT'S COMMENTS**
**IN SUPPORT OF THIRD REMAND REDETERMINATION**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

*Attorneys for Defendant*

Of Counsel:
KARL MUELLER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

October 30, 2026

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

BACKGROUND ..... 2

I. Administrative Determination Under Review ..... 2

II. The Court's First Remand Order and Commerce's First Remand Redetermination ..... 2

III. The Court's Second Remand Order and Commerce's Second Remand Redetermination ..... 3

IV. The Court's Third Remand Order ..... 4

V. Third Remand Redetermination ..... 5

SUMMARY OF THE ARGUMENT ..... 6

ARGUMENT ..... 7

I. Standard of Review ..... 7

II. Commerce's Remand Redetermination is in Accordance with the Remand Order, is Supported by Substantial Evidence, and Otherwise in Accordance with Law ..... 8

A. A Broadly Available Program May Be *De Facto* Specific Regardless of Whether the Program Employs a Standard Pricing Mechanism ..... 8

B. Commerce Reasonably Determined that GDP is a Relevant Comparator for Analyzing Specificity and Provided a Reasoned Explanation ..... 11

C. Commerce Did Not Err in Relying on Total Electricity Consumption, Rather than Industrial Class Electricity Consumption, When Evaluating Disproportionality ..... 15

D. Commerce Correctly Rejected Hyundai Steel's Enterprise Specific Analysis ..... 17

CONCLUSION ..... 18

## TABLE OF AUTHORITIES

Cases

*Aristocraft of Am., LLC v. United States*,
269 F. Supp. 3d 1316 (Ct. Int'l Trade 2017) ........ 16

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ........ 8

*Bethlehem Steel Corp v. United States*,
140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ........ 8

*Canadian Solar Inc. v. United States*,
23 F.4th 1372 (Fed. Cir. 2022) ........ 11

*Carlisle Tire & Rubber Co. v. United States*,
564 F. Supp. 834 (Ct. Int'l Trade 1983) ........ 9

*Consol. Edison v. NLRB*,
305 U.S. 197 (1938) ........ 7

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ........ 7

*Deacero S.A.P.I. de C.V. v. United States*,
996 F.3d 1283 (Fed. Cir. 2021) ........ 8

*Gov't of Quebec v. United States*,
105 F.4th 1359 (Fed. Cir. 2024) ........ 14

*Hyundai Steel Co. v. United States*,
745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ........ 3, 14

*Hyundai Steel Co. v. United States*,
798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) ........ 3, 14

*Hyundai Steel Co. v. United States*,
838 F. Supp. 3d 1339 (Ct. Int'l Trade 2026) ........ 1, 4, 11, 13, 14, 16, 18

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*,
405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ........ 11

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........ 7

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984) ........ 8

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) .......... 11

*Nippon Steel v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......... 8

*POSCO v. United States*,
794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) .......... 8

*QVD Food Co., Ltd. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) .......... 16

Statutes

19 U.S.C.§ 1677(5A)(D)(iii) .......... passim

19 U.S.C.§ 1677(D)(ii) .......... 10, 12, 13

Regulations

19 C.F.R. § 351.301(c)(4) .......... 16

Other Authorities

*Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Rev*iew; 2021,
88 Fed. Reg. 61,509 (Dep't of Commerce Sep. 7, 2023) .......... 2

Statement of Administrative Action to the Uruguay Round Agreements Act (SAA),
H.R. Doc. No. 103-316 (1994) .......... 9, 10, 14

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor<br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and,<br><br>NUCOR COPRORATION,<br><br>Defendant-Intervenor. | ) | Court No. 23-00211<br><br>**PUBLIC DOCUMENT** |

**<u>DEFENDANT'S COMMENTS</u>**
**<u>IN SUPPORT OF THIRD REMAND REDETERMINATION</u>**

Defendant, the United States, respectfully submits this response to Hyundai Steel Company (Hyundai Steel) and the government of Korea's (GOK) comments in opposition to the Department of Commerce's third remand redetermination, filed in accordance with this Court's order in *Hyundai Steel Co. v. United States*, 838 F. Supp. 3d 1339 (Ct. Int'l Trade 2026) (*Third Remand Order*). *See* Comments in Opposition to Third Remand Results, ECF No. 137 (Hyundai Steel Comments); Comments on the Third Final Results of Redetermination, ECF No. 139 (GOK Comments); Final Results of Redetermination Pursuant to Court Remand, ECF No. 135

(Third Remand Results). For the reasons described below, we respectfully request that the Court sustain the third remand redetermination and enter judgment for the United States.

## BACKGROUND

### I. Administrative Determination Under Review

The administrative determination under review is the final results of the administrative review of the countervailing duty order covering cut-to-length carbon-quality steel plate for the Republic of Korea (Korea) for the period of review (POR) January 1, 2021, through December 31, 2021. *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 61,509 (Dep't of Commerce Sep. 7, 2023) (P.R. 224) (*Final Results*), and accompanying Issues and Decision Memorandum (P.R. 222) (IDM).[1] In the final results, Commerce found that the GOK's Provision of Electricity for Less Than Adequate Remuneration (LTAR) (Electricity Program) was *de facto* specific within the meaning of 19 U.S.C.§ 1677(5A)(D)(iii)(III) because the top four industrial groups used a disproportionately large amount of industrial class electricity. IDM at 15-16.

### II. The Court's First Remand Order and Commerce's First Remand Redetermination

Hyundai Steel filed a complaint challenging Commerce's determination. On December 12, 2024, the Court remanded for Commerce to provide further explanation or reconsider its determination that the GOK's provision of industrial class electricity for LTAR was *de facto* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III). The court found that Commerce did not sufficiently explain the basis for its grouping of the top four industries.

---

[1] The record citations with P.R./C.R. designate citation to the initially filed administrative record index, *see* ECF No. 24, and P.R.R./C.R.R. designate citation to the third remand record index, *see* ECF No. 136.

*Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2024) *(First Remand Order*).

On remand, Commerce reevaluated the basis for its decision and modified its analysis. Commerce determined that the largest three industries consumed a disproportionately large amount of electricity because of the percentage of industrial class electricity consumed by those industries. Final Results of Redetermination Pursuant to Court Remand, ECF No. 62-63 (First Remand Results). Commerce grouped these industries "based on a relatively comparable percentage of total industrial electricity consumption in Korea during the POR." *Id.* at 6.

## III. The Court's Second Remand Order and Commerce's Second Remand Redetermination

On August 12, 2025, this Court again remanded this matter. The Court held that Commerce continued to misapply the statute's "disproportionality" requirement and that it must compare "the amount of subsidy and an attribute of the industry, not a comparison of the amount of a subsidy given to different industries." *Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283, 1289-90 (Ct. Int'l Trade 2025) (internal citations omitted) (*Second Remand Order*). The Court opined that one could imagine a situation where an enterprise received more of the subsidy than would be expected by some comparator such that its receipt could be considered disproportionate. The Court remanded for Commerce to either further explain its grouping of industries or to reconsider the basis of its determination. *Id.* at 1291.

On remand, Commerce found that, when comparing Hyundai Steel's consumption of industrial class electricity with Hyundai Steel's contribution to Korea's gross domestic product (GDP), Hyundai Steel received a disproportionately large amount of the subsidy. Commerce concluded that the subsidy was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III). Second Remand Results at 6-7.

Commerce explained that it had selected total GDP as a comparator to industrial class electricity consumption to determine whether the benefits received correlated with Hyundai Steel's share of the economy. Commerce sought to examine whether the subsidy was "evenly distributed across the Korean economy in a way that would be expected if the purpose of the subsidy was to benefit all enterprises equally." Final Results of Redetermination Pursuant to Court Remand, ECF No. 97 (Second Remand Results) at 11. Using this comparison, Commerce determined that Hyundai Steel received a disproportionately large amount of the subsidy on an enterprise basis, and the subsidy was therefore *de facto* specific. *Id.* at 15.

## IV. <u>The Court's Third Remand Order</u>

On May 18, 2026, this Court remanded the second remand results. The Court first held that Commerce had not adequately explained why Korea's GDP served as an appropriate comparator to assess disproportionality for electricity consumption. *Hyundai Steel Co. v. United States*, 838 F. Supp. 3d 1339, 1351 (Ct. Int'l Trade 2026) (*Third Remand Order*). Second, the Court held that the comparison must align logically, which was not the case here. *Id.* The Court found that Commerce had compared Hyundai's position in one universe to its position in another," "{b}y limiting the electricity usage side of the comparison to industrial-class consumption and leaving the output side at economy-wide GDP." *Id.* The Court further held that GDP measures economy-wide output, and "if the 'industrial-class' limit defines the relevant universe on the electricity side, the comparator on the output side must likewise be tied to that universe." *Id.* The Court remanded for further explanation or reconsideration of Commerce's use of Korea's GDP as a comparator to assess disproportionality for electricity consumption. *Id.*

## V. <u>Third Remand Redetermination</u>

Commerce reconsidered the basis for its determination and found that the Electricity Program is *de facto* specific within the meaning of 19 U.S.C.§ 1677(5A)(D)(iii)(III). Commerce explained that because "the GOK's provision of electricity is a broadly available domestic subsidy by its nature provided across the Korean economy, and thus measuring an industry/sub-sector's share of electricity consumption relative to its GDP contribution (an attribute measuring the industry's participation in the economy) allows {Commerce} to measure whether disproportional usage exists." Third Remand Results at 7.

Accordingly, Commerce compared the basic metals subsector's share of total electricity consumed in 2021, to its share of total production in 2021 to determine whether this sub-sector received more of the electricity subsidy than would be expected:

| Level Data | Economy-Wide | Electronic & Electrical Equipment | Basic Metals |
|---|---|---|---|
| Electricity Consumption *(in millions of kWh)* | 533,431 | 7,710 | 35,044 |
| Total Production *(in billions of Korean Won)* | 2,039,703 | 33,142 | 42,579 |
| | | | |
| As Share of Total in Economy | | | |
| Electricity Consumption *(as share of total electricity consumption)* | 100% | 1.4% | 6.6% |
| Total Production *(as share of GDP)* | 100% | 1.6% | 2.1% |
| | | | |
| Depth of Overreliance on Electricity | | 0.89 | 3.1 |

Third Remand Results at 28 (Attachment). Because the "basic metals' consumption of electricity was three times greater than its share of Korea's GDP during 2021," Commerce found that "the basic metals sub-sector received more than its fair share of the electricity subsidy." *Id.* at 8. Commerce explained that GDP was as an appropriate comparator because it allowed Commerce "to distinguish between high absolute consumption and consumption that is outsized relative to the sector's economic output," and "provides a consistent measure of each sector's relative contribution to the economy." *Id.* at 13, 18. Based on this evidence, Commerce found that

disproportionality exists within the GOK's provision of the electricity subsidy, making the subsidy *de facto* specific. *Id*. at 26.

**SUMMARY OF THE ARGUMENT**

Commerce's finding that the Electricity Program is *de facto* specific due to the disproportionately large use by the basic metals sub-sector is in accordance with the third remand order, supported by substantial evidence, and in accordance with law. Commerce determined that usage by the basic metals sub-sector is disproportionate by comparing that sector's usage of electricity to the sector's share of Korea's GDP, an external comparator measuring output. In doing so, Commerce did not limit the electricity usage side of the comparison to industrial-class consumption, thereby addressing the Court's concern that the comparators on both usage and output side must be tied to the same universe. The arguments by Hyundai Steel and the GOK in favor of further remand are not persuasive.

The GOK continues to argue that broad availability and a standard pricing mechanism render the Electricity Program non-specific. However, an input good provided for LTAR, even where broadly available, may still be *de facto* specific.

The plaintiffs also contend that Commerce has not sufficiently explained its use of GDP as an appropriate comparator for assessing disproportionality. Commerce's selection of GDP as a comparator was reasonable as a comparison between input and output. Use of GDP allows Commerce to distinguish between high absolute consumption and consumption that is outsized relative to the sector's economic output.

The GOK also argues that using total electricity consumption instead of industrial class electricity distorts the specificity analysis. Commerce was limited, however, to the available data on the record.

Lastly, Hyundai Steel argues the provision of electricity, even if specific to the basic metals sub-sector, is not specific to Hyundai Steel. This argument fails to give meaning to all parts of the statute. The statute expressly allows Commerce to conduct a disproportionate use analysis on industry basis. Once Commerce established that an industry or a group of industries disproportionately used the subsidy, that finding is sufficient to find *de facto* specificity and no further analysis of alternative grounds for finding *de facto* specificity is necessary (such as analysis of whether a particular enterprise disproportionately used the subsidy). The alternative enterprise-specific comparison suggested by Hyundai Steel seeks to compare industrial electricity consumption as a share of total electricity to its share of GDP. This would create a comparison between different universes, an approach this Court has previously rejected.

Because Commerce's determination is lawful and in accordance with the remand order, the Court should sustain the third remand redetermination and enter judgement in favor of the United States.

## ARGUMENT

### I. Standard of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," are "supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015). Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support the conclusion reached. *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed.*

*Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see also Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1297 (Fed. Cir. 2021). To hold a decision supported by substantial evidence, the Court need only find evidence "which could reasonably lead to {Commerce's} conclusion," so that the conclusion was a "rational decision." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some record evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II. Commerce's Remand Redetermination is in Accordance with the Remand Order, is Supported by Substantial Evidence, and Otherwise in Accordance with Law

The Court should sustain Commerce's third remand redetermination. Commerce reconsidered its specificity analysis and used GDP, an objective comparator measuring output against which to evaluate whether the basic metals sub-sector received disproportionate benefits from the provision of electricity, an input. None of the arguments raised by Hyundai and the GOK demonstrate any error in law or evidence.

### A. A Broadly Available Program May Be *De Facto* Specific Regardless of Whether the Program Employs a Standard Pricing Mechanism

The GOK continues to contend that, because electricity prices in Korea are set according to a standard pricing mechanism and electricity is broadly available, provision of electricity for LTAR is not specific and cannot be the type of subsidy that the countervailing duty law is designed to address. GOK Comments at 12-14 (citing *POSCO v. United States*, 794 F. Supp. 3d 1402, 1410-11 (Ct. Int'l Trade 2025) (citing *Bethlehem Steel Corp v. United States*, 140 F. Supp.

2d 1354, 1369 (Ct. Int'l Trade 2001)). The GOK's arguments find no support in either the statute or the SAA.

Commerce must find a subsidy is *de facto* specific where one of the following factors exist:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii). In evaluating these factors, Commerce "shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation." *Id.*

The Statement of Administrative Action to the Uruguay Round Agreements Act (SAA), H.R. Doc. No. 103-316 (1994) states that the specificity test "is to function as an initial screening mechanism to winnow out only those foreign subsidies which are truly and broadly available and widely used throughout an economy." *Id.* at 929. Not all government interventions in the economy (for example, benefits for certain public highways and bridges), would be appropriate to treat as a countervailable subsidy. *Id.* at 929 (citing *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983)). "The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy." *Id*. at 930. The SAA cautions that the specificity test is "not intended to function as a loophole through which narrowly focused subsides provided to or used by

discrete segments of the economy could escape the purview of the CVD law. *Id.* Yet that would be the result if the Court adopted the interpretation put forth by the GOK.

In this administrative review, Commerce examined the benefit provided by the use of electricity to determine if, despite being broadly available, one of the *de facto* specificity factors applied. Relevant here, the statute does not direct Commerce to consider the mechanism (such as a standard tariff pricing schedule) used to provide a subsidy or availability of the subsidy as part of its *de facto* specificity analysis; rather, these considerations apply to a *de jure* specificity analysis. *See* 19 U.S.C. § 1677(5A)(D)(iii); c*f.* § 1677(D)(ii) (directing that a subsidy is not *de jure* specific where eligibility for the subsidy is automatic, and criteria or conditions for eligibility are strictly followed and set forth in official, verifiable documents).

Both the GOK and Hyundai cite *Carlisle Tire* to assert that Commerce cannot treat generally available government benefits as countervailable subsidies because of usage differences among industries. GOK Comments at 7; Hyundai Comments at 6; *see also* SAA at 929-31. As Commerce explained, however, this case is entirely different from the situation at issue in *Carlisle*. In contrast to usage of highways, bridges, and tax credits mentioned in *Carlisle,* the sale of electricity as an input to producers across multiple sectors in their production is measurable. Third Final Remand Results at 19 (discussing *Carlisle*, 564 F. Supp. at 838). Countervailing the sale of a measurable input, such as electricity, does not lead to the "absurd results" cautioned. *Id.*; *Carlisle*, 564 F. Supp. at 838. The distribution of electricity as an input in production, however, is measurable. To read *Carlisle* as precluding countervailing duties for input goods would create the very loophole Congress warned against in the SAA.

Further, more recently, both the Federal Circuit and this Court have found that utilities, including electricity, provided for LTAR may be specific subsidies depending on the facts of the

case even where prices were standardized. *See, e.g.*, *Mosaic Co. v. United States*, 160 F.4th 1340, 1342-43, 1348 (Fed. Cir. 2025) (affirming Commerce's determination that natural gas for LTAR sold under regulated prices constituted a countervailable subsidy which was *de facto* specific); *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d 1317, 1337 (Ct. Int'l Trade 2019) (sustaining Commerce's determination that the provision of electricity at LTAR to the respondents, the subsidy at issue, was not general infrastructure); *Canadian Solar Inc. v. United States*, 23 F.4th 1372, 1380 (Fed. Cir. 2022) (finding an electricity program was *de jure* specific due to regional pricing constituted a countervailable subsidy, even though electricity was available in every region and prices within each region were standardized).

In sum, a subsidy of a broadly available good such as electricity for LTAR that includes a "standard pricing mechanism" can be countervailed where the facts on the record demonstrate that the subsidy is *de facto* specific to an enterprise or industry. *Third Remand Order*, 838 F. Supp. 3d at 1348.

**B. Commerce Reasonably Determined that GDP is a Relevant Comparator for Analyzing Specificity and Provided a Reasoned Explanation**

Hyundai Steel and the GOK assert that GDP is an inadequate comparator for Commerce's specificity analysis. Because the GOK's provision of electricity "is a broadly available domestic subsidy," Commerce found that "measuring an industry/sub-sector's share of electricity consumption relative to its GDP contribution" is an appropriate way to measure whether disproportional usage exists. Third Remand Results at 7. Commerce then compared the basic metals sub-sector's share of total electricity consumed in 2021 by all consumers to its total share of GDP in 2021 and found that the basic metals sub-sector's electricity consumption "was three times greater than its share of Korea's GDP during 2021." *Id.* at 7-8; 28 (Attachment). This

finding, Commerce explained, demonstrated that the basic metals sub-sector "received a disproportionately large amount of the electricity subsidy," pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III). Accordingly, Commerce found the electricity program to be *de facto* specific. *Id.* at 8.

Commerce further added that "reliance on GDP as an output comparator reflects the basic relationship between production inputs and economic scale." *Id*. at 13. Because electricity is a key input for manufacturing and GDP "provides a consistent measure of each sector's contribution to national output," using GDP as a comparator "offers a practical way to assess whether a sector's use of the subsidized input aligns with its relative economic footprint." *Id*.

The GOK and Hyundai allege that Commerce's revised analysis does not provide a reasonable explanation for its reliance on GDP as a comparator. *See* GOK Comments at 2; Hyundai Comments at 4. The GOK contends that "Commerce's explanation ends" with the description that "measuring an industry/sub-sector's share of electricity consumption relative to its GDP contribution {. . .} allows {Commerce} to measure whether disproportional usage exists." GOK Comments at 3 (alterations in original). The GOK misconstrues Commerce's explanation of GDP as a comparator. In responding to interested parties' comments, Commerce explained that GDP "offers a practical way to assess whether a sector's use of the subsidized input aligns with its relative economic footprint" and establishes a neutral reference point. Third Remand Results at 13. Further, Commerce explained at length that GDP, as a measure of output, is a reasonable comparator to determine if consumption of an input product, in this case electricity, was disproportionate. Third Remand Results at 13-16.

The GOK and Hyundai Steel claim, incorrectly, that Commerce failed to explain why GDP is an appropriate comparator, given the facts on this record. *See* GOK Comments at 2-9;

*see also* Hyundai Steel Comments at 4-7; Third Remand Results at 18. Contrary to this assertion, Commerce followed the Court's direction to find an appropriate comparator "in the specific context of this case." *Third Remand Order*, 838 F. Supp. 3d at 1347. Commerce explained that during "*this* POR, the provision of electricity for LTAR was disproportionately large for the basic metals sub-sector {…} when compared to the basic metals sub-sector's output." Third Remand Results at 14. Further, as described above, Commerce described why GDP, as an output, was appropriate to analyze proportionality of consumption of a good used as an input, in this case electricity. Third Remand Results at 13. This adequately explains why GDP is an appropriate comparator in this specific case. Accordingly, Commerce has provided a reasoned and supported explanation for its use of GDP as an appropriate comparator.

The GOK further alleges that because certain industries consume larger quantities of electricity, Commerce's approach "risks distorting the specificity analysis by treating ordinary differences in electricity intensity as evidence that an industry received a disproportionately large amount of the alleged subsidy." GOK Comments at 5. Commerce accounted for this risk. Commerce did "not assume that industries *must* consume electricity in perfect proportion to their GDP contribution," but rather the ratio helps determine proportionality for a government-provided input product. Third Remand Results at 15 (emphasis added). Using this ratio, Commerce found that the basis metals sub-sector stands out when measured against this comparator. Third Remand Results at 18. Specifically, "{t}he sector accounts for 6.6 percent of nationwide electricity consumption but only 2.1 percent of GDP, meaning its share of electricity usage is 3.1 times higher than its share of economic activity." *Id.* Commerce explained that this divergence from the norm stood out even against other manufacturing sectors, such as the Electronic and Electrical Equipment sector. *Id.*

Still, the GOK asserts that this fact "merely indicates that the sub-sector consumes more electricity per unit of economic output than the other sectors." GOK Comments at 6. To the contrary, Commerce's calculation shows that the basic metals subsector "is favored in some way (i.e., it receives more than its fair share)." *Second Remand Order*, 798 F. Supp. 3d at 1288 (citing *First Remand Order*, 745 F. Supp. 3d at 1352-53). The statute does not require Commerce to consider *why* that industry receives a disproportionate amount of a subsidy, only that it does. *See generally* 19 U.S.C. § 1677(5A)(D)(iii) (directing Commerce to consider diversification of economic activities in the country and the length of time during which a program has been in operation, but creating no similar requirement to consider what characteristics of the enterprise or industry could lead to 'justifiable' disproportionate use). In previous remand orders, the Court explained that Commerce must detail how industries would "benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." *First Remand Order*, 745 F. Supp. 3d at 1352-53. By comparing consumption of a subsidized input to output, Commerce has provided that explanation.

Moreover, the Court held that, when accounting for disproportionality, "{i}n general, Commerce may use an economy-wide comparator in assessing *de facto* specificity because the inquiry turns on whether a subsidy is 'broadly available and widely used throughout the economy.'" *Third Remand Order*, 838 F. Supp. 3d at 1349 (quoting *Gov't of Quebec v. United States*, 105 F.4th 1359, 1375 (Fed. Cir. 2024) (quoting SAA at 929)). Commerce addressed this in the third remand results. Commerce explained that electricity is widely used throughout the economy and that Commerce "expects *some* level of uniformity between consumption of a subsidized input and output if usage levels are 'proportional.'" Third Remand Results at 17.

Against this expectation, Commerce found that the basic metal sector's electricity consumption was disproportionate to its output (more than 300 percent higher), measured by contribution to GDP. This conclusion is in accordance with the Court's definition of disproportionality. *See id.*

Finally, Hyundai argues that GDP is an inappropriate comparator because GDP fluctuates and is affected by market factors unrelated to electricity consumption. Hyundai Comments at 7. These concerns are addressed by Commerce's focus on a specific time period of the review. In each segment of a proceeding, Commerce requests specificity information for programs which may be *de facto* specific during the relevant time period. "Commerce asks for this information in each administrative review in part precisely *because* the facts of a subsidy's distribution may change, rendering that subsidy specific or non-specific in different periods of review." Third Remand Results at 14. Accordingly, Commerce evaluated the information that was available on the record. Commerce determined that, during *this* POR, the provision of electricity for LTAR was disproportionately large for the basic metals sub-sector under section {1677}(5A)(D)(iii)(III) of the Act when compared to the basic metals sub-sector's output." *Id.* Because Commerce provided a reasoned explanation for its reliance on the "unrelated" factors Hyundai refers to, the Court should sustain the remand redetermination.

### C. Commerce Did Not Err in Relying on Total Electricity Consumption, Rather than Industrial Class Electricity Consumption, When Evaluating Disproportionality.

The GOK argues that, because total electricity consumption is fundamentally mismatched to the program under review, Commerce cannot include total electricity consumption data in the analysis. GOK Comments at 9-11. Hyundai Steel similarly argues that "by including the consumption of *all* classes of electricity as its comparator Commerce is not actually assessing

whether the basic metals sector or Hyundai Steel received a 'disproportionately large amount' of the *industrial class* electricity subsidy." Hyundai Comments at 4.

The Court required that, on remand, Commerce use a comparator that operated in the same "universe." *See Third Remand Order*, 838 F. Supp. 3d at 1350-51. To comply, Commerce used the total electricity consumption (not solely industrial class electricity) "to ensure the comparison is in the same 'universe,'" as GDP, an economy-wide measure. Third Remand Results at 21.

Moreover, despite being aware that the electricity consumption data reflected all classes of electricity, no party "provide{d} alternate data that would permit Commerce to compare industrial class electricity consumption to a comparator that is tied to a universe particular to solely industrial class electricity." *Id.* Commerce provided an opportunity for parties to do so on remand by reopening the record, placing data on the record and inviting parties to comment and provide factual information in response pursuant to 19 C.F.R. § 351.301(c)(4). *See* Placing Factual Information on the Record, dated July 9, 2026 (P.R. 5) at 2. To make a comparison following the Court's order, and to ensure that parties have an opportunity to place on the record sufficient and accurate data for making a comparison in the same "universe," While the GOK highlighted the fact that the data Commerce placed on the record was total electricity consumption data, it submitted no alternative information which would allow Commerce to make an alternative comparison. *See* Rebuttal Comments on the Department's New Factual Information, dated July 19, 2026 (P.R.R. 9). "Although Commerce *may* help develop the administrative record, the *burden* to develop it ultimately rests with interested parties like Plaintiff{}." *Aristocraft of Am., LLC v. United States*, 269 F. Supp. 3d 1316, 1327 (Ct. Int'l

Trade 2017) (citing *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). The GOK cannot now complain that it does not like the only data that was available.

Nor do the plaintiffs even suggest any alternative external comparators limited to the realm of industrial class electricity that would allow Commerce to make a comparison in the same universe to determine whether disproportionate use exists. After providing interested parties with an opportunity to supplement the record with new information and not receiving any alternative comparators that were limited to the realm of industrial class electricity, Commerce made its analysis with the information that was available to it. In conducting this analysis, Commerce highlighted:

> {T}otal electricity consumption is further diluted by uses which do not directly contribute to GDP data, such as consumption of electricity by households or street lamps. Thus, the use of total electricity consumption allows for a more conservative comparison to GDP as it represents the basic metal sub-sector's consumption of all types of electricity (such as, general) beyond simply the industrial class. . . . {T}his approach, which is more favorable to the basic metals sub-sector, demonstrates that basic metals received a disproportionately large amount of the electricity subsidy in 2021.

Third Remand Results at 21 (citing Data Memorandum at tabs "i_RawData(2)" and "i_RawData(3)" (P.R. 5)). Thus, Commerce's determination on disproportionality was based on the record before it and supported by substantial evidence.

**D. Commerce Correctly Rejected Hyundai Steel's Enterprise Specific Analysis**

Lastly, Hyundai Steel argues that, using GDP as a comparator, Hyundai Steel on an enterprise level did not receive a disproportionate amount of the subsidy. Hyundai Comments at 7-9. However, Hyundai Steel's comparison uses Hyundai Steel's consumption of only industrial class electricity in the numerator of the electricity consumption ratio, while using total electricity consumed for the entire economy in the denominator. *Compare* Third Remand Results at 22 (citing Hyundai Steel's Initial Questionnaire Response, dated June 27, 2022 at 41, Exhibit E-1

(P.R. 113, 120, C.R. 77) *with* Hyundai Steel Comments at 9 (also citing Hyundai Steel's Initial Questionnaire Response, dated June 27, 2022 at Exhibit E-1 (C.R. 77)). By excluding Hyundai Steel's consumption of other classes of electricity in the numerator while including other classes in the denominator, this approach does not permit an accurate approach. Further, Hyundai Steel also creates a consumption comparison that does not wholly operate in the same universe as total GDP, an approach which this Court already rejected. *See Third Remand Order*, 838 F. Supp. 3d at 1351.

Further, even if the data permitted such a comparison, Commerce is not limited to determining specificity on an enterprise basis; rather, Commerce is instructed to countervail a subsidy where "{a}n enterprise *or* industry receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III) (emphasis added). Thus, whether the subsidy is also disproportionately used by Hyundai Steel on an individual enterprise level is irrelevant if Commerce determines, as it has here, that the subsidy is *de facto* specific on an industry basis.

**CONCLUSION**

For these reasons, we respectfully request that this Court sustain Commerce's third remand results and enter final judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

Of Counsel:
KARL MUELLER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

October 30, 2026

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the word limitation set forth in Standard Chambers Procedure ¶ 2(B) because it contains **5,033** words, excluding the portions of the brief that do not count towards the word limitation.

/s/Tara K. Hogan
TARA K. HOGAN